No. 25-13546

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

DELTA AIR LINES, INC. AND AEROVIAS DE MEXICO S.A. DE C.V.,

*Petitioners*,

v.

DEPARTMENT OF TRANSPORTATION,

*Respondent*.

_____

On Petition For Review Of An Order Of The Department Of Transportation
Docket DOT-OST-2015-0070

_____

## MOTION FOR STAY OF DELTA AIR LINES, INC.
## Time-Sensitive Motion:  Ruling Requested By November 14, 2025

_____

Peter Carter
Marguerite H. Taylor
DELTA AIR LINES, INC.
1030 Delta Boulevard
Atlanta, GA  30320

Steven J. Seiden
Christopher Walker
DELTA AIR LINES, INC.
601 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C.  20005

Eugene Scalia
   *Counsel of Record*
Amir C. Tayrani
Christine M. Buzzard
Michael P. Corcoran
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
escalia@gibsondunn.com

*Counsel for Petitioner Delta Air Lines, Inc.*

*Delta Air Lines, Inc. and Aerovías de México S.A. de C.V. v. Department of Transportation*
Case No. 25-13546

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rules 26.1-1 through 26.1-3, Petitioner Delta Air Lines, Inc. provides the following certificate of interested persons:

1. **Aerovías de México S.A. de C.V.**, Petitioner.

2. **Christine M. Buzzard**, counsel for Petitioner Delta Air Lines, Inc.

3. **Peter Carter**, Chief External Affairs Officer of Delta Air Lines, Inc.

4. **Michael P. Corcoran**, counsel for Petitioner Delta Air Lines, Inc.

5. **Gregory D. Cote**, counsel for Respondent the United States Department of Transportation.

6. **Delta Air Lines, Inc.**, Petitioner (NYSE: DAL).

7. **Charles F. Donley II**, counsel for Petitioner Aerovías de México S.A. de C.V.

8. **Grupo Aeroméxico S.A.B. de C.V.** (AEROMEX.MX), parent company of Aerovías de México S.A. de C.V.

9. **Matthew J. MacLean**, counsel for Petitioner Aerovías de México S.A. de C.V.

10. **Steven Mintz**, counsel for Respondent the United States Department of Transportation.

*Delta Air Lines, Inc. and Aerovías de México S.A. de C.V. v. Department of Transportation*
Case No. 25-13546

11. **Robert Nicholson**, counsel for Respondent the United States Department of Transportation.

12. **Edward W. Sauer**, counsel for Petitioner Aerovías de México S.A. de C.V.

13. **Eugene Scalia**, counsel for Petitioner Delta Air Lines, Inc.

14. **Steven J. Seiden**, Director – Regulatory Affairs of Delta Air Lines, Inc.

15. **Nicole Steinberg**, counsel for Petitioner Aerovías de México S.A. de C.V.

16. **Marguerite H. Taylor**, Deputy General Counsel and Chief Litigation Counsel of Delta Air Lines, Inc.

17. **Amir C. Tayrani**, counsel for Petitioner Delta Air Lines, Inc.

18. **Christopher Walker**, Director – Regulatory and International Affairs of Delta Air Lines, Inc.

19. **United States Department of Transportation**, Respondent.

The below are subsidiaries of Delta Air Lines, Inc.

Aero Assurance Ltd.
Aircraft Foreign Sales, Inc.
Cardinal Insurance Company (Cayman) Ltd.
Comair Holdings, LLC
Comair, Inc.
Comair Services, Inc.
Compass Airlines, Inc.
Crown Rooms, Inc.
DAL Global Services, LLC
DAL Moscow, Inc.

Delta AirElite Business Jets, Inc.
Delta Air Lines, Inc. and Pan American World Airways, Inc.—
Unterstutzungskasse GMBH
Delta Air Lines Dublin Limited
Delta Air Lines Private Limited
Delta Benefits Management, Inc.
Delta Connection Academy, Inc.
Delta Loyalty Management Services, LLC
Epsilon Trading, LLC
Kappa Capital Management, LLC
MCH, Inc.
Mesaba Aviation, Inc.
MLT Inc.
Montana Enterprises, Inc.
New Sky, Ltd.
Northwest Aerospace Training Corporation
Northwest Airlines Charitable Foundation
Northwest Airlines Corporation
Northwest Airlines, Inc.
NW Red Baron LLC
NWA Fuel Services Corporation
NWA Real Estate Holding Company LLC
NWA Retail Sales Inc.
NWA Worldclub, Inc.
Tomisato Shoji Kabushiki Kaisha

    The below are subsidiaries of Aerovías de México S.A. de C.V.

Administradora Especializada en Negocios, S.A. de C.V.
Aerolitoral, S.A. de C.V.
Aeromexpress, S.A. de C.V.
Aerosys, S.A. de C.V.
Aerovías Empresa De Cargo, S.A. de C.V.
AM DL MRO JV, S.A.P.I. de C.V.
Am Formación Interna, S.A. de C.V.
Centro de Capacitación Alas de América, S.A. de C.V.
Corporación Nadmin, S.A. de C.V.
Empresa de Mantenimiento Aéreo, S.A. de C.V.
Estrategias Especializadas de Negocios, S.A. de C.V.
Fundación Aeroméxico, A.C.

Inmobiliaria Avenida Fuerza Aérea Mexicana 416, S.A. de C.V.
Inmobiliaria Boulevard Aeropuerto 161, S.A. de C.V.
Inmobiliaria Grupo Aeroméxico, S.A. de C.V.
Operadora de Franquicias y Productos Aéreos, S.A. de C.V.
Sistemas Integrados de Soporte Terrestre En México, S.A. de C.V.

    The below are affiliates of Aerovías de México S.A. de C.V.

Aeroméxico Cargo, S.A.P.I. de C.V.
AM BD GP JV, S.A.P.I. de C.V.
Concesionaria de Vuelos, S.A. de C.V.
Integración y Supervisión de Recursos Corporativos, S.A. de C.V.
Loyalty Servicios Profesionales Mundiales, S.A. de C.V.
Plm Premier, S.A.P.I. de C.V.
Servicios Corporativos Aeroméxico, S.A. de C.V.
T2 Servicios Aeroportuarios, S.A. de C.V.

    No publicly traded company or corporation apart from those listed above has an interest in the outcome of the case. Petitioners will file an amended certificate of interested persons should they become aware of a change in interests that would affect the disclosures as required by Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-4.

    Additionally, pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, counsel for Petitioner Delta Air Lines, Inc. hereby certify that Petitioner Delta Air Lines, Inc. is a publicly held company, traded under stock ticker NYSE: DAL, with no parent company. Counsel for Petitioner Delta Air Lines, Inc. further certify that no publicly held corporation holds 10% or more of Delta Air Lines, Inc.'s stock. The Vanguard Group, Inc. owns 10% or more of Delta Air Lines, Inc.'s stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................4

    A.    Airline Joint Ventures ................................................................4

    B.    The Delta-Aeromexico Joint Venture ........................................6

STANDARD OF REVIEW ....................................................................................9

ARGUMENT .......................................................................................................10

    I.    DELTA IS LIKELY TO SUCCEED ON THE MERITS..................10

    A.    The Department Did Not Adequately Explain Its Departure From Its Precedents When Applying A More Stringent Open Skies Standard To The Delta-Aeromexico Joint Venture Than Other Immunized Alliances ......................11

    B.    The Department's Conclusions That The Joint Venture Is Not In The Public Interest And Is Anticompetitive Are Arbitrary And Unsupported ........................................................14

    C.    The Order Rests On Speculation Regarding The Future Actions Of A Foreign Nation...................................................17

    II.    DELTA FACES IMMEDIATE AND IRREPARABLE HARM .......19

    III.    THE BALANCE OF HARMS AND THE PUBLIC INTEREST WARRANT RELIEF ........................................................................23

CONCLUSION ....................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Baltimore & Ohio R.R. Co. v. United States*,
    386 U.S. 372 (1967).................................................................20, 21

*Bidi Vapor LLC v. U.S. Food & Drug Admin.*,
    47 F.4th 1191 (11th Cir. 2022) ............................................15

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corp. of Eng'rs*,
    833 F.3d 1274 (11th Cir. 2016) ...........................................12

*Del. Dep't of Nat. Res. & Env't Control v. EPA*,
    785 F.3d 1 (D.C. Cir. 2015)..................................................17

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016)..............................................................11

*Fla. Immigrant Coal. v. Att'y Gen.*,
    2025 WL 1625385 (11th Cir. June 6, 2025)....................9, 23

*FTC v. Qualcomm Inc.*,
    935 F.3d 752 (9th Cir. 2019) ...............................................21

*Garcia-Mir v. Meese*,
    781 F.2d 1450 (11th Cir. 1986) ..............................................9

*Int'l Ladies' Garment Workers' Union v. Donovan*,
    722 F.2d 795 (D.C. Cir. 1983).............................................18

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*,
    32 F.4th 1363 (11th Cir. 2022) ..............................................9

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm
    Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).....................................................10, 15, 18

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*,
    915 F.3d 197 (4th Cir. 2019) ...............................................21

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*Nken v. Holder*,
  556 U.S. 418 (2009).................................................................................9, 14

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*,
  715 F.3d 1268 (11th Cir. 2013) ..........................................................21

*Westar Energy, Inc. v. FERC*,
  473 F.3d 1239 (D.C. Cir. 2007) ..........................................................11

*Yorktown Sys. Grp., Inc. v. Threat Tec LLC*,
  108 F.4th 1287 (11th Cir. 2024) .........................................................22

## Statutes

5 U.S.C. § 706(2)(A)................................................................................10

49 U.S.C. § 41308(b) ................................................................................5

49 U.S.C. § 41309(b) ................................................................................4

## Other Authorities

Air Transport Agreement Between the Government of the United
  States of America and the Government of the United Mexican
  States (Dec. 18, 2015), https://2009-2017.state.gov/documents/
  organization/250994.pdf ........................................................................5

iii

## INTRODUCTION

The Department of Transportation has terminated its approval of a longstanding Joint Venture between Delta Air Lines, Inc. ("Delta") and Aerovías de México S.A. de C.V. ("Aeromexico") that fully integrates their operations between the United States and Mexico—providing consumers with more routes and flight options and enhancing overall competition in the transborder market. The approval is set to expire on January 1, 2026, requiring Delta and Aeromexico to unwind the Joint Venture in little more than *three months*. According to the Department, this disruptive action is warranted because the Government of Mexico—*not* Delta or Aeromexico—has erected barriers to competition at a single airport. Although Delta fully supports the Department's efforts to address the Government of Mexico's actions, the Department's decision to end its approval of the Joint Venture is arbitrary and capricious in multiple respects, and its unrealistic timeline for the two airlines to disentangle their integrated transborder operations should be stayed.

Like other major U.S. airlines, Delta relies on joint ventures with foreign airlines to support its global network and increase connectivity between the United States and other countries. Delta's Joint Venture with Aeromexico does just that, as the Department acknowledged when it approved the Joint Venture in 2016. Yet the Department has now changed course and terminated approval of the nearly-decade-old Joint Venture, reasoning that the Government of Mexico's actions at Benito

Juárez Airport in Mexico City ("MEX") have supposedly rendered the Joint Venture anticompetitive.

The Department's decision to terminate approval of the Joint Venture is textbook arbitrary and capricious action. Competition in the U.S.-Mexico market is robust; the Joint Venture accounts for only 20% of the U.S.-Mexico passenger market (by seat shares)—compared with 21% for American, 16% for United, 16% for Volaris, and 27% spread among multiple other airlines. In nevertheless declaring the Joint Venture anticompetitive, the Department held Delta to a more stringent standard than it applies to other U.S. airlines operating Department-approved joint ventures, failed to acknowledge or explain its departure from prior precedents, and relied on unsubstantiated, irrelevant, and speculative reasoning, key pieces of which were offered by the Department for the first time in its final Order. *See* Order 2025-9-8 ("Order"). Delta is likely to succeed in its challenge to that Order.

In the absence of a stay, Delta will be immediately and irreparably harmed by the tremendously burdensome steps, documented in four attached declarations, required to unwind the operationally complex Joint Venture by January 1—harm that will be compounded by the costs associated with re-establishing the Joint Venture if Delta ultimately prevails in litigation. In addition, Delta must plan its itineraries for the peak 2026 summer travel season in the coming weeks and may be forced to cancel routes and otherwise reduce flights absent a stay. And, without the

Joint Venture, ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████.

The equities also favor Delta.  The Order's pernicious effects will directly harm the traveling public by weakening competition and limiting consumer choice in the U.S.-Mexico passenger market.  Moreover, the Department's accelerated timeline for unwinding the Joint Venture is entirely artificial:  The Department took no action on its initial proposal to terminate the Joint Venture for eighteen months, making clear that any urgency is manufactured.  And the Government of Mexico is now in the process of addressing several of the very matters at MEX with which the Department takes issue.  In short, there simply is no need for the Department's destabilizing Order to take effect before this Court has assessed its validity.

Because this Court is likely to vacate the Department's deeply flawed Order, because Delta is facing substantial irreparable harm from unwinding the Joint Venture, and because the equities favor leaving that procompetitive alliance in place, the Court should stay the Order.  In light of the impending harm to Delta and its customers, Delta respectfully requests a ruling by November 14.

# BACKGROUND

## A.    Airline Joint Ventures

Joint ventures are common in the airline industry, especially on international routes.  Consumers demand seamless global connectivity, but most countries restrict foreign ownership and control of their airlines.  Joint ventures allow airlines based in different countries to coordinate their operations and align their financial incentives—including the sharing of profits and losses—to meet that consumer demand.  In so doing, they generate economic efficiencies by eliminating duplicative profit margins from ticket sales, expanding route networks, and increasing flight frequency.  To achieve all these benefits, joint ventures typically operate in a "metal neutral" manner—with timetables, fares, and even in-flight experience and loyalty benefits all set jointly—rendering the carriers and their passengers indifferent as to which airline's plane ("metal") flies the route.  *See* Ex. C.

To foster these efficiencies, Congress has authorized the Department to approve international joint ventures and grant them antitrust immunity.  When evaluating a proposed joint venture, the Department must determine whether it "substantially reduces or eliminates competition."  49 U.S.C. § 41309(b)(1).  If it does not, the Department must approve the joint venture "when the [Department] finds it is not adverse to the public interest."  *Id.* § 41309(b).  The Department may also exempt the agreement from the antitrust laws to the extent necessary to allow

the parties to proceed with the transaction. *Id*. § 41308(b). The Department has approved many joint ventures under this framework, including joint ventures between American Airlines and British Airways, Order 2010-7-8, United Airlines and All Nippon Airways, and American Airlines and Japan Airlines, Order 2010-11-10.

In conducting its analysis, the Department often considers whether an "Open Skies" agreement exists between the United States and the country in which the foreign airline is based. *See* Order 92-8-13. These agreements authorize each signatory to designate an unlimited number of its carriers to operate from any points in its territory to any points in the other country with no frequency restrictions. *Id.* While the Department has treated Open Skies as a relevant consideration, it has approved multiple joint ventures that operate at airports carved out from an Open Skies agreement—in particular, Tokyo Haneda—or where government-imposed restrictions on takeoff and landing (called "slots") limit U.S. carriers' access, as at London Heathrow and Lisbon.

Since 2015, the United States has maintained an Open Skies agreement with Mexico. *See* Air Transport Agreement Between the Government of the United States of America and the Government of the United Mexican States (Dec. 18, 2015), https://2009-2017.state.gov/documents/organization/250994.pdf. In recent years, however, the United States has expressed concerns that certain Mexican

government policies—specifically, restrictive and nontransparent slot policies at MEX and a prohibition on "all cargo" flights (e.g., UPS flights) at MEX—violate its Open Skies obligations.

### B.    The Delta-Aeromexico Joint Venture

In 2015, Delta and Aeromexico submitted a proposal to establish a metal-neutral joint venture covering nonstop flights between the United States and Mexico, along with "flights within the [United States] and Mexico that connect to transborder services."  DOT-OST-2015-0070, at 7 (Mar. 31, 2015).  The following year, the Department approved the Joint Venture and granted antitrust immunity, concluding that it was "pro-consumer" and would "deliver substantial public benefits to the traveling public."  Order 2016-12-13, at 1.

The Joint Venture has been a resounding success for Delta and Aeromexico, as well as for their customers, who enjoy expanded routes, more frequent flight options, and a seamless travel experience as a result of the airlines' cooperation. Under the Joint Venture, Delta and Aeromexico share profits and losses, jointly plan their networks and schedules, cooperate as to sales and marketing, and have consolidated their airport operations and services for flights within the Joint Venture's scope.  The Joint Venture has resulted in the addition of 37 new routes between the United States and Mexico, substantially enhancing U.S. consumers' access to nonstop and one-stop routes in the transborder market and allowing Delta

6

to offer consumers an alternative to the entrenched U.S. incumbents, American and United, which dominated the market before 2017.  DOT-OST-2015-0070, at 6 (Aug. 11, 2025)  ("Supp. SCO Objections").  Since the Joint Venture was implemented, competition at MEX and in the broader U.S.-Mexico market has intensified, with Delta-Aeromexico, American, and United securing roughly equal market shares and several low-cost carriers substantially expanding their shares.  *See* Order at 20-21.

In 2022, at the Department's direction, Delta and Aeromexico submitted an application to renew the Joint Venture.  DOT-OST-2015-0070 (Mar. 29, 2022). Rather than act on that application, the Department issued an Order to Show Cause in January 2024 announcing its tentative decision to terminate approval of the Joint Venture based on concerns regarding the Government of Mexico's slot policies and prohibition on all-cargo operations at MEX.  Order 2024-01-17.

After Delta and Aeromexico filed objections, eighteen months passed before the Department issued a Supplemental Order to Show Cause, proposing to terminate approval of the Joint Venture based on the same concerns about the Government of Mexico's policies at MEX.  Order 2025-7-12.  Delta and Aeromexico again objected.  Supp. SCO Objections.

On September 15, 2025, the Department issued a final Order terminating its approval of and antitrust immunity for the Joint Venture, effective January 1, 2026. According to the Department, the eight-year-old Joint Venture is now

7

anticompetitive and no longer in the public interest because Mexico is allegedly violating its Open Skies obligations by restricting slots and prohibiting all-cargo flights at MEX. Order at 2, 17. The Department conceded that only about 21% of flights between the United States and Mexico fly to or from MEX, and that MEX's share of the market is "gradually falling." *Id.* at 19. And the Department never disputed that Delta and Aeromexico represent only 20% of the U.S.-Mexico market or that several other carriers have similar market shares and have maintained or expanded their shares in the past decade. *See* Supp. SCO Objections at 3.

Nevertheless, the Department faulted Delta and Aeromexico for supposedly enjoying an unfair competitive advantage on time-sensitive cargo at MEX (which they transport in the "belly" of passenger flights)—a new rationale unaddressed in the Department's prior orders—as well as for failing to expand connecting flights from MEX to non-U.S. destinations beyond Mexico, which are outside the Joint Venture's scope. *See* Order at 22-23. The Department also speculated that Mexico could introduce similar restrictions at other airports—while providing no substantiation for that conjecture and acknowledging that Mexico is engaged in meaningful steps to *improve* the slot-assignment process at MEX. *Id.* at 12. And despite conceding "the future costs, and challenges, that Delta and Aeromexico will face to wind down the joint venture," the Department gave them only until January 1,

8

2026—a mere three and a half months—to disentangle their highly integrated operations. *Id*. at 29.

Delta petitioned for review of the Department's Order on October 9 and moved for a stay from the Department the following day, requesting a decision from the Department by October 17. The Department deferred action until today, October 24, whereupon it summarily denied Delta's motion. Ex. B.

## STANDARD OF REVIEW

The "traditional stay factors . . . govern a request for a stay pending judicial review." *Nken v. Holder*, 556 U.S. 418, 426 (2009). These factors are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id*. The standard operates on a sliding scale, and a "'movant may . . . have his motion granted upon a lesser showing of a substantial case on the merits when the balance of the equities identified in factors 2, 3, and 4 weighs heavily in favor of granting the stay.'" *Fla. Immigrant Coal. v. Att'y Gen.*, 2025 WL 1625385, at *2 (11th Cir. June 6, 2025) (quoting *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986)); *see also League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022) (applying the sliding scale).

Under the Administrative Procedure Act ("APA"), this Court must hold unlawful and set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Courts scrutinize whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

## ARGUMENT

The Department's Order is arbitrary and capricious in multiple respects and will immediately and irreparably harm Delta and its customers if Delta is required to unwind its highly interconnected operations with Aeromexico—and then reestablish that complex infrastructure if this Court ultimately vacates the Order. The Court should stay the Order.

## I.     DELTA IS LIKELY TO SUCCEED ON THE MERITS.

In terminating its approval of the Joint Venture, the Department acted arbitrarily and capriciously by subjecting Delta to disparate treatment, ignoring its own precedent, and relying on inapposite assertions and conjecture in the place of relevant evidence and concrete facts.

10

A.    **The Department Did Not Adequately Explain Its Departure From Its Precedents When Applying A More Stringent Open Skies Standard To The Delta-Aeromexico Joint Venture Than Other Immunized Alliances.**

In its Order, the Department asserted that Open Skies are "essential" and "necessary" to secure and maintain approval of a joint venture, pointing to the Government of Mexico's slot controls and cargo restrictions at MEX as the primary basis for terminating approval of the Joint Venture. *See* Order at 2, 17. Yet the Department has not taken the same actions regarding other alliances operating at highly slot-controlled airports. The Department has accordingly violated the "fundamental norm of administrative procedure [that] requires an agency to treat like cases alike." *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007). And it has similarly failed to "at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

Open Skies indisputably do not exist at Tokyo Haneda—a fact that is fatal to the Department's reasoning. Haneda currently handles 55% of the overall air traffic between the United States and Japan but is *expressly carved out* from the U.S.-Japan Open Skies agreement. *See* Supp. SCO Objections at 56-57. Under that agreement, all-cargo operations are prohibited at Haneda, and U.S. carriers may operate only "17 daytime slot pairs and one nighttime/early morning slot pair"—with the Department charged with allocating the limited slots. *See* Order 2023-6-24, at 1.

11

Yet, despite these rigid slot controls and the all-cargo prohibition, the Department has approved and left in place immunized joint ventures with substantial presences at Haneda between United and All Nippon Airways, and American and Japan Airlines. *See, e.g.*, Order 2010-11-10, at 1. In fact, the Department recently allocated American and United *additional* slots at Haneda. Order 2023-6-24, at 2.

The Department failed to explain why Open Skies are "essential" and "necessary" to a Joint Venture at MEX, Order at 2, 17, but not at Haneda, an airport that handles a far higher percentage of passenger traffic between the United States and Japan than does MEX for U.S.-Mexico traffic. This is blatant disparate treatment of Delta and a plain violation of the APA. *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corp. of Eng'rs*, 833 F.3d 1274, 1289 (11th Cir. 2016) (an agency acts arbitrarily when it treats like cases dissimilarly).

Relatedly, the Department's treatment of the Joint Venture constitutes an unacknowledged and unreasoned change in the Department's position. The Department has never previously disapproved a joint venture based on the existence of a highly congested, slot-controlled airport in a joint venture partner's home nation. To the contrary, in addition to Haneda, the Department has approved joint ventures operating at a number of other heavily slot-controlled airports. For example, capacity is significantly constrained at London Heathrow, which handles 85% of U.S.-U.K. traffic and where longstanding slot restrictions substantially limit new

12

entry and expansion of existing service. Supp. SCO Objections at 47, 58-59. Nevertheless, the Department has approved an immunized joint venture between American and British Airways with Heathrow as its centerpiece. Order 2010-7-8, at 10, 19. Similarly, 85% of U.S.-Portugal traffic is handled by Lisbon, where TAP holds 50% of slots and there are no opportunities for new entry by U.S. carriers. *See* Supp. SCO Objections at 59-60. The Department nevertheless continues to provide immunity to a transatlantic alliance that includes United and TAP. *See* Order 2009-7-10.

According to the Department, alliances in the U.S.-Japan and U.S.-Europe markets are factually distinguishable because the Delta-Aeromexico Joint Venture is the only one in which a "foreign partner, in this case the [Government of Mexico], is unacceptably distorting competition in a manner that directly undermines the findings of previous orders approving and granting [antitrust immunity]." Order at 21. But the Department's distinction only highlights the disparate treatment here: It is no answer for the Department to point to an Open Skies prerequisite that it imposed on the Joint Venture but not on alliances operating at other slot-controlled airports.

As discussed, Haneda is explicitly carved out of the U.S.-Japan Open Skies agreement, and Japan imposes heavy slot controls and an all-cargo prohibition at Haneda. Heathrow is also one of the world's most difficult airports to access, and

Lisbon is closed indefinitely to new entry. The Department has acknowledged these restrictions but has not deemed them barriers to granting and maintaining approval of joint ventures operating at Haneda, Heathrow, and Lisbon. *See, e.g.*, Order 2010-7-8, at 10 (acknowledging slot restrictions at Heathrow as a concern). Nor has the Department explained how the actions taken by the Government of Mexico at MEX after approval of the Joint Venture have resulted in conditions meaningfully different from those at Haneda, Heathrow, Lisbon, and the hundreds of other slot-constrained airports.

The Department cannot "depart from [its] prior policy *sub silentio*," *Fox*, 556 U.S. at 515, which is precisely what it did when terminating the Joint Venture. Because the Department has not acknowledged or justified changing course, its Order is arbitrary and capricious.

**B.    The Department's Conclusions That The Joint Venture Is Not In The Public Interest And Is Anticompetitive Are Arbitrary And Unsupported.**

The Department also never adequately explained why the Government of Mexico's actions at one airport—MEX—warrant terminating a Joint Venture that operates at dozens of airports in Mexico. Given the Joint Venture's *U.S.-Mexico scope*, any analysis of its public benefits and competitive effects must account for the entire *U.S.-Mexico market* for air travel. Yet the Order provides no such analysis. It never engages with airlines' shares of the U.S.-Mexico market as a whole (which

14

show robust competition in a market that is far more competitive today than when the Joint Venture was launched) and never analyzes competition among airlines on specific routes (which shows the same robust competition on the most popular routes). *See* Supp. SCO Objections at 2-4.

Instead, the Department's Order focuses on two actions by the Government of Mexico—the prohibition on all-cargo flights at MEX, which purportedly provides Delta and Aeromexico with an advantage in time-sensitive cargo deliveries, Order at 22-23, and supposed reductions in Aeromexico's connecting flights to destinations outside Mexico, *id*. at 24. This narrow focus alone demonstrates that the Department has "failed to consider . . . important aspect[s] of the problem." *Bidi Vapor LLC v. U.S. Food & Drug Admin*., 47 F.4th 1191, 1202 (11th Cir. 2022) (internal quotation marks omitted). And even taking the Department's two areas of focus on their own terms, there is no "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted).

***Unwarranted Focus on Time-Sensitive Cargo.*** The Department claimed that "Delta and Aeromexico benefit from the inability of all-cargo carriers to operate at MEX and from seamlessly interlining cargo, particularly lucrative time-sensitive cargo, at MEX to other destinations in Mexico." Order at 22. But the Department failed to explain why potential competitive harms regarding time-sensitive *cargo* at

MEX justify ending approval of a joint venture between two *passenger* carriers that integrates their services at dozens of airports, to the substantial benefit of air travelers. In fact, the Department never provided any analysis of the supposed time-sensitive cargo market at MEX—a subset of cargo operations the Department largely ignored until its final Order. For example, the Department never analyzed the size of that market, pricing within that market, or how the market operates. And tellingly, despite multiple opportunities, no all-cargo operator commented in these proceedings.

Moreover, Felipe Ángeles International Airport ("NLU") has no cargo limitations and is located approximately 30 miles from the center of Mexico City—closer than Washington Dulles is to downtown Washington, D.C., and closer than Tokyo Narita (where all-cargo operators must operate due to the all-cargo prohibition at Haneda) is to downtown Tokyo. The Department contends that cargo arriving at NLU for other destinations in Mexico must transit a "three-hour transfer process" for onward travel via Aeromexico. Order at 22. But again, the Department never provides any evidence that this transfer process adversely affects all-cargo operators' delivery capabilities or prices—and their silence strongly suggests the contrary is true.

***Beyond-Mexico Connections.*** Apart from time-sensitive cargo, "the primary issue . . . the Department f[ound] with the nature of the joint venture" is a supposed

16

reduction in Aeromexico's "overall connections beyond MEX." Order at 24. But this figure includes flights to international destinations outside the United States and Mexico, which are beyond the Joint Venture's U.S.-Mexico scope. *See* Order 2016-12-13, at 1. The Department has never provided an explanation for considering these out-of-scope flights in its analysis.

Nor could it. Through the Joint Venture, Delta and Aeromexico partner only with respect to flights *within Mexico and the United States*. And that partnership has generated substantial consumer benefits, including a 5% increase in Aeromexico's connections between MEX and other Mexico destinations. Supp. SCO Objections at 14. The Department's misaligned focus on "*overall* connections beyond MEX," Order at 24 (emphasis added), is plainly wrong and sheds no light on the Joint Venture's competitive effects.

### C. The Order Rests On Speculation Regarding The Future Actions Of A Foreign Nation.

Finally, the Department speculates that the Government of Mexico may replicate its MEX policies at other airports, like Cancún. Order at 20. But this conjecture is entirely unsupported, which is sufficient standing alone to render the Department's action arbitrary and capricious. *See Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 11 (D.C. Cir. 2015).

Such baseless conjecture was particularly misplaced here, because the most recent actions by the Government of Mexico were aimed at *rectifying* issues that the

17

Department has identified as concerns, including slot controls at MEX. In August, in evident response to the Department's interventions, the Government of Mexico announced new rules that will substantially ease slot restrictions at MEX and increase transparency for slot allocations. *See* Order at 31; *see also* United Airlines Answer, DOT-OST-2015-0070, at 1 (Aug. 20, 2025). The Department's speculation that Mexico might pull an about-face and impose new slot restrictions at other airports thus "runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

At a minimum, the Department should have delayed action on the Joint Venture until the competitive impact of the Government of Mexico's recent actions is fully realized. In its proposed order in July, the Department expressly recognized that an alternative to immediately terminating approval of the Joint Venture was to pause and see if new pressures being placed on Mexico by the United States caused circumstances to improve. Yet when those improvements materialized—and sooner than expected—the Department terminated its approval of the Joint Venture nonetheless, offering only *ipse dixit* about the absence of a sufficient "track record" on Mexico's part and without vetting this alternative through notice and comment. Order at 31-32. Such an "artificial narrowing of options is antithetical to reasoned decisionmaking." *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 817 (D.C. Cir. 1983) (internal citation and quotation marks omitted).

18

## II.    DELTA FACES IMMEDIATE AND IRREPARABLE HARM.

Without a stay, Delta will be irreparably harmed by the operational disruptions, lost revenue, transition costs, and impaired customer goodwill that will inevitably result from dissolving the Joint Venture on the Department's needlessly expedited timeline.  Delta will not be able to recover any of those losses and, if successful on the merits, would suffer *additional* harm from the disruptions and costs of reestablishing the Joint Venture.

Absent a stay, Delta's flight operations will face severe disruptions.  Airlines need to schedule their flights six to nine months in advance, which means Delta must make imminent decisions regarding flights for next summer's peak travel season. Ex. D ¶ 16.  Due to the uncertainty surrounding the Joint Venture, Delta has already cancelled two flights to Mexico for the upcoming winter season, and, without a stay, it may need to cancel additional transborder flights for next summer and forgo opportunities to launch new summer routes.  *Id.* ¶¶ 15, 17.  Additionally, without a stay, Delta's operational flexibility at MEX—where Delta is currently able to optimize its U.S.-Mexico schedule in coordination with Aeromexico—would likely be impaired, given that airlines without a joint venture almost never provide each other with coordinated slot use.  *Id.* ¶ 18.

Other operational challenges from dissolving the Joint Venture abound. Delta's and Aeromexico's transborder operations are intertwined in a manner akin

19

to a "virtual merger." Order at 28. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████  ████  █████████████████████████████████

█████████  ██████  █████  ██████  ███████  ██████  ████  ██

█████████████████████████████████████.

It will be massively disruptive for the airlines to unwind—and renegotiate at arm's length—their relationship by January 1. Ex. C ¶¶ 15-20. Delta will need to rework highly complex operational arrangements with Aeromexico, ████████

████████████████████████████████████████,

re-train employees, and more. *Id.* Attempting to accomplish all of this in a few short months will lead to suboptimal decisions and serious disruption to Delta's business. *See Baltimore & Ohio R.R. Co. v. United States*, 386 U.S. 372, 392 (1967) ("unscrambling" a merger cannot be "effectively accomplished" without risking "serious[] disrupt[ion]").

Dissolution of the joint venture will also cause immediate out-of-pocket losses for Delta. As just one example, Delta faces an immediate loss of a ████████

████████████████████████████████████████████

████████████████. Delta is able to provide that access only because of the Joint Venture; without it, ████████████████████████████

███████████████████████. *Id.*; *see Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) (monetary losses that cannot be recovered "because of sovereign immunity" constitute irreparable injury).

Delta's relationships with its passengers, corporate clients, and travel agencies will also be at risk. Under the Joint Venture, Delta and Aeromexico have jointly executed over █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. And Delta likely will need to renegotiate ████████████████████████████████████████████, which will prove costly and disruptive. Ex. E ¶¶ 9-11; *FTC v. Qualcomm Inc.*, 935 F.3d 752, 756 (9th Cir. 2019) (company forced to "renegotiate" contracts faced irreparable harm).

Dissolving the Joint Venture on the Department's timeline will also cause Delta to lose substantial customer goodwill. *See Yorktown Sys. Grp., Inc. v. Threat Tec LLC*, 108 F.4th 1287, 1297 (11th Cir. 2024) (recognizing this harm for injunction purposes). For example, Delta almost certainly will lose the ability to provide customers in Mexico with its SkyMiles for Business program. Ex. E ¶¶ 16, 18. Delta currently relies on Aeromexico to service that program, and it will take Delta months, if not years, to re-establish the program without Aeromexico. *Id.* ¶¶ 16-17. Delta will accordingly lose customers in Mexico who demand the benefits of Delta's program and may never regain them. *Id.* ¶ 18. Similarly, Delta's corporate clients and travel agencies demand seamless, uninterrupted service, as well as the broadest network possible. Delta will almost certainly lose business and irretrievably forfeit customer goodwill if it can offer only its own, smaller network without the routes flown by Aeromexico—particularly after ████████████ ████████████████████████████████████████████████████████████████. *Id.* ¶¶ 7, 10.

These immediate, irreparable harms to Delta's operations, finances, and client relationships weigh strongly in favor of a stay.

## III.   THE BALANCE OF HARMS AND THE PUBLIC INTEREST WARRANT RELIEF.

Given the substantial harms faced by Delta and the flying public, the balance of harms and public interest are best served by "maintaining the . . . status quo." *Fla. Immigrant Coal.*, 2025 WL 1625385, at *6.

The Department took no action on its initial show cause order for eighteen months, making clear that there is no urgency here.  In fact, the Government of Mexico is currently taking steps to address many of the Department's operational concerns at MEX.  *See supra* at 18.  Thus, without a stay, the Department's Order will substantially and irreparably harm Delta based on conditions at MEX that may no longer exist when the Court decides this case.  In the interim, the public will experience fewer flight options and decreased connectivity when flying to Mexico—as well as a less competitive transborder market—not to mention the inevitable disruptions to Delta's pricing functions, loyalty programs, and other operations caused by the hurried unwinding of the Joint Venture.

To "promot[e]" "[c]ertainty and predictability" in the U.S.-Mexico passenger market—and to head off the Order's irremediable and unnecessary commercial costs and public harms—the Court should stay the Department's Order.  *Fla. Immigrant Coal.*, 2025 WL 1625385, at *6.

### CONCLUSION

The Court should stay the Order until the resolution of Delta's petition.

23

Dated:  October 24, 2025                    Respectfully submitted,


                                                 */s/ Eugene Scalia*
Peter Carter                                 Eugene Scalia
Marguerite H. Taylor                         Amir C. Tayrani
DELTA AIR LINES, INC.                        Christine M. Buzzard
1030 Delta Boulevard                         Michael P. Corcoran
Atlanta, GA  30320                           GIBSON, DUNN & CRUTCHER LLP
                                             1700 M Street, N.W.
Steven J. Seiden                             Washington, D.C.  20036
Christopher Walker                           (202) 955-8500
DELTA AIR LINES, INC.                        escalia@gibsondunn.com
601 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C.  20005


              *Counsel for Delta Air Lines, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this motion complies with the applicable typeface, type style, and type-volume limitations.  This brief was prepared using a proportionally spaced type (Times New Roman, 14-point font).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 5,199 words.  This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

October 24, 2025                Respectfully submitted,


    */s/ Eugene Scalia*
Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2025, I caused a true and correct copy of this motion to be filed electronically through the Court's CM/ECF system, which will send a notice of filing to all registered users.

 *   /s/ Eugene Scalia*  
Eugene Scalia  
GIBSON, DUNN & CRUTCHER LLP  
1700 M Street, N.W.  
Washington, D.C.  20036  
(202) 955-8500