# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

DELTA AIR LINES, INC., and
AEROVIAS DE MEXICO S.A. DE
C.V.,

      Petitioners,

           v.

DEPARTMENT OF
TRANSPORTATION,

      Respondent.

No. 25-13546

# RESPONDENT UNITED STATES DEPARTMENT OF
# TRANSPORTATION'S OPPOSITION TO PETITIONERS' MOTIONS
# FOR STAY PENDING APPEAL

**Delta Air Lines, Inc., et al. v. Department of Transportation, No. 25-13546**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**
**C-1 of 1**

Pursuant to Eleventh Circuit Rule 26.1-1, the undersigned certifies that the Certificates of Interested Persons filed by Petitioners on October 24, 2025, omit the following:

Enloe, Charles E., Assistant General Counsel, U.S. Department of Transportation

Haar, Daniel E., Attorney, Appellate Section, Antitrust Division, U.S. Department of Justice

Hendrixson, Erin D., Senior Trial Attorney, U.S. Department of Transportation

/s/ Steven J. Mintz

Steven J. Mintz
*Attorney*

## TABLE OF CONTENTS

Introduction ...................................................................................... 1

Background ....................................................................................... 2

Applicable Legal Standards ..................................................... 7

Argument ......................................................................................... 9

    A.   Delta and Aeromexico Are Not Likely to Succeed on the Merits. ... 9

    B.   Delta's and Aeromexico's Claims of Irreparable Harm Are Overblown ................................................................................... 22

    C.   The Balance of Harms and the Public Interest Favor Ending the JV and Restoring Open Market Competition. ............................... 26

Conclusion ....................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*ABC Aerolineas, S.A. de C.V. v. United States Dep't of Transp.*,
  747 F. App'x 865 (D.C. Cir. 2018)..........................................................13

*Air Line Pilots Assoc. Int'l v. Dep't of Transp.*,
  791 F.2d 172 (D.C. Cir. 1986)...............................................................17

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*,
  833 F.3d 1274 (11th Cir. 2016)...............................................................8

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999)..............................................................................12

*City of Lafayette v. La. Power & Light Co.*,
  435 U.S. 389 (1978)..............................................................................27

*Cuomo v. United States NRC*,
  772 F.2d 972 (D.C. Cir. 1985)...............................................................23

*Dilley v. Nat'l Transp. Safety Bd.*,
  49 F.3d 667 (10th Cir. 1995).................................................................17

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)................................................................................8

*FTC v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016)..................................................................23

*FTC v. Univ. Health, Inc.*,
  938 F.2d 1206 (11th Cir. 1991)..............................................................23

*Group Life & Health Ins. Co. v. Royal Drug Co.*,
  440 U.S. 205 (1979)..............................................................................27

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000).................................................................27

*Lindeen v. SEC*,
  825 F.3d 646 (D.C. Cir. 2016)...............................................................12

*Lopez-Martinez v. United States Att'y Gen.*,
  149 F.4th 1202 (11th Cir. 2025)..............................................................8

*Nat'l Ass'n for Better Broad. v. FCC*,
  849 F.2d 665 (D.C. Cir. 1988)...............................................................22

*Nken v. Holder*,
  556 U.S. 418 (2009).............................................................................7, 8

*Northeastern Chapter v. Jacksonville, Florida*,
  896 F.2d 1283 (11th Cir. 1990)....................................................24, 26, 27
*N. Pac. Ry. Co. v. United States*,
  356 U.S. 1 (1958) .................................................................................27
*United States v. Am. Airlines Grp., Inc.*,
  121 F.4th 209 (1st Cir. 2024)...............................................................14
*United States v. Anthem, Inc.*,
  855 F.3d 345 (D.C. Cir. 2017).............................................................14
*United States v. E. Air Lines Inc.*,
  792 F.2d 1560 (11th Cir. 1986)............................................................17
*United States v. Siemens Corp.*,
  621 F.2d 499 (2d Cir. 1980)................................................................23

## Statutes

5 U.S.C. § 706(2)(A) ....................................................................................8
49 U.S.C. § 40101(a)(6)............................................................................13
49 U.S.C. § 40101(a)(10)..........................................................................13
49 U.S.C. § 40105(b)(1)(B).......................................................................17
49 U.S.C. § 41308 .......................................................................................3
49 U.S.C. § 41308(b).......................................................................3, 16, 17
49 U.S.C. § 41309 ....................................................................................3, 7
49 U.S.C. § 41309(b).......................................................................9, 16, 17
49 U.S.C. § 41309(b)(1)......................................................................18, 21

## Introduction

To counteract anticompetitive effects and unfair competitive advantages, and to protect the interests of consumers, the U.S. Department of Transportation ("Department") ended its approval of the joint venture ("JV") between Delta Air Lines and Aerovias de Mexico, S.A. de C.V. ("Aeromexico") and its associated grant of antitrust immunity. The Department did so because the Government of Mexico's unilateral actions materially changed competitive conditions in the U.S.-Mexico City and broader U.S.-Mexico markets in which the JV competes and on which the Department had based its conditional approval. Those actions included: (1) large-scale confiscation of takeoff and landing slots at Benito Juarez International Airport ("MEX"), the primary airport in Mexico City; (2) prohibition of all-cargo operations at MEX; and (3) perpetuation of a slot allocation regime at MEX that does not meet international standards and advantages Delta and Aeromexico. The Government of Mexico's actions have caused competitive conditions in the U.S.-MEX and broader U.S.-Mexico markets that fail to justify a continuing grant of antitrust immunity. Under these circumstances, the Department validly decided to no longer

1

authorize legalized collusion by two formerly competing airlines that control almost 60 percent of operations at the fourth-largest international gateway to and from the United States.

Delta and Aeromexico seek a stay but do not show a substantial likelihood of prevailing on the merits. Their claims of irreparable injury are overblown. And the public interest favors restoring full and fair competition between Delta and Aeromexico themselves and among them and their competitors. The airlines' motions to stay therefore should be denied.

## Background

In 2015, the United States and Mexico concluded an Air Transport Agreement. The purpose of the Agreement is to liberalize air transport between the United States and Mexico and create free-market conditions with respect to the establishment of routes, capacity, and prices, so that market forces, rather than government intervention, determine market outcomes.[1]

---

[1] *See* Air Transport Agreement Between the Government of the United States of America and the Government of the United Mexican States, Mex.-U.S. Dec. 18, 2015, https://2009-2017.state.gov/e/eb/rls/othr/ata/m/mx/250782.htm. The United States has similar "Open Skies" agreements with over 130 foreign countries.

2

Concurrently, Delta and Aeromexico applied to the Department for approval of, and antitrust immunity for, a schedule, price, and capacity-setting joint venture agreement that would otherwise violate the U.S. antitrust laws. On December 14, 2016, the Department approved the airlines' application and the grant of antitrust immunity under 49 U.S.C. §§ 41309 and 41308 (Final Order, Exhibit C hereto).

But the U.S.-Mexico market only recently had been liberalized, the competitive effects of a new joint venture were difficult to predict, and the Department was concerned about Mexico's future compliance with the Agreement. The Department thus made its approval and grant of antitrust immunity subject to stringent conditions, including limiting the antitrust immunity period to five years and requiring a *de novo* application for renewal of approval. The Department also reserved the right—as authorized by the operative statute here—to review competitive conditions and withdraw its approval at any time. It further required Delta and Aeromexico to divest 24 slot pairs at MEX and four slot pairs at John F. Kennedy International Airport in New York to other airlines to allow for the possibility of new entry. *See* Ex. C.

3

On December 17, 2020, due to the Covid-19 pandemic and other factors, the Department extended the filing time for a renewal application to March 31, 2022. To mitigate any potential disruption to JV operations, the Department also agreed to continue the antitrust immunity period through consideration of the new application. On March 29, 2022, Delta and Aeromexico filed their new application. Beginning in 2022, however, the Government of Mexico unilaterally took actions that seriously constrained competition at MEX, did not comply with some of its obligations under the Agreement, and undermined critical competitive conditions on which the Department had based approval of the JV. Those actions included confiscating large numbers of slots from carriers at MEX (amounting to one-third of the airport's original capacity), prohibiting all-cargo operations at MEX, and perpetuating unreliable and opaque slot administration rules by enacting arbitrary capacity limits that foreclosed new entry.[2]

---

[2]*See* Order to Show Cause, Order 2024-01-17, DOT-OST-2015-0070-0245 (Jan. 26, 2024), https://www.regulations.gov/document/DOT-OST-2015-0070-0245.

In response to these changed competitive conditions, on January 26, 2024, the Department proposed to dismiss Delta and Aeromexico's new application and to withdraw antitrust immunity.[3]  The Department considered numerous comments on its tentative decision.  It also continued to engage with the Government of Mexico concerning its violations of the Agreement, but to no avail.

On July 19, 2025, the Department issued a Supplemental Order to Show Cause tentatively disapproving the JV and withdrawing antitrust immunity (Exhibit B hereto).  The Department found that the JV has a predominant share of capacity in the U.S.-MEX market and a substantial share of the broader U.S.-Mexico market.  *Id.* at 32.  It further found that the competitive market conditions that the Department relied upon in support of the 2016 temporary approval of the JV and grant of antitrust immunity were no longer present in the U.S.-MEX markets, and that due to Mexico's actions undermining competitive conditions at MEX, there were spillover effects in the broader U.S.-Mexico market that failed to justify a further grant of antitrust immunity.  *Id.* at 18-38.

---

[3] *See id.*

For example, Aeromexico controlled 50 percent of the slots at MEX at the time of the 2016 decision, but by 2025 the JV controlled 60 percent of operations. Exhibit B at 32.[4] Because of its predominant slot holdings at MEX, the JV can now exploit Mexico's actions to gain competitive advantages in ways that its rivals cannot. *Id.* at 19-20. Aeromexico also dramatically increased its share of belly cargo at MEX. *Id.* at 22-23. Moreover, the JV failed to achieve expected efficiencies, e.g., to increase passenger seat capacity or connecting traffic at MEX as compared to its competitors, as would be expected from an antitrust-immunized joint venture that benefits consumers. *Id.* at 33-37.

On September 15, 2025, the Department issued a Final Order terminating its approval of the JV and grant of antitrust immunity effective January 1, 2026 (Exhibit A hereto). The Department explained that the ongoing anticompetitive effects of Mexico's actions at MEX and elsewhere materially change market conditions, unfairly advantage the JV as predominant competitors, and harm consumers.

---

[4]Due to Mexico's opaque slot administration, the Department does not know the actual slot holdings at MEX and has been using "scheduled departures" as a proxy.

*Id.* at 1, 9-12.  Accordingly, the Department determined that the JV is "adverse to the public interest" and "substantially reduces or eliminates competition" under 49 U.S.C. § 41309.  *Id.* at 11.  The order explains that the United States will continue to work with Mexico to restore competitive market conditions.  *Id.* at 31-32.  During this process, which has spanned two presidential administrations in both the U.S. and Mexico, Delta will continue to hold its 20 percent ownership stake in Aeromexico, the airlines can continue to collaborate on an arm's-length basis with code-sharing, frequent flyer program cooperation, and other joint marketing activities, and they can continue coordination as members of the SkyTeam alliance.  *Id.* at 27, 29.

## Applicable Legal Standards

In determining whether to grant a stay, courts consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009).  A stay "is not a matter of right, even if irreparable injury might

7

otherwise result to the appellant." *Id.* at 427 (internal quotation and citation omitted).

To show a likelihood of prevailing on the merits "[i]t is not enough that the chance of success on the merits be better than negligible," or that there is "a mere possibility of relief." *Nken*, 556 U.S. at 434 (quotation marks omitted). Here, Delta and Aeromexico will have to show that the Final Order is "arbitrary and capricious." Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Judicial review under that standard is "deferential" to the government agency. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (agency decision need only be "reasonable and reasonably explained"); *see also Lopez-Martinez v. United States Att'y Gen.*, 149 F.4th 1202, *1210 n.6 (11th Cir. 2025) ("the Supreme Court has repeatedly characterized arbitrary-and-capricious review as being even more deferential than substantial-evidence review"). This deference extends to "drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1285 (11th Cir. 2016) (internal quotation and citation omitted).

8

## Argument

49 U.S.C. § 41309(b) provides that the Secretary of Transportation "shall approve an agreement" between air carriers "when the Secretary finds it is not adverse to the public interest and is not in violation of this part." But the Secretary "shall disapprove . . . or, after periodic review, end approval of, an agreement" that "substantially reduces or eliminates competition" unless the Secretary finds that the agreement "is necessary to meet a serious transportation need or to achieve important public benefits . . . [and] those benefits cannot be achieved by reasonably available alternatives that are materially less anticompetitive." *Id.*

## A.  Delta and Aeromexico Are Not Likely to Succeed on the Merits.

The Department in 2016 had justifiably serious concerns about the state of competition at MEX, due to Delta and Aeromexico's combined majority share of slots at the airport and their exploitation of the opacity of governmental slot administration. Given those concerns, the Department imposed—and the carriers expressly acquiesced in—two specific conditions of approval for the JV: (1) limitation of antitrust immunity to five years; and (2) divestiture of 24 slot pairs at MEX. Ex.

9

C at 1-2.  The Department also noted the expectation, based on a recommendation for comprehensive airport slot reforms by the independent Mexican competition authority, that Mexico's aviation regulators would soon draft and implement new slot administration policies and that significant new entry would become possible.  *Id.* at 3.

Unfortunately, this expectation did not come to fruition, and to make matters worse, in 2022-2023 the Mexican government greatly reduced the number of total slots at MEX after destroying a partially built new airport in close proximity to MEX that would have provided ample capacity.  As a result, meaningful new entry at MEX, which had remained difficult, now became impossible.  To permit antitrust immunity "in a market that the [Government of Mexico] has closed effectively and substantially to new entrants would mean that the Department has given a license for legalized collusion among partners that control almost 60 percent of operations at the fourth-largest gateway to and from the United States."  Ex. B at 19.  Given the sorry state of competition at MEX and resulting competitive advantages of the JV, the Department's termination of approval of the JV and of its antitrust immunity was both lawful and consistent with the

10

Department's public interest mandate from Congress. Delta's and Aeromexico's objections, which are focused on their private interests, are insubstantial and misdirected.

First, Aeromexico claims that the Department in terminating JV approval and antitrust immunity wrongly looked only at Mexico's noncompliance with the U.S.-Mexico Air Transport Agreement instead of the state of competition at MEX and the competitive effects of the JV. Mot. 11. As the Department's orders from 2016 to the present make clear, however, the Department has kept its eye on the state of competition at MEX as required under the Federal Aviation Act. The state of competition unfortunately has continued to be impaired, and that was the basis of the Department's Final Order. To be sure, the Government of Mexico's actions in contravention of the Air Transport Agreement have significantly contributed to the dire state of competition at MEX, as the Department's orders for years have pointed out. But to claim, as Aeromexico does, that the Department's description of what is causing the harm at MEX is the core of the Department's inquiry, is to confuse cause with effect.

11

Similarly unsound is Aeromexico's claim that the Final Order insufficiently examined the state of competition at MEX.  Mot. 8-9.  An agency need only conduct an examination of economic effect that is appropriate for the circumstances.  *See Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016) (an agency is not required to "conduct a rigorous, quantitative economic analysis unless the statute explicitly directs it to do so") (citation omitted); *cf. Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 779, 781 (1999) (not all analyses of competitive effects under antitrust laws "call for the fullest market analysis"; "what is required" is "an enquiry meet for the case").  And the circumstances here are that the Department in 2016, after a careful analysis, found that Delta and Aeromexico had slot dominance at MEX and that opaque governmental slot administration at MEX made new entry needed, but too difficult.  As the Final Order amply shows in detailed analysis and findings, those conditions remain a concern.  Indeed, they have worsened due to the Mexican government's confiscation of a large number of MEX slots— which Aeromexico (and Delta) do not appear to dispute.  And under these circumstances, there was no need for further Department examination of economic effect.

12

In this regard the Final Order properly considers not only present market conditions but also potential future competition. 49 U.S.C. § 40101(a)(6) "instructs the Department, in deciding whether to confer immunity, to . . .plac[e] maximum reliance on competitive market forces and on actual and potential competition." *ABC Aerolineas, S.A. de C.V. v. United States Dep't of Transp.*, 747 F. App'x 865, 872 (D.C. Cir. 2018) (cited by Aeromexico) (upholding the Department's use of its authorities to address competition issues at MEX). Moreover, 49 U.S.C. § 40101(a)(10) requires the Department to consider "avoiding unreasonable industry concentration, excessive market domination, monopoly powers, *and other conditions that would tend to allow* at least one air carrier or foreign air carrier unreasonably to increase prices, reduce services, or exclude competition in air transportation" (emphasis added). By considering potential competition, which necessarily includes anticipated future market conditions, the Final Order does not engage in impermissible speculation.

Moreover, contrary to Aeromexico's contention (Mot. 13-15), the Final Order does not suffer from inconsistency or contradiction. That the Department has focused on U.S.-MEX markets, while the JV also

13

covers other markets (i.e., routes) between the United States and other

Mexican cities is not a problem.  Under the antitrust laws, it is perfectly

appropriate to focus on one geographic market when a merger or

collaboration adversely affects competition only in that market, even if

the merging or collaborating firms compete in more than one

market.  *See*, *e.g.*, *United States v. Am. Airlines Grp., Inc.*, 121 F.4th

209, 219 (1st Cir. 2024) (output reduction on a handful of routes made

broader airline joint venture unlawful); *United States v. Anthem, Inc.*,

855 F.3d 345, 367-69 (D.C. Cir. 2017) (anticompetitive effects in

Richmond, VA sub-market alone warranted enjoining merger spanning

multiple markets).  Here, from the original 2016 approval order to the

2025 Final Order, the key market with the most competition at stake

has been U.S.-MEX, which itself constitutes multiple markets between

U.S. points to, from, and via MEX.[5]  As the leading international

gateway between Mexico and the United States and the preeminent

---

[5]That the Department, at the carriers' request, chose also to look
at growth in a broader U.S.-Mexico market (compare Mot. 14-15 with
Final Order at 23-24) does not detract from the propriety of the agency's
focus on U.S.-MEX and the obvious competition problems there.

connecting hub in Mexico for the JV, competition at MEX impacts competitive access and conditions in markets "beyond" MEX—as the JV parties argued in their initial application for antitrust immunity.

Aeromexico also contends that the Department "invented an extra-statutory threshold requirement for approval of the Joint Venture" in the form of an Open Skies agreement (Mot.12).[6]  The issue here, however, is not approval of the JV but the Department's termination of a prior approval and associated grant of antitrust immunity.  So whether the Department considers such an agreement a requirement for approval or renewal is irrelevant.  *See* Ex. A at 30-31 (making no decision on the airlines' *de novo* application for immunity).

In any event, the Department did not base its decision on whether there is an Open Skies agreement.  Instead, "Mexico's violations of the U.S.-Mexico Air Transport Agreement, an Open Skies agreement by its terms, inform the Department's consideration of the pertinent statutory factors," and the Department based its decision on "an overall analysis

---

[6]Delta agreed in a separate proceeding that antitrust immunity should not be granted "without a full open skies agreement."  Ex. B at 15 n.63.

of the statutory factors as applied to the joint venture." Ex. A at 17-18.

What the Department seeks as a matter of sound competition policy are

open-market *conditions*, i.e., "among other things, open entry, market-

based pricing, and open route rights." *Id.* at 17.  Open Skies is an

organizing principle, or sometimes a shorthand, for a set of conditions

that establish a pro-competitive regulatory framework where market

forces, not government intervention, determine market outcomes. *See*

*id.* at 2-3, 10 (referring to "elements" of an Open Skies agreement).

These conditions typically are embodied in an Open Skies agreement,

but the paper agreement alone is not sufficient because, as shown by

this case, the conditions must be present "in practice." *Id.* at 17.

To the extent that the Department evaluates a foreign

government's compliance with an Open Skies agreement, the need for

that evaluation is grounded in statute.  First, the Secretary cannot

approve a joint venture without first finding that it is "not adverse to

the public interest" and cannot make a grant of immunity without first

finding that such action is "required by the public interest."  49 U.S.C.

16

§§ 41309(b), 41308(b).[7]  A public interest standard confers broad

discretion on the Department.[8]  As discussed more fully *infra* (C),

competition is the fundamental national policy of commerce in this

country, and maintaining and promoting competitive markets therefore

is manifestly in the public interest.  The extent to which a foreign

government meets its obligations under an Open Skies agreement may

reveal or explain the extent to which it, in practice, enables market

forces to dictate routes, capacity, new entry, and competitive pricing, as

illustrated by this case.  To administer its statutory authorities, the

Department must examine not just the effects of a proposed joint

venture but also the regulatory and competitive environment in which

---

[7]*See also* 49 U.S.C. § 40105(b)(1)(B), which requires the Department, when considering negotiations with a foreign country concerning air navigation, to "consider applicable laws and requirements of a foreign country."

[8]*Cf. United States v. E. Air Lines Inc.*, 792 F.2d 1560, 1563 (11th Cir. 1986) (under 49 U.S.C. §§ 1421-1432, "[t]he Secretary of Transportation is empowered to grant exemptions from any rule or regulation if that official finds the action to be in the public interest"); *Dilley v. Nat'l Transp. Safety Bd.*, 49 F.3d 667, 669 (10th Cir. 1995) (FAA has "broad discretion" to suspend a pilot certificate if the Secretary determines that the "public interest" so requires); *Air Line Pilots Assoc. Int'l v. Dep't of Transp.*, 791 F.2d 172, 174 (D.C. Cir. 1986) (Civil Aeronautics Board "is granted broad discretion to advance its view of the public interest").

it will operate, to ensure that there will be adequate competition to counteract the harmful effects from an antitrust-immunized joint venture between two formerly competing airlines and to guarantee that any anticipated public benefits will be realized.

Second, 49 U.S.C. § 41309(b)(1) provides that the Secretary "shall disapprove" or, "after periodic review, end approval of" a joint venture agreement that "substantially reduces or eliminates competition." A foreign government's compliance with an Open Skies agreement is relevant to determining whether that government has given the joint venture competitive advantages that enable it to reduce or eliminate competition. In this case, Mexico's lack of compliance with important parts of the U.S.-Mexico Air Transport Agreement creates anticompetitive conditions that give the JV unfair competitive advantages that it otherwise would not have.

Delta for its part complains that the Department unfairly gave the JV disparate treatment from allegedly similar joint ventures operating in the U.S.-Tokyo-Haneda Airport ("HND") market (Mot. 11-14). While it is true that an agency should treat similar situations similarly, it is equally true that an agency may properly treat dissimilar situations

18

dissimilarly.  On undisputed facts, the competitive conditions at HND are significantly different from those at MEX—and have been from the start.  At HND the Department found no need to impose a five-year limitation on its grant of antitrust immunity to an airline joint venture or to require that joint venture to divest large numbers of slot pairs.  By contrast, the Department's concern about entry barriers and the competition situation at MEX required both of these conditions to be met on initial approval of the JV.

Equally important, the Government of Japan did not have inadequate slot administration rules, as the Government of Mexico did and still does.  And the U.S. Government *agreed* to the procedures for capacity allocation at HND and secured access for multiple U.S. carriers, including Delta, when it signed the Open Skies agreement with Japan, as compared to Mexico's unilateral actions.  Nor did the Government of Japan make competitive conditions worse by confiscating slots at HND, while the Government of Mexico did just that at MEX.  In fact, Japan has continually expanded international capacity and competition at HND, but Mexico has done the opposite at MEX.

19

The same dissimilarity applies to the competitive situations at Lisbon and London-Heathrow airports.  As the Final Order explains:

> *[t]his is the only matter* in which there are established facts and circumstances to show that the foreign partner, in this case the [Government of Mexico], is unacceptably distorting competition in a manner that directly undermines the findings of previous orders approving and granting [immunity] in the relevant markets.

Ex. A at 21 (emphasis added).  In short, the U.S.-MEX market involved unique circumstances, and the Department's treatment of it as such was both lawful and sound competition policy.

With respect to the air cargo services between the United States and Mexico, the Department properly considered the advantage that Mexico's prohibition of all-cargo operations at MEX confers on Delta and Aeromexico as authorized "combination" carriers that can carry both passengers and belly-cargo, that can coordinate cargo operations under the immunized JV, and that now face no competition from all-cargo carriers at MEX.  Delta does not dispute that since the prohibition "Delta and Aeromexico's cargo share for U.S.-MEX has dramatically increased to 73 percent."  Ex. A at 20.  Nor does Delta dispute that Aeromexico has the advantage of being "the only hubbing carrier in

20

Mexico and MEX and, as the largest slot holder at MEX, serves the most destinations throughout the country. No other cargo carrier can replicate that network." *Id.*; *see also* Ex. B at 21. These facts support the Department's "concern[] about maintaining a grant of [immunity] to Aeromexico under these circumstances." Ex. A at 20.[9]

Finally, Delta argues that the Department should have delayed action "until the competitive impact of the Government of Mexico's recent actions is fully realized" (Mot. 18). But the Government of Mexico has not lifted the ban on all-cargo carriers at MEX. The Final Order also explains that the process of returning confiscated slots to U.S. carriers "is an evolving situation and certain critical details with respect to how the process will work and what the capacity picture at MEX will look like . . . remain unanswered." Ex. A at 31. And the

---

[9]Delta cites a reference in the Final Order to "overall connections beyond MEX" (Ex. A at 24) and complains that the Department thereby considered connections beyond Mexico that are outside the scope of the JV. But that section of the Final Order focuses on rebutting Delta and Aeromexico's claim to have increased connecting traffic to destinations *within Mexico*. The Department's data analysis suggests that the Government of Mexico's actions have encouraged the JV to "protect[] high-end, nonstop [origin and destination] revenue rather than providing more capacity . . . involving Mexican domestic segments operated by Aeromexico." *Id.*

Government of Mexico's new decree regarding slots "did not address transparency concerns with respect to capacity declarations at constrained airports in Mexico." *Id.* In sum, the recent actions by Mexico, while positive, "fall well short of addressing the competitive issues raised by the operation of an immunized joint venture." *Id.*

The APA only requires that an agency's choice of action be reasonable, not "the best one." *Nat'l Ass'n for Better Broad. v. FCC*, 849 F.2d 665, 669 (D.C. Cir. 1988). It was reasonable for the Department to refuse to allow the anticompetitive effects of the JV, under the current market conditions, to continue potentially for years based on the possibility that the Government of Mexico might take further action subject to no clear timeline.

## B.    Delta's and Aeromexico's Claims of Irreparable Harm Are Overblown.

Delta and Aeromexico have known since 2016 that the Department's approval was narrow, limited to five years, and subject to disapproval at any time. And they have known since the 2024 show cause order that the Department had serious concerns regarding whether competitive conditions could justify a continued grant of antitrust immunity. The carriers had ample time to prepare for and

22

mitigate the consequences of winding down the JV. Thus, their claim of surprise at having to unwind the JV "in little more than three months" (Delta Mot. 1) rings hollow.

Petitioners' claimed financial harms and other private equities are entitled to little weight. The airlines liken the JV to a "virtual merger" (Delta Mot. 20). But in merger cases, courts considering requests for stays and injunctions pending appeal recognize that private equities do not outweigh the public interest in promoting competition. *See, e.g.*, *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1225 (11th Cir. 1991) ("While it is proper to consider private equities in deciding whether to enjoin a particular transaction, we must afford such concerns little weight."); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 352 (3d Cir. 2016) (private equities "are not to be afforded great weight"); *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980) ("private interests must be subordinated to public ones"). Additionally, "self-imposed costs," such as "break-up" fees and other voluntarily-imposed contractual terms in a merger agreement, "are not properly the subject of inquiry on a motion for stay." *Cuomo v. United States NRC*, 772 F.2d 972, 977 (D.C. Cir. 1985).

23

Additionally, claimed injuries cannot be remote or speculative. *See Northeastern Chapter v. Jacksonville, Florida*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citation omitted).  Aeromexico acknowledges that "the future is unpredictable in connection with marketing and rebranding success, pricing, and potential renegotiation of agency and corporate agreements" and that ending the JV "may require negotiating separate agreements" about slots with certain airports (Mot. 18-19).  These claimed harms are too uncertain and speculative to be credited.

Delta and Aeromexico also claim that they will have to renegotiate contracts with various parties.  But because the outcome of those negotiations is unknowable at present, any claimed costs imposed by revised contracts are speculative.  Delta and Aeromexico also allege a loss of customer goodwill, but this is also speculative given that both airlines likely will continue serving the Mexican markets as members of the SkyTeam alliance with cross-ownership and common board representation.

Delta and Aeromexico have other partnerships and alliances that must compete at arm's length and therefore have processes in place for scheduling, pricing, revenue/capacity management, and other core

24

activities with partners in the absence of antitrust immunity.
Unwinding the JV only requires that airline management begin
operating the competitively sensitive aspects of the businesses under
different, but existing processes and infrastructure that the airlines
already use in everyday business planning and operations with alliance
partners with whom they do not have antitrust immunity.

In any event, withdrawing approval of and antitrust immunity for
the JV would not end all cooperation between Delta and Aeromexico
and would not affect important aspects of that cooperation. Delta
maintains its 20 percent equity stake in Aeromexico, and the two
partners "will continue to have every economic incentive to cooperate in
the U.S.-Mexico market even without [antitrust immunity]." And even
without immunity, they will still be able to provide "codesharing,
frequent flyer program cooperation, and other joint marketing activities
(activities they have engaged in for more than 30 years)" under a non-
immunized JV. Ex. A at 29. The Department considered the airlines'
asserted harms and found that "[t]he estimates of harm the companies
provide do not assume such ongoing cooperation and are, at best,
inflated, especially since both carriers engaged in such cooperation prior

to obtaining [antitrust immunity]." *Id.*

## C.    The Balance of Harms and the Public Interest Favor Ending the JV and Restoring Open Market Competition.

The Final Order explains that the Government of Mexico's actions have conferred unfair anticompetitive advantages on Delta and Aeromexico that have harmed their competitors, competition, and consumers.  Among other things, market distortions "have reduced the economic incentive for the Delta/Aeromexico joint venture to pass along to consumers economic benefits in the form of better services, lower prices, and increased capacity on hub-to-hub routes providing additional seats for connecting markets."  Ex. A at 5.  A stay would perpetuate these negative effects:  "Delays in winddown and termination of the grant of [antitrust immunity] only compound the unfairness and actual and potential harm to other carriers and consumers."  *Id.* at 32-33.

The Department has "conducted this proceeding as deliberately and patiently as possible to avoid any unnecessary impacts," Ex. A at 29, but "the actual and potential harm occurring in the U.S.-Mexico market, as well as the benefits of restoring fair and open competition . .

. outweigh the reliance interests of the joint venture partners and is more responsive to the statutory standards in Sections 41309 and 41308, which focus on the public interest." *Id.*

Restoring fair competition immediately, both between the two airlines and their competitors and between Delta and Aeromexico themselves, is manifestly in the public interest. Competition is "the fundamental principle governing commerce in this country." *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 398 (1978). The Sherman Act "unequivocally laid down" a policy that competition "yield[s] the best allocation of economic resources, the lowest prices, the highest quality and the greatest material progress." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958); *see also Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) ("It is competition . . . that [the antitrust] statutes recognize as vital to the public interest."). Antitrust immunities are deviations from this fundamental national policy, are legally disfavored, and therefore even express statutory immunities are "to be narrowly construed." *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979).

## Conclusion

Petitioners' motions for stay should be denied.

November 3, 2025                          Respectfully submitted,


                                          /s/ Steven J. Mintz

                                          Steven J. Mintz

                                          DANIEL E. HAAR
                                          ROBERT B. NICHOLSON
                                          STEVEN J. MINTZ
                                          *Attorneys*

                                          United States Department of
                                          Justice
                                          Antitrust Division
                                          950 Pennsylvania Ave., NW
                                          Washington, DC 20530
                                          Telephone: (202) 353-0256
                                          Email: steven.mintz@usdoj.gov

                                          CHARLES E. ENLOE
                                            Assistant General Counsel

                                          ERIN D. HENDRIXSON
                                            Senior Trial Attorney

                                          United States Department of
                                          Transportation
                                          1200 New Jersey Ave., S.E.
                                          Washington, D.C.  20590

                                          *Counsel for Respondent U.S.
                                          Department of Transportation*

28

## CERTIFICATE OF COMPLIANCE

I hereby certify, this third day of November 3, 2025, that the foregoing Opposition to Motions for Stay Pending Appeal complies with the application typeface, type style, and type-volume limitations. This Opposition was prepared using a proportionally spaced type (New Century Schoolbook, 14-point font) and consists of 5,192 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare the Opposition.

/s/ Steven J. Mintz

Steven J. Mintz

*Attorney for the U.S. Department of Transportation*

29

## CERTIFICATE OF SERVICE

I, Steven Mintz, certify that this third day of November 3, 2025, I caused a true and correct copy of the foregoing to be served upon all counsel of record, to include the below, via electronic mail.


Eugene Scalia
Amir C. Tayrani
Christine M. Buzzard
Michael P. Corcoran
GIBSON DUNN & CRUTCHER LLP
1700 M Street, NW
Washington, D.C. 20036-4504
escalia@gibsondunn.com

*Attorneys for Delta Air Lines, Inc.*

Matthew J. MacLean
Charles F. Donley II
Edward W. Sauer
Nicole Steinberg
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, NW
Washington, D.C. 20036
matthew.maclean@pillsburylaw.com

*Attorneys for Aerovias de Mexico S.A. de C.V.*

/s/Steven J. Mintz

Steven J. Mintz
*Attorney for the U.S.*
*Department of Transportation*

EXHIBIT A

Order 2025-9-8
Issued: September 15, 2025



**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 15th day of September 2025

| | |
|---|---|
| Joint Application of<br><br>**DELTA AIR LINES, INC.**<br>**AEROVIAS DE MEXICO, S.A. DE C.V.**<br><br>Under 49 U.S.C. §§ 41308 and 41309 for<br>Approval of and Antitrust Immunity for<br>Alliance Agreements | **Docket DOT-OST-2015-0070** |

**FINAL ORDER**

By this Order, the U.S. Department of Transportation (the Department) makes final the proposed decision in Order 2025-7-12 to end the price- and capacity-setting joint venture operated by Delta Air Lines, Inc. (Delta) and Aerovias de Mexico, S.A. DE C.V. (Aeromexico). Specifically, the Department terminates approval of the Delta/Aeromexico joint venture agreements under 49 U.S.C. § 41309 and associated grant of antitrust immunity (ATI) under 49 U.S.C. § 41308. This termination is effective as of January 1, 2026.

This action is necessary because of ongoing anticompetitive effects in U.S.-Mexico City markets that provide an unfair advantage to Delta and Aeromexico as two predominant competitors and create unacceptable actual and potential harm for stakeholders, including consumers. These anticompetitive effects have broader implications beyond Mexico City, affecting competition for passengers and cargo operations in additional markets between the United States and Mexico.

The Government of Mexico (GoM) continues along a path of market intervention and distortion that adversely affects competition in the U.S.-Mexico air services market and is contrary to the U.S.-Mexico Air Transport Agreement in which the GoM made a "commitment to promote and facilitate an international aviation system based on competition among airlines in the marketplace."[1] As documented in this proceeding, the GoM confiscated slots, prohibited all-cargo operations at Mexico City's primary airport, Benito Juarez International Airport (MEX),

---

[1] Air Transport Agreement Between the Government of the United States of America and the Government of the United Mexican States (Dec. 18, 2015) at 1, *available at* https://20092017.state.gov/e/eb/rls/othr/ata/m/mx/250782.htm.

perpetuated a slot allocation regime that does not meet international standards and advantages Aeromexico, and generally demonstrated that, at any time, the GoM may upset aviation operations and long-term commercial planning by airlines through arbitrary action.[2]

In such an environment, it is inappropriate for the Department to continue a grant of ATI because there is inadequate competition in the market. Significant problems become not just possible, but likely: higher fares in some markets, stifled innovation, reduced capacity (including frequencies and new routes), "doing business" challenges for U.S. carriers due to government intervention, and other impediments for incumbent competitors and new entrants. The Department is observing some of these impacts in the U.S.-Mexico market already and the anticompetitive impacts are exacerbated by the joint venture. An open international regulatory framework consistent with Open Skies principles, in law and practice, remains essential, pursuant to 49 U.S.C. §§ 41309 and 41308, for obtaining approvals of, and maintaining grants of antitrust immunity for, price- and capacity-setting joint ventures.

This action is the culmination of an objective factual assessment based upon nearly a decade of persistent competition issues, effectuated through a transparent process of reviewing joint venture alliances under Sections 41309 and 41308, applying rigorous standards that the joint venture partners must continually meet. The Department is authorized by Congress to review developments in the marketplace periodically and act as warranted to safeguard competition in domestic and international markets.[3]

The Department is not foreclosing the possibility of an improved competitive environment in the future. The GoM has begun engaging with the Department to discuss U.S. concerns stemming from Mexico's noncompliance with the U.S.-Mexico Air Transport Agreement. However, it will take time before the Department is able to assess the GoM's willingness and ability to come back into and remain in full compliance with the U.S.-Mexico Air Transport Agreement, and for competitive market conditions to improve in the U.S.-Mexico market.

Even without a grant of ATI, Delta and Aeromexico have considerable flexibility to compete in the market and to work together to maintain and enhance their joint offerings. Delta's 20 percent equity stake in Aeromexico will be a powerful economic incentive to continue cooperation subject to the antitrust laws. If conditions improve, the Department will take those improved conditions into account at that time.

## I.     BACKGROUND

In 2015, the United States and the GoM agreed to a liberalized air services regulatory framework, with the resulting U.S.-Mexico Air Transport Agreement containing all elements of

---

[2] *See* Order to File Schedules, Order 2025-7-11 (July 19, 2025), DOT-OST-2025-0436-0001 (hereinafter referred to as "Order 2025-7-11").

[3] *See e.g.,* 49 U.S.C. § 41309 (b)(1) (the Secretary shall "after periodic review, end approval of, an agreement … that substantially reduces or eliminates competition…").

an Open Skies agreement as defined by the Department.[4]  Even before the agreement became effective, the United States indicated to the GoM and interested parties that each application for ATI is considered on its merits: "[b]ecause the DOT must, by statute, take into account the competitive market conditions contemporaneous with the filing of an ATI application, carriers should be aware of the need to take into account the availability of all essential commercial rights … in the framework of a modernized agreement."[5]

In 2016, the Department completed a lengthy review and granted a request by Delta and Aeromexico to launch a joint venture in the U.S.-Mexico market with a grant of ATI.  The joint venture is an integrated commercial arrangement enabling the joint venture partners to coordinate prices, capacity, and operations.  The full history of this matter, captured in nearly a decade of filings in this docket, is recited in Order 2025-7-12 and summarized as follows:

- ***First Application***: On March 31, 2015, Delta and Aeromexico applied for approval of, and a grant of ATI for, a joint venture providing integrated services between the U.S. and Mexico.  The Department paused the proceeding pending the implementation of an Open Skies agreement between the U.S. and the GoM.  During consideration of the application, the Department identified and committed to the record several significant competitive concerns regarding concentration at MEX, problematic competitive behaviors by incumbents at MEX, and anticompetitive slot administration practices by Mexican authorities.

- ***Approval with Conditions***: Based on concerns in the record, the Department identified a narrow pathway by which Delta and Aeromexico could obtain a grant of ATI, subject to strict conditions.  Among other factors, the Department was concerned about the slot allocation mechanism at MEX and its impact on competition and the realization of public benefits otherwise unattainable.  The conditions included a slot divestiture, limiting the duration of the approvals to five years, and language clarifying that the Department could review and terminate the ATI at any time.  Delta and Aeromexico were required to submit and obtain approval of a *de novo* application as a requirement to maintain ATI going forward.  The Department memorialized these conditions in a show cause order, with notice and an opportunity for comment, and a final order.  Delta and Aeromexico accepted the conditions on November 30, 2016[6] and were given approval of, and a grant of ATI for, their joint venture on December 14, 2016, for a limited time with an expiration date.[7]

---

[4] *See* Supplemental Order to Show Cause, Order 2025-7-12 (July 19, 2025)  at 15 and footnote 64 (hereinafter referred to as "Order 2025-7-12").
[5] Order 2025-7-12 at 4, citing U.S.-Mexico Memorandum of Consultations (Nov. 7, 2014), U.S. Department of State, *available at* https://2009-2017.state.gov/e/eb/rls/othr/ata/m/mx/250782.htm.
[6] Reply of the Joint Applicants (Nov. 30, 2016), DOT-OST-2015-0070-0091.
[7] Final Order, Order 2016-12-13 (Dec. 14, 2016), DOT-OST-2015-0070-0096.

- **Extension of the Expiration Date**: In December 2020, by Order 2020-12-18, due to the COVID-19 pandemic and other reasons, the Department agreed to postpone the expiration of the ATI.  The Department stated that the "grant of antitrust immunity will continue in effect through the Department's review of the Joint Applicants' *de novo* application."[8]

- **Second Application**: On March 29, 2022, Delta and Aeromexico filed a *de novo* application.  The Department reviewed the application and determined to suspend the procedural schedule.[9]  The suspension did not terminate the existing ATI, which continued in effect pending further consideration of the issues.  The *de novo* application was filed at a time when competitive concerns in the market were increasing significantly.  Order 2025-7-12 explains that, among other things, the Federal Aviation Administration had determined that the GoM was not providing aviation safety oversight in accordance with international standards and had frozen the service offered by Mexican carriers to existing levels, lessening competition.[10]

- **The GoM's Non-Compliance with the U.S.-Mexico Air Transport Agreement and Unilateral Changes to the Regulatory Framework**: Beginning in 2022, the GoM took a series of measures that restricted the U.S.-Mexico air services market, calling into question the propriety of the continued approval of the joint venture and undermining the Department's findings in its ATI orders.  These actions were documented by Notice in Docket DOT-OST-2021-0152, Order 2024-01-17 in this docket and again in Order 2025-7-11 in Docket DOT-OST-2025-0436 and Order 2025-7-10 in Docket DOT-OST-2025-0435, the former having been expressly cited and relied upon in Order 2025-7-12 in this docket.

- **Early Proposal to Withdraw the Grant of ATI**: In January 2024, after reviewing the *de novo* application and considering the issues then affecting the market, the Department proposed to withdraw its grant of ATI from Delta and Aeromexico by dismissing their pending application.  Order 2024-01-17 identified the Department's concerns, noting the decree by the GoM prohibiting all-cargo operations at MEX, the confiscation of U.S. carrier slots, and the unreliable and nontransparent slot administration practices that reduced capacity and restricted new entry at MEX.

Over the subsequent 18 months, the Department continued engagement with the GoM concerning its violations of the bilateral agreement, but to no avail.  The adverse conditions not only continued but worsened.[11]

---

[8] Order 2020-12-18 (Dec. 17, 2020) at 5, DOT-OST-2015-0070-0235.

[9] *See* Notice (April 11, 2022), DOT-OST-2015-0070-0239; *see also* Order 2025-7-12 at 9-10.

[10] *See* Order 2025-7-12 at 9-10.

[11] *See, e.g.*, Order 2025-7-10 (July 19, 2025) (documenting that the GoM began impairing operating rights of charter and cargo carriers), DOT-OST-2025-0435-0001.

4

### A. Supplemental Show Cause Order 2025-7-12

On July 19, 2025, the Department issued a detailed Supplemental Show Cause Order proposing to end the Delta/Aeromexico joint venture previously approved in 2016. In Order 2025-7-12, the Department cited a comprehensive list of authorities authorizing the Department to review regulatory conditions on an ongoing basis.[12] The Department explained that the applicable statutes for reviewing international joint ventures are 49 U.S.C. §§ 41309 and 41308 and that the Department's critical assessment of the international regulatory framework in relevant markets is firmly grounded in the statutory standards.

The Department established that circumstances have changed in the U.S.-Mexico City and broader U.S.-Mexico markets since the initial approval of the Delta/Aeromexico joint venture, and that significant competition concerns exist that create actual and potential harm for U.S. stakeholders, including consumers.[13] The Department outlined the competition-limiting measures taken by the GoM, including by reference to Order 2025-7-11, which required Mexican carriers to begin filing schedules. The Department explained the distortions in competition that are occurring and are likely to continue occurring due to inadequate competition in the market. Order 2025-7-12 described how these distortions have reduced the economic incentive for the Delta/Aeromexico joint venture to pass along to consumers economic benefits in the form of better services, lower prices, and increased capacity on hub-to-hub routes providing additional seats for connecting markets.

The Department conducted two analyses using publicly available information and market data widely available to interested parties: the Analysis of Changed Circumstances, which included a review of detrimental competitive effects and loss of public benefits, and the Additional Factual Assessment of Competitive Conditions. Relying upon the Analysis of Changed Circumstances, the Department applied the statutory standards in 49 U.S.C. §§ 41309 and 41308 to the facts and circumstances in the record:

> Based on these facts and circumstances, the Department cannot clear the statutory hurdles in section 41309 to approve, or maintain approval of, a significant [joint venture] agreement; rather, the statute guides us to 'after periodic review, end approval of … an agreement…that substantially reduces or eliminates competition.'

> [T]he Department concludes tentatively that its 2016 findings and conclusions supporting approval of the joint venture under 49 U.S.C. § 41309 and a grant of antitrust immunity for Delta and Aeromexico under 49 U.S.C. § 41308 are no longer valid. Consistent with this conclusion, under section 41309, the Department disapproves tentatively the [joint venture] agreement because continuation would be adverse to the public interest. Under section 41308, the

---

[12] *See* Order 2025-7-12 at 12-14 ("All of the statutes of general applicability strongly counsel the Department to remain vigilant and dynamic in its assessment and view of the public interest.").
[13] Order 2025-7-12 at 2-3, 10, 18-28.

Department determines tentatively that a grant of ATI is not required by the public interest.[14]

Before drawing tentative conclusions, the Department considered alternative approaches. Order 2025-7-12 documented the Department's consideration of (1) maintaining the ATI while waiting for events to change, (2) abandoning the earlier proposal to withdraw the grant of ATI and letting international negotiations play out, (3) carving out Mexico City and/or cargo from the scope of the ATI grant, and (4) using other means, such as 49 U.S.C. § 41310, to address competitive concerns. The Department weighed these alternatives in two pages of discussion and highlighted language in the ATI statutes providing that the Secretary shall disapprove a joint venture that substantially reduces competition unless he finds that (1) the agreement is necessary to meet a serious transportation need or to achieve important public benefits, and (2) the transportation need cannot be met or those benefits cannot be achieved by reasonably available alternatives that are materially less anticompetitive. In the context of this case, those reasonably available alternatives may include non-immunized forms of cooperation between Delta and Aeromexico, such as loyalty program coordination and code sharing.

The Department explained that there were two proceedings involving Delta and Aeromexico. The first proceeding was the review of the existing approval and grant of ATI as extended through the pendency of the Department's review, which may result in modification or termination of the ATI as warranted.

The second proceeding was initiated with the *de novo* application that the Department directed Delta and Aeromexico to file if they wished to obtain renewed approval of, and a grant of ATI for, the joint venture agreements to extend beyond the initial limited term. When the new application was filed in 2022, the Department suspended the procedural schedule via a Notice issued April 11, 2022, until the record was substantially complete. Order 2025-7-12 did not change this procedural posture. Thus, the *de novo* application remains suspended under the Department's previously issued Notice.[15]

After the Department issued Order 2025-7-12, Delta and Aeromexico, supported by several interested parties, moved for additional time to respond. Delta and Aeromexico asked for four additional weeks. The Department granted them one additional week over and above the normal 14-day comment period, stating that a longer extension risks the possibility of unnecessarily prejudicing parties affected by the competitive issues in the U.S.-Mexico market.

---

[14] Order 2025-7-12 at 25, 38.
[15] Notice (April 11, 2022), DOT-OST-2015-0070-0239.

### B. Comments on the Supplemental Show Cause Order 2025-7-12

The Department invited public comments on Order 2025-7-12.[16] **Delta and Aeromexico** continue to object strenuously to the Department's proposed action, defending their joint venture as proconsumer and procompetitive. They contend that their joint venture generates nearly 4,000 U.S. jobs, more than $310 million of U.S. gross domestic product (GDP), and more than $200 million of annual tourism spending in the United States. They stress that if their joint venture is unwound, those economic benefits will disappear, including that up to $800 million in annual consumer benefits could evaporate, up to two dozen routes could be canceled, smaller aircraft could replace current narrowbodies, and tens of thousands of jobs could be threatened. The two joint venture partners are concerned that the Department's approach would punish a U.S. company and a Mexican airline with significant U.S. ownership, while strengthening the hand of the Mexican state-sponsored airline, Mexicana. They also argue that the Department has failed to apply the relevant statutory standards and violated the Administrative Procedure Act.

The **Asociacion Sindical de Pilotos Aviadores de Mexico**, representing Aeromexico's pilots, opposes the Department's proposed action, highlighting that current marketplace activities produce significant labor, economic, and public benefits for Americans and Mexicans alike.

While not taking a position on the merits of the joint venture, **Allegiant Air and Viva Aerobus** express support for the Department's approach but also serious reservations insofar as the two carriers may be unable to develop a planned immunized alliance in the U.S.-Mexico market. Allegiant and Viva, which also have a request for ATI pending, appreciate that every application for approval of, and ATI for, a joint venture should be assessed on the specific facts, and they agree with the Department that the effectiveness of the Open Skies relationship is an important factor in the statutory competitive analysis. They submit that any failings of the Delta/Aeromexico joint venture would not be found in a competing joint venture by Allegiant and Viva. Allegiant and Viva state that the "ongoing delay in engaging in a fact specific assessment of the Allegiant/Viva alliance" is not only unfair but also anticompetitive and costly to consumers. Allegiant and Viva ask the Department to address any "prerequisites" of U.S.-Mexico cooperation expeditiously and to cease preventing greater competition in markets outside of Mexico City, such as leisure or "beach" markets that would be served by an Allegiant/Viva alliance. In a subsequent pleading, Allegiant and Viva state that "Open Skies" is not a prerequisite.

The **Department of Justice, Antitrust Division (DOJ)** underscores the importance of open market access for airlines wishing to serve a route for ensuring competition and endorses the Department's approach of reviewing the international regulatory framework (*i.e.*, whether there is an Open Skies agreement in law and practice) as a threshold requirement in reviewing

---

[16] **Exhaustless Inc.** and **Steven P. Endres** posted documents raising issues and concerns outside the scope of the proceeding.

international airline alliances.  DOJ also supports the Department's tentative decision not to renew the grant of ATI for Delta and Aeromexico.

**American Airlines** supports the Department's "decisive actions" to promote vibrant trade with foreign countries on terms that allow U.S. companies to compete fairly.  Absent a properly functioning Open Skies agreement, American says, U.S. carriers may be systematically disadvantaged and forced to compete on unfavorable terms, subjecting them to higher costs and distorting competition – and this is occurring now in the U.S.-Mexico market, American affirms. American supports the Department's tentative decision as consistent with longstanding approaches.

**United Airlines** takes no position on the merits of the Department's proposal but argues that Delta and Aeromexico have drawn false equivalencies between competitive effects in Mexico City, caused in large part by the restrictive actions of the GoM, and competitive effects in other congested cities such as Lisbon or Tokyo.  United believes that, in defending their joint venture, Delta and Aeromexico have ignored key distinctions in the operating and regulatory environment.[17]

## II.     STATUTORY FRAMEWORK

The Department reviews joint venture agreements involving foreign air transportation filed under 49 U.S.C. §§ 41309 and 41308 in accordance with its procedural regulations at 14 CFR Part 303. A person seeking approval of a transaction covered by 49 U.S.C. § 41309 may file an application.  Applications must be prepared and submitted consistent with the Department's procedures.  The applicant must state explicitly whether it seeks ATI under 49 U.S.C. § 41308.

When reviewing new requests, the Department undertakes a two-step process.  The first step, under Section 41309, involves determining whether the cooperation agreement is "adverse to the public interest," based on competitive factors (competitive effects analysis).  The Secretary shall approve the agreement if it is consistent with the public interest.  The Secretary shall disapprove, or after periodic review, end approval of, an agreement that substantially reduces or eliminates competition, unless the Secretary finds that the agreement is necessary to meet a serious transportation need or achieve important public benefits, and the transportation need cannot be met, or those benefits cannot be achieved, by reasonably available alternatives that are materially less anticompetitive.

The second step, under Section 41308, involves the request for ATI.  If the Secretary approves an agreement, he may exempt the parties to the agreement from the antitrust laws, when he decides it is required by the public interest, but only to the extent necessary to allow those parties to proceed with the transaction.  To determine whether an exemption is required by the public

---

[17] **JetBlue Airways** filed a letter in the docket, dated August 28, 2025, expressing concerns about airport access in markets where there are immunized alliances, including markets like Lisbon.  JetBlue indicates that the promise of an Open Skies policy is that new entrants and smaller carriers should not face barriers to entry, but rather should be able to succeed or fail in a competitive marketplace based on their commercial merit.  Embedded in JetBlue's letter is a motion for leave to file based upon good cause shown, which we grant.

interest, the Department conducts a detailed examination of public benefits (public benefits analysis). The Department's findings must be included in the final order approving or disapproving the agreement.

The Department has significant discretion to review past approvals and grants of antitrust immunity and to modify or revoke them as warranted. In its competitive analysis under Section 41309, the Department may modify, disapprove, or end any previously approved joint venture if, based on current facts and circumstances, the joint venture agreements have become adverse to the public interest, broadly defined, or they substantially reduce or eliminate competition without being necessary to meet a serious transportation need or to achieve important public benefits. In addition, in reviewing any ATI conferred previously in any Section 41309 transaction, the Department may at any time terminate or modify such a grant of ATI if it determines the ATI is not required by the public interest. Indeed, if the agreement under review is found to be adverse to the public interest under Section 41309, no grant of immunity under Section 41308 is possible. It was for that reason that the Department proposed to revoke the prior grant of ATI in Order 2025-7-12. After the Department found that the Delta/Aeromexico joint venture is adverse to the public interest (and substantially reduces competition) and must be disapproved, as a matter of law the prior grant of ATI must be revoked.

## III.    DECISION

After review of the objections, comments, and answers to objections on the record, the Department has decided to finalize the proposal in Order 2025-7-12, with some modifications, and end approval of and grant of ATI for the Delta/Aeromexico joint venture.

### A.    Explanation of the Decision

#### Changed Facts and Circumstances

The Department makes final the factual assessment from Order 2025-7-12, which incorporated by reference findings in Order 2025-7-11 describing the GoM's violations of the U.S.-Mexico Air Transport Agreement. Order 2025-7-12 identified significant and material changes to competitive conditions in U.S.-Mexico City and broader U.S.-Mexico markets in which the Delta/Aeromexico joint venture competes versus the Department's assessment in 2016 when the joint venture was initially approved and given a temporary grant of ATI. The following key facts and circumstances are firmly supported in the evidentiary record:

- Since 2022, the GoM has repeatedly distorted competition in the market in ways that are material to competition for passenger services, all-cargo services, passenger/combination services, entry into congested markets, predictability of entry across multiple markets, and with regard to ensuring a level playing field and equal opportunity to compete, including for airlines such as Delta and Aeromexico that operate with special permissions to coordinate prices and capacity without normal enforcement of the U.S. antitrust laws.[18]

---

[18] Order 2025-7-12 at 2, 18-19 (summarizing the GoM's actions and incorporating Order 2025-7-11).

- The GoM is not compliant with numerous provisions of the U.S.-Mexico Air Transport Agreement and thus is not acting consistently with all elements of a liberalized Open Skies agreement. These violations have deleterious implications for airline competition in the U.S.-Mexico market.[19]

- The competitive conditions in affected markets, at a minimum with respect to the GoM's ability to maintain a consistent and procompetitive regulatory framework, consistently have been poor for a number of years and have deteriorated further.[20]

- The Delta/Aeromexico joint venture includes price- and capacity-setting mechanisms that the parties would not implement without the approval of, and a grant of ATI from, the Department.[21]

- The Delta/Aeromexico joint venture has a predominant share of capacity in the U.S.-Mexico City market and a substantial share of the broader U.S.-Mexico market.[22]

- The Delta/Aeromexico joint venture partnership controls at least a predominant share of slots at MEX and has considerably more flexibility to adjust to adverse or changing circumstances at that airport or reductions in capacity than other competitors – even if those reductions also negatively impact Delta and Aeromexico.[23]

- Entry at MEX is severely restricted.[24] The slot administration process at MEX, and potentially other Mexican airports in the future, is non-transparent and needs reform to promote competition to and from Mexican gateways.[25]

- There are distortive effects in the market for cargo services to, from, and via Mexico City: all-cargo carriers were forced to absorb the cost of moving to new facilities involuntarily. Ongoing coordination between Delta and Aeromexico at MEX gives them commercial advantages in cargo carriage not available to their competitors by law.[26] Delta and Aeromexico have increased their share of a constrained and lucrative market for cargo services at MEX.[27]

---

[19] Order 2025-7-12 at 2, 18 and Objection of the JCA Partners to Supplemental Show Cause Order 2025-7-12 (Aug. 11, 2025) at 19 ("The JCA Partners do not dispute the Department's factual observations regarding the GOM's actions at MEX"), DOT-OST-2015-0070-0344 (hereinafter referred to as "Objection").

[20] Order 2025-7-12 at 19.

[21] Joint Application of Delta and Aeromexico for Renewed Approval of and Grant of Antitrust Immunity for Alliance Agreements (March 29, 2022) at 2 ("[C]losely integrated pricing, network planning, revenue management, joint sales, and other enhanced cooperation [are] made possible by the immunized JCA"), DOT-OST-2015-0070-236.

[22] Objection at 3 and Order 2025-7-12 at 32.

[23] Order 2016-11-2 at 15-17, Order 2016-12-13 at 16-18, and Order 2025-7-12 at 32.

[24] Order 2025-7-11 at 4 ("the GoM issued a Resolution on August 31, 2023, declaring MEX runway usage to be saturated and mandating that MEX operations be further reduced from 52 to 43 per hour effective with the Winter 2023/2024 traffic season"), DOT-OST-2025-0436-0001.

[25] Order 2025-7-12 at 19-20.

[26] Order 2025-7-12 at 2-3, 19, 21-22.

[27] Order 2025-7-12 at 22.

- Delta and Aeromexico have materially less incentive or ability to deliver public benefits that would not otherwise be possible without a grant of ATI given the restrictions at MEX and Aeromexico's hub at MEX.[28]

### Ending Approval Under Section 41309 and Termination of the Grant of ATI

The Department makes final its tentative conclusions that the findings from 2016 supporting the approval of the Delta/Aeromexico joint venture and the relevant agreements submitted under Section 41309 are no longer valid and that currently the joint venture substantially reduces or eliminates competition in relevant markets and is adverse to the public interest.

Order 2025-7-12 recounted the findings from the 2016 orders conditionally approving and making a temporary grant of ATI and provided a "cross-walk" showing how current facts and circumstances in the U.S.-Mexico market no longer support continuation of the ATI.[29] The Department affirms this review and determination.

Order 2025-7-12 also described detrimental competitive and public-benefits effects in sufficient detail to support a finding that the joint venture, in the context of current market and regulatory conditions, "substantially reduces or eliminates competition" as set forth in 49 U.S.C. § 41309. Order 2025-7-12 highlights the anticompetitive and distortive actions by the GoM, which are alone sufficient to support a conclusion under the statute that there is a substantial reduction of competition in relevant markets. However, the Department makes clear in Order 2025-7-12 that its decision rests on the materiality of the changing competitive conditions in which the Department would expect the joint venture to compete. The Department demonstrates a connection between the negative effects on competition caused by the GoM and further "downline" anticompetitive effects that the Department would expect from a price- and capacity-setting joint venture operating in those markets, especially in view of the scale achieved by Delta and Aeromexico and other particulars such as the carriers' commanding share of U.S.-MEX markets where entry is severely restricted. In brief, the Delta/Aeromexico joint venture exacerbates competitive concerns and materially contributes to a substantial reduction in competition.[30]

In Order 2025-7-12, the Department looked at practical impacts and documented competitive concerns supporting corrective action, which the Department affirms here:

- Delta and Aeromexico's predominant share ("almost 60 percent") at MEX, the fourth-largest gateway to the United States, creates the possibility for anticompetitive and efficiency-reducing outcomes such as reduced growth, decreased capacity for lower-yield connecting traffic, and exclusionary conduct.[31] The Department makes clear that these

---

[28] Order 2025-7-12 at 25-26.
[29] Order 2025-7-12 at 18, 24-27 (explaining that the findings from the 2016 approvals/grants of antitrust immunity were no longer valid and cross-referencing the specific findings with current evidence in the record).
[30] Order 2025-7-12 at 2-3, 19-28.
[31] Order 2025-7-12 at 19.

anticompetitive and efficiency-reducing effects are evident in potentially all U.S.-MEX markets actually or potentially served by Delta and Aeromexico in competition with other airlines, including, for illustration purposes, MEX-JFK, MEX-LAX, MEX-ORD, MEX-SEA, and MEX-BOS. These are relevant markets in which the lack of a procompetitive regulatory framework combines with the price- and capacity-setting flexibilities of a joint venture to yield serious and actionable concerns about the reduction of competition.

- Based on the GoM's interventionist and arbitrary capacity decisions in Mexico City, the Department sees a realistic possibility that the GoM could act in a similar manner at other congested gateways such as Cancun or Monterrey.[32]  The Department makes clear that in this regard all markets in the U.S.-Mexico market that could potentially be served by Delta and Aeromexico are of concern. For illustration purposes, CUN-JFK and CUN-BOS would be two such markets.

- The GoM's stalled and retrenched approach to slot administration creates actual and potential harm across many U.S.-Mexico markets, not just those serving MEX. The GoM confiscated slots on spurious and unsupported grounds, refused to implement reforms suggested by Mexico's competition authority, and called into question the principle of historical rights, fairness, and new entry. In the midst of this ongoing policy change by the GoM, Delta and Aeromexico maintain the largest share of slots at MEX and a history of successfully navigating challenges through means that are not available to other carriers. The approval of and grant of ATI for the joint venture enables Delta and Aeromexico to use scale and coordinated action to achieve better outcomes than would be possible for other carriers in light of regulatory conditions.

- The GoM forced U.S. all-cargo carriers to exit MEX. This action was disruptive, costly, and it violated the U.S.-Mexico Air Transport Agreement; importantly, it denied all-cargo carriers a fair and equal opportunity to compete against passenger/combination carriers that remain able to carry cargo to and from MEX. In the midst of this government intervention, Delta and Aeromexico are able to use the approval of and grant of ATI to coordinate cargo operations to, from, and via MEX, creating a material advantage enabled by the grant of ATI. This coordinated advantage unnecessarily and artificially reduces competition in cargo markets to, from, and via MEX to other Mexican destinations, and limits innovation and choice outside of MEX by all-cargo operators.

Order 2025-7-12 listed a number of public interest factors from the Department's authorizing statutes – factors that are relevant to the competitive effects observed in the U.S.-Mexico market.[33]  Throughout all economic matters, including the review of applications for approval of and a grant of ATI for a joint venture, the Department, as noted in Order 2025-7-12, is charged with "placing maximum reliance on competitive market forces," avoiding "conditions that would tend to allow at least one air carrier or foreign air carrier to unreasonably increase prices, reduce services, or exclude competition in air transportation," and "eliminating discrimination and unfair competitive practices faced by United States airlines in foreign air transportation,

---

[32] Order 2025-7-12 at 19-20.
[33] Order 2025-7-12 at 12-13.

including unreasonable restrictions on operations." Drawing upon these factors and the competitive and public benefits assessments, the Department tentatively determined that continuing the joint venture would be "adverse to the public interest."[34] The Department affirms that approach and determination here.

The Department also found tentatively (and affirms here) that the joint venture agreements substantially reduce competition under current market conditions. A joint venture that is found to reduce or eliminate competition substantially under Section 41309 cannot be approved unless the Department finds that the joint venture is necessary to meet a serious transportation need or to achieve important public benefits. As the Department has documented in this Final Order, and Orders 2025-7-12 and 2024-01-17, Delta and Aeromexico's joint venture does not meet this bar. The anticompetitive effects and distortions that the Department has documented are significant, and they fundamentally undermine the functioning of a competitive market where carriers have the right to enter new markets and compete on a fair and equal basis. Order 2025-7-12 did not find any compelling facts and circumstances to override this assessment. In short, using the language of the statute, the Department did not find that, despite a substantial reduction in competition, the joint venture is necessary to meet a serious transportation need or to achieve important public benefits.

In view of the findings and conclusions above, the Department concludes that it should exercise its authority under 49 U.S.C. § 41309(b)(1) to "end approval" of the joint venture agreement and related agreements and does therefore find under Section 41309(b) that those agreements substantially reduce competition and should be disapproved.[35]

<u>Review Under Section 41308</u>

Based on the same facts supporting the Department's decision that Delta and Aeromexico cannot meet the standards for approval of the joint venture under Section 41309, Order 2025-7-12 made clear that they cannot meet the standards for a grant of ATI to implement the joint venture under Section 41308. The standards required for a grant of ATI under Section 41308 are higher than those of Section 41309 (including that a grant of ATI is "required by the public interest").[36] Furthermore, as discussed above, having disapproved the joint venture agreements, the Department is required to revoke the related grant of ATI as no longer being necessary to proceed with the transaction approved under Section 41309.

The Department's conclusions using the standards in Sections 41309 and 41308 are consistent with the rationales provided in past ATI cases, including the first grant of ATI in this docket. The changes in market conditions have wide-ranging implications. A functioning, pro-

---

[34] Order 2025-7-12 at 38.
[35] The Department also finds that, notwithstanding any showing that the agreements substantially reduce or eliminate competition, that the agreements are adverse to the public interest under Section 41309. This finding results in the same necessity to disapprove (or end approval of) the alliance agreements and withdraw ATI under Section 41308.
[36] Order 2025-7-12 at 14, 17 (describing the standards in Section 41308 and stating that the Department's analysis in this matter, as it relates to analyzing the regulatory framework, is supported independently by Section 41308).

13

competitive market is essential to ensure that immunized joint venture partners have adequate economic incentives to pass along the benefits of their integrated commercial arrangements to consumers.[37]  Absent a competitive market landscape, including a procompetitive regulatory framework as a critical element, the airlines cannot show, to the Department's satisfaction under the "required by the public interest standard," that the joint venture will produce substantial public benefits that would not otherwise be achieved through vigorous competition and arms-length commercial cooperation.[38]  In addition, in the absence of an approved joint venture under Section 41309, there is no basis or need for a grant of ATI under Section 41308.  The Department thus withdraws the previous grant.

The Pending 2022 Application

In 2016, when it first granted Delta and Aeromexico approval and ATI, the Department intended for those approvals to be time-limited so that it could monitor and periodically review market developments.[39]  Given this posture, the Department offered Delta and Aeromexico the option to submit a new application for approval of and a grant of ATI on an ongoing basis.  Delta and Aeromexico submitted their "renewal" application in 2022.[40]

The Department's decision here exercises the statutory authorities to review immunized joint ventures at any time.  Changes to competitive conditions in the marketplace, including government-imposed distortions of competition, are affecting the joint venture operations and competitors *now*.  Any actual or potential harm is affecting stakeholders, including consumers, *now*.  If there are sufficient facts and circumstances to justify a modification of the authorities, it is logical and appropriate to take action with respect to the joint venture activities *now*.  Further, this Final Order deals with the merits of the matter in accordance with the public interest factors provided by Congress.

At the same time, the Department's decision does not change the status quo by dismissing or denying the 2022 application.  If conditions change again, Delta and Aeromexico will have the opportunity to refresh the record and seek to demonstrate that a new joint venture will meet statutory standards.

### B. Response to Comments

The Department received several comments in response to Order 2025-7-12, with some in support, some neutral, and some in opposition to the proposal to end approval of and terminate the ATI for the alliance.  A threshold issue emerges from the comments of Delta and Aeromexico that should be addressed at the outset.

---

[37] *See* Show Cause Order, Order 2008-4-17 (Apr. 9, 2008) at 13, DOT-OST-2007-28644-0174; and *see* Final Order, Order 2008-5-32 (May 22, 2008) at 2, DOT-OST-2007-28644-0185.
[38] *See* Order 2016-12-13 at 19.
[39] Order 2016-12-13 at 26-28.
[40] Joint Application of Delta and Aeromexico for Renewed Approval of and Grant of Antitrust Immunity for Alliance Agreements (March 29, 2022), DOT-OST-2015-0070-0236.

The thrust of Delta and Aeromexico's comments is that their joint venture is unquestionably procompetitive and that many of the economic benefits in the U.S.-Mexico market, ranging from a dynamic and competitive market to broader positive effects on GDP and job base, depend upon the joint venture. Were the Department to withdraw its grant of ATI, they argue, those benefits would "evaporate," and severe disruptions could occur, including the cancelation of up to two dozen services, the loss of tens of thousands of jobs, and a reduction in GDP.[41]

Over the course of 18 months, Delta and Aeromexico have consistently argued that the Department's reconsideration of the joint venture is unacceptable and unlawful. They urge the Department to start a review from scratch and not consider current distortions and their materiality to competition by the joint venture. According to this view, the continuing operation of the Delta/Aeromexico joint venture is a critical enabler of travel in the U.S.-Mexico air transport market and, therefore, the Department cannot take any action in this matter.

The basis for a decision is straightforward, focusing on the public interest. As the Department discusses further below, it does not agree that this action will result in net-negative consequences for the traveling and shipping public, or that the joint venture is the critical factor in maintaining a competitive marketplace.

To the contrary, the joint venture is exacerbating the competitive issues that are present and growing. An immunized alliance is not an entitlement. Far too much is at stake when the question is whether two airlines should comply with the U.S. antitrust laws. "Immunizing conduct from the antitrust laws … risks undermining our free market system and so must be done sparingly, carefully, and only in pursuit of legitimate—and actually realized—benefits."[42] Airlines seeking to obtain or maintain an immunized alliance with price- and capacity-setting mechanisms must meet rigorous statutory standards on an ongoing basis and demonstrate to the Department's satisfaction that their arrangements are and will continue to be in the public interest, broadly defined. If circumstances change after an approval is given, the Department may identify those changed circumstances, consider the materiality of the circumstances to the findings and to competition in joint venture markets, and modify the decision to any extent necessary to meet the statutory standards and the public interest. If the Department determines that any critical findings underpinning the prior decision are no longer valid, the Department will withdraw prior approvals until circumstances are more favorable. This approach will safeguard the positive benefits for stakeholders, including consumers, in the market, and prevent unnecessary harm to competition.

The Department has provided full and adequate due process to the joint venture partners here, even as conditions worsened. Order 2025-7-12 detailed the negative competitive effects caused by the GoM that have implications not just in U.S.-Mexico City markets, but also in other U.S.-Mexico markets (including by incorporating by reference Order 2025-7-11). The Department then identified Delta and Aeromexico as significant competitors in many of these markets and

---

[41] Objection at 1-5.

[42] Comments of the U.S. Department of Justice Antitrust Division (Aug. 8, 2025) at 2, DOT-OST-2015-0070-0342.

the predominant competitors in the U.S.-Mexico City market in which the distortive effects are having their greatest impact at the moment.  The Department explained that the price- and capacity-setting mechanisms in the joint venture would provide Delta and Aeromexico with unique privileges that are unavailable to other competitors, such as the ability to shift capacity from one airline to the other, that could exacerbate the distortive effects of the GoM's policies and increase the actual and potential harm for U.S. stakeholders.  Under current statutory standards, these impacts alone would be sufficient to support a decision to disapprove the joint venture agreements and deny or withdraw the grant of ATI.

The Department went on to conduct an Additional Factual Assessment of Competitive Conditions in Order 2025-7-12.  The Department did so to "further support the Department's decision to terminate the Delta/Aeromexico ATI and show why the Open Skies regulatory framework is critical."[43] Among other things, the Department tentatively found: that "[s]ervices to the Mexico City market are not meaningfully contestable, and competition and competitive benefits for consumers seem to be decreasing"; that analysis of "scheduled capacity since the implementation of the [joint venture] shows that Delta and Aeromexico have delivered substandard growth in the U.S.-Mexico market when compared to peers"; that the "growth that the Department hoped to see, enabled by a grant of ATI, does not seem to have materialized"; that, on balance, "current information suggests that Delta's and Aeromexico's capacity increases are less than those of their competitors, undermining a case that the ATI is enabling more public benefits than would otherwise be possible without a grant of antitrust immunity"; and that "traffic data both prior to the full implementation of [the] alliance in 2016 versus 2024 indicates that on U.S.-MEX routes there is marked reduction in the amount of connectivity at both the U.S. origin and Mexico City than there was before the implementation of the [joint venture]."[44]

Delta and Aeromexico appear largely to accept the facts and circumstances of Mexico's competitive distortions.  In fact, Delta and Aeromexico indicate that they too are victims,[45] underscoring the timeliness of the Department's decision to act now to protect the public interest.  Failure to act would further compound the distortive competitive effects and become part of the problem.  This choice of timing reflects the Department's efforts to balance the costs and benefits of ongoing forbearance with the costs and benefits to the traveling public of taking corrective action.

### *Compliance with the Administrative Procedure Act*

Delta and Aeromexico dedicate a substantial portion of their response to Order 2025-7-12, arguing that the Department's proposed approach in Order 2025-7-12 is "fatally flawed" under the Administrative Procedure Act.  Their primary arguments are that the Department has not applied the correct statutory standards, has not dealt with a key aspect of "the problem," has departed from past precedent without explanation, has failed to consider other alternatives to its

---

[43] Order 2025-7-12 at 31.
[44] Order 2025-7-12 at 31-37.
[45] Objection at 23.

action, and has failed to engage with key facts and studies submitted by the airlines. The Department will address these arguments in turn.

### *Applying 49 U.S.C. §§ 41309 and 41308*

Delta and Aeromexico argue that the Department has not applied the relevant statutory standards in Sections 41309 and 41308 to their immunized agreements. They emphasize that, in addition to superimposing a new requirement on the statute – the Open Skies predicate – the Department went through a process of disapproving and withdrawing the grant of immunity from the joint venture without showing that it "substantially reduces or eliminates competition," a showing they believe is required by Section 41309.

The Department disagrees. Order 2025-7-12 contained a reasoned analysis of the statutory requirements set forth in Sections 41309 and 41308. Order 2025-7-12 also specifically applied those standards to the present facts and circumstances. Still, Delta and Aeromexico, which previously supported this mode of analysis,[46] are unconvinced. They make the nuanced argument that, while the actions of foreign governments affecting competitive conditions in the market may be relevant to a competition analysis (but not, apparently, the primary focus), an Open Skies predicate is an invented step not supported by the statutory authority.[47]

As explained in Order 2025-7-12, the Department considers the applicable regulatory framework when it evaluates an international joint venture under 49 U.S.C. §§ 41309 and 41308.[48] An Open Skies regulatory framework is necessary under the competition and public interest analysis required by Sections 41309 and 41308 but not sufficient to obtain approval of and maintain a grant of ATI. As defined by the Department, an Open Skies agreement provides for, among other things, open entry, market-based pricing, and open route rights. If these essential competitive-enabling elements are present in law and in practice, the Department can reliably evaluate the structural impact of the proposed joint venture and its likely effects on consumers and the overall public interest.

Delta and Aeromexico argue that the Department engaged in an unsupported "Step 0" analysis under the statutory scheme, failing to use the tests and language provided therein. However, the basis for the Department's actions in this case is the statutory factors specified in 49 U.S.C. § 41309: that under present circumstances the joint venture agreements are adverse to the public interest and substantially reduces competition. While a "preliminary test" is not found expressly in the statutory language of Sections 41308 or 41309, compliance with an Open Skies agreement has a statutory foundation in the public interest and competition analysis required by Section 41309 and, for that matter, Section 41308.[49] Mexico's violations of the U.S.-Mexico Air

---

[46] Order 2025-7-12 at footnotes 62-63.
[47] Objection at 6, 36.
[48] Order 2025-7-12 at 15.
[49] *See* Comments of the U.S. Department of Justice Antitrust Division at 9 ("DOT articulated specific competitive dynamics in international air transportation that support the significance of open market access as embodied in Open Skies Agreements") and at 11 ("The fact that an entry barrier is created by government regulation does not make it

Transport Agreement, an Open Skies agreement by its terms, inform the Department's consideration of the pertinent statutory factors. The Department's decision, however, is based on an overall analysis of the statutory factors as applied to the joint venture. The Department considered, in addition to the effect on the market of Mexico's violations of the U.S.-Mexico Air Transport Agreement, the materiality of the change in market conditions on the operations of the joint venture, the joint venture's predominant market share at MEX, spillover effects in markets beyond Mexico City, and the ability of the joint venture to leverage its position under a grant of ATI to disadvantage competitors.

The argument that the Department did not conduct a proper analytical assessment under the statute – that it did not apply the "substantially reduce or eliminate competition standard" under 49 U.S.C. § 41309(b) – must also fail. The plain text of Order 2025-7-12 invalidates the point.[50] To the extent that Delta and Aeromexico believe the Department must conduct a longer and more particularized analysis of all potentially relevant markets, the Department disagrees. As noted above, the Department's analysis under Section 41309 focused first on identifying the changed circumstances in the competitive landscape in several critical and relevant markets to, from, and via Mexico City, and then on assessing whether those circumstances undermined the findings granting ATI.

Delta and Aeromexico argue that "even accepting the Department's own Open Skies policy, the Department has it backward. Under that policy, disapproval of a cooperative agreement is not an appropriate consequence of an Open Skies breach; the only permissible consequence under that policy is the loss of ATI."[51] Then, they undertake an elaborate statutory construction that is unmoored from a plain language reading of the statute. By way of example, Delta and Aeromexico argue that "[b]ecause the Department did not correctly apply Step 1 of the statutory analysis to the JCA–even accepting the validity of the Department's Open Skies policy–the Department must re-do that analysis before it can be in a position to conclude that the JCA no longer meets the ATI test in Step 2 of the statutory analysis."[52] They continue: "even if the Open Skies predicate were appropriate at Step 2 of the statutory analysis, the Department could apply it here only by addressing each of the 11 Open Skies factors and determining which the G[o]M has allegedly violated."

The Department reemphasizes that this decision is based on its determination that the Delta-Aeromexico joint venture is adverse to the public interest and substantially reduces competition. Based upon facts and circumstances established in the record, the Department has determined

---

any less relevant. Consideration of similar issues in other industries – such as the effects of patents, professional licensing requirements, and regulatory approvals required to sell pharmaceuticals or pesticides – is commonplace in antitrust competitive effects analysis. The competition concern with market access is particularly acute in the international air transportation context in which a foreign national regulatory authority with control over critical airport infrastructure may have an incentive to preference foreign national carriers…."), DOT-OST-2015-0070-0342.

[50] See, e.g., Order 2025-7-12 at 25.

[51] Objection at 40.

[52] "JCA" is in reference to the joint cooperative agreement representing the antitrust-immunized joint venture between Delta and Aeromexico.

18

that the joint venture no longer meets the statutory standards in Sections 41309 and 41308. The Department notes that the Department of Justice's Antitrust Division commented that the "record in this matter makes clear that consideration of the regulatory impact on market competition was integral to DOT's well-reasoned decision not to renew antitrust immunity for the Delta-Aeromexico Joint Venture based on the facts presented in this case."[53]

### *Addressing Key Aspects of the Problem*

Delta and Aeromexico argue that the Department disregards multiple key aspects of the problem and otherwise fails to provide sufficient reasoning. The crux of their argument is that Order 2025-7-12 focuses too much on competitive effects at MEX, which is a single airport served by the joint venture partners in the U.S.-Mexico market.[54]

The Department's "focus" on MEX is warranted by several factors evident in the record. As Delta and Aeromexico indicate in their pleadings, "MEX is the centerpiece of the JCA Partners' joint transborder network, a critical hub for both local and connecting traffic."[55] Without a properly functioning regulatory framework in place at MEX, the Department would not expect the same degree of competitive and public benefits to emerge from the Delta/Aeromexico joint venture with its central hub at MEX. Using the measurement provided by the joint venture partners, 21 percent of the traffic and flights between the United States and Mexico operate to/from MEX.[56] The Department's 2016 orders identified approximately 5 million passengers per year between the United States and Mexico City,[57] and while the percentage of total traffic in this market appears to be gradually falling relative to other U.S.-Mexico markets, the market is still growing in absolute terms and still retains a substantial percentage of total U.S.-Mexico traffic.

Based on any of these figures, MEX is a major and critical gateway. The Delta/Aeromexico joint venture has a predominant position at this gateway – controlling approximately 60 percent of the slots at the airport – and enjoys unique flexibilities by virtue of the ATI. These flexibilities include revenue sharing, shifting flights between the airlines to address slot shortages and preserve historical rights, and jointly setting pricing and capacity. Indeed, as documented herein, they have taken advantage of this situation to add additional services in U.S. markets whereas other competitors could not to the same degree, and they have shifted their focus from using MEX as a connecting hub airport to one focused more on higher-profitability nonstop traffic.[58] In circumstances where competition is diminishing and/or market distortions exist, these flexibilities become unfair competitive advantages. The Department affirms the findings in

---

[53] Comments of the U.S. Department of Justice Antitrust Division (Aug. 8, 2025) at 13, DOT-OST-2015-0070-0342.
[54] Objection at 43, 48.
[55] Objection at 24.
[56] Objection at 57.
[57] Order 2016-11-12 at 15.
[58] Order 2025-7-12 at 37.

Order 2025-7-12 on these points and assesses that the competitive issues observed today at MEX are sufficient to disapprove the Delta/Aeromexico joint venture and withdraw the grant of ATI.

Further, in the context of reviewing the Delta/Aeromexico joint venture, MEX is not one market of concern, but many. The market distortions at MEX, compounded by the predominant position of the joint venture partners, raise concerns in multiple city-pair markets served from MEX, including JFK-MEX (an overlap market), LAX-MEX (a market with intermittent overlapping services), and other markets that might benefit from more vigorous competition between the joint venture partners or new entry from their competitors.

Competition between and among all-cargo and combination cargo services is also significant enough by itself to merit corrective action. Perhaps the most egregious and harmful action by the GoM is the cargo decree requiring all-cargo carriers to move their services from MEX. This decree prevents all-cargo carriers from competing effectively against combination carriers in the provision of cargo services between the United States and MEX and beyond to the greater Mexico market on a fair and equal basis. As noted in Order 2025-7-12, Delta and Aeromexico's cargo share for U.S.-MEX has dramatically increased to 73 percent.[59] Under the current distorted regulatory framework, Aeromexico has the distinct advantage at MEX where it operates a large network to destinations throughout Mexico – and this advantage impacts competition for premium and time-definite services in the broader U.S.-Mexico market. Delta and Aeromexico's argument that, unlike passengers, cargo can be routed via different hubs because it does not care how it travels is unpersuasive, because, among other things, time-definite cargo products carry a revenue premium commensurate with the speed of delivery. Aeromexico is the only hubbing carrier in Mexico and MEX and, as the largest slot holder at MEX, serves the most destinations throughout the country. No other cargo carrier can replicate that network. The Department has ample reason to be concerned about maintaining a grant of ATI to Aeromexico under these circumstances.

The Department's concerns extend to the broader U.S.-Mexico market. The GoM's policies giving rise to particular decisions at MEX are not isolated effects of unintentional mistakes; they are part of a pattern of government interventions at odds with a liberalized Open Skies framework that make the market less competitive. Using Cancun as an example, the Department would be concerned that the prospect of future arbitrary action could affect competition to and from that congested airport, with potential impacts on the competition offered by immunized joint ventures. Finally, Delta and Aeromexico argue that access issues at MEX are not as profound as the Department suggests. To support their argument, Delta and Aeromexico state that the Department's claim in Order 2025-7-12 that "no new carrier has entered the U.S-MEX market since" 2016 is false; that Viva entered in 2017 and has grown since then to operate eight percent of U.S.-MEX flights.[60] The Department notes that Delta and Aeromexico omit a crucial part of the sentence in Order 2025-7-12, which reads, *"[o]ther than the attempts made through the slot divestiture process*, no new carrier has entered the U.S.-MEX market since that time"

---

[59] Order 2025-7-12 at 22.
[60] Objection at 27.

(emphasis added).[61]  Viva was a recipient of the Department's slot divestiture process and began U.S.-MEX services in December 2017 with flights to Las Vegas and then subsequently added New York-JFK with "remedy slots" secured by the Department.  The data show that Viva has expanded its footprint modestly at MEX, serving additional destinations.  During this time period, an important competitor, Interjet, exited the market and the GoM redistributed a significant portion of Interjet's MEX slots to Viva, allowing Viva to further expand its services from MEX.[62]  The Department believes that, despite Viva's modest expansion, the distortions caused by the GoM have limited growth and network adjustments by many carriers such that an ongoing grant of ATI is no longer justified.

### Consistent Application of ATI

Delta and Aeromexico argue that the Department has departed from past precedent without explanation, and therefore acted in an arbitrary and capricious manner, by treating this case differently than past ATI cases and by holding the carriers to a different standard.  They argue that Tokyo-Haneda (HND), London-Heathrow (LHR), and Lisbon (LIS) are just as congested as MEX, but the Department has not attempted to withdraw its grant of ATI from joint ventures operating at those airports.

The Department is concerned about the impact of congestion and airport access on competition where immunized joint ventures operate.  However, there is no inconsistency or infirmity in the Department's decision to act in this case.  There is a distinction here.  This is the only matter in which there are established facts and circumstances to show that the foreign partner, in this case the GoM, is unacceptably distorting competition in a manner that directly undermines the findings of previous orders approving and granting ATI in the relevant markets.  While the Department does not preclude the possibility that similar facts and circumstances could be established in future matters involving other markets, the comments by Delta and Aeromexico do not provide any specific allegations or actionable information, other than to point out congestion at other global gateways.  As American and United point out in their filings, Mexico's issues complying with the air services agreement in ways that distort competition are not analogous to the issues faced by airlines in other markets at this point in time.  The Department also notes that Delta, in claiming inconsistent treatment, ignores the fact that it too enjoys ATI in all three of the examples it cites (HND, LHR and LIS) via its partnerships with Korean Air and the Blue Skies joint venture.

### Considering Reasonable Alternatives

Delta and Aeromexico insist that the Department failed to consider alternatives to its action in violation of the Administrative Procedure Act.  They repeat the alternatives that the Department considered explicitly in Order 2025-7-12,[63] including letting the Department's Part 213 action

---

[61] Order 2025-7-12 at 32.
[62] *See* Objection at 28; *see also* Answer of Concesionaria Vuela Compania de Aviacion, S.A.P.I. de C.V. dba Volaris (Feb. 2, 2023) at footnote 19, DOT-OST-2021-0152-0042.
[63] *See, e.g.*, Order 2025-7-12 at 28-31.

run its course, taking action under 49 U.S.C. § 41310, invoking consultations or arbitration under the U.S.-Mexico Air Transport Agreement, and finally, carving out U.S.-MEX cargo operations in lieu of ending approval of and grant of ATI for the existing alliance agreements.

The carriers misread the Department's orders, asserting that disapproval of the joint venture (and termination of the grant of ATI) is a misdirected attempt to enact countermeasures against Mexico and thus punish the joint venture partners unfairly for actions taken by the GoM. That the Department's decision might induce the GoM to comply with the U.S.-Mexico Air Transport Agreement is neither wrong nor undesirable. But it is not the Department's objective in this proceeding. The objective is to assess the extent to which there are issues affecting competition in the markets served by the joint venture and ensure that approved joint ventures and grants of ATI remain consistent with statutory standards and the public interest. The Department will continue to reserve the right to take, or not take, other actions to address its concerns in the bilateral U.S.-Mexico market. Here, the Department is addressing the anticompetitive effects made worse by the approved and immunized joint venture. The finalized actions in the Order are a consequence of the present market conditions and the joint venture operations – not a means to rectify the GoM's actions. As stated in Order 2025-7-12, even addressing the compliance concerns in the bilateral market "does not necessarily lead to the continuation of grants of ATI in the U.S.-Mexico market."[64]

With respect to the cargo carveout alternative, Delta and Aeromexico benefit from the inability of all-cargo carriers to operate at MEX and from seamlessly interlining cargo, particularly lucrative time-sensitive cargo, at MEX to other destinations in Mexico. These represent competitive disadvantages for all-cargo and combination carriers operating at Felipe Angeles International Airport (NLU) or other less preferred airports. Even if Delta and Aeromexico had no exclusivity provisions on partnerships, all-cargo/combination carriers operating at NLU would still have to spend up to two hours trucking cargo on two-lane roads from NLU to MEX, then clear the cargo through another airport for transfer to Aeromexico belly-cargo operations.[65] These requirements are substantially more onerous given that a three-hour transfer process reduces speed to destination – the primary attribute of time-definite premium cargo products. Not only does a carve out not solve the broader market access problem at MEX for both combination and cargo carriers, it would have to be accompanied by a number of additional regulations and oversight by the Department to be effective: (1) prohibiting exclusivity provisions of Delta and Aeromexico partnerships; (2) requiring that Aeromexico interline with competitors; and (3) requiring Aeromexico to interline cargo at the same rates with the same degree of inventory and capacity access as Aeromexico provides Delta. Even then, such conditions on Delta-Aeromexico could not compensate for the time penalty that carriers forced

---

[64] Order 2025-7-12 at 29.
[65] Order 2025-7-12 at 21.

to operate at other airports will continue to face, creating a permanent structural competitive disadvantage for those carriers.

In sum, the Department considered reasonable alternatives when it made its decision to revoke its approval of the joint venture agreements and grant of ATI.

### *Providing Substantial Evidence and Adequate Reasoning*

According to Delta and Aeromexico, the Department's decision lacks substantial evidence, is internally inconsistent, and does not provide adequate reasoning. Notably, Delta and Aeromexico assert that the Department manufactured and misapplied statistics, failed to engage with an assessment by expert consultants in the 2022 application and Delta's objections, and did not demonstrate harm.

<u>Growth and Connectivity</u>

The Department reviewed these assertions and the data provided by Delta and Aeromexico and is aware that the carriers are particularly concerned with the assessment that their growth in the U.S.-Mexico market is "substandard," which is to say that despite their grant of ATI they grew in the market at a slower pace than other competitors. If true, this would undermine a primary basis of the grant of ATI, which is that the joint venture will produce greater public benefits than would otherwise occur absent a grant of ATI.

Order 2025-7-12 assessed the capacity growth comparing 2015 as a base year versus subsequent years. Delta and Aeromexico respond by claiming that the Department should have chosen 2016 as the base year, but the Department chose 2015 because 2015 was the year in which Delta and Aeromexico initially submitted their application for ATI to the Department.[66] The Department chose 2015 as a means of comparison in a year where there was no ATI to subsequent years in which Delta and Aeromexico enjoyed their grant of ATI. Delta and Aeromexico also fault the Department for comparing their growth against all other carriers operating in the U.S.-Mexico market, including Mexican and U.S. Low Cost Carriers (LCCs), saying that the growth of LCCs post the grant of ATI was disproportionately high and skewed the Department's analysis.[67] In citing service benefits attributable to ATI, Delta and Aeromexico conflate benefits arising from the newly implemented air services agreement and the expanded slot portfolios of Aeromexico, Volaris, and Viva Aerobus obtained from Interjet's bankruptcy. The Department refutes this argument, as the base for the Department's comparison included all other carriers, including large U.S. carriers that already had large shares in the U.S.-Mexico market, as well as smaller carriers that ended up growing. Consequently, the Department's analysis in Order 2025-7-12 took into account both the higher growth of the LCCs enabled by the open entry provisions of the newly implemented U.S.-Mexico Air Transport Agreement, as well as the comparatively lower growth of other carriers in its analysis.[68] Regardless of whether the Department chose

---

[66] Objection at 11-12, 20.
[67] Objection at 11-12.
[68] Order 2025-7-12 at 35.

2015 or 2016 as Delta and Aeromexico prefer, and regardless of the carrier set against which the Department compared market growth, a pro-competitive joint venture should have shown substantial growth by both joint venture partners in all relevant U.S.-Mexico markets. It did not, as demonstrated in Order 2025-7-12.[69]

The primary public benefit of ATI is the reduction in double marginalization or multiple markups on itineraries involving travel on both carriers. Experience has shown that, in early phases of the implementation of a joint venture, traffic volumes on connecting routes increase significantly and joint venture partners increase capacity to/from their hubs to carry increasing numbers of connecting passengers across their networks. It is reasonable to expect that MEX, as the primary hub of Aeromexico and the fourth largest international gateway to/from the United States, would support a substantial increase in connecting traffic once the two networks were linked in an immunized joint venture.

The Department's analysis in Order 2025-7-12 shows that Delta and Aeromexico did not prioritize connectivity as expected. The Department observed that Delta and Aeromexico use MEX more as an origination-and-destination (O&D) market than as a hub.[70] Delta and Aeromexico state that connections to in-scope destinations within Mexico have increased, which they characterize as consistent with expectations. Delta and Aeromexico admit that overall connections beyond MEX are down, which is the primary issue that the Department finds with the nature of the joint venture. As the Department notes in Order 2025-7-12, on Aeromexico-operated flights from the United States to Mexico City, nonstop traffic ending in Mexico City increased by 32 points, from 44 percent pre-joint venture to 76 percent after implementation, while on Delta-operated flights from the United States to Mexico City, nonstop traffic ending in Mexico City increased by 23 points, from 28 percent to 51 percent.[71]

This result is precisely the opposite of what the Department expects to see post implementation of an immunized alliance. In this case, the actions of the GoM, as documented extensively in this order and in Order 2025-7-12, likely have affected the incentives for the joint venture partners to pass along the benefits of the alliance to consumers. This conclusion is reflected in lower levels of connectivity at the largest (by far) Mexican hub – where the primary benefits of the reduction in double marginalization and tremendous increase in connecting traffic have not been nearly as substantial as in other joint ventures. This fact suggests that Delta and Aeromexico are protecting high-end, nonstop O&D revenue rather than providing more capacity to carry more passengers in one- or two-stop markets involving Mexican domestic segments operated by Aeromexico.

<u>Keating Analysis</u>

Order 2025-7-12 reviewed and responded to the work submitted by Bryan Keating on behalf of Delta and Aeromexico. Keating claims that withdrawing the grant of ATI would lead to

---

[69] Order 2025-7-12 at 34-35.
[70] Order 2025-7-12 at 37.
[71] Order 2025-7-12 at 37.

irreparable economic harm to communities in the United States and Mexico. He goes on to conclude that consumer harm could reach $800 million and, as summarized by Delta and Aeromexico in their Objection, that the joint venture "generates nearly 4,000 U.S. jobs, more than $310 million of U.S. GDP, and more than $200 million of annual tourism spending in the United States." Citing Keating's work, the carriers assert that "[i]f Delta and Aeromexico's Joint Cooperation Agreement ('JCA') is unwound, those economic benefits for the United States will evaporate …."[72]

Keating's paper was "based largely on Delta's network planners' identification of 21 routes, either operating or planned, that are *at risk* of cancellation or reduced service in the event of the dissolution of the Joint Cooperative agreement...." The Department has multiple serious concerns about the accuracy of the assessment, including the assumption that when the at-risk routes are canceled or reduced the existing aircraft will be parked and not utilized elsewhere.[73]

As a basis for his estimated impact figures, Keating focuses on markets that he claims would be withdrawn should ATI cease. However, he does not acknowledge that some markets have proven not to be viable, even for an immunized alliance. For example, since receiving ATI, Delta and Aeromexico announced, began selling, and have since withdrawn from service on routes from Monterrey to New York, Salt Lake City, and Los Angeles, and from Guadalajara to Detroit. Other routes that Aeromexico has announced, such as Mexico City to Raleigh/Durham, continue to be sold and have not been withdrawn, suggesting that those are more viable.

While the GoM has arbitrarily removed slots from longstanding slot holders at MEX, access remains opaque, and new operators cannot establish a foothold at this important airport. Meanwhile, Delta and Aeromexico, which together hold more than 60 percent of the slots, are able to expand their flying in MEX-U.S. markets and continue to add flights at MEX to the U.S. even when others cannot do so. Aeromexico began service from Tampa, Florida, to Mexico City in July 2024, and Aeromexico also began service from Mexico City to Newark in Winter 2024 and Phoenix and Philadelphia in 2025. Additional services such as these indicate that Aeromexico and Delta continue to search for growth opportunities in what is the largest international market from the United States while the joint venture's competitors cannot, thereby reinforcing the anticompetitive regulatory environment.

Given some of the flaws identified in his approach, the Department, through its own analysis, has determined that Keating's $800 million estimate is inflated. Furthermore, several assumptions he makes regarding the 21 routes and associated 1,062 one-stop connecting routes that would be at risk are so questionable that they undermine the credibility of his assessment. For example:

- Keating provides no independent assessment of the Delta/Aeromexico network going forward, relying exclusively on Delta's network planning team without incorporating the

---

[72] Objection at 1.
[73] Order 2025-7-12 at 30-31.

25

views of Aeromexico. At points, the author assumes what was identified as *at risk* is a given outcome, treating arguments of probability as certainty.

- Delta's network planning team identified impacted routes by comparing the antitrust immunized joint venture to run-of-the-mill arms-length codesharing. However, the choice of arms-length codesharing as the counterfactual overestimates the reality and ignores that the parties are still SkyTeam members, that they have a strategic partnership, and that they have aligned incentives going well beyond a typical codeshare relationship, especially given that Delta holds a 20 percent ownership stake in Aeromexico. Delta's history with other partners where ATI was not pursued due to the Department's action (*i.e.*, Delta-WestJet) shows that the carrier is incentivized and likely to pursue an alternative path beyond the typical arms-length arrangement to produce similar benefits.

- Keating makes no attempt to quantify fare impacts as a result of taking away ATI, including on nonstop overlap routes (*e.g.*, JFK-MEX) where the reintroduction of an additional competitor would likely lead to lower fares. The author does, however, note portions of the economic literature that support his argument – namely, that joint venture cooperation is estimated to decrease *connecting* fares modestly – without referencing the literature's evidence contrary to his argument: joint venture cooperation is estimated to increase *gateway-to-gateway* fares modestly.[74]

- Keating uses market stimulation curves for routes originating in Europe for 2005-2015 (footnote 25) as a proxy for calculating demand that is stimulated by nonstop routes in the U.S.-Mexico market in 2024. This approach likely results in an overestimate due to the short-haul and more domestic-like nature of transborder U.S.-Mexico travel versus intercontinental travel.

- In the QSI analysis (footnote 26), Keating is annualizing a week in July 2024 to reflect the year. July is a peak demand travel month and annualizing July data will also likely lead to a significant overestimate.

- Keating's numbers are likely inflated as at least five of the routes he identifies as being part of his 21-route analysis were never started or have only operated minimal frequencies. Even some that were started, such as Atlanta-Merida (ATLMID), have since ceased operating, indicating that even with the support of ATI, some markets simply are not viable.

With regard to the "nearly 4,000 U.S. jobs," Keating states that the elimination of the joint venture would put at risk "3,779 jobs in the United States" as the "at-risk frequencies directly and indirectly support thousands of jobs, including pilots, flight attendants, reservations staff, maintenance staff, customer service staff, and management. They further support non-airlines jobs through the purchase of goods and services by airlines. Finally, these frequencies support tourism jobs...."[75] The Department has reservations about these estimates. Keating incorrectly

---

[74] *See Pricing by International Airline Alliances: A Retrospective Study Using Supplementary Foreign-Carrier Fare Data*, Brueckner and Singer, revised Feb. 2019, *available at* https://sites.socsci.uci.edu/~jkbrueck/DOT_study.pdf.
[75] *An Economic Assessment of the Effect of Eliminating the Joint Cooperation Agreement between Delta Air Lines and Aeromexico*, Bryan Keating (Feb. 23, 2024) at 5, DOT-OST-2015-0070-0258 (hereinafter referred to as "Keating").

assumes that if the at-risk routes are impacted, existing assets will be parked and not utilized elsewhere, where they would provide significant and similar economic benefits. This assumption is a fatal flaw in the paper. In an environment in which aircraft delivery timelines continue to be uncertain and all delivery slots are spoken for, and when Delta has a number of aircraft on order, it is unlikely the withdrawal of the grant of ATI will have long-term implications for Delta's fleet plan. In essence, the jobs and airplanes supporting the identified routes will not simply "evaporate"; Delta will redeploy the airplanes onto other routes in its network, thereby significantly reducing the possibility of these estimated job losses. The narrowbody fleet that Delta uses for these services may be reallocated to an additional frequency on a domestic route such as Minneapolis/St. Paul to Atlanta or Orlando, or any number of high-demand domestic routes or nearby international routes such as to the Caribbean, while airlines typically have a more difficult time finding alternative uses for widebody aircraft used in international immunized joint ventures due to demand, regulatory, slot, and network compatibility issues, among others.

The flaw extends to Keating's claims regarding the more than $310 million in U.S. GDP and $200 million in tourism that could "evaporate" should the joint venture be terminated. Keating calculates these numbers based, in part, on summing up the estimated impact of job losses associated with the cessation of Delta services on two routes, as well as on the estimated loss of visitor spending to the United States due to the loss of nonstop service on the 21 routes identified. These numbers also incorporate the loss of Delta jobs in the United States tied to a reduction in servicing Aeromexico flights to the United States.[76] The Department believes that these numbers are likely inflated due to the already mentioned issues regarding the estimates of both flight reductions and job losses, as well as the fact that these numbers incorporate estimates for several routes that were never operated.

Finally, the Department notes that a determination of whether an agreement achieves important public benefits under 49 U.S.C. § 41309(b)(1)(A) is broader than simply whether an agreement benefits one or two companies, such as Delta and Aeromexico. As the statutory language explicitly states, the analysis is whether the joint venture produces benefits to the "public." Under that analytical framework, even if Delta and Aeromexico were to lose market share due to competitors that provide better services or lower prices, that could be a net gain for consumers and the public writ large. Many significant public benefits of the Delta/Aeromexico alliance are likely to continue absent ATI as the two carriers have every economic incentive to continue non-immunized coordinated activities, such as codesharing and frequent flyer program cooperation, in order to retain their market shares. The public benefits solely attributable to ATI (*e.g.*, substantial capacity increases, especially for connecting passengers across both networks, as noted in the Department's orders and the 2016 final order granting conditional ATI in this case) have not been fully realized, as noted in Order 2025-7-12 and affirmed above. Any financial loss that Delta would experience from a lack of ATI (and not recapture through its financial investment in Aeromexico or other arms-length commercial decisions) would flow from the

---

[76] Keating at 44-45.

inability to engage in joint price and capacity setting usually prohibited by the U.S. antitrust laws. The public will clearly benefit from resumption of competition between Delta and Aeromexico, given the lack of sufficient competition to discipline a virtual merger of transborder operations due to the competition-suppressing market intervention by the GoM.

More Potential Harm from the ATI Withdrawal

Delta and Aeromexico claim that their ATI has enabled them to add more routes than they would otherwise be able to serve in the market, and that by removing ATI, these routes would be at risk, leading to the previously discussed "evaporation" of benefits. They claim that between "October 2023 and June 2025, on the expectation that ATI-level JCA coordination would continue indefinitely, the JCA partners launched flights in 37 new transborder markets, increased frequencies in four existing markets, and upgauged equipment in 17 markets."[77]

A closer evaluation of these claims reveals some inaccuracies when compared to publicly available OAG schedule information, suggesting that Delta and Aeromexico have a long-standing interest in serving several market pairs in the U.S.-Mexico market absent the ATI. Of the 37 "new" markets, schedule data shows that 12 are, indeed, routes that the partners had at no time served before and were inaugurated in the time period referenced (*e.g.*, Tampa-Mexico City (TPAMEX) and Raleigh Durham-Mexico City (RDUMEX)).[78] Three are markets that the partners started serving during the initial stages of their joint venture post 2017, reduced during the COVID pandemic, and restored to service during the time period referenced (*i.e.*, Atlanta-Queretaro (ATLQRO), Detroit-Queretaro (DTWQRO), and Denver-Monterrey (DENMTY)). The remaining 22 markets are ones in which Delta and/or Aeromexico had a presence at various times pre-joint venture, during the COVID pandemic, and during the referenced time period. For example, schedule data shows that at least one of the partners has served the Los Angeles-Guadalajara (LAXGDL) market continuously since at least 2010, with only small gaps of service in May of 2020 during the depths of the pandemic and for three months during 2023. Markets such as Minneapolis/St. Paul-Puerto Vallarta (MSPPVR) have been served on a seasonal basis for at least as long with no cessation of service during COVID. By relying on these claims, Delta and Aeromexico cast doubt on the severity of impacts the cessation of ATI will have on their operations in the U.S.-Mexico market.

Many of the routes that Delta and Aeromexico claim to be at risk are leisure routes such as MSPPVR, Minneapolis/St. Paul-San Jose del Cabo (MSPSJD), Cincinnati-Cancun (CVGCUN), Atlanta-Cancun (ATLCUN), Detroit-Cancun (DTWCUN) and others.[79] These are unique markets that have been operated largely by Delta (and not Aeromexico) for U.S. customers

---

[77] Objection at 15.

[78] In addition to RDUMEX and TPAMEX, these are the additional wholly-new routes: Atlanta to San Luis Potosi (ATLSLP); Atlanta to Tulum (ATLTQO); Detroit to Tulum (DTWTQO); Newark to Mexico City (EWRMEX); Orlando to Guadalajara (GDLMCO); McAllen to Mexico City (MFENLU); Miami to Guadalajara (GDLMIA); Minneapolis/St. Paul to Tulum (MSPTQO); Philadelphia to Mexico City (MEXPHL); and Phoenix to Mexico City (MEXPHX). It should be noted that Delta it is withdrawing service from DTWTQO and MSPTQO. Source: OAG Schedules.

[79] Objection at 16.

traveling on vacations. These are routes in which the vast majority of customers originate in the United States and may connect on a Delta-operated flight at the U.S. departure point to the Delta-operated flight to the Mexico "beach" destination. Upon arrival at the Mexican destination, these customers do not connect to a further Mexican destination on Aeromexico; they terminate at the "beach" destination. Delta is not reliant on assistance from Aeromexico to operate these flights because, in general, the primary customers, American citizens, have the relationship with and loyalty to Delta. Delta is not likely to end this type of flying as doing so would simply cede this traffic to competitors.

Reliance Interests

The Department is aware of the future costs, and challenges, that Delta and Aeromexico will face to wind down the joint venture. The Department acknowledges these and other reliance interests and, as discussed below, has decided to extend the wind-down period from October 25, 2025, proposed in Order 2025-7-12, to January 1, 2026, to provide a longer transition period in order to reduce disruption. The Department also notes that since 2022, it has conducted this proceeding as deliberately and patiently as possible to avoid any unnecessary impacts. However, the actual and potential harm occurring in the U.S.-Mexico market, as well as the benefits of restoring fair and open competition in accordance with our longstanding and consistent approach to Open Skies markets, outweigh the reliance interests of the joint venture partners and is more responsive to the statutory standards in Sections 41309 and 41308, which focus on the public interest. As noted above, the Department has made this assessment by balancing the costs of continued forbearance with the costs and benefits to the traveling and shipping public of acting now.

Delta and Aeromexico will continue cooperating as arms-length commercial partners, continuing many of the benefits of the joint venture. As reported by Delta, the two carriers began their first codeshare in 1994, over 30 years ago, and entered into an enhanced alliance relationship in 2011.[80] Given this longstanding partnership, which predates the 2017 implementation of the immunized joint venture by several years, Delta's 20 percent ownership stake in Aeromexico, the shared commercial interests stemming from the carriers' participation in the SkyTeam alliance, and the commercial imperative to maintain their shares in a growing international market, Delta and Aeromexico will continue to have every economic incentive to cooperate in the U.S.-Mexico market even without ATI. And even without immunity, they will still be able to provide consumer benefits through codesharing, frequent flyer program cooperation, and other joint marketing activities (activities they have engaged in for more than 30 years), which will enable them to continue to attract customers to their services. The estimates of harm the companies provide do not assume such ongoing cooperation and are, at best, inflated, especially since both carriers engaged in such cooperation prior to obtaining ATI.

---

[80] Press Release (Nov. 18, 2015), Delta Air Lines, *available at* https://ir.delta.com/news/news-details/2015/Delta-Announces-Intention-to-Acquire-Additional-Shares-of-Grupo-Aeromexico/default.aspx

Needing ATI to Compete

In their responses to Order 2025-7-12, Delta and Aeromexico argue that, even though Delta is one of the three largest U.S. global carriers, they need ATI to compete with United and American in the largest international market to/from the United States, while Allegiant argues that it needs ATI just to enter this market.[81]  It has not been the Department's policy to grant ATI for the purpose of enabling one carrier to compete with another carrier without also generating fundamentally new benefits that would not otherwise be possible.

The Department has encouraged airlines to establish arms-length cooperation that does not require ATI first, such that if ATI is granted, all benefits generated proximate to the grant of ATI would fit the statutory definition of "benefits otherwise not obtainable."  Only once the benefits obtainable from this arms-length cooperation have been exhausted does the Department consider ATI to align economic incentives to further integrate operations to achieve public benefits otherwise unobtainable.  In at least two applications for ATI, the Department has approved the proposed cooperation but denied ATI, given that the carriers had not sufficiently developed non-immunized cooperation to justify a grant of immunity.[82]

The 2022 Application

Delta and Aeromexico believe that the Department has not engaged with their *de novo* March 29, 2022, application for ATI, including the document production and economic analysis provided by them before the substantial distortions of competition came into focus.  The 2022 application for ongoing renewal of the joint venture will continue to be addressed in a separate proceeding.  In that proceeding, the Department suspended the procedural schedule on April 11, 2022.

When considering a *de novo* ATI application, the Department's regulations provide for a multi-step process that must be completed before that application is ripe for adjudication by the Department.[83]  This process includes, among other things, public notice, an opportunity for the public to comment on the application, and, as warranted, show cause proceedings.[84]  This process has not yet been completed, and therefore the Department will not issue a decision on the *de novo* application at this time.  However, in the interest of considering all reasonably available information in its evaluation of Delta and Aeromexico's existing ATI, the Department reviewed the pertinent information included in the *de novo* application, including the corresponding data and information and economic analysis.  Delta and Aeromexico also had an opportunity to

---

[81] Objection at 31, 44-45; and Joint Answer of Allegiant Air and Viva Aerobus (Aug. 21, 2025) at 4, DOT-OST-2015-0070-0348.
[82] Final Order,  Order 2020-3-5 (March 13, 2020), DOT-OST-2018-0084; and Final Order,  Order 2011-11-12 (Nov. 9, 2011), DOT-OST-2011-0111, in which the Department granted approval for joint venture agreements to Hawaiian and Japan Airlines in Order 2020-3-5 and to American Airlines and Qantas in Order 2011-11-12 under Section 41309 without granting ATI under Section 41308.
[83] 14 CFR Part 303, Subpart E.
[84] *See* id.

provide any additional information that they consider pertinent in their response to the Department's show-cause order in this proceeding.

Delta and Aeromexico's recently expressed concerns about the suspension of the 2022 proceeding are unavailing.[85]  The *de novo* ATI application is not currently ripe for an adjudication while, as discussed previously, Delta and Aeromexico's existing immunized joint venture is subject to continuing review under Sections 41309 and 41308.  Therefore, this order will finalize the Department's consideration of the existing immunized joint venture without taking action on the *de novo* application.

### *Reviewing Recent Information*

In rendering this decision, the Department is aware of two steps that the GoM has announced it will take.  First, the MEX airport authority has notified U.S. carriers that it will return their confiscated slots in the coming traffic seasons.[86]  This is an evolving situation and certain critical details with respect to how the process will work and what the capacity picture at MEX will look like once U.S. carriers' historical slot allocations are restored remain unanswered.  What is clear at present is that this process will require a period of several traffic seasons.  Second, on August 29, 2025, the office of Mexican President Claudia Sheinbaum published a decree amending, adding, and repealing various provisions of the national airports law.[87]  The provisions provide for the establishment of new rules for historical treatment of slots, new "use or lose" rules, and a new slot coordinator.  It is apparent from the text of the decree that further information will be required in order for Mexican civil aviation officials to interpret and implement the new rules.  Critically, the decree did not address transparency concerns with respect to capacity declarations at constrained airports in Mexico.  Transparency in setting capacity at an airport is critical for fostering competition and is in keeping with international standards.

The Department views these steps as positive and anticipates and looks forward to continuing a deliberative process of bringing Mexico into compliance with the U.S.-Mexico Air Transport Agreement and addressing all of the well-founded concerns that have been raised.  For the purposes of this ATI proceeding, the steps taken to date fall well short of addressing the competitive issues raised by the operation of an immunized joint venture in the U.S.-Mexico market.  The Department emphasized in Order 2025-7-12 that the severity of the concerns required Mexico to "establish a track record of providing certainty that the rights of new entry,

---

[85] The Department notes that there is a Motion from Delta and Aeromexico to suspend the procedural schedule for their 2022 application pending in the docket.  Motion to Suspend the Procedural Schedule (Feb. 9, 2024), DOT-OST-2015-0070-0253.  Because this Order takes no action on the 2022 application, the Department continues to defer adjudication of the pending motion.

[86] Answer of United Airlines, Inc. (Aug. 21, 2025) at 1 ("Mexican officials informed IATA, American, Delta, and United on an August 18, 2025, call that slots confiscated in the Winter 2022/2023 and Summer 2023 seasons will be reinstated"), DOT-OST-2015-0070-0346.

[87] *See* Decreto, Diaro Oficial de la Federacion (Aug. 29, 2025), *available at* https://dof.gob.mx/nota_detalle.php?codigo=5766959&fecha=29/08/2025.

competitive pricing, and a fair and equal opportunity to compete will be respected."[88] The Department sees no basis to delay or change the decision proposed in Order 2025-7-12.

### C. Conclusion

In view of the facts, circumstances, and discussion above, the Department is moving forward to end approval of the joint venture under 49 U.S.C. § 41309 (as adverse to the public interest and substantially reducing competition) and to terminate the grant of ATI used to implement that joint venture.[89]  Because there will no longer be an approved agreement under Section 41309, the joint venture will no longer be eligible for ATI under 49 U.S.C. § 41308.

The Department emphasizes that our decision is limited to the statutory factors specified in these ATI statutes.  It is not our view that arms-length cooperation between Delta and Aeromexico is anticompetitive.  To the extent that these airlines wish to continue that cooperation following the termination of the grant of their ATI, readers should draw no inferences or conclusions about any negative competitive effects arising from those arrangements.  The Department is ending approval of the package of agreements, featuring an integrated price- and capacity-setting joint venture agreement at the core, submitted for our review in 2015 and updated by the airlines since that time.  The Department asked Delta and Aeromexico to comment on any transition issues of this nature and received no comments.

There is a wind down period.  In Order 2025-7-12, the Department proposed that the joint venture should end October 25, 2025.  Delta and Aeromexico indicated that given the practical challenges of winding down the joint venture, they request, at a minimum, an extension of the termination date through March 28, 2026.  The Department recognizes the practical challenges and reliance interests.  The Department agrees to extend the termination date to January 1, 2026. This provides additional time to settle accounts and prevent disruptions for customers ahead of some holiday travel and end of year business.  This date strikes the appropriate balance between addressing the practical challenges and reliance interests, on the one hand, and protecting the public interest, on the other hand.  Therefore, by the terms of this order, Delta and Aeromexico will not have a grant of ATI on January 1, 2026.

The Department remains focused on maintaining a level playing field.  The GoM's intervention in transborder markets creates an imperative for the Department to act not only to withdraw ATI in a transborder market no longer open and contestable as provided in the U.S.-Mexico Air Transport Agreement, but to avoid distortive and competition-suppressing impacts that further discriminate against other carriers in the market, including some that may seek their own immunized joint ventures.  This approach to ATI establishes parity for all market participants. The concept of parity extends to the wind down period as well.  Delays in winddown and

---

[88] Order 2025-7-12 at 2.
[89] The Department also finds that Delta and Aeromexico no longer meet the standard in 49 U.S.C. § 41308, which is to say that the grant of ATI is no longer required by the public interest whether or not they engage in commercial cooperation or have an approved joint venture under Section 41309.  Order 2025-7-12 at 38.

termination of the grant of ATI only compound the unfairness and actual and potential harm to other carriers and consumers.

**ACCORDINGLY:**

1.  We determine that, effective January 1, 2026, the findings of Order 2016-12-13, as modified by Order 2020-12-18, are no longer valid.  Further:

    a.  Under 49 U.S.C. § 41309, we end approval of the joint venture described in the application submitted by Delta Air Lines, Inc. and Aerovias de Mexico, S.A. DE C.V. on March 31, 2015, in this docket, including any modifications made since up to and including the present.  For the avoidance of doubt, we also end approval of the joint venture described in this subparagraph and find that approval is not necessary to meet a serious transportation need or to achieve important public benefits (including international comity and foreign policy considerations);

    b.  Because the Department is ending approval of the joint venture under 49 U.S.C. § 41309, the Department terminates the antitrust immunity previously granted to this joint venture under 49 U.S.C. § 41308;

    Accordingly, as of 12:00 a.m. Eastern Standard Time on January 1, 2026, the joint venture between Delta Air Lines, Inc. and Aerovias de Mexico, S.A., DE C.V. will be disapproved and will cease to have a grant of antitrust immunity from the Department;

2.  We reserve the right to take further or separate action as warranted by the public interest;

3.  We defer action on Delta Air Lines Inc.'s February 9, 2024 Motion to Suspend the Procedural Schedule in this docket; and

4.  We grant all motions for leave to file submitted to date.

By:

**SEAN P. DUFFY**
Secretary of Transportation

(Seal)

*An electronic version of this document is available online at [www.regulations.gov](www.regulations.gov).*

# EXHIBIT B

Order 2025-7-12
Issued: July 19, 2025



**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 19th day of July, 2025

| | |
|---|---|
| **Joint Application of**<br><br>**DELTA AIR LINES, INC.**<br>**AEROVIAS DE MEXICO, S.A. DE C.V.**<br><br>**Under 49 U.S.C. §§ 41308 and 41309 for**<br>**Approval of and Antitrust Immunity for**<br>**Alliance Agreements** | **Docket DOT-OST-2015-0070** |

**SUPPLEMENTAL ORDER TO SHOW CAUSE**

## I.    SUMMARY

By this Order, the U.S. Department of Transportation (the Department or DOT) identifies ongoing concerns with the state of competition in the U.S.-Mexico air services market and proposes to take appropriate corrective action with respect to a joint venture (JV) operating with the approval of and grant of antitrust immunity (ATI) from the Department.

Pursuant to 49 U.S.C. §§ 41308-41309, the Department proposes to withdraw the approval and grant of ATI for a JV operated by Delta Air Lines, Inc. (Delta) and Aerovias de Mexico, S.A. de C.V. (Aeromexico) (collectively, the Joint Applicants). The Delta/Aeromexico JV, which is subject to conditions that the Joint Applicants accepted, was originally set to expire in 2020 and has since been extended pending review. Based on our review, the conditions required for an immunized JV do not exist and the immunized JV no longer serves the public interest due, in large part, to anticompetitive measures imposed by the Government of Mexico (GoM or Mexico) that are distorting the marketplace. The Department made a similar proposal in January 2024 that received several objections. This revised proposal clarifies the basis for the Department's action with additional reasoning and support.

Delta and Aeromexico also have filed a *de novo* application to continue their immunized JV on a long-term basis. Because the Department is committed to restoring a level playing field for all market participants as soon as possible, the new application will remain suspended pending full

resolution of the critically anticompetitive and distortive market conditions in the U.S.-Mexico market.

## II.    NEED FOR ACTION

Since 2022, Mexico has significantly altered the playing field for airlines in ways that reduce competition and allow predominant competitors to gain an unfair advantage in the U.S.-Mexico market.  The United States and Mexico have an air services agreement, the U.S.-Mexico Air Transport Agreement (the Agreement), that commits both parties to a liberalized operating environment for all airlines, including a fair and equal opportunity to compete.

Mexico has walked away from its commitments.  As documented in Order 2025-7-11, Mexico arbitrarily reduced capacity at the country's primary gateway airport in Mexico City, Benito Juarez International Airport (MEX), confiscated slots from U.S. carriers at MEX, and ordered all-cargo carriers to vacate MEX.  In addition, Mexico lacks a transparent and non-discriminatory slot allocation regime that adheres to international standards and applies consistently across the country's airports, including MEX.  The lack of a coherent slot allocation regime and the prospect of arbitrary action looming at any time raises serious concerns about the long-term competitiveness of the U.S.-Mexico market and the ability of the Department to depend upon the air services agreement as a mechanism to ensure adequate competition. Mexico's actions harm airlines seeking to enter the market, existing competitor airlines, consumers of air travel and products relying on time-sensitive air cargo shipments traded between the two countries, and other stakeholders in the American economy.

In this environment, the Department is proposing to take responsive action with respect to the Delta/Aeromexico JV that operates with special permissions not available to other competitors. As immunized JV partners, Delta and Aeromexico can jointly price and plan routes, shift capacity from one partner to the other, and achieve greater scale to compete in both passenger and cargo markets as if they were a merged firm.  The regulatory framework enabled by the Agreement is, as we will explain in more detail, the cornerstone of the Department's statutory analysis and precedent supporting the approval of and grants of ATI for JVs.  Mexico's non-compliance over a period of years, despite significant efforts by the Department to resolve, raises serious concerns about Mexico's commitment to providing a stable and pro-competitive market environment.  The Department's concerns with respect to ATI matters require Mexico to establish a track record of providing certainty that the rights of new entry, competitive pricing, and a fair and equal opportunity to compete will be respected.  Only under such circumstances can the Department have confidence that its competition analysis, conducted under Clayton Act standards, is able to fully assess the competitive implications of a grant of ATI.

The Department is concerned about potentially severe impacts to consumers, other airlines competing in the market, and the U.S. economy.  In material respects, Mexico has compromised the ability of market forces to determine outcomes and has unilaterally resorted to government intervention for over three years, such that the market is no longer competitively contestable. The Department sees significant economic harm resulting from the actions of Mexico, including with respect to the continuation of the Delta/Aeromexico JV, and this harm is likely to increase over time given the current distortive marketplace.  For example, since 2023, after U.S. all-cargo carriers were forced to exit the premium MEX market and overall cargo tonnage declined by approximately 40 percent, Aeromexico's share of that tonnage increased about 10 percent in

short order and continues its upward trend today. Mexico's actions impose significant distortive revenue and cost impacts on U.S. carriers that are beyond their control. It is not tenable to allow the Joint Applicants to continue to operate with ATI in a market in which the underlying regulatory foundation no longer guarantees open market access, resulting in actual or potential harm to consumers, the traveling public, competing air carriers, and the economies of both countries.

When the Department first reviewed the Delta/Aeromexico JV, the Department made the grant of ATI subject to strict conditions because we were concerned that Mexico would not adhere in practice to the open and pro-competitive regulatory framework that the two countries agreed to in principle. Unfortunately, as the facts and circumstances show, those concerns have materialized. The Department now determines tentatively, in light of Mexico's failure to honor its obligations under the Agreement, that approval of the JV and a grant of ATI are no longer consistent with the public interest.

The Department's authority to act expeditiously and decisively in international aviation matters is supported by multiple statutes and well established in practice. In reviewing JVs under its statutory authority, the Department has the responsibility to protect the public interest, defined broadly, and to consider the implications of implementing international air transport agreements and overseeing a range of aviation economic functions, including regulating foreign air transportation. For example, the Department must pursue the public interest mission of strengthening the competitive position of domestic air carriers to ensure at least equality with foreign air carriers.[1]

The importance of the Open Skies regulatory framework to the Department's review of ATI matters cannot be overstated. Wherever joint ventures operate with a grant of ATI, the Department has insisted that an open and competitive market exists. This core tenet of U.S. international aviation policy is strongly supported by the Department's statutory authority, which requires the Department to consider, among other things, whether a joint venture agreement: (1) does not substantially reduce competition; and (2) is not adverse to the public interest.[2]

Crucially, withdrawing approval of the immunized JV would not end the cooperation between Delta and Aeromexico. Delta maintains its equity stake in Aeromexico, and the two partners can continue traditional commercial cooperation as practiced by their competitors, including code sharing and joint marketing. The Department leaves open the possibility that the United States and Mexico can work together to restore an open market for air services.

## III.    BACKGROUND

For years, the U.S.-Mexico air services market was highly restrictive under the terms of a 1960 bilateral air services agreement that limited frequencies, routes, and air carriers that could operate.[3] The essential elements of an open, market-oriented air services market were not in

---

[1] 49 U.S.C. § 40101(a)(15). *See also* 49 U.S.C. § 40105(b)(1)(B), which requires the Department, in carrying out its responsibilities in regulating air commerce, to consider the laws and requirements of a relevant foreign country, reflecting the international nature of air transportation.
[2] 49 U.S.C. § 41309(b) and (b)(1).
[3] The Air Transport Services Agreement between the United States and Mexico was first signed on Aug. 15, 1960, and entered into force on Jan. 17, 1961. It was amended through an Exchange of Notes on July 3, 1970, and through

place as demand increased and new U.S. and Mexican airlines emerged.  In November 2014, the United States and Mexico reached a significantly more liberalized agreement in an effort to more effectively enable market forces, rather than government regulation, to address the substantial demand for air travel between the two countries and beyond.[4]  This liberalized agreement – still in force today – meets, by its written terms, the U.S. Open Skies threshold for enabling competition by allowing any Mexican or U.S. airline to adjust its network to serve the demand in the ways it sees fit.[5]  The Agreement, similar to all U.S. Open Skies air transport agreements, also provides airlines of both parties with a fair and equal opportunity to compete.

Ancillary to the agreement, and as shown below, the United States and Mexico expressed an understanding that, under longstanding decisional standards, the Department would not consider an application for ATI on its merits unless there was a liberalized air service agreement in place.  They further acknowledged that during the review the Department would take into account the availability of all essential commercial rights in a competitive marketplace.[6]

*U.S.-Mexico Memorandum of Consultations (Nov. 7, 2014)*

"…Both delegations noted that the new Agreement represents a significant step forward in the aviation relationship, creates opportunities in a new and modern pro-competitive environment, and sets the stage for substantial public benefits.  The Mexican delegation shared with the U.S. delegation a letter dated 4 November 2014…emphasizing its view of the importance of the availability of antitrust immunity (ATI) so that U.S. and Mexican carriers could further their beneficial alliances and/or commercial agreements.

The U.S. delegation explained that each application for ATI is considered on its merits and is given fair and expeditious treatment by the DOT, according to well-established policies and standards.  Because the DOT must, by statute, take into account the competitive market conditions contemporaneous with the filing of an ATI application, carriers should be aware of the need to take into account the availability of all essential commercial rights in a competitive marketplace and in the framework of a modernized agreement…"

---

Exchanges of Notes and Letters on Sep. 23, 1988; Nov. 21, 1991; Dec. 4, 1997; and Feb. 15, 1999.  This initial agreement saw its last amendments and extensions entered into on Dec. 12, 2005.

[4] Air Transport Agreement Between the Government of the United States of America and the Government of the United Mexican States, Dec. 18, 2015; U.S. Department of State, https://2009-2017.state.gov/e/eb/rls/othr/ata/m/mx/250782.htm.  *See also* Memorandum of Consultations, Nov. 5-7, 2014; U.S. Department of State, https://2009-2017.state.gov/e/eb/rls/othr/ata/m/mx/234716.htm.

[5] The Agreement provides "for the airlines of both Parties to compete in providing the international air transportation governed by this Agreement…(and) allow each airline to determine the frequency and capacity of the international air transportation it offers based upon commercial considerations in the marketplace…neither Party shall unilaterally limit the volume of traffic, frequency or regularity of service, or the aircraft type or types operated by the airlines of the other Party…." Air Transport Agreement Between the Government of the United States of America and the Government of the United Mexican States, Dec. 18, 2015; U.S. Department of State, https://2009-2017.state.gov/e/eb/rls/othr/ata/m/mx/250782.htm, at 10.

[6] *See* Memorandum of Consultations, Nov. 7, 2014, U.S. Department of State, *available at* https://2009-2017.state.gov/e/eb/rls/othr/ata/m/mx/234716.htm.

4

*First Application*

On March 31, 2015, Delta and Aeromexico filed an application for approval of, and antitrust immunity for, a JV agreement in the U.S.-Mexico market.  In the application, Delta and Aeromexico expressly reiterated their understanding that "[t]he existence of liberalized agreements with the United States has long been a public interest factor that is a prerequisite to approval of an ATI application."[7]

Before addressing the merits of the request for ATI, the Department noted that the Joint Applicants failed to satisfy the threshold criteria as the Agreement did not yet contain all the elements of an Open Skies agreement.[8]  DOT paused the proceeding to investigate and deliberate.  A subsequent exchange of letters with the GoM in May 2015 ensured that all elements of the U.S. Open Skies policy were provided under the Agreement.

The Department's review of the regulatory conditions was rigorous, transparent, and fundamental to its overall analysis of the application.  The Department sought information and involved multiple interested parties,[9] and requested information formally from the applicants and the GoM regarding access to landing slots and facilities at MEX, as well as any plans Mexico had to improve the slot allocation process at MEX.[10]  In addition, the Department asked the Joint Applicants for information regarding their slot holdings at MEX and other slot constrained airports they planned to serve with their proposed joint venture, such as at New York John F. Kennedy International Airport (JFK).  Finally, the Department asked the Joint Applicants additional questions regarding their ability to deliver promptly the consumer benefits that the joint venture was expected to produce.[11]  The Joint Applicants responded by providing information about their holdings and operations, as well as information about airport slot administration practices in Mexico.  Among other things, Delta and Aeromexico expressed their view that the slot administrator at MEX is the airport administration, but that the airport is accountable to the Ministry of Communications and Transportation.[12]

Separately, the Department sent two letters to MEX's airport administration seeking information on the slot administration procedures in place at MEX.  The answers did not address any barriers to entry concerns in the transborder market, did not provide a commitment or plan to reform

---

[7] Joint Application for Approval of and Antitrust Immunity for Alliance Agreements, Mar. 31, 2015; DOT-OST-2015-0070-0001, at 30; and Joint Applicants, at 2 ("Delta and Aeromexico applaud the landmark bilateral air services agreement initialed by the U.S. Government and Mexico on Nov. 21, 2014.  Once entered into force the new agreement will provide for full liberalization on U.S.-Mexico transborder routes, removing previous designation limitations which restricted carriers' ability to introduce beneficial new services and limited new entry and competition.  This agreement provides a sound framework to support the proposed transborder JCA agreement between Delta and Aeromexico – and the substantial increase in new transborder network service and competition it will produce.").

[8] Notice Suspending the Procedural Schedule, Apr. 8, 2015; DOT-OST-2015-0070-0002, at 1.

[9] *E.g.,* Motion of JetBlue Airways Corporation to Require Submission of Additional Documents and Data, July 2, 2015; DOT-OST-2015-0070-0017, at 1-2 (requiring the Joint Applicants to submit additional documents and data before the Department to determine the Application for Approval of and Antitrust Immunity for Alliance Agreements).

[10] Order Requesting Additional Information, July 31, 2015; Order 2015-7-18, DOT-OST-2015-0070-0022, at 6-7.

[11] Order Requesting Additional Information, July 31, 2015; Order 2015-7-18, DOT OST-2015-0070-0022, at 8-11.

[12] Joint Applicants' Response to Order Requesting Additional Information, Nov. 6, 2015; DOT-OST-2015-0070-0025, at 8.

5

existing procedures, and did not answer the Department's questions on whether it would implement any of the Mexican competition authority's recommendations on implementing changes at MEX.[13]

Also, during this time period, the Department and the Mexican competition authority, the Comision Federal de Competencia Economica (COFECE), conducted parallel reviews of the Mexican slot administration practices, which bolstered the Department's assessment of the situation at MEX as supported by responses to the Department's evidence request.  COFECE, whose future status is unclear following recent legislative changes in Mexico,[14] provided a decisive voice in determining that the slot allocation regime at MEX was opaque and anticompetitive, and that Aeromexico, the largest slot holder, was the primary beneficiary of these policies.[15]  Through anticompetitive rules and lax enforcement, Aeromexico was allowed to underutilize its slot portfolio while simultaneously keeping slots out of the hands of competitors.[16]  COFECE concluded that "…MEX does not follow the IATA WSGs or have functionally equivalent transparent rules for slot allocation and administration."[17]  The Department's analysis was equally rigorous with respect to entry at New York City airports, finding several impediments that were addressed in subsequent orders.[18]

### *Approval With Conditions That Were Accepted*

In late 2016, the Department tentatively approved the Delta/Aeromexico JV and granted ATI. The Department tentatively concluded that "a grant of ATI would be unjustified without stringent conditions.  We therefore tentatively find that it is necessary both (1) to limit the duration of a grant of ATI while efforts to reform the slot rules continue and (2) to ensure that competitors are able to gain access to an adequate number of MEX slots to effectively compete in the interim."[19]  In a Show Cause Order, the Department proposed to approve the Delta/Aeromexico JV and grant ATI subject to the following conditions:  Delta and Aeromexico were required to divest 24 slot-pairs at MEX and six (6) at JFK to U.S. or Mexican low-cost carriers and low-fare carriers for transborder service; and ATI was limited to five (5) years with a *de novo* application requirement.[20]

The Show Cause Order was the first step in the decision-making process.  By Order 2016-11-2, the Department found tentatively that "[t]here is ample evidence in the record that MEX is severely constrained, slot administration at the airport is opaque and diverges from industry standard practices, and new entry or expansion by potential competitors is severely limited. …

---

[13] Answer from the Mexican Secretariat of Communications and Transportation (SCT): Answer from the General Directorate of Civil Aviation (DGAC) on slot policy, DOT-OST-2015-0070-0024, Oct. 2, 2015, at 13; Aeropuerto Internacional de la Ciudad, S.A. de C.V. – Response to Request for Additional Information, DOT-OST-2015-0070-0038, June 2, 2016, at 6-7.

[14] "Mexico Dissolves Antitrust Authority in Setback to Competition" Law.com, Jan. 2, 2025, http://law.com/international-edition/2025/01/02/mexico-dissolves-antitrust-authority-in-setback-to-competition/.

[15] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 15-17; Final Order, Dec. 14, 2016; Order 2016-12-13, DOT-OST-2015-0070-0096, at 16-18.

[16] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074 at 15-17; Final Order, Dec. 14, 2016; Order 2016-12-13, DOT-OST-2015-0070-0096 at 16-18.

[17] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074 at 15-16.

[18]  Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074 at 17.

[19] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074 at 17.

[20] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 2.

[T]he Department has been unable to determine that MEX follows, or has committed to follow, any consistent or transparent guidelines for slot administration that would address the significant barriers to entry."[21]  The Department stated that it "tentatively believes that the JV will lead to an increase in transborder connectivity and will serve the interest of transborder passengers provided that infrastructure issues are addressed."[22]  Among the findings and conclusions:

- The Department's competitive analysis concluded tentatively that "approving the Joint Application will not substantially reduce or eliminate competition at the network or country-pair level, except with respect to JFK and MEX.  The Department further tentatively finds that there will be no substantial reduction or elimination of competition at the city-pair level, aside from the infrastructure constraints noted at JFK and MEX."[23]

- The Department found tentatively that slot administration practices at MEX created significant competitive access concerns and proposed tentatively slot divestitures to prevent Delta and Aeromexico from exerting market power unduly.  To address these issues, the Department proposed that the carriers divest 24 slot-pairs at MEX and six (6) at JFK to U.S. or Mexican low-cost carriers for U.S.-Mexico transborder service.[24]

- The Department decided tentatively to grant ATI to the alliance agreements between Delta and Aeromexico because it found that "the proposed JV, as conditioned, is required by the public interest and the Joint Applicants have stated that it would not be implemented without a grant of ATI."[25]  The Department's public benefits analysis found tentatively that the proposed JV would offer the following consumer benefits:  "a broader network with better connections resulting from network coordination, significant operational and cost efficiencies, increased accrual and redemption opportunities from the Joint Applicants' frequent fliers, a stronger market position resulting in more attractive services for consumers in several important markets where other legacy carriers have a strong presence (*e.g.*, Chicago, Dallas, Washington), and the potential development of an additional regional hub in Mexico to connect the U.S. to additional points in Mexico, and perhaps beyond, resulting in a further decrease in double marginalization and a further increase in capacity."[26]  Granting relief from U.S. antitrust laws provides an extraordinary opportunity for air carriers to work together to produce consumer benefits that they would not otherwise be able to deliver; a failure to deliver on these expectations challenges the basis upon which the Department granted ATI.

- Next, the Department proposed that the grant expire after five (5) years, after which time Delta and Aeromexico could submit a *de novo* application if they wished to continue with their immunized joint venture.[27]  Given the infrastructure issues at MEX, many parties were skeptical about Mexico's commitment to providing and adhering to transparent and market-based processes, especially those regarding access at key Mexican airports.  Such transparent processes were core to ensuring airlines had a fair and equal opportunity to compete in the liberalized market enabled by the Agreement.

---

[21] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 16.
[22] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 9.
[23] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 17-18.
[24] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 2.
[25] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 20.
[26] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 19.
[27] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 2.

Delta and Aeromexico maintained that the Mexican authorities were committed to reforming their slot allocation regime to conform to international standards of transparency thereby ameliorating both structural problems.[28]  As a result, the Department established tentatively the five-year expiration of the ATI and required the Joint Applicants to submit a *de novo* application for renewal of the Delta/Aeromexico JV.

Under these circumstances, the Department tentatively determined that the five-year period would be long enough to evaluate the impact of any future changes and reforms in the MEX slot allocation regime objectively, while providing some certainty to interested parties regarding the rules that would apply to the new alliance.  As the U.S.-Mexico market had only recently been liberalized, the likely competitive effects of a new joint venture were difficult to predict.[29]  As such, in lieu of additional carve-outs or other precautionary measures that potentially could limit the consumer benefits of the alliance, the Department tentatively decided to reexamine the grant of ATI after a suitable observation period.  The Department tentatively determined that "[s]hould the situation prove otherwise, the regulatory predicate for a grant of ATI would no longer exist and the Department's findings could be rendered invalid."[30]  With this declaration, the Department reserved the right to revisit its findings should integral components of the air services relationship change.

Delta and Aeromexico, in their reply of November 30, 2016, argued that the time limit was not necessary by citing the Department's ability to withdraw immunity at any time as precluding the need for such a remedy.  The carriers acknowledged that "[g]iven DOT's authority, DOT has no need to place an unprecedented time limit on the grant of ATI in this case."[31]  Here, Delta and Aeromexico affirm DOT's authority to grant and revoke ATI "at any time" should it find "concerns" such as the "slot regime" and other issues that are exhaustively documented in the case record.[32]

The Joint Applicants objected to several of the Department's findings, conclusions, and proposed conditions.  Primarily, the Joint Applicants asserted that there were no barriers to entry at MEX, and that the divestitures required for approval by the Mexican competition authority were sufficient to address any issues.[33]  The Joint Applicants also claimed that the five-year time-limited grant and *de novo* application requirement would be "unprecedented and harmful" to consumers and that the Joint Applicants, given the uncertainty regarding the longevity of its alliance, would not be able to make the long-term investments necessary to deliver the public benefits promised.[34]  Overall, the Joint Applicants alleged that the tentative decision and conditions "would jeopardize the sizeable consumer and economic benefits that the Show Cause Order recognized would flow from the proposed [joint venture]."[35]

The Final Order was the second step.  By Order 2016-12-13, the Department made final its tentative findings and conditions, but reduced the number of slot-pair divestitures at JFK from

---

[28] Joint Applicants' Response to Order Requesting Additional Information, DOT-OST-2015-0070-0025, at 16-17.

[29] Final Order, Dec. 14, 2016; Order 2016-12-13, DOT-OST-2015-0070-0096, at 27-28.

[30] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 8.

[31] Reply of the Joint Applicants, Nov. 30, 2016; DOT-OST-2015-0070-0091.

[32] Reply of the Joint Applicants, Nov. 30, 2016; DOT-OST-2015-0070-0091, at 28.

[33] Objections of the Joint Applicants, Nov. 18, 2016; DOT-OST-2015-0070-0084, at 12.

[34] Objections of the Joint Applicants, Nov. 18, 2016; DOT-OST-2015-0070-0084, at 38-39.

[35] Objections of the Joint Applicants, Nov. 18, 2016; DOT-OST-2015-0070-0084, at 1.

six (6) to four (4) while maintaining the requirement for 24 slot-pair divestitures at MEX, as well as making final the five-year limit and requirement for a *de novo* application.[36]  The Department cited the Joint Applicants' slot holdings at MEX as evidence of potential to exert market power as well as continued questions regarding the efficacy of ongoing reforms to the slot allocation system at MEX as reasons to affirm the tentative decisions made in the Show Cause Order.[37]  The Joint Applicants accepted the conditions and stated that, in their view, less onerous conditions would have enabled them to "generate even greater consumer benefits."[38]

### *Extension of Expiration Date*

In 2020, the Department agreed to postpone the expiration of the antitrust immunity following a motion filed on the record.  In their motion, Delta and Aeromexico contended that the five-year review condition created a disincentive to long-term investment and was unreasonably burdensome.[39]  They argued that slot access at MEX had not proven to be a barrier to entry as many of the recipients of divested slots either did not need their slots or had returned their slots and left the market due to exogenous circumstances, and that competitive conditions had changed so fundamentally that the basis for the five-year period and *de novo* application no longer existed – that such a process would be "wasteful and potentially disruptive."[40]  Alaska, Southwest, JetBlue, Interjet, and the Delta Master Executive Council opposed the motion, highlighting ongoing challenges in accessing MEX, the prematurity of removing the condition while reforms were still evolving, and the size and proximity of the Mexican market warranting special scrutiny.

By Order 2020-12-18, issued on December 17, 2020, the Department granted in part the motion of Delta and Aeromexico to amend Order 2016-12-13.[41]  The Department maintained the requirement that Delta and Aeromexico file a *de novo* application and extended the filing date for that application to March 31, 2022, while extending the existing grant of ATI through the pendency of a renewal application so long as Delta and Aeromexico filed their application in a timely manner and worked expeditiously toward establishing a substantially complete record.

### *Second Application*

On March 29, 2022, Delta and Aeromexico filed their *de novo* application (Reapplication) and the Department issued a notice suspending the procedural schedule on April 11, 2022.  Consistent with Order 2020-12-18, the carriers' existing JV has remained immunized during the pendency of the Reapplication.

At the time of their Reapplication, competitive conditions in the U.S.-Mexico market remained unpredictable and less favorable than expected.  In May 2021, the Federal Aviation Administration (FAA) downgraded Mexico's International Aviation Safety Assessment (IASA) rating to Category 2 after finding that the country did not meet International Civil Aviation Organization safety standards.  Under Category 2, Mexican carriers were no longer able to

---

[36] Final Order, Dec. 14, 2016; Order 2016-12-13, DOT-OST-2015-0070-0096, at 1.
[37] Final Order, Dec. 14, 2016; Order 2016-12-13, DOT-OST-2015-0070-0096, at 3.
[38] Notice of the Joint Applicants, Dec. 21, 2016; DOT-OST-2015-0070-0100, at 1.
[39] Consolidated Reply and Motion for Leave to File, Aug. 15, 2019.
[40] *See* Consolidated Reply at 17.
[41] Order, Dec. 17, 2020; Order 2020-12-18, DOT-OST-2015-0070-0235.

initiate new own-metal flying to the United States, and U.S. carriers, including Delta, were required to suspend the display of U.S. carrier designator codes on flights operated by their Mexican code-share partners. Carriers from both countries could continue already-existing services, and U.S. carriers were still free to add services to Mexico. Despite these limitations, with the understanding that reforms were being pursued such that the downgrade may have only been temporary, the Department continued to evaluate Delta and Aeromexico's Reapplication without taking any action that would impair the existing ATI. On September 14, 2023, FAA restored Mexico's IASA Category 1 status, after which Delta and Aeromexico resumed joint marketing and selling activities on U.S.-Mexico routes and Aeromexico, along with other Mexican carriers, added own-metal services in the U.S.-Mexico market.

In the time period after Delta and Aeromexico submitted their Reapplication, the Department became increasingly concerned about competitive conditions. Between 2022 and 2023, the GoM took a series of measures at MEX that constricted and restricted the U.S.-Mexico air transportation market, calling into question the continued validity of the Agreement and undermining the Department's findings in its ATI orders.

With respect to the existing ATI and the Reapplication, the Department was conservative in its approach, allowing time for carriers to emerge from the COVID-19 pandemic (even though the pandemic did not reduce U.S.-Mexico transborder traffic as much as other international markets), awaiting the restoration of Mexico's IASA Category 1 status, and allowing for government-to-government consultations with Mexico at all levels to resolve issues relating to Mexico's noncompliance with the Agreement.

### *Order 2024-01-17 Proposing to Withdraw the ATI*

In January 2024, the Department, by Order 2024-01-17, identified fundamental concerns regarding the international regulatory framework and competition in the U.S.-Mexico market, including the imposition of a decree by Mexico prohibiting all-cargo operations at MEX, the confiscation of slots of U.S. carriers, and the unreliable and nontransparent slot administration practices that reduced capacity at MEX and created no possibility for new entry.[42] The Department identified the potential harmful impacts of antitrust immunity in this environment, with specific emphasis on the lack of entry or the possibility of entry in the Mexico City market.

By Order 2024-01-17, the Department determined tentatively that Delta and Aeromexico should not have ATI under current competitive conditions. The Department tentatively proposed to dismiss the Reapplication and allow the existing immunity to expire after an orderly and extended wind down period.

Rooted in the same concerns regarding Mexican noncompliance, the Department previously had suspended the procedural schedule in the application of Allegiant and Viva Aerobus for an antitrust immunized joint venture between the United States and Mexico.[43]

---

[42] Order to Show Cause, Jan. 26, 2024; Order 2024-01-17, DOT-OST-2015-0070-0245, at 4.
[43] Notice to Joint Application of Allegiant Air, LLC and Aeroenlaces Nacionales, S.A. de C.V. d/b/a Viva Aerobus, July 31, 2023; DOT-OST-2021-0152-0193.

10

*Comments by Interested Parties*

The Department received numerous comments on its 2024 tentative decision to terminate ATI. American and JetBlue supported DOT's competitive assessment and its reliance on a predicate of an open and pro-competitive international regulatory framework as a necessary condition for an immunized JV. This predicate, they agreed, was a longstanding requirement that every interested party had understood. American and JetBlue pointed to some of the specific concerns identified by the Department, including a nontransparent and non-standard slot administration regime in Mexico.

Delta and Aeromexico, joined by parties such as the Mexican Undersecretary for Transport and the Asociacion Sindical de Pilotos Aviadores de Mexico (ASPA), objected. Delta and Aeromexico stated their belief that the Department's tentative decision was cursory, unsupported, premature, extra statutory, and extra record-based.[44] In this administrative proceeding, the Department has reviewed these arguments thoroughly to ensure due process. The Joint Applicants assert that the Department:

- violated the Administrative Procedure Act (APA) by, among other things, failing to provide a statutory justification, a factual analysis, or clear evidence showing how Mexico's actions breached the Agreement or how any actions by the GoM or the current competitive conditions established a basis to withdraw the ATI;
- failed to identify which provisions of the U.S.-Mexico agreement were breached;
- had been unclear about its assumptions, including whether the Felipe Angeles International Airport (NLU) was outside the Mexico City market, and whether there was actual harm to U.S. aviation interests. To Delta/Aeromexico, the multi-airport system in Mexico City is not different materially from other global examples such as London or Tokyo where ATI has been granted; further, Delta and Aeromexico believe the Department is applying stricter standards to MEX unfairly;
- violated due process by not allowing proper review, public comment, or a chance to contest the rationale;
- failed to consider reasonably available alternatives, such as diplomatic or regulatory tools including: formal consultations under the Agreement, the International Air Transportation Fair Competitive Practices Act (IATFCPA), 14 CFR Part 213 allowing the Department to require the filing of schedules or reduce schedules, or dispute resolution provisions under the Agreement; and
- violated law and procedure extending to its treatment of the new application by failing to take evidence, follow procedures in its regulations, allow public comment, and consider the application *de novo* as laid out in previous orders.

Delta and Aeromexico urged the Department to withdraw Order 2024-01-17 and, should the Department continue to have concerns after pursuing other options, it should announce a new process to review the ongoing necessity of ATI.

Allegiant and Viva Aerobus, which also seek a separate grant of antitrust immunity, supported Delta and Aeromexico. Allegiant and Viva Aerobus argued that MEX access issues do not harm U.S. airlines or access to the rest of Mexico. They asserted that disputes should be resolved

[44] Objection of the JCA Partners to Show Cause Order 2024-01-17, Feb. 23, 2025; DOT-OST-2015-0070-0258.

11

through the resolution processes outlined in the Agreement and that the Department did not cite specific articles of the Agreement that the GoM violated. They advocated for reinstating the procedural schedule for their ATI application, warning that inaction on both applications creates competitive imbalance. They stressed that localized issues at one airport should not call into question a nation's overall compliance with Open Skies commitments. They claimed the Department did not provide empirical analysis to support the decision and that there is no clear evidence of unfair treatment at MEX.[45]

## IV.    STATUTORY FRAMEWORK

The Department's approach in this Order is firmly grounded in statute as well as competition analysis, and well within the scope of discretion provided to the Secretary of Transportation by Congress to protect the public interest.

### A. Statutes of General Applicability

There are statutes of general applicability that are relevant to this ATI matter and provide important guidance in support of the Department's overall mission to promote competition and exercise sound regulatory oversight. For example, Congress has enumerated a number of public interest factors DOT must consider in reviewing alliance agreements in consideration of ATI, including:[46]

- placing maximum reliance on competitive market forces and on actual and potential competition;
- developing and maintaining a sound regulatory system that is responsive to the needs of the public and in which decisions are reached promptly to make it easier to adapt the air transportation system to the present and future needs of the commerce of the United States;
- preventing unfair, deceptive, predatory, or anticompetitive practices in air transportation;
- avoiding unreasonable industry concentration, excessive market domination, monopoly powers, and other conditions that would tend to allow at least one air carrier or foreign air carrier to unreasonably increase prices, reduce services, or exclude competition in air transportation;
- encouraging, developing, and maintaining an air transportation system relying on actual and potential competition;
- encouraging entry into air transportation markets by new and existing air carriers and the continued strengthening of small air carriers to ensure a more effective and competitive airline industry;
- strengthening the competitive position of air carriers to at least ensure equality with foreign air carriers, including the attainment of the opportunity for air carriers to maintain and increase their profitability in foreign air transportation;
- with respect to all-cargo services, encouraging and developing an integrated transportation system relying on competitive market forces to decide the extent, variety, quality, and price of services provided;

---

[45] Joint Objection of Allegiant Air and Viva Aerobus to Order to Show Cause, Feb. 23, 2024; DOT-OST-2015-0070-0259.

[46] 49 U.S.C. § 40101(a), (b), and (e).

- with respect to all-cargo services, providing services without unreasonable discrimination, unfair or deceptive practices, or predatory pricing;
- the maximum degree of multiple and permissive international authority for air carriers so that they will be able to respond quickly to a shift in market demand; and
- eliminating discrimination and unfair competitive practices faced by United States airlines in foreign air transportation, including unreasonable restrictions on operations.

We include a significant portion of 49 U.S.C. § 40101(a), (b), and (e) here to demonstrate the extent of the Department's relevant responsibilities that we uphold through the action in this Order.[47]

## B. The ATI Statutes

The Department reviews a joint venture involving foreign air transportation under 49 U.S.C. §§ 41309, 41308, and its procedural regulations at 14 CFR Part 303. A person seeking approval of a transaction covered by 49 U.S.C. § 41309 may file an application with the Department.[48] Applications must be prepared and submitted consistent with the Department's procedures.[49] The applicant must state explicitly whether it seeks ATI under 49 U.S.C. § 41308.[50] When reviewing new requests, there is a two-step process.

The first step involves determining whether the cooperation agreement is "adverse to the public interest," based on competitive factors (competitive effects analysis).[51] The Secretary shall approve the agreement if it is consistent with the public interest. The Secretary shall disapprove, or after periodic review, end approval of an agreement that substantially reduces or eliminates competition, unless the Secretary finds that the agreement is necessary to meet a serious transportation need or achieve important public benefits, and the transportation need cannot be met or those benefits cannot be achieved by reasonably available alternatives that are materially less anticompetitive.[52]

The second step involves the request for ATI.[53] If the Secretary approves an agreement, he *may* exempt the parties to the agreement from the antitrust laws, when he decides it is required by the public interest, but only to the extent necessary to allow those parties to proceed with the transaction.[54] To determine whether an exemption is required by the public interest, the Department conducts a detailed examination of public benefits (public benefits analysis). The Department's findings must be included in the final order approving or disapproving the agreement.[55]

---

[47] *See also* 49 U.S.C. § 40105(b)(1)(B). We further note this source: *International Air Alliances: Greater Transparency Needed on DOT's Efforts to Monitor the Effects of Antitrust Immunity*, GAO-19-237 (Mar 20, 2019).
[48] 14 CFR § 303.03.
[49] 14 CFR §§ 303.04, 303.30-32.
[50] 14 CFR § 303.05.
[51] 49 U.S.C. § 41309(b).
[52] 49 U.S.C. § 41309(b)(1).
[53] 49 U.S.C. § 41308.
[54] 49 U.S.C. § 41308(b).
[55] 49 U.S.C. § 41309(c)(3).

13

In the event that the Department reviews or withdraws existing approvals or grants of ATI, it exercises, as needed, its full range of economic and international aviation policy authorities including sections 41309 and 41308. In reviewing any ATI conferred previously in any section 41309 transaction, the Department may terminate or modify such ATI if, after notice and hearing, it determines the ATI is not required by the public interest.[56] In determining whether ATI is required by the public interest, the Department considers the factual record and statutory policy objectives.[57] The proponents of the ATI have the burden of justifying the continuation of ATI conferred previously.[58]

In their objections, Delta and Aeromexico challenge the Department's statutory authority – at a minimum with respect to dismissing their new application based on the GoM's failure to comply with the terms of the Agreement. We note, above all, that the ATI statutes provide for termination of approval for joint venture agreements while also establishing high standards for obtaining and maintaining a grant of ATI. The Secretary's approval is contingent upon findings of adequate competition ("not adverse to the public interest"; "substantially reduces or eliminates competition"). Modification and termination of a JV are expressly allowed.[59] In addition, with respect to the Department's authority to grant, to deny, or to withdraw ATI under section 41308, the Secretary may draw upon the public interest factors.[60] The Department should only grant ATI "to the extent necessary" and only as "required by the public interest."[61] It is entirely supportable for the Secretary to find that the continued grant of ATI is not required by the public interest given present facts and circumstances, including material changes in the international regulatory framework that alter the competitive playing field. Because the standards for obtaining approvals and grants of ATI are high, once a grant of ATI is made, it is reasonable that changed circumstances after the initial actions by the agency could result in current holders of authority falling short of those standards. All of the statutes of general applicability strongly counsel the Department to remain vigilant and dynamic in its assessments and view of the public interest.

To put the Joint Applicants' objections in context, it is instructive to look at the broader purpose and structure of the Department's approach to these cases. ATI proceedings contain a procedural phase in which parties submit comments routinely and the Department engages in detailed and transparent factfinding on the key issues. In the decisional phase, there are an initial comment period and detailed written decisions containing policy positions upon which interested parties can further comment. The resulting record of evidence provides a firm foundation for decisions and the conditions and limitations that apply to those decisions. The Department and interested parties rely routinely upon precedent and cite it in both the procedural and decisional phases. One reason that the Department engages in such detailed process *ex ante* is to ensure that, if there is a serious issue with an ATI grant *ex post*, we have the flexibility to protect the public interest adequately should circumstances warrant.

---

[56] 49 U.S.C. § 41308(b); 14 CFR § 303.06.
[57] *See* 49 U.S.C. § 40101.
[58] 14 CFR § 303.06.
[59] 49 U.S.C. § 41309 (b)(1) provides that the Secretary of Transportation shall "end approval of, an agreement, request, modification, or cancellation, that substantially reduces or eliminates competition…."
[60] *See* 49 U.S.C. § 41308.
[61] 49 U.S.C. § 41308.

### C. DOT's Assessment of the Regulatory Framework While Exercising the Statutory Authority to Review and Grant ATI

The Joint Applicants have changed their positions and questioned the legal foundations for the Department's "ATI predicate" and Mexico's compliance with key terms of the Agreement. Whereas historically, and during the application process, the Joint Applicants recognized the prerequisite of an Open Skies agreement, they now, as the only holders of ATI in the market, argue that the Department's authority is limited.[62, 63]

In the 1990s, the Department developed and defined its Open Skies policy.[64] We did so in a public proceeding, subject to notice and comment, and then transparently incorporated the resulting "Open Skies" model into international aviation policy, negotiations, and regulatory proceedings such as applications for ATI. There is broad consensus about the meaning of U.S. Open Skies agreements and their economic effects developed through this body of precedent over several decades.[65] Numerous airlines have relied upon this understanding while working with foreign regulators, negotiating the terms of joint ventures or other cooperative agreements, and to inform their positions in many different aviation dockets.

With respect to ATI proceedings, the Open Skies predicate is an organizing principle that ensures a competitive market in which joint ventures do not substantially reduce competition and provide public benefits for which a grant of ATI is required by the public interest. For that reason, it is the longstanding policy of the Department not to consider requests for ATI in a market until all the elements of an Open Skies agreement are available to carriers.[66] In a seminal 2008 order involving Delta as an applicant, we wrote that:

> The predicate for our consideration of a request for immunity is the existence of
> an "open-skies" framework between the United States and the government of

---

[62] In a 2022 statement, a senior executive at Delta stated: "Today, there are more than 120 Open Skies agreements worldwide. These have allowed Delta to expand our flying and build industry-leading joint ventures and codeshare partnerships with our airline partners around the world …. But there is one very important 1992 milestone not likely on any of our radars at the time that would transform the airline industry and become the backbone for the growth not only of Delta, but all of civil aviation. That was the year the very first Open Skies Agreement was signed between the U.S and the Netherlands. This groundbreaking agreement between our two countries eliminated government interference in airline decisions regarding service levels, routes, and pricing. It paved the way for airlines like KLM and Delta to form robust, metal-neutral joint venture partnerships enabled by the U.S. Department of Transportation's grants of antitrust immunity (which are based on, and cannot be granted without, Open Skies)…." *See* https://www.deltatakingaction.com/content/deltaactions/en/news/2022/oct/let-s-celebrate-three-decades-of-open-skies-agreements-and-their.html.

[63] Delta has previously commented on the Open Skies issue, stating, "well settled Department precedent and international aviation policy preclude the United/bmi request. Thus, in the absence of an open skies agreement, the Department must dismiss or deny the pending applications and terminate the proceeding. The Department adopted a sound policy nearly a decade ago that antitrust immunity will not be granted without a full open skies agreement. That policy has been immutable and has been applied in every single immunity case considered by the Department, since the first Northwest/KLM proceeding in 1993." (Reply of Delta Air Lines, Inc., DOT-OST-2001-11029-0117, March 1, 2002, at 1-2.).

[64] Final Order in the matter defining "Open Skies," Aug. 5, 1992; Order 92-8-13, Docket 48130.

[65] "Regulatory Convergence Between U.S. Antitrust Law and EU Competition Law in International Air Transport—Taking Stock" by Antigoni Lykotrafiti *Journal of Competition Law & Economics*, 2023, 19, 146–176 https://doi.org/10.1093/joclec/nhac013.

[66] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 7.

each foreign applicant-carrier's homeland. We are willing to consider the instant request because the United States has an "open-skies-plus" air transport agreement with the European Union and its Member States that includes as a signatory the homeland of each foreign carrier-applicant…The U.S.-EU Air Transport Agreement will allow U.S. airlines to serve any point in the EU, and European Community airlines to serve any point in the U.S., with open intermediate and beyond rights. The open-skies-plus framework between the United States and Europe encourages more competitive service, because market forces, not restrictive agreements, discipline the price, frequency, capacity levels, and quality of airline service.[67]

We also discussed the importance of maintaining an Open Skies predicate where immunized joint ventures operate when we stated that:

Open-skies agreements create a situation in which pricing, capacity, frequency, routing, new entry, and quality of airline service are determined by market forces, not government restrictions or the threat of government restrictions. Without an open-skies framework, airlines operating with antitrust immunity may not be subject to competitive market forces, which could compel the Department to reconsider its prior grants of immunity.[68]

These passages – echoed in virtually every ATI case, including this one – mean that the Department's starting point for reviewing a joint venture is ensuring that it will operate within a pro-competitive regulatory framework where market forces, not government intervention, determine market outcomes. In many industries, one might take for granted that firms can enter a market and compete vigorously without interference from the government. Not so in the global airline industry. While commercial aviation in the United States since its deregulation in 1978 is subject to market forces based on U.S. law, when it comes to flights beyond U.S. borders, the markets and ability to access them are subject to the terms of an air services agreement negotiated between the United States and a foreign government.

### *Statutory Grounding for the Open Skies Regulatory Framework*

Delta and Aeromexico argue that the Department's reliance on the "Open Skies predicate" to dismiss the application is "extra-statutory." Regardless of the label, the Department's approach is firmly grounded in statute and U.S. competition law.

Proper review of an application requires an assessment of the market's regulatory framework to determine first whether the market structure is open and competitive and second what competitive effects will result from the JV operating in that market structure. As noted above, unlike the domestic U.S. market, the regulatory framework for foreign air transportation is established by air transport agreements negotiated between the United States and the foreign country. We therefore review the implementation of the applicable air transport agreement, in

---

[67] Order to Show Cause, Apr. 9, 2018; Order 2008-4-17, DOT-OST-2007-28644-0174, at 2. *See also* Order 2008-4-17, at 13 ("In light of all the factors discussed above, we tentatively find that the proposed alliance will not substantially reduce or eliminate competition, provided that transatlantic markets remain governed by a regional open skies agreement that promotes new entry regardless of national borders.").
[68] Final Order, Feb. 13, 2007; Order 2007-2-16, DOT-OST-2005-22922-0055, at 2.

this case, the U.S.-Mexico Air Transport Agreement, to determine the extent to which it enables market forces such as new entry, competitive pricing, and a fair and equal opportunity to compete.[69]  Each of these elements are part of the defined U.S. Open Skies framework – what we have referred to as the "Open skies predicate" in ATI cases.  If the elements exist in principle and are adhered to in practice, the Department can establish on the record that a minimally pro-competitive environment exists to adequately discipline the type of integrated commercial activities that the Joint Applicants propose, which includes joint pricing, capacity planning, and revenue sharing like a merged firm.

The statutes support this approach.  Under section 41309, the Secretary shall disapprove a joint venture agreement that "substantially reduces or eliminates competition," which is the same standard applied in the Clayton Act when examining the impact of a transaction (such as a merger) on relevant markets.  This threshold analysis for immunized joint ventures is independently supported by section 41308 as well.  Section 41308(b) supports the ATI predicate because a grant of ATI is discretionary; further, the statute contains high standards for granting and, by logical extension, maintaining ATI in its own right (ATI must be "required by the public interest" and DOT should only grant ATI only "to the extent necessary").  This broad discretion and dynamic approach that takes into account changing circumstances is further buttressed by the policy standards in section 40101 that Congress infused heavily with competition standards present in other competition laws (*e.g.*, "eliminating discrimination and unfair competitive practices faced by U.S. airlines in foreign air transportation, including unreasonable restrictions on operations").

DOT's approach is consistent with the U.S. Government's standardized reviews of regulatory matters in antitrust, as well as case law.  The Merger Guidelines issued jointly by the Federal Trade Commission and the U.S. Department of Justice indicate that a merger may lessen competition substantially if it would enable firms to avoid a regulatory constraint because that constraint was applicable to only one of the merging firms.[70]  Antitrust case law further supports the notion that regulatory barriers, including a government's desire to limit new entry, are relevant to assess the competitiveness of mergers.[71]  DOT's longstanding approach of using the Open Skies threshold to assess a minimally viable regulatory framework is not only wholly consistent with sections 41308 and 41309, but it also provides benefits to interested parties including efficiency, predictability, and enhanced competitiveness.  Here, we are administering our statutory authority in the context of a market in which the United States and Mexico have

---

[69] Final Order, Dec. 14, 2016; Order 2016-12-13, DOT-OST-2015-00070-0096, at 19 (The Department "…must, in order to protect the public interest, not examine just the effects of the proposed alliance, but also the environment in which that alliance will operate, to ensure that there will be adequate competition to not only mitigate any potential harm from the proposed transaction, but to guarantee that the anticipated public benefits are likely to be realized.").

[70] Merger Guidelines (2023), U.S. Department of Justice, at § 2.11, https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf;  *see also* Merger Guidelines, at § 4.4 (explaining that factors such as regulation are important to determine whether competitors may become effective or "rapid" new entrants in a market affected by a transaction).

[71] In the Matter of RWJ Barnabas Health, June 2, 2022; Docket No. 9409, https://www.ftc.gov/system/files/ftc_gov/pdf/D09409RWJP3ComplaintPublic.pdf; In the Matter of Lifespan Corporation, Feb. 17, 2022; Docket No. 9406, https://www.ftc.gov/system/files/ftc_gov/pdf/d_9406_lifespan-cne_p3_complaint_public_redacted.pdf; Federal Trade Commission Staff Submission to Indiana Health Department, Sep. 5, 2024; U.S. Federal Trade Commission, https://www.ftc.gov/system/files/ftc_gov/pdf/in_copa_comment_9-5-24_public_redacted.pdf.

agreed to a liberalized agreement on paper, and two competitors in that market have a grant of ATI with unprecedented conditions designed explicitly to address problems with the consistency and adequacy of the international regulatory framework in practice.

## V.    TENTATIVE DECISION

We have reviewed the competitive state of the U.S.-Mexico air services market based on the current facts and circumstances noted above and determined tentatively that the Delta/Aeromexico JV – initially approved and given a grant of ATI by the Department – no longer meets applicable statutory standards.  We also assess that the Department's findings approving the JV and granting ATI are no longer valid.  Therefore, we decide tentatively to disapprove the JV and withdraw the grant of ATI currently in effect following a wind-down period.  This tentative decision is supplemental to Order 2024-01-17, responds in detail to the objections raised to the proposal in that order, and provides a more extensive basis and explanation for the Department's action.

The Department provided every opportunity for the circumstances to change and for the Joint Applicants to prepare for the eventuality that the situation would not change.  When the Joint Applicants petitioned to extend the expiration date for their grant of ATI, we granted the request; when the COVID pandemic and the FAA safety audit were in progress, we extended the timeline; when two other carriers, Allegiant and Viva Aerobus sought a new grant of ATI, we deferred a decision; when Delta and Aeromexico strongly opposed the first proposal to terminate the ATI, the Department allowed another 18 months for conditions to improve and for new government administrations in each country to transition to office.  Not only did market conditions in the U.S.-Mexico market fail to improve, they worsened, as described below in section B and in Part VI, Additional Factual Assessment of Competitive Conditions.  The Department can no longer wait to prevent further consumer harm and must treat all stakeholders fairly.  If ATI is withdrawn as proposed, Delta and Aeromexico will still have pro-competitive options to coordinate many aspects of their services in the market just like other competitors.

### A.    Mexico's Non-Compliance with Open Skies Regulatory Framework

Based upon the evidence set forth in Order 2025-7-11, the Department finds that the necessary competitive conditions for an immunized joint venture are no longer present in the U.S.-Mexico market.

In their comments to the Department's earlier tentative findings, Delta and Aeromexico express concern that the Department did not identify specific terms of the Agreement that Mexico failed to meet before we proposed to terminate the ATI.  The primary violations that affect the competitive structure of the market materially are Mexico's regulatory actions to prohibit cargo operations at MEX, its confiscation of slots at MEX, and its continued application of anticompetitive slot administration rules.  The Department found that, in implementing these restrictions, Mexico acted inconsistently with its obligations to allow U.S. carriers to conduct scheduled combination operations between the United States and Mexico under Annex I of the U.S.-Mexico agreement.  The Department also found that Mexico acted inconsistently with its obligations 1) under Article 11(1) of the Agreement to allow U.S. airlines a fair and equal opportunity to compete in providing air transportation governed by the Agreement, and 2) under Article 11(2) of the Agreement to not limit unilaterally the volume of traffic, frequency, or

18

regularity of service, or the aircraft type or types operated by the airlines of the United States. These actions limit materially and unacceptably entry and capacity at MEX and distort competition in a market where two predominant competitors may coordinate pricing and capacity.

Since the issuance of Order 2024-01-17, the competitive situation in the U.S.-MEX market has deteriorated. Delta and Aeromexico are able to exploit this uneven playing field by adding additional flights between MEX and U.S. points. Meanwhile, U.S. carriers continue to be significantly disadvantaged in their ability to plan, maintain and/or add services at MEX due to a non-transparent slot allocation regime that continues to favor Aeromexico and Delta. The degree of opacity and arbitrariness surrounding the GoM's slot management practices at MEX, coupled with the disproportionate impacts on U.S. carriers versus Mexican carriers or third-country carriers, undercuts the ability of U.S. carriers to fairly compete in the market. All-cargo carriers also remain prohibited from operating at MEX, which undermines their ability to compete with combination passenger-cargo carriers such as Delta and Aeromexico at the largest Mexican airport.

Mexico's lack of compliance with a suitable international regulatory framework provided by the Agreement creates anticompetitive conditions in the U.S.-Mexico market. It makes a material difference in the review of a Delta/Aeromexico JV under the statutes as described below.

## B. Analysis of Changed Circumstances

### *Detrimental Competitive Effects*

The 2016 orders proposing to grant ATI and then granting it analyzed competitive effects in U.S.-Mexico markets. As first identified in Order 2024-01-17, and reiterated here with additional explanation, the changed circumstances in the market undermine seriously the Department's going in position for its statutory analysis and conclusions. Actions taken by Mexico regarding access to MEX for both cargo and passenger airlines highlight that the issues the Department identified in 2016 remain, confirming the Department's concerns about the suitability of the U.S.-Mexico market to support a grant of ATI to any JV, including specifically the Delta/Aeromexico JV.

<u>Entry at MEX</u>

Mexico's Transport Ministry, SICT, confirmed to the Department in direct correspondence on November 28, 2023, that additional entry at MEX is closed. A copy of this letter is being placed in the docket. It should be noted that this communication came after the Department expended significant time outside of this proceeding working with Mexican counterparts to address Mexico's failure to adhere to the Agreement. The threat, potential, and ability of a new entrant to come in as a market disruptor is an important disciplining competitive force. Permitting ATI in a market that the GoM has closed effectively and substantially to new entrants would mean that the Department has given a license for legalized collusion among partners that control almost 60 percent of operations at the fourth-largest gateway to and from the United States. It would provide safe harbor to possible anti-competitive and efficiency-reducing arrangements, such as reduced growth, inefficient timings, or exclusionary conduct. While this potential harm has been evidenced at MEX to date, we see a realistic possibility that Mexico could act in a similar arbitrary manner at other congested Mexican gateways, such as Cancun, given Mexico's

19

lack of a coherent and transparent slot allocation regime that is applied consistently at the national level. The strike against a major underpinning of the Agreement – the free entry and exit of new competition – is seriously problematic for the continued relevance of the findings that the Department identified as necessary to constrain the anticompetitive effects of the Delta/Aeromexico JV.

Slot, Regulatory, and Transparency Issues

A key component of the 2016 ATI order was mutual recognition by the Department and Mexico's competition regulator, COFECE, that substantial slot and regulatory transparency issues needed to be addressed by the GoM. We chose to proceed in 2016 based on Mexico's commitment to address these issues through reforms (among other conditions). One of the primary reasons for limiting the original grant of ATI to five years was to provide an incentive for Mexico to follow through on implementing the promised reforms.[72] Since then, Mexico has reversed course through its actions, including the confiscation of slots from foreign and domestic carriers at MEX without adhering to international standards. Indeed, American, United, as well as Mexican carriers such as Volaris and Viva Aerobus, lost approximately two slot pairs each at MEX during the Winter 2022/2023 and Summer 2023 schedule periods, and as of this writing there continues to be a lack of clarity as to whether these carriers will be able to recover their historic access to these slots or will ever be able to expand their services from MEX even as Aeromexico continues to launch new routes and frequencies from MEX to the United States. Even if these carriers were to get some or all of the slots back, the Department now has a fundamental concern as to Mexico's commitment to historical rights and the principle of fairness and new entry that are critical at congested gateways, in addition to the foundational concern regarding the absence of a transparent slot allocation mechanism consistent with international norms that would apply to all Mexican IATA Level 3 airports both now and in the future. The considerable due process and patience requested by Delta and Aeromexico to address the Department's concerns with ATI stand in contrast to the speed at which the GoM has proven it will act to fundamentally change market conditions.

In this environment, the immunized Delta/Aeromexico JV has an unfair advantage as it can leverage the continued lack of transparency at MEX with dominant slot holdings and favored positioning at MEX. For example, while other carriers have been forced to cut capacity between the U.S. and Mexico City, Delta/Aeromexico have announced new routes.[73] In a closed market, giving ATI to the largest slot holders magnifies the competitive concerns and increases the potential for consumer harm, because they can leverage their large pool of holdings to trade slots among themselves. This is not an opportunity afforded readily to other carriers whose slots are being taken away (*e.g.*, Delta may not have to reduce services at MEX as Aeromexico can instead sacrifice lower yielding domestic services within Mexico to repurpose those slots for expansion on transborder routes). The Department cannot simply count the number of new services by the joint venture from MEX. It must also take into account the counterfactual (*i.e.*, what Delta and Aeromexico could have done otherwise) and the overall impact on the market given the limitations placed on their competitors.

---

[72] *See* Order 2016-11-2, at 27 (noting that if sufficient reforms and transparency at MEX are lacking, "the Department would have to carefully consider whether it could approve a new application if tendered...").

[73] Aeromexico initiated new flying from MEX to Boston (BOS), Raleigh Durham (RDU), Tampa (TPA), and Washington Dulles (IAD) airports in 2024, and to Philadelphia (PHL) and San Juan (SJU) in 2025.

Cargo market distortions in Mexico City

The existing ATI allows Delta and Aeromexico to coordinate cargo operations in the U.S.-Mexico market, including at MEX. By decree, Mexico forced the all-cargo carriers to leave MEX, leaving them no choice but to relocate to the distant new airport – NLU. This type of airport planning enforced by abrupt fiat creates uncertainty in the market that limits growth and investment, especially by new entrants. In addition, by forcing all-cargo carriers out of MEX while allowing Delta/Aeromexico and other combination carriers to continue to carry belly-cargo at MEX, Mexico confers an unfair advantage in the cargo market to the ATI holders who also have a disproportionate share of the slots at MEX. All-cargo operations at NLU are further hampered as they cannot feed their cargo to connecting operations to other points in Mexico and beyond which was previously possible (and which Delta/Aeromexico can still do) at the much larger MEX. Carriers operating "combination" services, *i.e.*, both passenger and belly cargo operations, continue to benefit from the proximity and infrastructure advantages of MEX whereas all-cargo services have incurred extra costs associated with transitioning operations to NLU resulting in a competitive imbalance between combination and all-cargo carriers.

**Figure 1**

*United States – MEX:  Total Cargo*



21

Source:  DOT T100 Segment

**Figure 2**

*Total Cargo Shares in the United States – MEX market*



Source:  DOT T100 Segment

The charts above show the impact of Mexico's actions to move all-cargo operations out of MEX by September 2023.  Predictably, overall cargo tonnage has declined, and Delta/Aeromexico now controls the majority share of cargo tonnage at MEX, placing the carrier in an advantageous position to connect air cargo in markets throughout the region.  Notably, this impact is also occurring in an environment where other combination carriers that offer belly cargo are also having their capacity reduced, further providing an upper hand to Delta/Aeromexico in the air cargo markets that serve or connect through MEX.  Aeromexico is the carrier with the largest volume of belly cargo in the U.S.-Mexico transborder region, carrying 59 percent of all belly cargo tons for 2022-2023.  American, United, and Delta are the only other carriers transporting significant belly cargo in the broader U.S.-Mexico market, each with between 9 and 15 percent of belly cargo tons.[74]

Aeromexico has an even larger share of belly cargo volume between the U.S. and MEX specifically, carrying 73 percent of all belly cargo tons for 2022-2023.[75]  The only other carriers with significant belly cargo operations are American, United, and Delta.  These three carriers each have single-digit shares of the belly cargo in this market.

---

[74] DOT T-100 Segment.
[75] Ibid.

**Figure 3**

*United States – MEX:  Belly Cargo*



Source:  DOT T100 Segment

**Figure 4**

*Belly Cargo Shares in the United States – MEX Market*



Source:  DOT T-100 Segment

<u>Infrastructure Issues</u>

In 2016, DOT identified lack of capacity at MEX as one of the main issues driving the need for improved slot administration at the airport.  During the 2016 proceeding, the GoM was already

23

in the process of building a replacement airport for MEX at Texcoco. Indeed, in 2016, construction was well underway on the project, with portions of the terminal as well as the runway and other physical elements of the airfield complete. In late 2018, the newly elected Mexican president, Andres Manuel Lopez Obrador, cancelled the project, citing the results of a referendum. Instead, his government looked to a distant converted military airport, NLU. All-cargo carriers had no choice but to move their operations there to serve Mexico City after his government forced them out of MEX via decree.[76] His government also coerced additional passenger services to move to NLU by restricting capacity at MEX on the basis of saturation of the airport.[77]

It is inappropriate and contrary to the public interest for the Department's grant of ATI authority to contribute to and indeed reinforce this harmful competitive dynamic. The regulatory framework has created significantly changed circumstances that either are no longer consistent with the Department's decision in 2016, including these findings and citations, or validates the structural concerns we identified, including those in the table below.

**Table 1**

| **Finding** | **Citation** |
|---|---|
| "It is the longstanding policy of the Department not to consider requests for ATI in a market until all of the elements of an Open Skies agreement are available to carriers…Should the situation provide otherwise, the regulatory predicate for a grant of ATI would no longer exist and the Department's findings could be rendered invalid." – concern validated | Order 2016-11-2 at 8. |
| "The Department therefore tentatively finds that approving the application will not substantially reduce or eliminate competition in the U.S.-Mexico market, except in markets involving MEX." – no longer supported | Order 2016-11-2 at 11 and 13. |
| "The Department tentatively views the concentration and barriers to entry in [the JFK-Mexico City] market as having a substantial impact on competition in the foreseeable future, unless appropriate conditions are imposed." – no longer supported | Order 2016-11-2 at 14 |
| "There is no suitable substitute airport for MEX" and "this is unlikely to change in the foreseeable future." – concerns validated | Order 2016-11-2 at 15. |

---

[76] *See* Feb. 2, 2023, Decree, *available at* https://dof.gob.mx/nota_detalle.php?codigo=5678705&fecha=02/02/2023.
[77] *See* Mar. 3, 2022, Resolution *available at* https://dof.gob.mx/nota_detalle.php?codigo=5644607&fecha=03/03/2022; *see also* Aug. 31, 2023, Resolution *available at* https://www.dof.gob.mx/nota_detalle.php?codigo=5700389&fecha=31/08/2023.

| Finding | Citation |
|---|---|
| "While the Mexican government has proposed to construct a new, larger Mexico City airport as a replacement for MEX, it is unclear when the new airport would enter into service." – concerns validated | Order 2016-11-2 at 15. |
| "Based upon longstanding competition policy principles, as well as established aviation policy, the Department would have serious concerns about granting ATI to any airlines under these circumstances.  [A] grant of ATI would be unjustified without stringent conditions.  We therefore tentatively find that it is necessary both (1) to limit the duration of a grant of ATI while efforts to reform the slot rules continue and (2) to ensure that competitors are able to gain access to an adequate number of MEX slots to effectively compete in the interim." – concern validated | Order 2016-11-2 at 17. |
| "Competitors cannot rely upon a slot administration regime at MEX that meets international standards to aid new entry and to make the adjustments necessary to respond to enhanced competition by major slot holders." – concern validated | Order 2016-11-2 at 23. |
| "The Department notes that it retains the ability to alter or amend its grant of ATI at any time so that harsh competitive effects…can be mitigated if necessary.  The competitive balance and the policies governing allocation of slots at MEX are fluid and the Department needs to retain the ability to fully reexamine the basis for granting ATI." – concerns validated | Order 2016-12-13 at 27-28. |

Based on these facts and circumstances, the Department cannot clear the statutory hurdles in section 41309 to approve, or maintain approval of, a significant JV agreement; rather, the statute guides us to "after periodic review, end approval of…an agreement…that substantially reduces or eliminates competition".

### *Effects on Public Benefits*

In its 2016 orders, the Department conducted a standard analysis to assess the extent to which there was adequate competition in the U.S.-Mexico market to ensure that the JV partners would pass along the benefits of their cooperation to consumers.  As part of this analysis, we measured – applying the statutory language in 41308 to determine whether a grant of ATI was required by the public interest – whether the joint venture would produce substantial public benefits quickly for consumers.[78]

Consistent with competition analysis, there is a counterfactual aspect to the Department's public interest test in that we measure whether the grant of ATI is required by the public interest because it would enable substantially *more benefits* than would *otherwise be possible* without a

---

[78] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 18.

grant of ATI, *i.e.*, under normal market conditions in which carriers compete independently on price and capacity to make their best offerings to consumers.[79] This reasonable interpretation of the statutory language, importing rigorous competition law principles and sound economic policy, lends itself to the facts and circumstances presented in this Order.  It is easy to understand how the actions taken by Mexico to restrict entry and certainty for competitors would significantly devalue the potential public benefits of a JV that has a unique ability provided on a discretionary basis by the government to coordinate prices and capacity.

The Department conditioned its grant of ATI on the assumption that the Agreement between the United States and Mexico would enable open entry and new competition in the market, thereby allowing both Delta and Aeromexico, new entrants, and incumbents to deliver public benefits in the form of additional flights and other benefits over and above what would have been expected under the terms of the pre-existing air transport agreement.  As the Agreement was only negotiated recently at the time, and the Department had identified several concerns in its analysis of the case, we imposed a five-year sunset and reapplication requirement in order to assess whether the foundations of an Open Skies agreement continued to be implemented and whether competition in the U.S.-Mexico market encouraged all market participants to deliver the expected public benefits.

Since 2016, the changes in the regulatory framework and other commercial developments have not enhanced the benefits that travelers and shippers experience in the U.S.-Mexico market or as a result of the immunized Delta/Aeromexico JV.  Mexico's cargo decree and seizure of slots used by U.S., Mexican, and other third-country operators invalidates the assumptions on which the Department conditioned its approval.  The uncertain operating environment that these actions caused has enabled and could further enable Delta and Aeromexico to consolidate their position in the passenger and cargo markets at MEX; meanwhile, other airlines cannot add additional flights at MEX, depriving consumers in both countries the public benefits the Department assumed that the grant of ATI would deliver.

Based upon the changes in the regulatory framework documented in Order 2025-7-11, we no longer believe the findings and determinations of the 2016 orders can be sustained, or that the concerns we identified have been validated.  Such findings and determinations include those in the table below.

**Table 2**

| **Finding** | **Citation** |
|---|---|
| "It is the longstanding policy of the Department not to consider requests for ATI in a market until all of the elements of an Open Skies agreement are available to carriers…Should the situation provide otherwise, the regulatory predicate for a grant of ATI would no longer exist and the Department's findings could be rendered invalid." – concerns validated | Order 2016-11-2 at 8. |

---

[79] Order to Show Case, Apr. 9, 2008; Order 2008-4-17, DOT-OST-2007-28644-0174, at 14-16.

| Finding | Citation |
|---|---|
| "Based upon longstanding competition policy principles, as well as established aviation policy, the Department would have serious concerns about granting ATI to any airlines under these circumstances.  [A] grant of ATI would be unjustified without stringent conditions.  We therefore tentatively find that it is necessary both (1) to limit the duration of a grant of ATI while efforts to reform the slot rules continue and (2) to ensure that competitors are able to gain access to an adequate number of MEX slots to effectively compete in the interim." – concerns validated | Order 2016-11-2 at 17. |
| "Many of these traditional benefits of ATI result from increases in capacity on hub-to-hub routes, usually with wide-body aircraft that are necessary to carry substantial connecting traffic on long-haul trans-oceanic routes.  Transborder and other near-international markets, more analogous to the domestic market with more nonstop point-to-point travel and shorter stage-lengths, limit some of these traditional benefits…Similarly, the limited geographical scope of the proposed JV limits network connectivity and capacity benefits, as there will be less demand for network feed from behind and beyond destinations.  Nevertheless, the Department is tentatively convinced that significant public benefits will be generated from the proposed alliance based upon the particular facts and circumstances of this case." – no longer sustained | Order 2016-11-2 at 18. |
| "The Department must, in order to protect the public interest, not examine just the effects of the proposed alliance, but also the environment in which that alliance will operate, to ensure that there will be adequate competition to not only mitigate any potential harm from the proposed transaction, but to guarantee that the anticipated benefits are likely to be realized." – concerns validated | Order 2016-12-13 at 19. |
| "The Department notes that it retains the ability to alter or amend its grant of ATI at any time so that harsh competitive effects…can be mitigated if necessary.  The competitive balance and the policies governing allocation of slots at MEX are fluid and the Department needs to retain the ability to fully reexamine the basis for granting ATI." – concerns validated | Order 2016-12-13 at 27-28. |

Based on these facts and circumstances, the Department cannot clear the statutory hurdles in section 41309 to approve, or maintain approval of, a significant JV agreement; rather, the statute guides us to "after periodic review, end approval of…an agreement…that substantially reduces or eliminates competition".

The Joint Applicants allege that a proposal to withdraw their ATI is inconsistent with the Department's treatment of other immunized alliances in, for example, the U.S.-Japan market or the U.S.-Europe market. Both situations present facts and circumstances that are different from this case as both Japan and Europe have transparent slot allocation mechanisms that largely conform to international standards. In these situations where certain conditions or government decisions have the potential to limit entry at gateway airports, the Department has expressed concern and either exercised its regulatory tools or negotiated outcomes that provide for adequate competition and that maximize public benefit. The Joint Applicants do not point to any restrictions imposed by foreign governments that create conditions in which an immunized JV could substantially reduce or eliminate competition in the market despite the Department's actions to address the issues. Addressing ATI matters necessarily requires a case-by-case analysis of facts and circumstances.

### C. Assessment of Alternatives and Harm

Delta and Aeromexico contend that the Department's approach focusing on Mexico's anticompetitive changes to the market is insufficient to justify withdrawing a grant of ATI. They make a series of related arguments suggesting that: 1) we failed to consider reasonably available alternatives; 2) our actions cause significant harm; 3) Delta and Aeromexico have reliance interests that have not been addressed; 4) we normally do not scrutinize slot administration in Open Skies negotiations; 5) we are applying a more stringent approach in the ATI review regarding the U.S.-Mexico market than other markets in which there are congested hubs; and 6) we are unfairly challenging the validity of a "multi-airport" system in which Mexico forces some operators to distant NLU, which Delta and Aeromexico do not prefer, versus the prime MEX hub, which they and virtually every airline serving Mexico do prefer.

Based upon the actions of Mexico, which have distorted the market and changed the competitive effects of the Delta and Aeromexico JV materially, we do not assess that there are acceptable alternatives to withdrawing ATI that would be consistent with the public interest and the international aviation policy interests of the United States. We review some of the alternatives suggested by Delta and Aeromexico:

> *Maintaining the ATI while waiting for things to change, taking into account that the harm may compound over time.* In effect, the Department took this approach. DOT has waited multiple years and deferred by 18 months specific action from the January 2024 show cause order with the expectation that extensive and high-level consultations under the Agreement would resolve the underlying issues of Mexico's noncompliance with the Agreement. Unfortunately, those consultations yielded nothing in the way of resolving the concerns. We assess that this approach is no longer viable as it is causing significant confusion, promoting an unlevel playing field, and harming consumers; these effects are getting worse over time.

> *Abandoning Order 2024-01-17 and letting international negotiations play out.* The Department also took this approach in effect for a period of time. In addition to the fact that negotiations are separate from the exercise and enforcement of the ATI statutes, this approach has yielded no progress over several years. We assess that we can no longer ignore our statutory responsibility to review and address the competitive effects of the status quo. Even if the Department agreed with the concerns expressed by Delta and Aeromexico, and if it accepted their invitation to begin the process anew, this alternative is not viable. As

28

demonstrated in the history section above, the competitive issues are documented and longstanding, and a new and even more elongated process will do little if anything to shed further light on the competitive environment in the context of the ATI docket. Further delay would perpetuate harm to stakeholders and disrupt the Department's exercise of its policy and regulatory functions. One of the Joint Applicants' strongest concerns was the Department's dismissal of the new application, and the Department is returning that application to a suspended state.

*Carving out Mexico City and/or cargo from the scope of the ATI grant.* Mexico City is the largest city and network hub in Mexico as well as being among the largest destinations for U.S.-Mexico services. A carveout of Mexico City, which the Department does not see as possible, would in any event impair significantly the potential consumer benefits by removing the heart of the network; such a remedy may lead to a worse outcome where the joint venture is allowed to coordinate legally in other markets without producing the network benefits of the JV as the largest hub is outside the scope of it. We also note our concern that MEX is not the only constrained airport in Mexico, and Mexico's lack of transparency and arbitrary capacity management may not be limited to MEX in the future. Removing the cargo cooperation from the joint venture would only target one element of the competitive harm and would at best be a partial and incomplete fix as it would not address passenger harm nor the harm created by the anticompetitive framework that gave rise to the concern.

*Other means to compel compliance by Mexico.* Delta and Aeromexico argue that the Department should pursue other processes, including issuance of an order under 14 CFR Part 213 and countermeasures under 49 U.S.C. § 41310. This argument is based on an incorrect premise that the Department is taking this action to assert leverage to bring Mexico into compliance with the Agreement. That is not the case. The matter of Mexico's noncompliance with the Agreement is addressed through Order 2025-7-10 and Order 2025-7-11 under 14 CFR Parts 212 and 213. That process will play out separately, in part because, were the Department ultimately to disapprove schedules in that proceeding, it would merely compound the competitive concerns with the ATI in this proceeding by further reducing capacity in a market effectively restricted by the GoM and providing Delta and Aeromexico with unique flexibility to manage the situation. Meanwhile, outside of this proceeding, the Department will continue to press for solutions with the GoM that allow U.S. carriers to exercise fully the rights available to them under the Agreement. Identifying these solutions, however, does not necessarily lead to the continuation of grants of ATI in the U.S.-Mexico market. The competitive issues summarized here are entrenched. Mexico's ability to resolve them will take time, as will any potential improvements to the competitive environment to make it more certain and stable. Meanwhile, consumer harm has and will continue to increase given the incumbents' favorable position that is only strengthened by ATI. Therefore, any argument that the Joint Applicants should retain their ATI pending resolution of the Agreement compliance matters and any other competition concerns is unfounded. Furthermore, while we have thus far not elected to take certain other actions, *e.g.*, initiate proceedings under 49 U.S.C. § 41310, we reserve the right to take any future steps that we find appropriate in the public interest to bring Mexico into compliance with the Agreement. In any event, each of these options are separate from the ATI proceeding and are not properly viewed as alternatives.

The language in the ATI statutes, including the Department's flexibility to consider reasonably available alternatives that are materially less anticompetitive while weighing international aviation policy concerns, strongly supports the Department's approach in this Order. A materially less anticompetitive alternative to an immunized alliance is an arms-length commercial alliance like the ones pursued by other competitors in the market. Such an alliance remains available to the Joint Applicants and would still deliver public benefits in the market.

The Department has also evaluated the harm resulting from the existing ATI and the comparative harm that may occur should it be withdrawn. As noted above, significant potential harm to consumers and stakeholders is likely occurring and might continue to occur absent our action. The extent to which the Joint Applicants could and would rely upon a time-limited grant of immunity was discussed extensively in the record and our administrative decisions dating back to the 2016 Show Cause Order. Then, the Department asked Delta and Aeromexico to express in writing their consent or non-consent with the conditions in the final order, including the time-limited grant of ATI and the Department's ability to withdraw it.[80] The Joint Applicants provided that written consent.[81] The Department acknowledges that withdrawing the ATI would require the carriers to incur costs to end their coordination on pricing and routing. However, the Department has determined that such an approach is required by the broader public interest.

Delta and Aeromexico argue that, without ATI, they will have to reduce or eliminate services to multiple cities. Although we do not agree with this analysis, we share the same goal of ensuring that the U.S.-Mexico market is able to sustain service to as many cities as possible. Unfortunately, the Department's concerns about the restrictions imposed by Mexico in contravention of the Agreement cannot be resolved by citing speculation about particular routes. Without an open market in place, it is simply not consistent with the ATI statutes and the 2016 orders granting ATI that the Department should allow two competitors to coordinate pricing and capacity in such a market when there are detrimental impacts to consumers or other airlines who do not have the same extraordinary relief. While finalizing this Order would revoke antitrust immunity from the alliance agreement, the carriers would have a period during which they can unwind the aspects of their relationship that require immunity, while keeping the core commercial cooperation that supports the introduction and mutual marketing of flights intact. Delta and Aeromexico will continue to have every incentive to cooperate in the U.S.-Mexico market given Delta's ownership stake in Aeromexico, the ability to continue code sharing and frequent flyer cooperation, and the various mutual commercial interests stemming from their participation in the SkyTeam alliance.

Delta and Aeromexico hired Brian Keating to provide an economic assessment of what he considers the economic harms of the dissolution of the Delta/Aeromexico ATI grant as proposed in Order 2024-01-17. Much of this economic assessment is outside the scope of this Order, which reviews the regulatory framework of the U.S.-Mexico market. Keating's analysis estimates economic harm of more than $800 million due to potential service changes after ATI is withdrawn. The Keating paper, provided as an appendix to the carriers' objection to the Department's 2024 proposal, was based largely on Delta's network planners' identification of 21 routes, either operating or planned, that are *at risk* of cancellation or reduced service in the event of the dissolution of the Joint Cooperative Agreement, with a potential downgauging on seven

---

[80] Final Order, Dec. 14, 2016; Order 2016-12-13, DOT-OST-2015-0070-0096, at 29.
[81] Notice of the Joint Applicants, Dec. 21, 2016; DOT-OST-2015-0070-0100.

routes to smaller aircraft type. Keating states that even markets that were served prior to the implementation of ATI might lose service due to changing demand patterns but does not identify those patterns, nor does he provide any independent assessment of the at-risk services provided by Delta.

Keating's conclusions are not determinative in the Department's review on these facts and circumstances. The Department has multiple serious concerns about the accuracy of the assessment, including the assumption that when the at-risk routes are canceled or reduced the existing aircraft will be parked and not utilized elsewhere. The Department's focus must remain on broader public interest concerns. Further, Delta and Aeromexico may continue to look for opportunities to jointly serve the U.S.-Mexico market.

## VI. ADDITIONAL FACTUAL ASSESSMENT OF COMPETITIVE CONDITIONS

As demonstrated above, the findings supporting the Department's approval and grant of ATI to the Delta/Aeromexico JV are no longer valid. Mexico's actions have adversely affected the market in ways that no longer enable an immunized alliance to operate without substantially reducing competition and consistently with the public interest. This changed circumstance underscores the importance of DOT's ability to withdraw ATI, which flows from a competitive market enabled by a fully implemented Open Skies agreement and rigorous regulatory review with high standards, in a market where the foreign party is failing to comply with core pro-competitive provisions of such an agreement.

To further support the Department's decision to terminate the Delta/Aeromexico ATI and show why the Open Skies regulatory framework is critical – we have conducted an additional factual assessment of competitive conditions consistent with the requirements of section 41309(c)(3). We looked back at the first application submitted by Delta and Aeromexico, plus supporting materials, to identify the expectations set by the Department at the time of the 2016 final order and assess to what extent developments between 2016 and now have affected Delta's and Aeromexico's ability to meet those expectations. This assessment provides further context for the Department's actions, recognizing the costs of the ATI decision on Delta and Aeromexico and their implicit argument – with which we disagree – that the Department should consider only facts and circumstances within their control.

### *Competitive Issues*

In Order 2016-11-2, the Department found serious concerns with respect to the market for travel to Mexico City, including infrastructure concerns magnified by an opaque regulatory regime concerning slot policy and potential market concentration on the JFK-MEX overlap route. Despite these concerns, we provided a path forward through a slot divestiture and time-limited grant of immunity, conditions which we deemed necessary, at a minimum, to ensure adequate competition and provide a means to adequately monitor developments. The Department sought a voluntary divestiture of 24 slot-pairs at MEX that would enable low-cost carriers and new-entrant carriers to enter the U.S.-MEX market; the Department hoped that these divestitures would mitigate, at least for the five-year initial grant of immunity period, the identified transparency, regulatory, and market-power concerns with the slot regime at MEX at least until the new airport at MEX was completed or new transparent slot allocation procedures were implemented. Of the 24 slot-pairs, our current estimate is that only six (6) slot-pairs are still

actively in use by the divestiture recipient(s). Unfortunately, despite the Department's efforts to facilitate entry to overcome market concerns and enable a path forward for the Delta/Aeromexico JV, the failure of the majority of divestiture recipients – including all U.S. carrier recipients – to sustain service in the market leads us to conclude that we erred in our 2016 finding that a large slot divestiture was sufficient to address the entry and market power concerns at MEX identified in the 2016 show cause order.

At the time of Order 2016-11-2, Delta and Aeromexico combined accounted for an estimated 48 percent of U.S.-MEX traffic.[82] Today, the two air carriers account for 50 percent of U.S-MEX capacity on a rolling twelve-month basis ending June 2025.[83] For total MEX capacity, while COFECE identified Aeromexico's slot holdings at 50 percent at the time of the 2016 decision, schedule analysis today shows that Delta and Aeromexico, combined for the same twelve-month period ending June 2025, collectively account for 60 percent of scheduled departures from MEX.[84] The concerns DOT identified in 2016 are still present today, except with the proven experience that the slot divestitures were not sufficiently effective. Other than the attempts made through the slot divestiture process, no new carrier has entered the U.S.-MEX market since that time.

The Department scrutinized the JFK-MEX market with the two parties' overlapping services accounting for 81 percent market share in 2016. Today, that estimated figure remains concerning, but is lower – in part due to the voluntary divestitures at JFK – where Delta/Aeromexico are now estimated to command a 72 percent share of the market.[85]

The Department noted MEX's importance as the singular megahub for Mexico without an equivalent substitute, with the most domestic destinations served and host to the largest operations for the five largest Mexican carriers.[86] We did not find that Toluca (TLC) was a substitute for MEX due to distance, minimum levels of service, and the strong preference of transborder passengers for MEX. Those findings are still applicable today as there are no scheduled passenger flights from Toluca to the United States.[87] Additionally, Mexico's recent emphasis on adding services at NLU – which has not been designated as a Mexico City airport under the Agreement – has not made it a substitute for MEX in any material respect. Despite significant pressure for carriers to launch operations at NLU, at present only two routes from NLU to the United States are served, both on regional jets: Houston and McAllen, TX.[88] Services to the Mexico City market are not meaningfully contestable, and competition and competitive benefits for consumers seem to be decreasing.

---

[82] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 15.
[83] Sabre Market Intelligence.
[84] Sabre Market Intelligence.
[85] Estimated using Sabre Market Intelligence for the twelve-month period ending Apr. 2025.
[86] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 15.
[87] Analysis of OAG Schedule Data from 2008 until 2026. The last schedule flights from the United States to / from Toluca were in 2016. There are no scheduled flights from the United States to Toluca.
[88] Analysis of OAG Schedule Data for 2025 and 2026; as of this writing the only scheduled passenger flights that operate to NLU from the United States are from Houston-Intercontinental Airport and McAllen, Texas.

*Public Benefits Issues*

At the time of their application, Delta and Aeromexico claimed that they operated at a disadvantage in the U.S.-Mexico market. They claimed that structural issues, such as Delta's lack of a hub in Texas and Aeromexico's lack of ability to serve that hub, resulted in U.S.-Mexico market shares of 11 percent for Delta and 14 percent for Aeromexico, while competitors American and United, each of which operate large Texas hubs, maintained market shares of 25 and 22 percent, respectively.[89] The Joint Applicants claimed in their application that ATI would enable them to overcome these structural challenges and "…create a third network competitor of roughly equal size to American and United…working together, the JCA Parties will be able to introduce new nonstop services that would not otherwise be achievable as two-stand-alone competitors, create a new hub at Los Angeles serving Mexico, increase service on hub-to-hub pipeline routes, and offer greater frequencies on the largest and most important transborder routes: New York-MEX and Los Angeles-MEX…these new services and the competition they bring to the market will produce significant consumer welfare benefits."[90] Not only did Delta and Aeromexico indicate that they would add new markets and create a "new" hub in Los Angeles, they also identified 21 markets in which they would increase seats by up to 60 percent.[91] Based on experience in multiple ATI cases, the Department views increased capacity as one of the key benefits of a grant of ATI, as the additional capacity can lower fares and create additional demand in several markets. Delta and Aeromexico further claimed that "[a]ntitrust immunity for the Alliance Agreements is necessary to achieve these benefits."[92]

In adjudicating the 2015 Delta/Aeromexico ATI application, the Department concluded that "…the JV will lead to an increase in transborder connectivity and will serve the interest of transborder passengers provided that infrastructure issues are addressed."[93] Specifically, the Department stated that the proposed JV "…as conditioned, is required by the public interest and the Joint Applicants have stated that it would not be implemented without a grant of ATI."[94]

Capacity Growth

While exogenous factors affected the ability of the carriers to add service in the U.S.-Mexico market, such as the COVID-19 pandemic (though Mexican transborder traffic was much less affected by the pandemic than other international markets) and the downgrade of Mexico to IASA Category 2, based on experience, the Department still would have expected to see the Delta/Aeromexico JV produce most of the benefits noted above. During the period since the grant of ATI, the Mexican market grew from the second largest to the largest origination and

---

[89] Joint Application for Approval of and Antitrust Immunity for Alliance Agreements, Mar. 31, 2015; DOT-OST-2015-0070-0001, at 12.

[90] Joint Application for Approval of and Antitrust Immunity for Alliance Agreements, Mar. 31, 2015; DOT-OST-2015-0070-0001, at 13.

[91] Joint Application for Approval of and Antitrust Immunity for Alliance Agreements, Mar. 31, 2015; DOT-OST-2015-0070-0001, at 17.

[92] Joint Application for Approval of and Antitrust Immunity for Alliance Agreements, Mar. 31, 2015; DOT-OST-2015-0070-0001, at 13.

[93] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 19.

[94] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 20.

33

destination market for the United States, growing from 30.8 million passengers in the year ended 2019 to 40.1 million passengers for the year ended 2024 or 30 percent growth.[95]

However, the ATI granted to Delta and Aeromexico has not enabled the expected level of growth. Especially in the transborder U.S.-Mexico market, airlines have many ways of growing capacity. They can, in theory, add flights at different time channels, which adds both additional flights and seats into the market. If, on the other hand, they do not have additional slots available but still want to add capacity, they can utilize larger aircraft on currently-existing flights, which adds seats to the market. They can also add new markets that they may not have served before. Given the short distances between the United States and Mexico, airlines can use smaller aircraft such as the 76-seat Embraer 175 regional jet to evaluate demand and operational feasibility for new markets; as demand increases, they can then either add additional flights, increase size of aircraft, or pursue both approaches to adding capacity. Analysis of scheduled capacity since the implementation of the JV shows that Delta and Aeromexico have delivered substandard growth in the U.S.-Mexico market when compared to peers. Antitrust immunity for integrated joint ventures between U.S. and foreign carriers enables them to achieve merger-like synergies (in scheduling, planning, marketing, distribution, corporate contracting, pricing, capacity/revenue management, and cost efficiencies) to pass on consumer benefits in the form of more capacity over an integrated network than would otherwise be possible. Unlike mergers, which tend to rationalize capacity, pro-competitive alliances increase capacity more than would otherwise occur to carry more passengers across the linked networks. Additional capacity that would otherwise not be possible is a key test for assessing whether an immunized JV is pro-competitive. The extent to which the alliance is adding capacity in the market, especially compared with its competitors, can be an indicator of the degree to which an alliance is competitive.

The following tables indicate the yearly increase of seats, or capacity, in the U.S.-Mexico and U.S.-MEX markets with 2015 as a baseline, which is the year before the carriers received their grant of ATI. Our preliminary analysis indicates that Delta/Aeromexico did not add new capacity at a rate higher than competitors, either in the broader U.S.-Mexico market or in the U.S.-MEX market in most years subsequent to receiving ATI. For example, in the first year after operating as a JV, Delta and Aeromexico had increased seats by four (4) percent while competitors had increased seats by eight (8) percent. After 2017, the first full year of JV implementation, Delta and Aeromexico had increased seats by eight (8) percent while other airlines increased by 19 percent. Similarly, in the U.S.-MEX market, Delta and Aeromexico seat capacity growth lagged other airline capacity as well. Delta and Aeromexico capacity in U.S.-MEX increased by three (3) percent in 2016 while, while capacity by other carriers in the market increased by 13 percent. Only by 2024, the year after the FAA returned Mexico to IASA Category 1 status, which lifted the freeze that restricted Mexican carriers' ability to grow in the U.S. market since 2021, did Delta and Aeromexico deliver more growth in Mexico City than other carriers, at 15 percent versus 13 percent. Aeromexico added new service from Mexico City to several U.S. cities such as Raleigh/Durham, Tampa, and Washington-Dulles in the second half of 2024, which contributes to this gain. Even then, in the overall U.S.-Mexico

---

[95] U.S. International Air Passenger and Freight Statistics Report, December 2019, Released December 2020 and December 2024, Released April 2025, *available at* https://www.transportation.gov/policy/aviation-policy/us-international-air-passenger-and-freight-statistics-report.

market, Delta and Aeromexico delivered substandard growth rates of 18 percent versus 70 percent for its peers.

**Table 3**

| U.S. - Mexico Percentage Seat Change with 2015 as Base Year | | |
|---|---|---|
| Year | Delta/Aeromexico | All Other Carriers |
| **2016** | 4% | 8% |
| **2017** | 8% | 19% |
| **2018** | 12% | 23% |
| **2019** | 1% | 21% |
| **2020** | -40% | -17% |
| **2021** | -2% | 40% |
| **2022** | 0% | 54% |
| **2023** | 4% | 58% |
| **2024** | 18% | 70% |
| Source: OAG Schedule Data | | |

**Table 4**

| U.S. - Mexico City Percentage Seat Change with 2015 as Base Year | | |
|---|---|---|
| Year | DL / AM | Others |
| 2016 | 3% | 13% |
| 2017 | 5% | 38% |
| 2018 | 6% | 51% |
| 2019 | -7% | 37% |
| 2020 | -50% | -32% |
| 2021 | -12% | 11% |
| 2022 | -1% | 12% |
| 2023 | 3% | 4% |
| 2024 | 15% | 13% |
| Source: OAG Schedule Data | | |

Further, Delta and Aeromexico specifically claimed in their 2015 application that ATI would enable them to create a hub to serve Mexican travelers at Los Angeles International Airport (LAX). Specifically, they stated that "Delta and Aeromexico anticipate forming a cohesive hub at Los Angeles serving the 10 largest West Coast-Mexico markets…frequency and gauge on existing routes will be expanded. Neither Delta nor Aeromexico acting alone could implement such expansion at Los Angeles."[96] Analysis of OAG schedule data for year end 2015 versus year end 2024 shows that Delta and Aeromexico have not realized this growth at LAX. Combined, the two carriers operated service to 11 destinations in Mexico from LAX in 2015, while for the year end 2014 they serve eight (8); by June 2025, that number had reduced to Delta

---

[96] Joint Application for Approval of and Antitrust Immunity for Alliance Agreements, Mar. 31, 2015; DOT-OST-2015-0001, at 18.

and Aeromexico only serving five (5) destinations in Mexico from LAX; furthermore, the same data shows that the carriers have reduced seat capacity by over 29 percent in the LAX-Mexico market.[97]  Meanwhile, other carriers flying from Los Angeles to various Mexican destinations, led primarily by Mexican low-cost carriers Volaris and Viva Aerobus, have added 36 percent more seats and added a net three destinations.[98]  The growth that the Department hoped to see, enabled by a grant of ATI, does not seem to have materialized.

Finally, in the important JFK-MEX and LAX-MEX markets, the two carriers do not appear to have delivered the increased frequency and improved schedule they claimed ATI would enable them to deliver in their 2015 application.  There, Delta and Aeromexico claimed that the metal neutrality enabled by a grant of ATI would enable the carriers to jointly "increase service on the LAX-MEX route by two frequencies (from six to eight) and on the JFK-MEX route by one (from 5 to 6)… Metal neutrality enables the carriers with the incentives to offer the best and most attractive schedule…."[99]  A review of the carriers' published schedules for 2024 and 2025 shows that this level of service has not materialized, with schedules peaking at six (6) frequencies on LAX-MEX and five (5) on JFK-MEX, with Delta not consistently operating its own metal on LAX-MEX, leaving flying to Aeromexico in certain months.[100]

On balance, current information suggests that Delta's and Aeromexico's capacity increases are less than those of their competitors, undermining a case that the ATI is enabling more public benefits than would otherwise be possible without a grant of antitrust immunity.  While growth by Delta and Aeromexico in the U.S.-Mexico market is welcome and encouraging, their competitors continue to grow at faster rates.  The carriers may note that their growth in the U.S.-MEX market in 2024 was larger than that of their competitors, but competitors still grew more than Delta and Aeromexico in the overall U.S.-Mexico market despite their inability to establish new services to/from MEX.  Given the continued growth of traffic in the U.S.-Mexico market, we would expect that the two carriers would continue to be competitive players in the market without a grant of ATI.

Connectivity

During the 2016 proceeding, the Department was concerned about the limited connectivity that could be enabled by the joint venture due to the scope of the agreement limited to connections within Mexico and not beyond, the nature of transborder travel, which involves more point-to-point routes, shorter hauls versus transoceanic routes where JVs have enabled large benefits, and the use of single aisle aircraft having many different seat capacity configurations that widebody aircraft.[101]  In their application, Delta and Aeromexico claimed that a grant of ATI was required to join their networks, stating, "the parties can create bank structures and connectivity to better

---

[97] OAG Schedule Data.
[98] OAG Schedule Data.
[99] Joint Application for Approval of and Antitrust Immunity for Alliance Agreements, Mar. 31, 2015; DOT-OST-2015-0001, at 20.
[100] OAG Schedule Data.
[101] Order Requesting Additional Information, July 31, 2015; Order 2015-7-18, DOT-OST-2015-0070-0022, 8-9; and Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070-0074, at 18-19.

serve network passengers. Antitrust immunity is essential for each carrier to effectively plug into the respective hub networks on both sides of the border."[102]

The Department identified that Delta and Aeromexico potentially could offer some network benefits with ATI. The Department stated, "[t]he Department…expects the JV to improve connectivity between the United States and Mexico...a significant portion of Delta's flights to Mexico – those to Mexico City in particular – will connect on to Aeromexico services and vice versa. Aeromexico will expand the joint network to reach secondary and smaller Mexican markets, and will benefit its passengers, especially those originating from Delta's hubs where much of its transborder services are focused…. The carriers can rely on greater amounts of passenger feed to support their routes…the resulting enhanced network linkage, reduced travel times, and increased efficiency will be a net positive to consumers."[103] Pricing efficiencies, in the form of reduction of double marginalization, are a key benefit that DOT looks for as part of its public interest analysis. This efficiency occurs in connecting travel that flows through the hubs of the combined transborder network of the alliance. Aeromexico's largest hub, at MEX, could have unlocked the potential benefits of the alliance.

The Department's analysis of traffic data both prior to the full implementation of alliance in 2016 versus 2024 indicates that on U.S.-MEX routes there is marked reduction in the amount of connectivity at both the U.S. origin and Mexico City than there was before the implementation of the JV. On Aeromexico-operated services between the U.S. and Mexico City, local traffic, or those just going from the U.S. origin to Mexico City, grew from 44 percent to 76 percent, while overall transit traffic decreased on both sides from 56 percent in 2016 to 24 percent in 2024.[104] Similarly, on Delta-operated flights between the U.S. and Mexico City, local traffic grew from 28 percent to 51 percent of traffic, while connectivity dropped from 72 percent to 49 percent.[105] This preliminary quantitative analysis shows that following implementation of the JV, flights to Aeromexico's largest hub carry significantly more local passengers as opposed to beyond MEX passenger than before implementation of the JV.

There are factors other than ATI that are contributing to the cooperative strategies and underpinning of the Delta and Aeromexico partnership. Delta owns a 20 percent equity stake in Aeromexico, guaranteeing the company's interest in working with its partner in practical and effective ways in this expanding market. Additionally, the two carriers are members of the SkyTeam alliance in North America, benefitting from a coordinated effort across many carriers to flow traffic efficiently. This membership supports the carriers' continued investment in mutual marketing and frequent flyer cooperation. Finally, the carriers can continue mutual code sharing and limited schedule cooperation with or without ATI; Delta's 20 percent investment in Aeromexico, and its presence of two (2) board members on Aeromexico's board provides every incentive to continue this operational coordination. Delta reinvested in Aeromexico after its bankruptcy, while playing a significant role in its reorganization process from 2020 to 2022. Importantly, Delta has shown that a relationship with Aeromexico without ATI can work, just as it is currently doing in its increasingly close partnership with Canadian carrier WestJet. Indeed,

---

[102] Joint Application for Approval of and Antitrust Immunity for Alliance Agreements, Mar. 31, 2015; DOT-OST-2015-0001, at 2-3.
[103] Order to Show Cause, Nov. 4, 2016; Order 2016-11-2, DOT-OST-2015-0070, at 19.
[104] Analysis of Sabre Market Intelligence data, calendar year 2016 and 2024, leg data.
[105] Analysis of Sabre Market Intelligence data, calendar year 2016 and 2024, leg data.

the relationship between the two carriers has grown in the last year. In May 2025, Delta announced that it will be investing $330 million to acquire a 15 percent ownership stake in WestJet.[106] This investment is in addition to several flights the carriers have added to each other's hubs over the past year such as Edmonton-Minneapolis/St. Paul, Calgary-Detroit, and Calgary-Atlanta. The continued investment in WestJet absent a grant of ATI in the U.S.-Canada market represents a template for the type of relationship that Delta and Aeromexico can have in the U.S.-Mexico market should ATI be withdrawn.

## VII.    CONCLUSION

Based on the analyses above, the Department concludes tentatively that its 2016 findings and conclusions supporting approval of the joint venture under 49 U.S.C. § 41309 and a grant of antitrust immunity for Delta and Aeromexico under 49 U.S.C. § 41308 are no longer valid. Consistent with this conclusion, under section 41309, the Department disapproves tentatively the JV agreement because continuation would be adverse to the public interest.[107] Under section 41308, the Department determines tentatively that a grant of ATI is not required by the public interest to any extent.

If the Department finalizes these determinations, the JV agreement and the agreement(s) integral to the JV that required antitrust immunity would be disapproved. The Department only intends to disapprove those agreements for the purposes of withdrawing the ATI for the alliance. To be clear, the Department is encouraging the Joint Applicants to continue pro-competitive commercial cooperation and is not finding that the kind of arms-length cooperation practiced widely in the airline industry is anticompetitive in this market. Because this is a complicated matter involving multiple agreements and arrangements, the Department invites comment by the Joint Applicants as to which agreements would be terminated as a result of this disapproval and which would survive to be implemented by Delta and Aeromexico without antitrust immunity.

We determine tentatively that a final order will disapprove the JV and end the JV's antitrust immunity after a wind down period, allowing for Delta and Aeromexico to square their accounts and procedures and to prevent avoidable disruptions for consumers. To give the Joint Applicants sufficient time to make any necessary adjustments, a final order would not become effective until October 25, 2025, at the earliest, which is the end of the 2025 Northern Summer Traffic Season. A suitable wind down period provides enough time to mitigate costs incurred by the joint venture partners with potential risks to consumers and stakeholders, while also preventing avoidable inconveniences to consumers.

The Department is not proceeding with the dismissal of the *de novo* application for ATI submitted by Delta and Aeromexico as proposed in Order 2024-01-17. That application remains in a suspended state, similar to the application of Allegiant and Viva Aerobus, pending a possible return to a satisfactory and procompetitive regulatory framework in the U.S.-Mexico market. A satisfactory framework would include – among other considerations – Mexico's full compliance

---

[106] "Delta, Korean Air to strengthen partnerships with WestJet" May 9, 2025, at https://news.delta.com/delta-korean-air-strengthen-partnerships-westjet.
[107] As described in the Decision section, without an open regulatory framework in Mexico City and elsewhere, the Department determines tentatively that an approved agreement with antitrust immunity could cause substantially reduce competition and cause harm by allowing the JV carriers to exercise unique flexibilities that are not available to other carriers.

with the Agreement on a *de jure* and *de facto* basis.  If and when the Department can adjudicate those applications on the basis of full Mexican compliance with the Agreement, we would ask for updated and current information and data.  The Department continues to reserve all rights to suspend, dismiss, or deny those applications.

We will serve this Order on all interested parties on the service list in this docket.

**ACCORDINGLY:**

1. We direct all interested parties to show cause why we should not issue a Final Order confirming the tentative findings and conclusions discussed herein.  Objections or comments to our tentative findings and conclusions shall be due not later than 14 calendar days from the service date of this Order, and answers to objections shall be due no later than seven (7) business days thereafter.  In the event that no objections are filed, all further procedural steps shall be deemed waived, and we may enter an order making final our tentative findings and conclusions;

2. We determine tentatively that, effective October 25, 2025, the findings of Order 2016-12-13, as modified by Order 2020-12-18, are no longer valid.  Therefore:

   a. Under 49 U.S.C. § 41309, we determine tentatively that we should end approval of the joint venture described in the application submitted by Delta Air Lines, Inc. and Aerovias de Mexico, S.A. DE C.V. on March 31, 2015 in this docket, including any modifications made since up to and including the present.  For the avoidance of doubt, we also disapprove tentatively the joint venture described in this subparagraph and find tentatively that approval is not necessary to meet a serious transportation need or to achieve important public benefits (including international comity and foreign policy considerations);

   b. Because we are tentatively ending approval of the joint venture under 49 U.S.C. § 41309, we are also revoking tentatively the antitrust immunity previously granted to this joint venture, as it is no longer required by the public interest;

   Accordingly, as of midnight Eastern United States time on October 25, 2025, the joint venture between Delta Air Lines, Inc. and Aerovias de Mexico, S.A., DE C.V. will be disapproved and will cease to have a grant of antitrust immunity from the Department;

3. We reserve the right to take further or separate action as warranted by the public interest;

4. We continue to suspend the *de novo* application for antitrust immunity submitted by Delta Air Lines, Inc. and Aerovias de Mexico, S.A. DE C.V. on March 29, 2022;

5. We defer action on Delta Air Lines Inc.'s February 9, 2024, Motion to Suspend the Procedural Schedule in this docket; and

39

6.  We grant all motions for leave to file submitted to date.

By:




**SEAN P. DUFFY**
Secretary of Transportation


(Seal)


*An electronic version of this document is available online at www.regulations.gov.*

# EXHIBIT C

Order 2016-12-13
Issued: December 14, 2016



**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE SECRETARY**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 14th day of December, 2016

| | |
|---|---|
| **Joint Application of**<br><br>**DELTA AIR LINES, INC.**<br>**AEROVIAS DE MEXICO, S.A. DE C.V.**<br><br>**Under 49 U.S.C. §§ 41308 and 41309 for**<br>**Approval of and Antitrust Immunity for**<br>**Alliance Agreements** | **Docket DOT-OST-2015-0070** |

## FINAL ORDER

### I. SUMMARY

By this Order, the Department of Transportation (the Department or DOT) grants approval of, and antitrust immunity (ATI) for, the proposed alliance agreements submitted by Delta Air Lines, Inc. (Delta) and Aerovías de México, S.A. de C.V. (Aeromexico) (collectively, the "Joint Applicants"), with conditions.[1, 2]

The Joint Applicants have requested a grant of immunity from the U.S. antitrust laws in order to allow Delta and Aeromexico to operate a joint venture (JV) between the United States and Mexico.[3]  Based on its analysis, the Department believes the proposed alliance has the potential to deliver substantial public benefits to the travelling public, including broader connectivity between the United States and Mexico, improved network coordination, reduced travel times, and improved efficiency.  However, the Department also identified significant competitive issues that could prevent the public from realizing those benefits if left unchecked.  Therefore, in order to ensure adequate competition in the covered market, thereby making the approval of the alliance pro-consumer, our grant of antitrust immunity (ATI) is subject to a number of conditions.  Among those conditions is the requirement that the Joint Applicants divest 24 slot-pairs at Mexico City's Benito Juarez International Airport (MEX) and four (4) slot-pairs at New York City's John F. Kennedy International Airport (JFK).  We will also limit the duration of our grant of ATI to five years, among other conditions.

---

[1] The common names of the carriers are used throughout this Final Order.

[2] The agreements are the "Joint Cooperation Agreement" and those agreements enumerated in section 2.1 thereof.

[3] *See* Docket DOT-OST-2015-0070, Delta Air Lines, Inc. and Aerovías de México, S.A. de C.V. - Approval of and Antitrust Immunity for Alliance Agreements, hereinafter "Joint Application" at 1.

The Department received numerous comments from a broad range of stakeholders in response to the Department's Show Cause Order (2016-11-2, Nov. 4, 2016). In response to those comments, we have made adjustments to our conditions that we believe will make them more effective and strike the proper balance. The Department believes that if the remedies and conditions are adopted, the proposed alliance will not reduce competition and will provide substantial public benefits.

## II. OVERVIEW OF DECISION ON THE MERITS

On March 31, 2015, Delta and Aeromexico filed a joint application requesting approval of, and antitrust immunity for, agreements covering foreign air transportation between the United States and Mexico.[4] The alliance agreements at issue in the application would allow Delta and Aeromexico to operate a metal-neutral joint venture between the United States and Mexico. The Joint Applicants argue that, "[a]ntitrust immunity for the Alliance Agreements is necessary for Delta and Aeromexico to achieve the synergies and public benefits that will flow from the [joint venture]."[5] They further argue that such a grant would not lead to a substantial reduction in competition and would provide substantial public benefits.

The Department issued a Show Cause Order (Order 2016-11-2, the Show Cause Order) on November 4, 2016, announcing the Department's tentative decision to approve the proposed alliance, with conditions. In order to ensure sufficient competition in the environment in which the proposed alliance will operate, as well as to alleviate the competitive harm likely to result from the transaction, the Department proposed remedies, namely slot divestitures at JFK and MEX. The Department also tentatively concluded that its grant of ATI should be limited to five years, thereby allowing the Department to reevaluate the competitive and regulatory situation at that time. The Department also tentatively required the Joint Applicants to modify and resubmit their alliance agreements to remove exclusivity clauses. The Department also included its standard conditions concerning annual reporting and Origin & Destination (O&D) survey data reporting, among others.

To support the tentative conclusions in the Show Cause Order, the Department conducted a thorough review of the evidentiary record and made several tentative findings. We assessed the competitiveness of the U.S.-Mexico transborder market as it stands, as well as the effects on competition likely to result from the transaction at the network, country-pair, and city-pair level. Based on that analysis, the Department tentatively concluded that approving the Joint Application will not substantially reduce or eliminate competition, except with respect to JFK and MEX, largely resulting from the infrastructure constraints at those airports, and, at MEX, the lack of a slot regime that comports with international standards and which has been deemed anticompetitive by the Comisión Federal de Competencia Económica (COFECE, Mexico's competition regulator).[6]

---

[4] On April, 8, 2016, the Department issued a notice suspending the procedural schedule of the case. After issuing two formal requests for additional evidence from the Joint Applicants, the Department issued a notice establishing a procedural schedule on June 15, 2016.

[5] *See* Joint Application, DOT-OST-2015-0070-0001, Mar. 31, 2015, at 3.

[6] *See* COFECE Report Translation, DOT-OST-2015-0070-0037, Jun. 1, 2016.

As the Department noted in the Show Cause Order, the importance of access to Mexico City cannot be overstated. Approximately two-thirds of all domestic and one-third of all international passengers in Mexico have their origin or destination at MEX.[7] The main contested issue in this proceeding has been the ability, or lack thereof, of new entrant carriers to access the important Mexico City market. The record contains substantial evidence that the Joint Applicants exert significant market power at MEX, control approximately 50% of MEX slots, and are able to use the MEX slot allocation system to their advantage by leveraging its non-standard rules to preclude competitive entry by other carriers.[8]

We also, however, have statements on the record from Aeropuerto Internacional de la Ciudad de México (AICM, the operator of MEX) and the Dirección General de Aeronáutica Civil (DGAC, which oversees AICM), stating that they have made improvements to the slot allocation system at MEX since COFECE's report was published and that it is in the process of implementing a system more compatible with the International Air Transportation (IATA) Worldwide Slot Guidelines (WSGs). The Department fully supports those efforts. However, the record is not clear as to when or if those reforms will be implemented. Further, COFECE has yet to release its final recommendations for reforms, which the Mexican Government will then need to evaluate and address.

We note the position of AICM and the DGAC, but the Department must make a decision in this case now, using the evidence at hand. Based on that evidence, we are here finalizing our determination in the Show Cause Order that a grant of ATI cannot be justified without stringent conditions to ensure that public benefits are realized. We will, however, modify our tentative decision in that we will require ten MEX slot-pairs and two JFK slot-pairs to be subject to exhaustion of efforts by the receiving carriers. We will also reduce the number of required divestitures at JFK from six to four. We are finalizing all other conditions and remedies proposed in the Show Cause Order.

## III. SUMMARY OF RESPONSIVE PLEADINGS

The Department invited public comment on the Show Cause Order. The comment period closed on November 30, 2016. The Department received several comments from various stakeholders. Those comments are summarized below.

### A. Hawaiian

Hawaiian filed comments generally supporting the Department's tentative decision. Hawaiian commends the Department's decisions to confirm that all aspects of an Open Skies agreement be in place before considering a grant of ATI; requiring the removal of exclusivity clauses from the alliance agreements; recognizing that competitive access to commercially viable slots at capacity-constrained airports promotes competition; and requiring the applicants to reapply for ATI after a five-year period. Hawaiian states that, in its experience, lack of access to commercially viable slots can limit the ability of competitive carriers to enter new markets,

---

[7] *Id.* at 124.
[8] *See* Order 2016-11-2, at 16.

3

curtailing the competitive benefits to consumers of new entry. Finally, Hawaiian respectfully disagrees with the Department's decision not to grant independent carrier access to foreign carrier O&D data. Hawaiian argues that, even assuming strict compliance with the Department's regulations concerning access to O&D data, the Department has ignored the fact that the foreign carrier in an antitrust immunized partnership could share its data with its U.S. partner. Additionally, Hawaiian argues that immunized partners indirectly benefit through the insights gained from O&D data while undertaking joint network planning and revenue management activities.

### B. JetBlue

JetBlue submitted comments supporting the Department's tentative decision in the Show Cause Order. JetBlue states that because of the massive size of the "big three" airlines, along with their demonstrated anticompetitive tendencies, basic questions about airport access and the ability of smaller competing airlines like JetBlue to serve certain markets are now at the forefront of aviation public policy. JetBlue states that its experiences at MEX are consistent with the Department's findings concerning opaque and non-standard slot allocation practices, limited ability for new entry, and the ability of the Joint Applicants to thwart new entry.

JetBlue provides comments on the implementation of the Department's proposed slot remedy. Specifically, JetBlue suggests that the remedy be phased-in over a three-year period with 10 MEX slot-pairs and six JFK slot-pairs being divested in 2017, followed by seven MEX slot-pairs each in 2018 and 2019. JetBlue further suggests that the MEX divestitures be spread throughout the 0700-2259 time period, and that no more than three slot-pairs per hour be divested. JetBlue suggests that, with the Joint Applicants' vast slot portfolio at MEX and their ability to upgauge aircraft, these provisions would minimize the impact on their operations. JetBlue also recommends that if a carrier that receives divested slots no longer wishes to operate them, the slots should revert to the Department for reallocation. If no carrier applies for them, they would revert to the Joint Applicants, but still be subject to the on-going slot remedy and be available at any time for eligible carriers to request. JetBlue also acknowledges that if at any time eligible carriers are able to acquire commercially viable slots at MEX, the carrier would not need to rely on the remedy slots and those slots would remain with the Joint Applicants.

JetBlue also supports the Department's tentative decision to limit the grant of ATI in this proceeding to five years. JetBlue states that such a practice is common in other jurisdictions, including U.S. aviation partners in Australia, the European Union, New Zealand, and South Korea. JetBlue notes that it is rare for a government to grant any exemption or approval in perpetuity. JetBlue urges the Department to include similar provisions in all future ATI grants. JetBlue also states that it is disappointed that the Department did not adopt JetBlue's recommendation that annual reports of ATI alliances be made public. JetBlue, however, believes that, in this instance, the Department's decision to limit ATI to five years and require a *de novo* application is an adequate alternative. JetBlue also supports the Department's decision to require the removal of exclusivity clauses from the alliance agreements.

In its reply, JetBlue argues that the Department should ignore the Joint Applicants' claims that they may abandon the JV if the Department moves forward. JetBlue cites press reports quoting Aeromexico's CEO as stating that the two carriers plan to move forward with the JV, regardless

of the Department's ultimate decision. JetBlue further argues that the Joint Applicants' claims that circumstances have improved at MEX since the COFECE report was published was specious and irrelevant. JetBlue states that the Joint Applicants claims that there are no barriers to entry at MEX are completely contrary to JetBlue's experience at MEX. Further, JetBlue points out that the Joint Applicants, as well as AICM and the DGAC, had multiple opportunities to provide their own views on the COFECE report on the record but failed to do so. JetBlue argues that the Department should not accept claims by the Joint Applicants, AICM, and the DGAC that the MEX slot regime has improved, as JetBlue continues to have its MEX slot requests go unheeded.

JetBlue also states that it is unaware of any progress that AICM has made in implementing the IATA WSGs at MEX, despite the Joint Applicants' claim in March 2015, that they would be implemented in the next year. JetBlue finds AICM/DGAC's current claims that they will be implemented by the second quarter of 2017 unconvincing.

JetBlue also argues that the Joint Applicants have made several incorrect and misleading arguments in their pleading. First, JetBlue argues that the Joint Applicants improperly assume that other carriers will soon enter the JFK-MEX market because they ignore the slot restrictions in place on both ends of the route. JetBlue also does not believe that Aeromexico would be forced to cancel service to certain destinations, as it can easily upgauge many of its existing services. JetBlue also disagrees with the Joint Applicants arguments concerning JFK and the New York City market. JetBlue states that the market for Mexico City service favors JFK over Newark-Liberty International Airport (EWR). JetBlue notes that both Interjet and Volaris have chosen to serve JFK instead of EWR, and that in fact, no Mexican carrier serves EWR. JetBlue also states that even though United has operated EWR-MEX service for decades, it has never substantially increased its frequency on the route, indicating it will not add new competitive discipline to the market.

JetBlue also argues that the Joint Applicants have misconstrued the Department's precedential history regarding slot divestitures. JetBlue argues that the Joint Applicants ignore the Department's decision in 2002 to condition the approval of a joint venture between American Airlines and British Airways on the carriers' divestiture of 17 daily slot-pairs at London-Heathrow (LHR). Further, JetBlue states that it does not oppose the expanded remedy suggested by Interjet and that it believes the Department does have the authority to compel a slot divestiture at MEX. JetBlue also disagrees with American's arguments that it should be eligible to receive divested slots and argues, contrary to American, that all future ATI grants should include time limitations. JetBlue also supports the Department's tentative decision to require the removal of exclusivity clauses. Finally, JetBlue argues that the Department's procedures and reasoning in this case have been fully compliant with the Administrative Procedures Act (APA).

### C. Southwest

Southwest filed an Answer stating that it strongly supports the Department's tentative decision to require the Joint Applicants to divest 24 MEX slot-pairs. Southwest states that the decision is eminently reasonable and extremely well justified. Southwest reiterates the difficulty it and other U.S. low-cost carriers (LCCs) have had in accessing slots at MEX. Southwest argues, however, that the divested slots should only be made available to U.S. LCCs. Southwest argues that Mexican airlines already hold the vast majority of MEX slots and do not need or deserve

more slots through a divestiture. Southwest notes the Department's tentative exclusion of Interjet, but believes that Volaris and VivaAerobus, which hold 58 and 32 slot-pairs respectively, should also be excluded. Southwest states that these carriers can profitably redeploy slots they use in the Mexican domestic market for transborder service and upgauge other flights. Southwest also urges the Department to ensure that sufficient gates and other necessary facilities are made available commensurate with the slot divestitures. Unlike JetBlue, Southwest does not believe hourly slot divestiture limits are necessary given the Joint Applicants' large slot holdings.

Southwest also believes that the Department should reduce its tentative decision to grant ATI from five years to three years, and require annual ATI reviews to ensure that MEX is adapting its slot management system to a more transparent one, in line with international norms including the IATA WSGs. Southwest believes five years is too long given the anticompetitive situation at MEX. Southwest further argues that, given the existing relationship between Delta and Aeromexico and the investments that have already been made in that relationship, a time-limited grant of ATI should not prevent their commitment to a JV.

Southwest also requests that the Department require Cancun to reform its local slot program and adopt international norms such as the IATA WSGs, to prevent what it claims are anticompetitive practices by Delta to block access for LCCs.

In reply comments, Southwest argues that the proposed divestitures will not affect the public benefits of the JV because the Joint Applicants do not utilize 39 percent of their MEX slots, a figure they have not provided evidence to rebut. Further, Southwest argues that it is clear the Department has authority to require the proposed divestitures at MEX. In response to the Joint Applicant's arguments that the Department has exceeded its authority by going beyond a strict Clayton Act test in its analysis, Southwest points out that the Department is statutorily charged with addressing broad public interest concerns in its analysis of requests for antitrust immunity. The Clayton Act test is one part of that analysis, but not its entirety. Southwest does not support the phased approach to implementation of the divestiture suggested by JetBlue. Southwest also argues that the Joint Applicants', AICM's, and DGAC's claims that the Department's decision offends international comity are baseless. Southwest notes the Department's recent rejection of the American-Qantas ATI application, in a market that has had an Open Skies relationship for almost a decade, as proof that an Open Skies agreement does not guarantee a grant of ATI.

### D. Volaris

Volaris filed an answer in which it did not seek to comment on the merits of the Show Cause Order and the grant of ATI, but to support the remedies recommended by the Department. Volaris commends the Department for recognizing the scope of the access problems at both JFK and MEX, acknowledging that competitive discipline can be exerted by both Mexican and U.S. LCCs, and limiting the grant of ATI to five years. Volaris agrees with the Department that an unconditioned grant of ATI could position Delta and Aeromexico to take advantage of the current slot regime in order to prevent new entry or expansion of service by other carriers. Volaris agrees that a significant slot divestiture is necessary in order to counter this potential result and ensure the arrangement benefits the public interest. Further, Volaris supports the Department's tentative decision to limit the grant of ATI to five years. Volaris states that

6

because the Mexican Government has not yet adopted COFECE's proposed slot administration reforms, limiting the duration of ATI will help mitigate potential anticompetitive effects.

In reply comments, Volaris continues to argue that significant barriers to entry exist at both JFK and MEX that must be remedied. Volaris also contests arguments that the proposed divestitures will harm service to smaller Mexican communities, given the findings by COFECE that Aeromexico does not utilize a large portion of its MEX slot portfolio. Volaris' also rebuts the Joint Applicants' arguments that new entry at MEX is possible. Volaris states that its new transborder services were not the result of acquiring new MEX slots, but rather repurposing existing slots. Volaris states that, due to complicated procedures at MEX, it would have had to delay the start of new service by as much as nine months had it requested new slots for the service. Volaris also believes the Department's divestiture is reasonable and precedented, and agrees with the Department's carrier eligibility determinations.

### E. Interjet

Interjet filed comments objecting to a number of aspects of the conditions proposed by the Department in the Show Cause Order. First, Interjet states that the proposed slot divestitures at JFK are inadequate to remedy the competitive harm from a grant of ATI to Delta and Aeromexico. Interjet argues that the Joint Applicants should be required to divest at least 10 slot-pairs at JFK. Interjet argues that a significant portion of JFK-MEX traffic is time-sensitive business travel, and the Joint Applicants' extensive slot holdings in peak-hours provide them with both a quantitative and qualitative advantage. Further, Interjet argues that the Joint Applicants should be required to divest at least 36 slots pairs at MEX. Interjet cites COFECE's finding that in 2014, Aeromexico did not use 39 percent of its MEX slots. Interjet states that even allowing for changes since 2014, it is hard to imagine that Aeromexico has increased its MEX operations, and therefore utilization, by 39 percent.

Interjet also disagrees with the Department's tentative decision that it is not eligible to receive divested MEX slots. Interjet argues that it does not have a significant share of U.S.-Mexico transborder traffic and that public benefits would be maximized if Interjet is allowed to compete with other LCCs for the divested slots. Interjet also argues that the Department does not have the authority to require the Joint Applicants to transfer their MEX slots directly to competing carriers selected by the Department. Rather, Interjet argues that only AICM can determine which carriers receive the divested slots and what restrictions may apply to the use of those slots.

In its reply comments, Interjet continues to urge the Department to dismiss the Joint Applicants' arguments that the COFECE remedy is sufficient to address any harm from the transaction. Interjet also continues to support even larger divestitures at MEX and JFK, citing the barriers to entry and the Joint Applicants' large slot holdings at both airports. Interjet also states that the Department should defer to the Mexican Government to allocate the divested slots, as it believes AICM is best positioned to administer such an allocation. Finally, Interjet argues that neither its exclusion from eligibility by the Department, nor Southwest's argument that all Mexican carriers should be excluded, serve the public interest.

### F.  American

American filed objections to the Department's tentative decision in the Show Cause Order to prohibit certain carriers, including American, from acquiring any of the proposed slot divestitures.  American argues that all carriers should be able to participate in the process.  American cites its efforts to grow services to Mexico City through its investments in its DFW hub, as well as acquiring assets at MEX.  American argues that the Department's tentative decision is not supported by precedent, claiming that those precedents cited in the record by Southwest concerned domestic airports.  American also argues that the Department's tentative decision to limit its grant of ATI to five years should not be applied to future cases, but rather constrained to the unique circumstances of this case.  American argues that joint ventures require significant long-term investments and such time limits would discourage their formation and deprive the public of their benefits.  In its reply comments, American repeated its arguments for its inclusion in any slot remedy.

### G.  Dirección General de Aeronáutica Civil

The Dirección General de Aeronáutica Civil (DGAC) submitted comments objecting to the Department's proposed remedies.  The DGAC states that the slot divestitures and the five-year time limit of the approval are excessive and unprecedented, and are not in keeping with the spirit of the recently liberalized bilateral aviation agreement between the United States and Mexico.  The DGAC argues that the COFECE remedy is sufficient and represents an appropriate balancing of the competitive interests.  The DGAC states that the Department chose to disregard COFECE's determination and instead impose a punitive slot remedy.  The DGAC further argues that in reaching its tentative conclusions, the Department relied on a report from COFECE that is based on out of date data that does not reflect the current slot regime at MEX.

The DGAC also argues that the size of the slot divestitures at MEX is unprecedented, stating that the largest divestiture required to date was four slot-pairs at London-Heathrow (LHR), and that such a large divestiture as proposed exceeds antitrust standards.  The DGAC also disagrees with the Department's characterization that the current MEX slot regime is not transparent, stating that the Airports Law and regulations and the Civil Aviation Law and regulations, as well as the AICM guidelines and general operating rules for MEX, are all available online, along with historic and current slot allocation statistics.  The DGAC also states that software is now in operation at MEX that allows for matching a flight plan filed with air traffic control to a slot authorized by AICM.  Further, the DGAC states that it will be implementing SLOTIX software in January 2017, allowing AICM to optimize the slot allocation process, monitor slot usage in real-time and provide a platform for the exchange of slots.  The DGAC states that the current regime includes many of the key aspects of the IATA WSGs, and that there has been significant new and expanded service at MEX in the past several years.  The DGAC states that it supports adoption of the IATA WSGs and that they will be implemented at MEX in early 2017.

The DGAC further argues that it understood that a prompt and favorable grant of antitrust immunity was necessary for Mexico's willingness to agree to the new liberalized aviation agreement.  The DGAC states that the Mexican Government moved forward to implement the agreement in good faith with the expectation that ATI would be favorably granted, subject to reasonable conditions.

8

The DGAC also states that the five-year time limit to the grant of ATI is unprecedented and that the Department has not similarly limited a grant of ATI in any other proceeding. The DGAC argues that the time limit may distort the pro-consumer incentives generated by the proposed alliance. The DGAC also states that the construction of the New International Airport at Mexico City, scheduled to open in 2020, will eliminate any capacity constraints at MEX. The DGAC also disagrees with the Department's tentative finding that Toluca is not a substitute airport for MEX.

### H. Aeropuerto Internacional de la Ciudad de México

Aeropuerto Internacional de la Ciudad de México (AICM), the operator of MEX, filed comments substantially similar to those filed by the DGAC. AICM argues that the Department placed too much weight on COFECE's report on the slot allocation regime at MEX, given its preliminary status and the fact that it relies on data from 2009-2014. AICM also states, as did the DGAC, that the laws, regulations, and rules governing slots and operations at MEX are available online. AICM states that its slot allocation system is compliant with many of the aspects of the IATA WSGs, and stated that it informed the Department in May 2016 that it would be implementing a slot allocation system based on the IATA WSGs in June 2016. As did the DGAC, AICM states that it has implemented software improvements to better track slot usage with actual operations, and plans to implement SLOTIX in January 2017. AICM states that it plans to adopt IATA WSG recommendations no later than the second quarter of 2017.

AICM also takes issue with the COFECE report's claim that AICM does not enforce usage requirements. AICM states that it revoked over 7,000 allocated slots for failure to comply with usage requirements. AICM also states that it has been able to accommodate new entry from several carriers (Mexican, U.S., and international) in the last two years. AICM also states that the divestiture of 24 slot-pairs would negatively impact connectivity at MEX, both to smaller Mexican destinations and to the United States, thereby reducing the potential public benefits of the transaction.

### I. Joint Applicants

The Joint Applicants filed comments objecting to the Department's findings and proposed remedies, largely echoing those of the DGAC and AICM. First, the Joint Applicants argue that the Department erred in its competitive effects analysis. They argue that the Department improperly excluded EWR when considering competition in the New York City – Mexico City (NYC-MEX) market. The Joint Applicants also argue that there are no barriers to entry at MEX, claiming that the COFECE remedy (requiring the divestiture of eight MEX slot-pairs) is more than sufficient to remedy any competitive concerns in the NYC-MEX market.

Agreeing with the DGAC and AICM, the Joint Applicants argue that the COFECE report on slot administration at MEX is outdated and should not be relied upon by the Department. The Joint Applicants state that much has changed at MEX since the report was issued and those changes should remove any basis for concern about the MEX slot regime. The Joint Applicants repeat the DGAC and AICM arguments that the laws and regulations governing the slot regime are available online and that AICM plans to implement an IATA WSG compliant slot allocation system in either January 2017, or by no later than the second quarter of 2017. The Joint

Applicants again go on to quote the DGAC's comments in arguing that new entry has been facilitated at the airport.

The Joint Applicants also argue that there are no barriers to entry at JFK for competitive service to MEX.  They cite existing service on the route from Interjet, as well as Volaris' announced new service beginning in March 2017.  The Joint Applicants also argue that JetBlue and American both hold significant JFK slots and could initiate service if they choose.  They argue that the Department should consider service from JetBlue and American as "committed future market participants" and be included in the competitive analysis.

The Joint Applicants argue that the NYC-MEX market analysis must include EWR.  They argue that federal courts and the Department have both previously concluded that JFK and EWR are competitive substitutes in the New York City market.  The Joint Applicants state that JFK and EWR are equidistant from midtown Manhattan and that both airports attract substantial passengers from Manhattan, specifically, and New York City, generally.

The Joint Applicants argue that the Department's proposed remedies are unconnected to any theoretical harm posed by the JV.  They claim that the Department's failure to include EWR in its analysis of the NYC-MEX market ignores actual and potential competition that will discipline the JV.  They also argue that the growth plans of the JV cited by the Department are not harmful to consumers, but actually a benefit.  The Joint Applicants also point out that once the COFECE remedy is implemented, they will hold no more MEX slots than Aeromexico currently does, which should alleviate any Departmental concerns about market concentration at MEX.  The Joint Applicants maintain that the divestitures are unwarranted in that they greatly exceed those required in any previous ATI proceeding.

The Joint Applicants contend that the Department's proposed MEX divestitures offend international comity.  They claim that the Department is using this ATI proceeding as an attempt to engineer the slot regime at MEX, thereby usurping the Mexican Government's authority.  The Joint Applicants argue that other foreign authorities may require reciprocal demands upon the United States.

The Joint Applicants further argue that the divestitures at MEX would require them to reduce or eliminate service to many smaller Mexican cities, reducing feed for transborder and other international services, thereby suboptimizing MEX as a connecting hub and undermining the public benefits of the JV.

The Joint Applicants also claim that the Department's proposed five-year time limit to its grant of ATI is unprecedented and harmful to consumers.  They state that doubts about the longevity of the arrangement would cause the parties to alter their investment and integration plans.  The Joint Applicants state that given the Department's right to amend, modify, or revoke a grant of ATI at any time, the Department has no need to place a time limit on the grant of ATI.

The Joint Applicants also contend that the Department's requirement to strike the exclusivity clauses from the alliance agreements is unprecedented and harmful to consumers.  They claim

that the provisions are needed to eliminate free-rider concerns and to ensure investment incentives are aligned.

Finally, the Joint Applicants state that the Department's Show Cause Order does not represent reasoned decision making and is deficient under the Administrative Procedures Act (APA). They claim that the Show Cause Order does not establish a rational connection between the proposed slot divestiture and any potential competitive harm from the JV. They also claim that the divestiture constitutes an unacknowledged and unexplained departure from the Department's practice. They argue that the Department's decision did not address issues made pertinent by Congress, namely international comity and foreign relations considerations.

In their reply comments, the Joint Applicants largely repeated their initial arguments against the Department tentative decision. The Joint Applicants argue that the only potential competitive harm resulting from the JV would be on the JFK-MEX overlap route, and that several carriers have or soon will enter the route. They also explain that EWR is a viable commercial alternative and that the Department's analysis failed to account for the substitutability of this airport and its recent change in designation to IATA Level 2. As such, harm is unlikely to result and remedies are unnecessary. The Joint Applicants also argue that the filings by AICM and the DGAC state that the slot allocation problems at MEX have largely been solved and the Department should take them at their word.

They further argue that MEX slots and access are not a relevant market for antitrust analysis and that similar remedies have not been required in analogous situations previously. The Joint Applicants state that their proposed alliance is no different than many of the other alliances that the Department has previously approved and immunized, and that theirs should be subject to the same conditions as those other ATI grants.

### J. Delta Master Executive Council

The Delta Master Executive Council (Delta MEC) of the Air Line Pilots Association, International submitted objections to the Department's Show Cause Order. The Delta MEC argues that the limitations called for in the Show Cause Order will negatively impact the scope and benefits of the proposed alliance for two primary reasons: (1) the slot divestiture requirements will undercut the Joint Applicants' ability to service those markets with optimum efficiency, harming their ability to deliver the benefits of the proposed alliance; and, (2) the five year limit of the ATI grant will diminish the Joint Applicants' incentive to make the needed investments to realize the benefits of the cooperation.

### K. Frente por la Defensa de la Aviación Nacional

The Frente por la Defensa de la Aviación Nacional, an umbrella group representing several Mexican aviation workers' unions, filed reply comments. Its comments contained similar arguments as the DGAC, AICM, and the Joint Applicants. The Frente believes the Department's proposed remedies would reduce the public benefits of the proposed alliance and cause Aeromexico to reduce its transborder service and service to small and medium-sized Mexican communities. It also argues that the proposed time limit would reduce the parties' incentives to invest in the JV. Finally, the Frente argues that the proposed remedies violate the Mexican Constitution and Mexican sovereignty.

11

**L. Asociación Sindical de Pilotos Aviadores de México**

The Asociación Sindical de Pilotos Aviadores de México, the union representing Aeromexico's pilots, filed objections to the Department's tentative decision, arguing that, if implemented, it would force Aeromexico to reduce its pilot workforce. It argues that the Department applied unprecedented analysis in this case and that the proposed divestitures and time limit are unnecessary. It further argues that the proposed remedies violate principles of the Chicago Convention.

## IV. DECISION

We have decided to grant the Joint Applicants' request for approval of, and a grant of antitrust immunity for, alliance agreements covering air transportation between the United States and Mexico, with conditions. In arriving at this decision, we have applied the relevant policy and legal standards to the facts of the record in this case and have considered the views of the parties who have commented throughout the course of the proceeding and made some adjustments, accordingly, as explained below.

## V. ISSUES RAISED IN COMMENTS

Below, we address the issues raised by commenters in response to the Show Cause Order by topic area, describe the changes to our tentative decision in response to those comments, and explain our final decision.

### A. ATI's Relationship to the U.S.-Mexico Bilateral Aviation Agreement

In its comments on the record, the DGAC noted that the "Mexican Government repeatedly made clear that antitrust immunity for its carriers was a fundamental prerequisite" for agreeing to the new liberalized Agreement.[9] The DGAC went on to note that, in letters dated November 4, 2014, and July 22, 2016, the Mexican Government emphasized that granting of antitrust immunity was necessary to agree to the new liberalized regime.[10]

While the Mexican Government has taken this position in this proceeding, it is not borne out by the negotiating history. Throughout more than two years of talks, the delegation negotiating on behalf of the U.S. Government made clear it could not promise a grant of ATI, and that any application for antitrust immunity would be evaluated on its own merits. Indeed, in the Memorandum of Consultations initialed on November 21, 2014, the delegations included the following language after the delegation of Mexico noted its views on the importance of antitrust immunity:

> The U.S. delegation explained that each application for ATI is considered on its merits and is given fair and expeditious treatment by the DOT, according to well-established policies and standards. Because the DOT must, by statute, take into account the

---

[9] *See* Comments of the Dirección General de Aeronáutica Civil Mexico, Nov. 16, 2016, DOT-OST-2015-0070-0077, at 7.
[10] *Id.*

competitive market conditions contemporaneous with the filing of an ATI application, carriers should be aware of the need to take into account the availability of all essential commercial rights in a competitive marketplace and in the framework of a modernized agreement.[11]

Throughout the talks, the U.S. delegation emphasized the precedent that, as the basis for consideration of an application for ATI, all eleven elements discussed in Order 92-8-13 must be present in the bilateral relationship. These elements include, among other things, open, liberal traffic rights, including fifth freedoms, commercial rights, and liberal charter arrangements. This mutual understanding of the process by both delegations is highlighted in the exchange of letters dated May 28, 2015, discussing proposed treatment of fifth-freedom rights.[12]

The DOT letter to the DGAC states:

> If DGAC affirms the foregoing understandings, the DOT plans to consider the air services relationship between our two countries to provide all of the elements of DOT Order 92-8-13 to the airlines of both countries.

The DGAC letter to the DOT states:

> Also and because of the trends in international civil aviation, DGAC affirms that given the above understanding, the air services relationship between our two countries, namely the Agreement, should receive definite and formal consideration by the U.S Department of Transportation (hereinafter referred to as "DOT") as providing all of the elements of DOT Order 92-8-13, and therefore all analyses undertaken by DOT with regard to international airline alliance agreements and applications that involve airlines from both countries should take into account said premise.

It has been and continues to be Department policy that the presence of the elements discussed in Order 92-8-13, are a prerequisite for consideration of a grant of ATI, but they are not a guarantee of such a grant.

### B. The Department's Authority to Require Divestitures in Mexico

Several commenters discussed the ability of the Department to require Delta and Aeromexico to divest MEX slots and to assign them to recipient carriers. One commenter, Frente por la Defensa de la Aviación Nacional, went so far as to imply that the action would violate the Mexican Constitution.[13] Other commenters noted that international comity would instruct that Mexican

---

[11] *See* Memorandum of Consultations, initialed Nov. 21, 2014, found at http://www.state.gov/e/eb/rls/othr/ata/m/mx/234716.htm.

[12] *See* Correspondence between Department of Transportation (DOT) and Dirección General de Aeronáutica Civil (DGAC), DOT-OST-2015-0070-0073, Nov. 4, 2016.

[13] *See* Reply Comments of Frente por la Defensa de la Aviación Nacional, Nov. 30, 2016, DOT-OST-2015-0070-0089, at 4-5.

authorities should preside over the allocation of MEX slots. Still other commenters supported the Department's tentative decision regarding divestiture and slot allocation.

Slot divestiture is neither a new nor unusual condition to airline mergers or grants of antitrust immunity. The Department has extensive precedent on requiring airlines to divest slots when the market conditions warrant in order to preserve competition. For example, in the U.S.-U.K. alliance case, the Department tentatively required the divestiture of 17 daily slot-pairs at LHR, although the case was later dismissed at the request of the parties.[14] Another example, cited by both opponents and proponents, is the oneworld ATI case in which we required a divestiture of four slot-pairs at LHR.[15] In that case, we found that the European Commission had similar procedures to our own to facilitate the divestiture.[16]

Compared to LHR, MEX presents a separate and unique set of issues including carrier dominance in a transborder market, and non-standard rules for slot allocation, which requires divestiture. With regard to the administration of that divestiture, the Department is finalizing its decision to require MEX slots to be divested, but unlike what some commenters have asserted, the Department will not be allocating those slots. Rather, the Department will be instituting a proceeding to determine which carriers the Joint Applicants must divest slots to through an agreement to transfer slots. The transfer of slots is permitted by AICM rules, as that organization noted in its comments.[17] While the Department is determining which carriers the Joint Applicants are to arrange the slot transfers for, the ultimate approval of those transfers continues to rest with AICM.

Further, in answer to the challenge that the divestiture is contrary to Mexican law, the Department must point out that the Joint Applicants are availing themselves of U.S. law for the purposes of obtaining antitrust immunity. The Department's grant of such authority is within its discretion, and not something that Aeromexico is entitled to as a matter of right. The grant of such authority subject to one or more conditions is not inconsistent with U.S. or, for that matter, Mexican law.[18] If the Joint Applicants are unable to comply with such a condition in a manner that is consistent with Mexican law, their failure to meet the condition will result in the ATI not becoming effective. Aeromexico is not unaware that the Department may impose conditions on its U.S. authority, as its foreign carrier permit has long been subject to numerous conditions, including one that states the Department may amend or modify those conditions.[19]

The Frente por la Defensa de la Aviación Nacional argues we should not impose our proposed divestiture because it will have an adverse effect on airline competition in Mexico. We do not

---

[14] *See* Order to Show Cause 2002-1-12, Jan. 25, 2002.

[15] *See* Final Order, Order 2010-7-8, DOT-OST-2008-0252, July 20, 2010.

[16] *Id.*

[17] *See* Comments of Aeropuerto Internacional de la Ciudad de Mexico, Nov. 17, 2016, DOT-OST-2015-0070-0078, at 8.

[18] We note that COFECE itself has imposed divestiture conditions on its approval of the Joint Applicants' alliance.

[19] *See* Order 91-5-25.

agree.  Indeed, the divestiture will increase competition in the Mexican airline industry, as was noted by Volaris and Interjet.[20]

### C.  Validity of COFECE Report

In examining the record and the U.S.-Mexico aviation market for this proceeding, the Department determined that the nature of the slot regime at MEX is a significant factor to be considered before granting ATI.  The Department partially relied on a staff report from COFECE[21] in tentatively finding that conditions at MEX made it necessary to require the Joint Applicants to divest slots in order to preserve and enhance competition.[22]  The COFECE investigative report has not been finalized, as the Joint Applicants, AICM, and the DGAC note.[23]  Indeed, COFECE has not yet issued its final recommendations for how the Mexican Government should address the anticompetitive aspects of the slot allocation regime at MEX, a facility it has deemed an essential input under Mexican law.  Once COFECE issues its final recommendations, the Mexican Government will determine how they will be implemented.

The Joint Applicants, AICM, and the DGAC all spend considerable effort in their objections suggesting that the Department was incorrect to use the COFECE report to inform its analysis of the competitive situation at MEX.[24]  The Joint Applicants contend that the situation at MEX has substantially changed and that it will continue to change given AICM representations in the record that MEX will soon operate under the WSGs.[25]  Similar representations were made to the United States delegation throughout the course of the negotiations for the new U.S.-Mexico air services agreement over the past several years.  The Department recognizes that commitment and notes that, in finalizing its decision, it has made ten MEX slot-pairs subject to an exhaustion of efforts provision. This will limit the divestiture required if the MEX slot regime allows more robust competition and promotes efficient usage, in accordance with the WSGs as planned.

Throughout the course of this proceeding the Department has asked for information on the status and details of reforms to the slot administration regime at MEX on multiple occasions and did not receive an authoritative answer from AICM.  We thus proceeded using the COFECE staff report as a snapshot in time that was indicative of the conditions at MEX.  We did not, however, rely exclusively on the COFECE staff report.  Several carriers, both U.S. and Mexican, have filed pleadings in this proceeding that support the COFECE findings regarding the difficulty in

---

[20] *See* Answer of Volaris, Nov. 21, 2016, DOT-OST-2015-0070-0085, at 2; Comments of Interjet, Nov. 18, 2016, DOT-OST-2015-0070, at 2 (arguing that the tentative decision proposed too few slots divested).

[21] *See* COFECE Report Translation, DOT-OST-2015-0070-0037, Jun. 1, 2016.

[22] *See* Order to Show Cause, DOT Order 2016-11-2, at 20.

[23] *See* Objections of the Joint Applicants, DOT-OST-2015-0070-0084, Nov. 18, 2016 at 13; Comment from Aeropuerto International de la Ciudad de Mexico, DOT-OST-2015-0070-0078, Nov. 17, 2016 at 2; Comment from Dirección General de Aeronáutica Civil Mexico, DOT-OST-2015-0070-0077, Nov. 17, 2016 at 2-3.

[24] *See* Comment from Aeropuerto Internacional de la Ciudad de Mexico, DOT-OST-2015-0070-0078, Nov. 17, 2016 at 13-14.

[25] *Id.*; Comment from Aeropuerto Internacional de la Ciudad de Mexico, DOT-OST-2015-0070-0078, Nov. 17, 2016 at 6.

obtaining commercially-viable MEX slots.[26]  The Department has accordingly made its decision based on the best available information in the record regarding the situation at MEX at this time. Given the Department's right to alter or amend this Order at any time, along with the five-year time limit on the ATI granted, and exhaustion of efforts provisions regarding ten of the slot-pairs to be divested, the Department is satisfied that prospects for changing conditions at MEX, and in the U.S.-Mexico market more broadly, have been fairly considered.

### D.  Status of Current MEX Slot Regime

AICM and the DGAC, and to some extent the Joint Applicants, have commented on the record that the slot regime at MEX as described by the Department in the Show Cause Order is neither accurate nor current.[27]  They argue that the situation at the airport is not the same as was captured in the COFECE preliminary report.  Carriers, including Southwest, JetBlue, and Volaris, disagree.  We do as well.

AICM goes into some detail regarding its plans to implement WSG slot allocation guidelines and to install new computer software to accomplish that objective; however, those systems are not currently in place and their scope and effectiveness has not been demonstrated publicly.[28]  The Joint Applicants contend that the situation at MEX has substantially changed and that it will continue to change given AICM's representations in the record that MEX will soon operate under the WSGs.  As noted elsewhere, representations such as these have been made in the past, including during the course of the bilateral negotiations on the new Agreement.[29]

Throughout this proceeding, however, the Department has sought evidence from the Mexican Government about the current status of the slot allocation system at MEX.  When the Department explicitly asked AICM when it planned to adopt the IATA WSGs, the DGAC responded that, "[n]o defined date exists for the implementation of a new slots regime given that this shall imply necessary modifications to the Airport Law."[30]  Later, when asked what progress was being made to harmonize MEX's slot allocation system with the IATA WSGs, AICM

---

[26] *See, e.g.*, Comments of JetBlue Airways Corporation, DOT-OST-2015-0070-0081, Nov. 18, 2016 at 4-5; Answer of Southwest Airlines, DOT-OST-2015-0070-0082, Nov. 18, 2016 at 3-4; Reply of Concesionaria Vuela Compania de Aviacion, S.A.P.I. d/b/a Volaris, DOT-OST-2015-0070-0058, July 15, 2016 at 6-8; Comments of ABC Aerolineas, S.A. de C.V., d/b/a Interjet, DOT-OST-2015-0070-0086, Nov. 21, 2016, at 6, 8; Reply of ABC Aerolineas, S.A. de C.V., d/b/a Interjet, DOT-OST-2015-0070-0095, Dec. 1, 2016, at 5-8.

[27] *See* Comment from Direccion General de Aeronautica Civil Mexico, DOT-OST-2015-0070-0077, Nov. 17, 2016 at 5; Comment from Aeropuerto Internacional de la Ciudad de Mexico, DOT-OST-2015-0070-0078, Nov. 17, 2016 at 5-7; Objections of the Joint Applicants, DOT-OST-2015-0070-0084, Nov. 18, 2016 at 13-16.

[28] *See* Comment from Aeropuerto Internacional de la Ciudad de México, DOT-OST-2015-0070-0078, Nov. 17, 2016, at 6 (declaring that AICM will implement SLOTIX in January 2017, and the WSGs no later than second quarter of 2017).

[29] Indeed, the Joint Applicants noted in their 2015 application that adoption of the WSG at MEX would occur by March, 2016. *See* Consolidated Reply of JetBlue Airways Corporation, DOT-OST-2015-0070-0088, Nov. 30, 2016, at 5.

[30] *See* DGAC Response on Slot Policy, DOT-OST-2015-0070-0024, Oct. 2, 2015 at 19.

responded on June 2, 2016, that, "On June 1, 2016, AICM shall implement a slot allocation system in place that allows for the processing of allocation requests based on the IATA WSG."[31] Then, on November 17, 2016, AICM stated that "AICM hereby declares that it undertakes to adopt those IATA WSG recommendations for slot allocations at MEX by no later than the second quarter of 2017…"[32]  From this conflicting information, the Department cannot determine what, if any, aspects of the WSGs have been implemented, and cannot be confident that they will be implemented in the foreseeable future.

In its answer, AICM also states that the airport continues to have three different opportunities for carriers to adjust their slot holdings (*i.e.,* what the COFECE report referred to as long, medium, and short-term slots): seasonally allocated slots, schedule adjustments made at least 20 business days in advance of the operation, and further schedule adjustments made at least four hours in advance of the operation.[33]  AICM cites the codification of these opportunities to adjust slot holdings in the Mexican airports law and AICM's operational guidelines.  As the Department found in the Show Cause Order, and COFECE noted in its report, this flexibility significantly weakens use-or-lose rules because carriers can simply cancel an operation on short notice and not have it count against their slot usage.  This ability inhibits the competitive use of slots.  That fact is directly relevant to the proceeding, not because the DOT wishes to opine on AICM's practices, but because we are called upon to assess competitive effects in the U.S.-MEX market and the ability of airlines to introduce new services in competition with the JV.  The facts in the record show, due largely to the state of AICM rules and practice, that the likelihood of new entry is low.

There is also ongoing concern that Mexican law's prioritization of incumbents over new entrants will further hinder thorough adoption of the WSGs.[34]  We also do not understand how Mexico will develop a more independent slot coordination function, given that Mexican law appears to require that AICM allocate slots.  It is unclear to the Department how an effective IATA WSG-compliant slot regime can be implemented while these elements are maintained in Mexican law.

AICM and the DGAC also dispute COFECE's and the Department's finding that the slot allocation system at MEX is not transparent.  They point to the fact that the laws, regulations, and rules governing slot allocation and airport operations are available to the public, online.  They further state that seasonal slot allocations are listed on the AICM website.  This may be true; however, COFECE's findings take issue with the way the laws, regulations, and rules are implemented (or not implemented), not their availability.  Further, even though AICM does list seasonal slot allocations on its website, as stated above, Mexican law and AICM rules allow carriers to modify their slot holdings throughout the season and up to four hours before a planned operation, making seasonal allocations essentially meaningless for the purposes of our analysis.

---

[31] *See* AICM Response to 2nd Evidence Request, DOT-OST-2015-0070-0038, Jun. 2, 2016, at 6.

[32] *See* Comment from Aeropuerto Internacional de la Ciudad de México, DOT-OST-2015-0070-0078, Nov. 17, 2016, at 6.

[33] *See* Comment from Aeropuerto Internacional de la Ciudad de México, DOT-OST-2015-0070-0078, Nov. 17, 2016, at 4-5.

[34] *See* Consolidated Reply of Southwest Airlines Co., DOT-OST-2015-0070-0092, Nov. 30, 2016, at 4.

The fact remains that regardless of what reforms AICM and the DGAC have implemented at MEX, it is clear that new entrant carriers have not been able to achieve meaningful competitive entry at the airport to date. As JetBlue, Southwest, and Volaris all commented, they have been unable to acquire new slots at MEX.[35] Specifically, Volaris explains in its reply, that in order to initiate new transborder services, it was forced to reallocate slots that it had been using to serve domestic Mexican markets, since it was unable to acquire new slots from AICM without going through a potentially nine-month process at AICM with no guarantee of success.[36]

AICM and the DGAC have stated on the record their intention to improve the slot allocation system at MEX through closer adoption of the IATA WSGs. However, it is far from clear when, and what aspects of the IATA WSGs will be implemented at MEX. We reiterate that COFECE has not yet even issued its final recommendations to address the anticompetitive aspects of the MEX slot regime that it identified in its report. Once those recommendations are issued, the Mexican Government will then need to decide how to address them. The Department is obligated to make a decision based on the evidentiary record as it stands today. Based on that record, we must finalize our conclusion that the MEX slot regime is unlikely to facilitate new entry, is anticompetitive, and is likely to remain so for the foreseeable future.

### E. Analytical Standards

In their answer, the Joint Applicants argue that the Department erred in its tentative decision because "[the Department's] assessment of the competitive effects from the JCA at MEX bears no relationship to the Clayton Act test or traditional antitrust law principles."[37] The Joint Applicants' argument assumes that the Department's analysis of the competitive effects of an application for antitrust immunity is limited to the Clayton Act test. However, as clearly articulated in the Show Cause Order, previous ATI Orders, and noted by Southwest in its reply comments, the Department's analysis *includes* the Clayton Act test, but is not *limited* to the Clayton Act test.

As stated in the Show Cause Order, under 49 U.S.C. §§ 41308 and 41309, the Department engages in a two-step analysis of foreign air transportation agreements submitted for our approval. We first examine the application under § 41309(b) to determine whether the agreement(s) are adverse to the public interest because they would substantially reduce or eliminate competition (the "Competitive Effects Analysis"). Because antitrust-immune joint ventures allow carriers to achieve merger-like efficiencies, as part of our competitive analysis, the Department also examines the application under the Clayton Act test. The Department's

---

[35] *See, e.g.*, Comments of JetBlue Airways Corporation, DOT-OST-2015-0070-0081, Nov. 18, 2016 at 4-5; Answer of Southwest Airlines, DOT-OST-2015-0070-0082, Nov. 18, 2016 at 3-4; Reply of Concesionaria Vuela Compania de Aviacion, S.A.P.I. d/b/a Volaris, DOT-OST-2015-0070-0058, Jul. 15, 2016 at 6-8; Comments of ABC Aerolineas, S.A. de C.V., d/b/a Interjet, DOT-OST-2015-0070-0086, Nov. 21, 2016, at 6, 8; Reply of ABC Aerolineas, S.A. de C.V., d/b/a Interjet, DOT-OST-2015-0070-0095, Dec. 1, 2016, at 5-8.

[36] *See* Reply of Concesionaria Vuela Compañía de Aviación, S.A.P.I. de C.V. d/b/a Volaris, DOT-OST-2015-0070-0093, Nov. 30, 2016, at 3.

[37] *See* Objections of the Joint Applicants, DOT-OST-2015-0070-0084, Nov. 18, 2016, at 29.

public interest analysis under both §§ 41309(b) and 41308(b) entails a balancing of any anticompetitive effects and public benefits.[38]

The Department must, in order to protect the public interest, not examine just the effects of the proposed alliance, but also the environment in which that alliance will operate, to ensure that there will be adequate competition to not only mitigate any potential harm from the proposed transaction, but to guarantee that the anticipated public benefits are likely to be realized. The Department did conduct an in-depth competitive effects analysis, including but not limited to the Clayton Act test, to assess market power and the likelihood of potential new entry in key markets.[39] The Department determined that the Joint Applicants would be able to exert market power between the United States and MEX, and that, without divestitures, new entry is unlikely to occur. The record in this case clearly demonstrates that MEX is a primary market, particularly for transborder air service in Mexico.

Further, several carriers have argued on the record, and COFECE's Investigative Authority found, that MEX is subject to an anticompetitive slot allocation regime that hinders competitive new entry. Given the facts of this case, and applying the decisional standards described in the Show Cause Order, the Department has determined, consistent with its findings in prior cases,[40] that the public benefits of the alliance can only be realized if there is sufficient competitive entry during the period that the current anticompetitive slot regime is in place. These divestitures are therefore designed to ensure that there is adequate competition to outweigh the harm caused by the Joint Applicants' market power at MEX in order that the benefits of the alliance are passed on to consumers, given the barriers to entry caused by the slot regime at MEX, documented extensively in the record of this proceeding.

### F. Cancun Access

Southwest provided evidence in its answer that Cancun International Airport (CUN) does, in fact, have a locally-imposed slot regime by which carriers must obtain arrival and departure approval from the airport operator. As a remedy, Southwest proposes that the Department require the IATA WSGs to be implemented at CUN within one year of ATI becoming effective, include CUN in an annual review of airline access and competition in Mexico, and ensure that CUN takes concrete steps to prevent Delta's Saturday schedule from inhibiting additional daily low-fare service.[41]

The Department notes, however, that Southwest is the only carrier in this proceeding that has raised access to CUN as an issue. As a condition of ATI, the Department does not have the authority to impose remedies on a third party (in this case, Grupo Aeroportuario del Sureste (ASUR), the operator of CUN), independent of the Joint Applicants. While the Department empathizes with Southwest's frustration, this ATI proceeding is not the proper venue to address those concerns.

---

[38] *See* Order 2016-11-2 at 8-9.

[39] *See* Order 2016-11-2 at 9-18.

[40] *See e.g.,* Order 2002-1-12, Order 2010-7-8.

[41] *See* Answer of Southwest Airlines Co., DOT-OST-2015-0070-0082, Nov. 18, 2016, at 13.

19

### G.  Access to O&D Survey Data

The Department remains unconvinced by Hawaiian's comments related to making O&D survey data of foreign carriers available to independent carriers.  As Hawaiian and the Department have pointed out, implicit in the grant of antitrust immunity between a U.S. carrier and their foreign partner(s) is their ability to share information related to network planning and revenue management activities.  Each participant is able to bring its own expertise and market intelligence into the arrangement.  It is the Department's view that this exchange of information is a driver of the partnership's ability to generate public benefits.  As noted in the Department's Show Cause Order, Hawaiian has access to more data than do any immunized partners despite the fact that immunized foreign carriers can share their own data with their U.S. partner.  Foreign carriers are not able to share data with their U.S. partners from other foreign carriers while Hawaiian does have access to all O&D (including foreign itineraries) submitted by U.S. carriers.

Therefore, the Department upholds the finding in the Show Cause Order and determines that the Department should maintain the same collection procedure for the foreign carrier-submitted international O&D.  We are not persuaded by Hawaiian to make a change in the established policy, which we believe protects competition and promotes U.S. carrier interests, including Hawaiian's.

### H.  Conditions of Final Approval and Grant of Antitrust Immunity

The Show Cause Order tentatively approved the alliance, subject to the following conditions:

1. The divestiture of 24 slot-pairs at MEX and six (6) slot-pairs at JFK;

2. A five-year time limit to the grant of ATI;

3. The removal of exclusivity clauses in the alliance agreements;

4. Annual reporting to the Department on the alliance's public benefits and commercial development;

5. O&D survey data reporting;

6. Withdrawal from IATA tariff coordination; and

7. The obligation to seek prior approval of any common branding.[42]

We hereby make final our tentative decision to impose all of the above conditions, with modifications to the implementation of the divestitures at MEX and JFK, and the size of the divestiture at JFK, as discussed below.

---

[42] *See* Order 2016-11-2 at 33-35.

### 1. MEX Divestitures

In the Show Cause Order, the Department tentatively found that a slot remedy was necessary at MEX in order to facilitate the minimum level of competition necessary to ensure the proposed alliance was net-positive for the public interest. The Department's proposed remedy requires that 24 MEX slot-pairs be divested.

The Department sought and received comments on both the size and terms of the divestiture. The Joint Applicants, Mexican aviation unions, AICM, and the DGAC all objected to the size of the divestiture. The Joint Applicants argued that it was disproportionate to any actual or potential harm caused by the proposed alliance. The Mexican unions, AICM, and the DGAC argued that the divestiture was unnecessarily punitive and would have adverse effects on Aeromexico, Mexican aviation generally, and foreign relations between the United States and Mexico. JetBlue suggested that the divestiture be phased-in over the course of three years. Southwest opposed this suggestion.

The Department affirms its tentative decision to require the divestment of 24 slot-pairs.[43] As explained in the Show Cause Order, this remedy reflects the eight (8) slot-pairs that constitute the immediate concentration of the Joint Applicants at MEX post-transaction (consistent with COFECE's remedy), as well as 16 additional slot-pairs to provide adequate competition to ensure that public benefits from the Joint Applicants' planned growth at MEX are realized by ensuring sufficient competitive entry.[44] As part of their application, the Joint Applicants provided detailed plans for growing transborder services if the JV is approved.[45] Based on the evidence in the record, these services can, and likely will, be introduced under the existing slot regime which the COFECE report deemed anticompetitive and a barrier to an essential input (*i.e.,* MEX). In order to ensure that both the price and service benefits of the Joint Applicants' new services are passed along to consumers, DOT seeks to foster the requisite competition by enabling new entry.

AICM and the DGAC state that they intend to make improvements to the slot allocation system at MEX, despite the fact that it has not yet seen COFECE's final recommendations, nor has it had an opportunity to respond to them. We will therefore alter our decision and require that only 14 slot-pairs be divested immediately.[46] Through a subsequent proceeding in this docket, the Department will adopt an assignment of all 24 slot-pairs; however, for the last ten pairs, the acquiring carriers will need to demonstrate that they have exhausted reasonable efforts to obtain slots through AICM's slot allocation procedures in the next practicable IATA scheduling season

---

[43] The Department's remedy contemplates the divestiture of slot-pairs for year-round use (i.e., summer and winter seasons).

[44] *See* Order 2016-11-2 at 21.

[45] *See* Confidential Document Production at DL000812, DL-R-0006.1; Answer of Southwest Airlines Co., DOT-OST-2015-0070-0050, July 7, 2016, at 8.

[46] The Department would seek to allocate the initial 14 slot-pair divestitures such that they would also satisfy the COFECE remedy requirements. *See* discussion of remedy compatibility in Order 2016-11-2, at 26-27.

(likely the Northern Summer-2018 season) after the initial 14 divestitures.[47]  If the acquiring carriers are unsuccessful, the Joint Applicants would then need to supply the remaining slots.  We believe this modification to our remedy strikes a balance amongst the tripartite goal of:  ensuring sufficient competitive access to MEX, recognizing the Mexican Government's efforts to implement reforms to the slot allocation system at MEX, and limiting the impact to the Joint Applicants to the greatest extent possible.  Further, in response to comments on the issue of hourly limits, we have decided that the Joint Applicants should not be obligated to transfer more than six (6) slots per hour during the hours that the airport authority has declared as saturated.  The Joint Applicants, however, may designate two non-consecutive hours during the saturated period in which they will not be obligated to transfer more than four (4) slots per hour.  This approach enables competitors to operate schedules that are commercially viable while at the same time avoiding any significant disruptions to the Joint Applicants' existing schedules and ability to operate a hub at MEX.

We note Interjet's argument that our remedy does not go far enough and that the Department should require the divestment of at least 36 slot-pairs at MEX.  We understand the carrier's desire to secure additional access at this important but congested facility.  However, given the timeframe of the approval (*i.e.,* five years), the Department's analysis cannot support the higher figure proposed by Interjet.  The Department believes that the divestiture of 24 MEX slot-pairs is proportional given the Joint Applicants' ability to exert market power between the United States and MEX, and the uncertainty of reform of the current anticompetitive slot regime at MEX.

Southwest also commented that the Department should require that commensurate gates and ground facilities, including remain-overnight (RON) parking positions if necessary, must be divested along with slots in order to ensure competitive service can be initiated.  The record indicates that the operational authority conferred by a slot at MEX entails the right to use all necessary associated infrastructure and services of the airport.[48]  As our remedy is predicated on the ability of carriers to enter the market and provide competitive service, if they are not able to do so because of facility or other constraints even after acquiring the necessary slots, the effectiveness of the remedy would be moot and the Department would have to reconsider its grant of ATI.[49]

Southwest has also argued that the Department should limit eligibility to receive the divested MEX slots to U.S. LCCs, thereby excluding the Mexican LCCs that the Department tentatively determined should be eligible.  Southwest argues that Mexican airlines already hold the vast majority of MEX slots and do not need or deserve more slots through the Department's divestiture process.  Southwest states that Volaris and VivaAerobus have 58 and 36 slot-pairs, respectively.[50]  In a related argument, Interjet and American both object to their exclusion from

---

[47] The initial 14 MEX and two JFK slot-pairs may be referred to as the "phase one" slots, the remaining ten MEX and two JFK slot-pairs are the "phase two" slots.

[48] *See* DGAC Response on Slot Policy, DOT-OST-2015-0070-0024, Oct. 2, 2015, at 11-12.

[49] The Department notes that AICM must approve all slot transfers.  Based on evidence in the record, this appears to be a straightforward, administrative action.  However, should AICM delay the approval of, or ultimately deny the transfers, the Department's remedy would likewise be moot.

[50] *See* Answer of Southwest Airlines Co., DOT-OST-2015-0070-0082, Nov. 18, 2016 at 5.

the Department's remedy.[51]  Interjet argues that while it does hold 26.8 percent of the slots at MEX, it has less than 5.5 percent of the U.S.-Mexico transborder market; less than Volaris, Southwest, and Alaska, carriers that the Department tentatively determined are eligible to receive MEX slots.[52]  American argues that the remedy should be open to all carriers, not a subset selected by the Department.

The Department disagrees with Southwest, Interjet, and American.  The Department's remedy is focused on providing access at MEX to carriers that do not have it, and have demonstrated that they cannot achieve it otherwise, in order for them to provide competitive service, disciplining the JV.  Southwest has provided no evidence to demonstrate that the competition provided by Mexican LCCs is any less vigorous or of any less quality than that provided by U.S. LCCs. Interjet and American's arguments that they should be eligible to receive MEX slots are misplaced.  As stated above, the objective of the Department's remedy is to inject sufficient competition at MEX to discipline the dominant position of the Joint Applicants at MEX.  The Department believes that the most efficient way to do this, requiring the least number of divestitures, is to link LCC and low-fare carrier networks to MEX, thereby ensuring adequate network competition.  We then determined the eligibility of LCC and low-fare carriers based on their level of slot holdings at MEX, and their ability and willingness to launch competitive service in a timely fashion.  By its own admission, Interjet has over 26% of the slots at MEX, more by far than any other carrier besides Aeromexico.  Interjet does not need assistance to achieve competitive access at MEX; it already has it.  As discussed below, the Department will adopt a similar approach at JFK.

American, on the other hand, is not an LCC or low-fare carrier.  As explained above, one of the overriding goals the Department pursued in crafting its remedy was to minimize the remedy's impact on the Joint Applicants.  The Department determined that limiting the eligibility to receive divested slots to LCC and low-fare carriers was the best way to achieve this goal.  As stated in the Show Cause Order, the Department has previously found that LCCs exert the greatest competitive impact when entering constrained markets.[53]  Therefore limiting eligibility to those carriers would require the least slots to achieve the requisite competition needed to remedy the transaction.  Permitting American and other legacy carriers to participate in the divestiture would compel us to require a larger slot divestiture, thereby jeopardizing the viability of the alliance and its public benefits.

The DGAC also argues that the Department erred in not considering Toluca as a substitute airport for MEX and believes the Department should lower its MEX remedy accordingly.  There is no evidence in the record to indicate that Toluca is a suitable substitute for MEX.  Just the fact that an airport exists in relative proximity to another does not make it substitutable.  The Department examined airline schedules beginning in January, 2014.  During that time, the

---

[51] In Interjet's case, only at MEX.

[52] *See* Comments of ABC Aerolineas, S.A. de C.V., d/b/a Interjet, DOT-OST-2015-0070-0086, Nov. 18, 2016, at 10.

[53] *See* Petition for Waiver of the Terms of the Order Limiting Scheduled Operations at LaGuardia Airport, 76 FR 63702, Oct. 13, 2011 at 63705.

entirety of U.S.-Toluca service consisted of less-than-daily service.[54]  No U.S.-Toluca passenger service has existed since May, 2016, and no carrier has filed any future schedules to reintroduce U.S.-Toluca service at least through December, 2017.[55]

## 2.  JFK Divestitures

In their objections to the Show Cause Order, the Joint Applicants argue that the Department erred in its analysis of the competitive effects of the alliance on the JFK-MEX overlap route. Specifically, they contend that the proper scope of analysis is the New York City-Mexico City city pair, and that EWR should be considered as part of the New York City market.  They argue that there are no barriers to entry at EWR given the airport's recent change of designation from IATA Level 3 (slot controlled) to Level 2 (schedule facilitation), and that it is an appropriate substitute for JFK.  The Joint Applicants also argue that there are no barriers to entry at JFK and that, as a result of the new liberalized air services agreement between the United States and Mexico, more carriers are likely to introduce service in the near future.  The Joint Applicants also note the expected financial and commercial impact that divestitures will have on Delta's hub operation at JFK.

The Department acknowledges that for some, but not all, passengers, EWR is a substitute airport for JFK.  The airports have overlapping, but not identical, catchment areas; the two airports are not perfect substitutes that can be freely interchanged.  As the Department of Justice pointed out in its recent antitrust complaint against United at EWR, "Airlines do not view service at other airports as reasonable substitutes for the service offered at Newark, and thus they are unlikely to switch away from slots at Newark in response to a small but significant increase in the price of slots.  Thus, slots at Newark constitute a relevant market under the antitrust laws."[56]

Further, a regional air service demand study conducted by the Federal Aviation Administration (FAA) shows that the distribution of passenger origins vary among New York/New Jersey area airports.  In contrast to both LaGuardia (LGA) and JFK where more than 40 percent of passengers surveyed originated in Manhattan, only 16 percent of EWR passengers originated in Manhattan.[57]  This study also found JFK to be the only airport that includes all five boroughs of New York City within its service area.[58]  The study concludes:  "This analysis shows that passengers who use the New York airports (JFK and LGA) are less likely to consider EWR as an alternative to one of the two New York airports.  EWR passengers are less likely to consider using a New York Airport, but when they do, they are more likely to consider JFK than LGA."[59]

---

[54] OAG schedule data for Jan., 2014-Dec., 2017.  As published Dec., 2016.

[55] *Id.*

[56] *See* United States of America v. United Continental Holdings, Inc. (D. N.J.),  Verified Complaint, Case 2:15-cv-07992-WHW-CLW Document 1 Filed 11/10/15, ¶ 30.

[57] https://www.faa.gov/airports/eastern/planning_capacity/media/panynj-task-b-and-d-final-may-2007.pdf at I-8

[58] *Id.*, at I-12

[59] *Id.*, at III-26.

EWR's recent designation change to a Level 2 schedule facilitated airport is not a complete solution for access as the Joint Applicants claim. As stated in the notice announcing EWR's change to Level 2, "approval of new or retimed operations must avoid significant schedule peaking and allow for recovery to avoid causing a consistent level of unacceptable delay… The FAA intends, if necessary, to deny schedule submissions that exceed the declared airport runway capacity…" and "while the FAA is responsible for managing the airport's runway capacity, there are terminal, gate, and other operational factors that may require schedule adjustments."[60] While some new entry has been possible at EWR, the airport is still congested and not all requests for access are likely to be approved.

It is also telling that during the schedule submission period for both the Winter-16/17 and Summer-17 IATA scheduling seasons, no Mexican carrier requested schedule approval at EWR. In fact, no Mexican carrier has served EWR since Mexicana Airlines ceased its EWR-MEX service in June, 2004. There is a clear, revealed preference for Mexican carriers, and therefore presumably their passengers, to access New York City via JFK. This is evidenced by the fact that Interjet and Volaris serve JFK at off-peak, non-slot controlled times, rather than seek access to EWR at more commercially-viable times.

The Joint Applicants also claim that new JFK-MEX service is likely to be introduced because the limitation on the number of carriers providing service on a route has been removed under the new U.S.-Mexico air services agreement. This argument, however, ignores the fact that, in order to commence JFK-MEX service, a carrier must not only have slots on both ends of the route, but *coordinated* slots. The record clearly indicates that carriers have been unable to obtain any slots at MEX, let alone the specific slots needed to facilitate commercially-viable JFK-MEX service.

The Joint Applicants point out that Volaris will soon begin service on the JFK-MEX route which constitutes new entry by a fourth carrier in the airport-pair market (pre-transaction). Although the proposed times are during non-slot controlled early morning hours limiting its competitive impact for time-sensitive business travelers, the carrier's low-cost business model will offer new competition for price-sensitive passengers. Further, the Department recognizes that, unlike MEX slots, there is a secondary market for JFK slots.

This new, even if limited, competition for a subset of consumers, as well as the fact that slot divestitures themselves have a significant monetary impact on the divesting carriers, has led the Department to lower its divestiture requirement at JFK to four (4) slot-pairs.[61] This number comports with Aeromexico's existing complement of JFK slots used to serve Mexico City. We have further decided to limit to two (2) the number of slots that must be divested in the peak-hours at JFK of 1500-2059. This will limit the loss of what are presumably the most financially and operationally valuable slots to the Joint Applicants. It will also alleviate the impact that the divestitures will have on the Joint Applicants' trans-Atlantic hub operation at JFK.

---

[60] *See* Change of Newark Liberty International Airport (EWR) Designation, Federal Aviation Administration, Apr. 6, 2016. 81 FR 19861, at 19862.

[61] Carriers receiving divested JFK slots, as well as the Joint Applicants as the current holder(s) of the slots, must apply to the FAA for a waiver from the Order Limiting Operations at JFK in order to permanently transfer the slots.

Additionally, similar to our adjusted MEX remedy above, we will make two of the slot-pairs subject to exhaustion of efforts whereby the acquiring carriers would need to demonstrate that they have exhausted reasonable efforts to obtain slots from the airport's slot coordinator, by the next practicable IATA scheduling season (likely the Northern Summer-2018 season) after the initial divestiture. If they are unsuccessful, the Joint Applicants would then need to supply the remaining slots. Unlike MEX slots, slots at JFK do not automatically confer access to necessary ground services and terminal facilities. Carriers receiving JFK slots will likewise have to demonstrate that they have exhausted reasonable efforts to seek accommodation for terminal space and other necessary infrastructure, including by availing themselves of any applicable lease terms at JFK. Should they prove unable to find adequate accommodation, the Joint Applicants will be expected to provide it.

The primary competitive problem posed by the transaction in the context of the existing slot regime at MEX is the degree of market power that the Joint Applicant's would have in the United States-MEX market. The Department's MEX remedy has therefore focused on the need to adequately link competing LCC networks to MEX in order to discipline the joint venture in transborder markets. The Show Cause Order, as well as the response of the Joint Applicants, acknowledged that JFK-MEX is the only nonstop air services market that raises competitive concerns, requiring a route-specific remedy. The importance of this market (linking the two largest cities in North America where the preponderance of traffic has a revealed preference for nonstop services) was discussed in detail in the Show Cause Order. As a result, the Department's divestitures at JFK are specifically designed to address competition in this nonstop market and the Department will give preference in assigning JFK slots to proposals for nonstop service between JFK and MEX.

### 3. Time Limit

The Department tentatively proposed in the Show Cause Order that its grant of ATI should be subject to a five-year time limit. The Joint Applicants would then need to submit a *de novo* application prior to the expiration of the five year term for a possible renewal of ATI. In response to the Department's tentative decision, the Joint Applicants argued that no other grant of ATI has carried such a condition, and that a five year grant would negatively affect their ability to make long term investments.[62] The Joint Applicants contend that many of the public benefits expected to accrue from an immunized alliance rely on a shared incentive to develop the alliance to maximize long term benefits, in particular an incentive "to invest in joint operations, modify route structures, and otherwise achieve pro-consumer modifications."[63] They argue that a five-year term would have a chilling effect on the Joint Applicants' willingness to make the investments necessary to achieve those benefits. The Department does not agree and notes that Delta already has an equity stake in Aeromexico, and is separately seeking approval to increase that stake to 49 percent.

---

[62] *See* Reply of the Joint Applicants, DOT-OST-2015-0070-0091, Nov. 30, 2016, at 26.

[63] *See* Objections of the Joint Applicants, DOT-OST-2015-0070-0084, Nov. 18, 2016, at 39.

As JetBlue noted in its response, there are many recurring obligations for airlines under the Department's regulations, including two-year exemptions, limited entry route awards, and continuing fitness reviews. It is also common practice in foreign jurisdictions to place time limits on alliance authorizations.[64] Accordingly, the Joint Applicants are not unfamiliar with structuring and planning investments when facing an eventual need to renew. While the Department has not previously imposed firm time limits on grants of ATI, it has always retained the ability to alter or amend its grant of ATI at any time if the Department believes a change in competitive circumstances has occurred.[65] In this case, we find that, in light of the circumstances presented, it is necessary to impose a definite time for review.

The Department observed in its Show Cause Order that conditions at MEX serve as a barrier to entry to the market.[66] The Joint Applicants spent much time in their comments arguing that those conditions have changed or will change, based on the representations of AICM.[67] While the Department is optimistic regarding AICM's anticipated move towards complying with the WSGs, the uncertainty surrounding current conditions and the potential condition of the slot regime in the near future requires the Department to finalize the five year time limit.

Southwest restated its position that the grant of ATI should be subject to a three year time limit rather than the five years tentatively proposed by the Department.[68] It argues that five years is too long because the Joint Applicants will be entrenched in a dominant position by the time the ATI expires if the MEX slot regime is not reformed immediately.[69] The Department finds that three years is too short a time frame for the public benefits of ATI to accrue. It will take time for the Joint Applicants to fully integrate their businesses and fully achieve the maximum consumer benefits. A three-year time limit is too short a time for such a review. The Department notes that it retains the ability to alter or amend its grant of ATI at any time so that harsh competitive effects like those Southwest warns about can be mitigated if necessary. The five year time limit is accordingly the best balance of interests to permit the Joint Applicants to fully pursue the benefits of ATI while allowing the Department an opportunity to fully reexamine its decision in light of that implementation and the subsequent changing marketplace.

The U.S.-Mexico market is rapidly changing and will likely continue to do so as airlines and consumers adapt to the new liberalized marketplace. At the same time, the uncertainty surrounding the slot regime at MEX could mean that "the Department would have to carefully consider whether it could approve a new application if tendered, and, if it were to do so, whether additional divestitures would be necessary."[70] The competitive balance and the policies governing allocation of slots at MEX are fluid and the Department needs to retain the ability to

---

[64] *See* Comments of JetBlue Airways Corporation, DOT-OST-2015-0070-0081, Nov. 18, 2016, at 7-8.

[65] 49 U.S.C. § 41309(b)(1).

[66] *See* Order 2016-11-2, at 27.

[67] *See* Objections of the Joint Applicants, DOT-OST-2015-0070-0084, Nov. 18, 2016, at 12.

[68] *See* Answer of Southwest Airlines, DOT-OST-2015-0070-0082, Nov. 18, 2016, at 10-11.

[69] *Id.*

[70] *See* Order 2016-11-2, at 27.

fully reexamine the basis for granting ATI. Accordingly, the Department finalizes its decision to set a five-year time limit on its grant of ATI.

### 4. Exclusivity Provisions

The Joint Applicants argued that the Department's requirement to remove exclusivity provisions from their alliance agreements is inconsistent with precedent and harmful to consumers. They state that "DOT's proposal to strike the exclusivity provisions in the JCA operating agreements is an unprecedented assault on a highly procompetitive aspect of the proposed JCA."[71] The Department disagrees on both counts. The requirement is not unprecedented. The Department has previously required the elimination of provisions in alliance agreements that would allow one partner to unilaterally prevent procompetitive activities by the other partner.[72] Further, a provision that enables parties to prohibit competitive access for third-party carriers cannot be deemed "procompetitive."

As stated in the Show Cause Order, we recognize the importance of ensuring that the parties work together in order to achieve success in the joint venture. However, the Department will not endorse provisions in alliance agreements that allow either partner to prevent procompetitive activities by the other partner.

### I. Slot Assignment Proceeding: Next Steps

Following this Final Order on the merits of the application, the Department intends to conduct a selection process in this docket. It is important that we move quickly to transfer the slot-pairs to be divested at MEX and JFK. Expedient transfer will enable competitors to introduce new services in the U.S.-Mexico market in parallel with the Joint Applicants' implementation of the joint venture, which the Department would aim to facilitate as soon as possible. COFECE's approval of the joint venture also requires prompt implementation. Based upon COFECE's final resolution, COFECE requires that the Joint Applicants implement the joint venture no later than May 17, 2017. Of particular importance, COFECE's approval is conditioned upon the transfer of eight slot-pairs subject to terms that are not being adopted by DOT. Notably, the eight slot-pairs identified by COFECE:

- Must be transferred, with approval by AICM, by May 17, 2017;
- Must be notified to COFECE;
- May be transferred to a list of carriers that is broader than the list of eligible carriers established by the Department; and
- May not be reacquired generally by the Joint Applicants for a period of 10 years.[73]

---

[71] *See* Objections of the Joint Applicants, DOT-OST-2015-0070-0084, Nov. 18, 2016, at 39.

[72] *See* Order 2010-2-8 at Confidential Appendix B.

[73] *See* COFECE Plenary Translation, DOT-OST-2015-0070-0037, Jun. 1, 2016.

As explained in the Show Cause Order and below, the Department's broader remedy of 24 MEX slot-pairs and four JFK slot-pairs takes into account these terms and is compatible with COFECE's approach.

There are a number of steps needed for the Joint Applicants to implement the joint venture, but they need not take long. The first step is for the Joint Applicants to confirm that they intend to implement the joint venture as conditioned by the Department. A similar step was required by COFECE earlier this year. We are requiring the Joint Applicants to file written notice in the docket indicating whether they accept all terms and conditions described in this Final Order, including Appendix A, within seven (7) business days from the service date of this Order. One condition requires the Joint Applicants to amend the alliance agreements to remove exclusivity clauses. The Joint Applicants need not complete that step as quickly; they may comply any time prior to the joint venture's actual implementation date.

If the Joint Applicants accept all terms and conditions, the Department will take the next step of promptly issuing a notice instituting a selection process to assign the available MEX and JFK slots for both the initial Phase One slots, as well as the Phase Two slots that are subject to exhaustion of efforts at both airports. The notice would request proposals and provide the details that airlines should provide in their proposals, which will include, at a minimum:

- Key terms: requested timings, number of frequencies, routes intended to be served, proposed start date and schedule, and aircraft to be operated; and
- Business and operational plans: pricing structure, service offerings, and transborder network plan.

The Department intends to make proposed selections in a show-cause order and final selections in a final order. Mindful of the need for expedition, abbreviated answer and reply dates are likely at each phase of the selection process. With regard to the second phase of slots that would be transferred in time for use in the IATA Northern Summer-2018 season, if the carriers selected are able to obtain suitable slots from the slot administrators, the Joint Applicants will not be obligated to transfer the requisite number of slots and the overall slot divestiture of 24 MEX and 4 JFK slots will be credited and adjusted down accordingly.

Given the May 17, 2017, COFECE deadline, the Department encourages airlines interested in obtaining slots in this process to approach Mexican and United States authorities promptly to discuss the processes for obtaining necessary economic, safety, and operational approvals to launch services with remedy slot-pairs. Additionally, we note that the Joint Applicants are obligated to notify COFECE which slot-pairs are transferred pursuant to COFECE's remedy and that those slots will be subject to the unique terms and conditions imposed by COFECE.

Once the Department makes selections, we will require the Joint Applicants to enter into slot transfer agreements and to seek prior approval of those agreements before they may be executed. The Department will take into account proposed service dates in its evaluations of the proposals. Services introduced in parallel with the Joint Applicants' services will exert competitive discipline in the market faster than services introduced at a later date. Except as limited by the COFECE remedy, the Department's remedy does, however, allow the Joint Applicants to

29

execute slot transfer agreements that enable competing airlines, at their option, to begin using the slots at future dates. The dates must be reasonably close in time to the date the slot transfer agreements are executed. The Department finds that this allowance is necessary given the need for competing airlines to obtain economic, safety, and operational approvals and to ensure proper time for competing airlines to prepare for the introduction of new international flights.

The Joint Applicants' antitrust immunity will become effective once the slot transfer agreements for the initial round of 14 MEX slot-pairs and 2 JFK slot-pairs have been approved by the Department, executed by the parties, and approved by the slot coordinators, and once the requirements for the COFECE remedy have been met. The Joint Applicants should submit a notice to the record indicating the date the Joint Applicants completed execution of the slot transfer agreements, and received AICM or FAA approval of the transfers as applicable, for the first 14 MEX slot-pairs and the first two (2) JFK slot-pairs described in Appendix A to this Order. The filing of such notice automatically triggers the effectiveness of the antitrust immunity. The five-year limit on the antitrust immunity will run from the date of the notice submitted by the Joint Applicants.

With regard to these second phase slot-pairs, the Department's notices and orders will provide additional details on applicable dates and processes to be followed by the Joint Applicants and the competing airlines eligible to obtain the slots. The competing airlines will be expected to approach AICM and the FAA to apply for slots using the applicable procedures at those facilities and subject to the normal deadlines established by each slot coordinator. The competing airlines must submit a written request for slots detailing the specific times requested, and should file those requests in this docket, as well. If they do not receive a complete response, or are not granted slots within a 60-minute window of their requests, the Department will consider that the competing airlines have exhausted all reasonable efforts to obtain slots. At this point, the Joint Applicants' obligation to transfer remedy slots as a condition of maintaining their antitrust immunity will be triggered. The Department will notify the Joint Applicants if they are obligated to provide these remedy slots. Before that notification, it would be prudent for the competing airlines to notify the Joint Applicants of their timing requests to AICM and the FAA, and for the Joint Applicants to identify appropriate slots and prepare for a potential slot transfer.

A summary of the steps and timeline is provided in the table below:

| Timeline | |
|---|---|
| **Step 1** | Joint Applicants indicate their acceptance or rejection of the terms and conditions – within 7 business days of the issuance of this Final Order. |
| **Step 2** | DOT issues an instituting notice requesting proposals for remedy slots. |
| **Step 3** | DOT selects eligible carriers to receive remedy slots in show-cause and final orders. |
| **Step 4** | The Joint Applicants and carriers receiving Phase 1 slots negotiate slot transfer agreements and the Joint Applicants seek prior approval of the agreements prior to execution. |
| **Step 5** | The Joint Applicants submit a notice on the record indicating the date the execution of the Phase 1 slot transfer agreements are complete and approved by the slot coordinators, and the date that the Joint Applicants will implement the JV. The antitrust immunity is effective from the date of the notice. |
| **Step 6** | The Joint Applicants prepare for a potential transfer of Phase 2 slots. |

**ACCORDINGLY:**

1.    Subject to the ordering paragraphs below, we approve and grant antitrust immunity to alliance agreements between Delta Air Lines, Inc. (along with its affiliate Endeavor Air, Inc.) and Aerovías de México, S.A. de C.V. (along with its affiliate Aerolitoral, S.A. de C.V.), insofar as such agreements relate to foreign air transportation;[74]

2.    We direct the Joint Applicants to file a notice in this docket within seven (7) business days from the service date of this Order, indicating their acceptance or rejection of the Department's decision, including all remedies and conditions contained in this Order and its Appendix A;

3.    The approval and grant of antitrust immunity shall become effective upon the date on which the Joint Applicants submit a notice on the public record in this docket stating the following information:

   a.    The date upon which the Joint Applicants completed execution of the slot transfer agreements, and received AICM or FAA approval of the transfers as applicable, for the first 14 MEX slot-pairs and the first two (2) JFK slot-pairs described in Appendix A to this Order;

   b.    The implementation date of the Joint Cooperation Agreement; and

---

[74] The alliance agreements shall mean those referred to in footnote 2 of this Order.

31

c.   A statement that COFECE's conditions have been met;

4.      The approval and grant of antitrust immunity shall expire five (5) years from the date upon which the Joint Applicants submit the notice described in Ordering Paragraph 2;

5.      We determine that the Joint Applicants shall divest up to 24 slot-pairs at Mexico City's Benito Juarez International Airport (MEX) and up to four (4) slot-pairs at New York's John F. Kennedy International Airport (JFK), subject to the processes, terms, and conditions set forth in Appendix A to this Final Order;

6.      We direct the Joint Applicants to submit for prior approval all slot transfer agreements required by Appendix A to this Final Order as well as any subsequent subsidiary agreements implementing the alliance;[75]

7.      We direct the Joint Applicants to obtain prior approval if they choose to hold out service under a common name or use common brands;

8.      We direct the Joint Applicants to revise the Joint Cooperation Agreement as directed in Ordering Paragraph 6 of the November 4, 2016, Order to Show Cause issued in this docket, and provide the Department a complete and unredacted copy of the most recent and updated Joint Cooperation Agreement and any appendices prior to the agreement's implementation;

9.      We direct the Joint Applicants to submit annual progress reports to the Office of Aviation Analysis, beginning one year from the effective date of ATI, and continuing each year thereafter while the alliance agreements are effective;[76]

10.     We direct Delta Air Lines, Inc. and Aerovías de México, S.A. de C.V. to withdraw, or remain withdrawn, from participation in any International Air Transportation Association tariff coordination activities that discuss any proposed through fares, rates, or charges applicable between the United States and any countries whose airlines have been or are subsequently granted antitrust immunity, or renewal of, to participate in similar alliance activities with a U.S. airline(s);

11.     We delegate to the Director of the Office of International Aviation the authority to determine the applicability of the directive set forth in the preceding paragraph as to

---

[75] Regarding this requirement, we do not expect the Joint Applicants to provide the Department with minor technical understandings that are necessary to implement fully their day-to-day operations but that have no additional substantive significance. We do, however, expect and direct them to provide the Department with all unredacted contractual instruments that implement or materially alter, modify, or amend cooperation agreements, joint ventures, slot transfer arrangements, or confidentiality/antitrust guidelines.  Any appropriate documents shall be submitted to the Director of the Office of Aviation Analysis.

[76] We expect the Joint Applicants to deliver the progress report by the close of business on the anniversary date.  If that date falls on a weekend or federal holiday, the Joint Applicants may deliver the report by the close of business on the following business day.

specific prices, markets, and tariff coordination activities, consistent with the scope and purpose of the condition, as previously described;

12.    We direct Aerovías de México, S.A. de C.V. to report full-itinerary Origin-Destination Survey of Airline Passenger Traffic for all passenger itineraries that include a U.S. point;[77]

13.    We may amend, modify, or revoke this authority at any time, without hearing;

14.    We defer action on all motions for confidential treatment submitted in this docket to date;

15.    The Department will not entertain petitions for reconsideration of this Order; and

16.    We will serve this Order on all parties on the service list for this docket.

By:

**JENNY T. ROSENBERG**
Acting Assistant Secretary for
Aviation and International Affairs

(Seal)

*An electronic version of this document is available online at www.regulations.gov.*

---

[77] We expect applicants to report the O&D data beginning with the first full quarter following the date of the issuance of a Final Order.  Detailed instructions are available from the Department's Office of Airline Information at the Bureau of Transportation Statistics.  We treat the foreign airlines' O&D data as confidential, do not allow U.S. airlines any access to the data, and do not allow foreign airlines any access to U.S. airline O&D Survey data.  We use these data only for internal analytical purposes.

## SLOT DIVESTITURES

In consideration of United States Department of Transportation ("DOT") approval of the alliance agreements submitted in Docket DOT-OST-2015-0070, and a grant of antitrust immunity, Delta Air Lines, Inc. and Aerovias de Mexico, S.A. (together, the "Joint Applicants") commit to transfer to eligible competitors certain landing and takeoff authorizations ("slot-pairs" or "slots"[78]) at Mexico City's Benito Juarez International Airport ("MEX") and New York's John F. Kennedy International Airport ("JFK"). The Joint Applicants shall transfer the slot-pairs for use in the United States-Mexico air services market subject to terms and conditions specified in the attached Final Order, in this Appendix, and in subsequent notices or orders published in the docket. DOT's notices or orders will determine the eligibility of competitors to receive the slot-pairs and make selections for the Joint Applicants to follow. Each eligible competitor receiving slot-pairs ("Selected Carrier") shall comply with the terms and conditions applicable to the request, receipt, use, and subsequent transfer of the slot-pairs.

1. **Number of Slot-pairs**

    a. **MEX** - The Joint Applicants shall make available to eligible competitors twenty-four (24) slot-pairs for year-round use at MEX in two phases:
        i. **Phase 1** - Fourteen (14) slot-pairs shall be transferred as soon as practicable in time for use in the International Air Transport Association ("IATA") Northern Summer 2017 season;
        ii. **Phase 2** - Ten (10) slot-pairs shall be transferred in time for use in the IATA Northern Summer 2018 season and shall be subject to the exhaustion of efforts requirements in Section 2.h.
    b. **JFK** – The Joint Applicants shall make available to eligible competitors four (4) slot-pairs for year-round use at JFK in two phases:
        i. **Phase 1** - Two (2) slot-pairs shall be transferred as soon as practicable in time for use in the IATA Northern Summer 2017 season;
        ii. **Phase 2** - Two (2) slot-pairs shall be transferred in time for use in the IATA Northern Summer 2018 season and shall be subject to the exhaustion of efforts requirements in Section 2.h.

2. **Terms and Conditions**

    a. **Slot Transfer Agreements** – The Joint Applicants shall meet the terms and conditions of the slot divestiture, and arrange for the transfer of the slot-pairs, by entering into a Slot Transfer Agreement with each Selected Carrier. The Joint Applicants shall meet deadlines, and submit slot transfer agreements to DOT for prior approval, as follows:

---

[78] A "slot-pair," consisting of two slots, enables one round-trip operation at slot-controlled airports. One slot is used for landing and the other for takeoff.

     i. **Deadlines** – The Joint Applicants shall conclude slot transfer agreements with each Selected Carrier by deadlines established by DOT in notices or orders published in the docket.  DOT may also establish deadlines in notices or orders by which Selected Carriers must demonstrate that they have exhausted efforts to obtain slots as provided under Section 2.h.

     ii. **Prior Approval** – Prior to execution, each slot transfer agreement shall be submitted to DOT for prior approval.

**b. Transborder Service** – The slot-pairs shall be used exclusively to provide scheduled nonstop commercial air service originating from or terminating at MEX and originating from or terminating at JFK.  MEX slot-pairs shall be used by Selected Carriers to provide nonstop service between MEX and U.S. airports, consistent with proposals made to DOT during the selection process.  JFK slot-pairs shall be used by Selected Carriers to provide nonstop service between JFK and Mexican airports, consistent with proposals made to DOT during the selection process.

**c. Free and Permanent Transfer** – The slot-pairs shall be transferred to Selected Carriers permanently, irrevocably, and free of charge (without cash or non-cash consideration).

**d. Compliance with Usage Rules, Regulations, and Operational Requirements** – The Joint Applicants shall transfer slot-pairs that meet usage rules, regulations, and operational requirements imposed by slot administrators at MEX and JFK, respectively, such that the slot-pairs are not subject to withdrawal during or after the end of the scheduling season by virtue of any actions or omissions of the Joint Applicants.  Selected Carriers shall comply with the same usage rules, regulations, and additional requirements on an ongoing basis for the duration of the terms and conditions as set forth in Section 5.

**e. Historical Priority** – The Joint Applicants shall transfer slot-pairs which, based upon local rules, are eligible for historical priority such that Selected Carriers may be expected to obtain such historical priority in the following corresponding seasons.  For the duration of the terms and conditions of the slot divestiture, as set forth in Section 5, the Selected Carriers shall maintain historical priority for remedy slot-pairs.

     i. **Ability to Improve Times** - Once the slot-pairs have been transferred by the Joint Applicants, no prior approval from DOT is necessary if Selected Carriers wish to work with the slot administrator or other operators at the airports to improve the timing of the slot-pairs to meet commercial needs.

**f. Preferred Times** –DOT may require eligible competitors to include preferred times in their requests for remedy slots.  Subject to the hourly limits in Section 2.g., DOT may direct the Joint Applicants to transfer slots at or near the times requested by the eligible competitors.  To facilitate the transfer process and

fulfillment of the goals of the remedy, the Joint Applicants shall make reasonable efforts to identify and transfer slots that meet, as closely as possible, the timing requests of the Selected Carriers.  DOT may require the Joint Applicants to meet the timing requests for each slot in a slot-pair within a sixty (60) minute window, subject to the hourly limits in Section 2.g.  If the Joint Applicants do not have slots within the +/- sixty (60) minute window, DOT may require the Joint Applicants to offer to transfer the slots closest in time to the Selected Carriers' requests.  The arrival and departure slot times shall allow for reasonable aircraft rotation taking into account standard industry practice for international flights, terminal requirements, and the Selected Carrier's business model, including aircraft utilization requirements.

g. **Hourly Limits** – For both Phase 1 and Phase 2 slots, the Joint Applicants shall use reasonable efforts to accommodate the timing requests of the Selected Carriers during hours declared as saturated or slot controlled by the airport authorities.

    i. **MEX** – At MEX, the Joint Applicants shall not be obligated to transfer more than six (6) slots per hour during hours that the airport authority has declared as saturated, provided, however, that the Joint Applicants may designate two (2) non-consecutive hours during the saturated period in which they will not be obligated to transfer more than four (4) slots per hour, in order to minimize disruptions to the Joint Applicants' banking of flights.

    ii. **JFK** – At JFK, the Joint Applicants shall not be obligated to transfer more than 2 slots per hour.  During the 15:00-20:59 period, the Joint Applicants shall not be obligated to transfer more than 2 slots total.

h. **Exhaustion of Efforts to Obtain Slots** – The Phase 2 slot-pairs for both MEX and JFK are subject to the obligation of Selected Carriers to exhaust reasonable efforts to obtain slots from the slot administrators of the airports prior to making a request of the Joint Applicants.  Selected Carriers shall apply to the slot administrators with specific timing requests.  The requests shall, to the maximum extent possible, comply with local rules and shall be submitted on a timely basis, provided that the Selected Carriers receive notice of pertinent deadlines in advance.  Selected Carriers shall be deemed to have exhausted all reasonable efforts, and the Joint Applicants shall be liable to divest the requisite amount of Phase 2 slots to satisfy the selections made by DOT, where:  (1) the Selected Carrier submits evidence to DOT that it requested slot-pairs in writing on a timely basis and received no response or an incomplete response, or (2) the Selected Carrier submits evidence to DOT that it requested slot-pairs in writing on a timely basis and did not receive the slots it requested within a sixty (60) minute window (+/- 60 minutes from the request).  Selected Carriers have until the deadlines

provided in Section 2.a.i. to demonstrate that they exhausted all reasonable efforts. Pending the outcome of the exhaustion of efforts requirement, the Joint Applicants shall identify appropriate Phase 2 slots for potential timely transfer to Selected Carriers. DOT's written notice to the Joint Applicants that DOT has accepted a Selected Carrier's demonstration of exhaustion of efforts shall constitute a final decision that requires the Joint Applicants to transfer the requisite number of Phase 2 slots necessary to satisfy the selections made by DOT, subject to the terms and conditions of the slot divestiture.

i. **Access to Facilities and Services** – Selected Carriers intending to serve JFK and/or MEX using remedy slots shall use reasonable efforts to obtain access to facilities and services which are normally provided by the airport authorities at MEX and JFK and which are necessary to sustain the air service. Such facilities and services include, but are not limited to, gates, terminal space, ticket and boarding areas, and, if needed, permission and parking to Remain Over Night/ RON. Reasonable efforts require Selected Carriers, at a minimum, to work with the airport authorities to identify available space and accommodation and, if necessary, to avail themselves of forced accommodation provisions in applicable use and lease agreements at the relevant airport. If a Selected Carrier demonstrates to DOT that it has exhausted all reasonable efforts, but has not been able to obtain the access it requires at a minimum to introduce service with the remedy slots, the Joint Applicants shall be responsible for accommodating the Selected Carrier to the extent necessary to allow the services to operate in a commercially viable fashion. Nothing in this subsection shall be construed to require the Joint Applicants or any airport authority to provide access to facilities or services at rates below market levels or below charges established by accommodation provisions in existing airport use and lease agreements.

j. **Non-Interference** – The Joint Applicants shall not take any action that could in any way impede Selected Carriers from obtaining permits or authorizations, or interfere with eligible competitors' operations.

k. **Necessary Approvals and Authorizations** – Selected Carriers shall make reasonable efforts to obtain the necessary safety and economic authority from the Governments of the United States and Mexico to launch the new transborder services in a timely manner. Selected Carriers shall notify DOT if they face unreasonable delays.

l. **Duty to Provide Information to DOT** – The Joint Applicants shall respond promptly to information requests by the Department to facilitate the transfer of slot-pairs. Such requests may include, but shall not be limited to, the amount of slots held at MEX or JFK in total and/or by hour, any specific information corresponding to slots such as number or assigned times, and recorded usage of specific slots.

Appendix A

**3. Eligibility and Selections**

The Joint Applicants shall transfer slot-pairs consistent with the selections made by DOT by order(s) in the docket. DOT may select among competitors it deems eligible through notices or orders published in the docket, subject to the subsequent transfer and reassignment provisions in Section 4, below.

    **a. Requests** – DOT may publish notices or orders in the docket to request proposals to obtain the slot-pairs made available by the slot divestiture. In such notices or orders, DOT may request that eligible competitors provide the key terms of their requests, including the requested timings, the number of frequencies, the routes intended to be served, proposed start date and schedule, and the aircraft intended to be operated, as well as a business and operational plan, including pricing structure, service offerings, and transborder network plan.

    **b. Selections** – DOT may establish a ranking of the requests and propose the Selected Carriers, including primary and backup recipients.

**4. Subsequent Transfers and Reassignment**

Selected Carriers shall seek prior approval from DOT to transfer to third party airlines any slot-pairs obtained from the Joint Applicants as part of the slot divestiture. Any such subsequent transfers shall not include cash or non-cash consideration for the duration of the terms and conditions set forth in Section 5.

**5. Duration**

Although the Joint Applicants' transfer of slots to Selected Carriers is permanent, as required by Section 2.c., the terms and conditions of the slot divestiture apply to the Joint Applicants and Selected Carriers for a period of five (5) years from the date on which the Joint Applicants' antitrust immunity becomes effective. The terms and conditions apply for an initial five-year period from the date on which the Phase 1 slot-pair transfers are completed and the antitrust immunity becomes effective under the terms of a Final Order, and not beyond that initial period should the Joint Applicants re-apply for, and obtain, a further grant antitrust immunity.