No. 25-13546

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

DELTA AIR LINES, INC. AND AEROVIAS DE MEXICO S.A. DE C.V.,

*Petitioners*,

v.

DEPARTMENT OF TRANSPORTATION,

*Respondent*.

_____

On Petition For Review Of An Order Of The Department Of Transportation
Docket DOT-OST-2015-0070

_____

## PETITIONERS' OPENING BRIEF

_____

Matthew J. MacLean
Charles F. Donley II
Edward W. Sauer
Nicole Steinberg
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, N.W.
Washington, D.C.  20036
(202) 663-8000
matthew.maclean@pillsburylaw.com

*Counsel for Aerovías de México, S.A. de C.V., dba Aeroméxico*

Eugene Scalia
Amir C. Tayrani
Christine M. Buzzard
Michael P. Corcoran
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500
escalia@gibsondunn.com

*Counsel for Delta Air Lines, Inc.*

*[Additional counsel listed on inside cover]*

Peter Carter
Marguerite H. Taylor
DELTA AIR LINES, INC.
1030 Delta Boulevard
Atlanta, GA  30320

Steven J. Seiden
Christopher Walker
DELTA AIR LINES, INC.
601 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C.  20005

*Counsel for Delta Air Lines, Inc.*

*Delta Air Lines, Inc. and Aerovías de México S.A. de C.V. v. Department of Transportation*
Case No. 25-13546

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rules 26.1-1 through 26.1-3, Petitioners provide the following certificate of interested persons:

1. **Aerovías de México S.A. de C.V.**, Petitioner.

2. **Christine M. Buzzard**, counsel for Petitioner Delta Air Lines, Inc.

3. **Peter M. Bozzo**, counsel for Respondent the United States Department of Transportation.

4. **Peter Carter**, Chief External Affairs Officer of Delta Air Lines, Inc.

5. **Michael P. Corcoran**, counsel for Petitioner Delta Air Lines, Inc.

6. **Gregory D. Cote**, counsel for Respondent the United States Department of Transportation.

7. **Delta Air Lines, Inc.**, Petitioner (NYSE: DAL).

8. **Charles F. Donley II**, counsel for Petitioner Aerovías de México S.A. de C.V.

9. **Grupo Aeroméxico S.A.B. de C.V.** (AEROMEX.MX), parent company of Aerovías de México S.A. de C.V.

10. **Matthew J. MacLean**, counsel for Petitioner Aerovías de México S.A. de C.V.

11. **Steven Mintz**, counsel for Respondent the United States Department of Transportation.

12. **Robert Nicholson**, counsel for Respondent the United States Department of Transportation.

13. **Edward W. Sauer**, counsel for Petitioner Aerovías de México S.A. de C.V.

14. **Eugene Scalia**, counsel for Petitioner Delta Air Lines, Inc.

15. **Steven J. Seiden**, Director – Regulatory Affairs of Delta Air Lines, Inc.

16. **Nicole Steinberg**, counsel for Petitioner Aerovías de México S.A. de C.V.

17. **Marguerite H. Taylor**, Deputy General Counsel and Chief Litigation Counsel of Delta Air Lines, Inc.

18. **Amir C. Tayrani**, counsel for Petitioner Delta Air Lines, Inc.

19. **Christopher Walker**, Director – Regulatory and International Affairs of Delta Air Lines, Inc.

20. **United States Department of Transportation**, Respondent.

The below are subsidiaries of Delta Air Lines, Inc.

Aero Assurance Ltd.
Aircraft Foreign Sales, Inc.
Cardinal Insurance Company (Cayman) Ltd.
Comair Holdings, LLC
Comair, Inc.
Comair Services, Inc.

Compass Airlines, Inc.
Crown Rooms, Inc.
DAL Global Services, LLC
DAL Moscow, Inc.
Delta AirElite Business Jets, Inc.
Delta Air Lines, Inc. and Pan American World Airways, Inc.—
Unterstutzungskasse GMBH
Delta Air Lines Dublin Limited
Delta Air Lines Private Limited
Delta Benefits Management, Inc.
Delta Connection Academy, Inc.
Delta Loyalty Management Services, LLC
Epsilon Trading, LLC
Kappa Capital Management, LLC
MCH, Inc.
Mesaba Aviation, Inc.
MLT Inc.
Montana Enterprises, Inc.
New Sky, Ltd.
Northwest Aerospace Training Corporation
Northwest Airlines Charitable Foundation
Northwest Airlines Corporation
Northwest Airlines, Inc.
NW Red Baron LLC
NWA Fuel Services Corporation
NWA Real Estate Holding Company LLC
NWA Retail Sales Inc.
NWA Worldclub, Inc.
Tomisato Shoji Kabushiki Kaisha

The below are subsidiaries of Aerovías de México S.A. de C.V.

Administradora Especializada en Negocios, S.A. de C.V.
Aerolitoral, S.A. de C.V.
Aeromexpress, S.A. de C.V.
Aerosys, S.A. de C.V.
Aerovías Empresa De Cargo, S.A. de C.V.
AM DL MRO JV, S.A.P.I. de C.V.
Am Formación Interna, S.A. de C.V.
Centro de Capacitación Alas de América, S.A. de C.V.

*Delta Air Lines, Inc. and Aerovías de México S.A. de C.V. v. Department of Transportation*
Case No. 25-13546

Corporación Nadmin, S.A. de C.V.
Empresa de Mantenimiento Aéreo, S.A. de C.V.
Estrategias Especializadas de Negocios, S.A. de C.V.
Fundación Aeroméxico, A.C.
Inmobiliaria Avenida Fuerza Aérea Mexicana 416, S.A. de C.V.
Inmobiliaria Boulevard Aeropuerto 161, S.A. de C.V.
Inmobiliaria Grupo Aeroméxico, S.A. de C.V.
Operadora de Franquicias y Productos Aéreos, S.A. de C.V.
Sistemas Integrados de Soporte Terrestre En México, S.A. de C.V.

The below are affiliates of Aerovías de México S.A. de C.V.

Aeroméxico Cargo, S.A.P.I. de C.V.
AM BD GP JV, S.A.P.I. de C.V.
Concesionaria de Vuelos, S.A. de C.V.
Integración y Supervisión de Recursos Corporativos, S.A. de C.V.
Loyalty Servicios Profesionales Mundiales, S.A. de C.V.
Plm Premier, S.A.P.I. de C.V.
Servicios Corporativos Aeroméxico, S.A. de C.V.
T2 Servicios Aeroportuarios, S.A. de C.V.

No publicly traded company or corporation apart from those listed above has an interest in the outcome of the case. Petitioners will file an amended certificate of interested persons should they become aware of a change in interests that would affect the disclosures as required by Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-4.

Additionally, pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, counsel for Petitioner Delta Air Lines, Inc. hereby certifies that Petitioner Delta Air Lines, Inc. is a publicly held company, traded under stock ticker NYSE: DAL, with no parent company. Counsel for Petitioner Delta Air Lines, Inc. further certifies that no publicly held corporation holds 10% or more of Delta Air

Lines, Inc.'s stock.  The Vanguard Group, Inc. owns 10% or more of Delta Air Lines,

Inc.'s stock.  Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit

Rule 26.1-2, counsel for Petitioner Aerovías de México S.A. de C.V. hereby certifies

that Petitioner Aerovías de México S.A. de C.V. is a wholly owned subsidiary of

Grupo Aeroméxico, S.A.B. de C.V., a publicly held company.  Counsel further

certifies that Delta Air Lines, Inc. and Apollo Global Management, Inc. are the only

publicly held corporations that own more than 10% of Grupo Aeroméxico's capital

stock.

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners Delta Air Lines, Inc. and Aerovías de México S.A. de C.V. respectfully submit that oral argument would be helpful to the Court's consideration of this case, which concerns the Department of Transportation's order terminating its approval of a longstanding Joint Venture that fully integrates Petitioners' operations between the United States and Mexico. According to the Department, its highly disruptive action is warranted because the Government of Mexico has erected barriers to competition at a single Mexican airport. This Court stayed the Department's order on November 12, 2025. Considering the lengthy procedural history and extensive administrative record, oral argument would assist the Court in resolving Petitioners' challenge to the Department's order.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION..........................................................5

STATEMENT OF THE ISSUES................................................................6

STATEMENT OF THE CASE ...................................................................6

      A.    Airline Joint Ventures ...................................................6

      B.    The Department's Approval Of Airline Joint Ventures ............8

      C.    The Department's Approval Of The Delta-Aeroméxico Joint Venture .......................................................................10

      D.    The Joint Venture Enhances Competition And Produces Consumer Benefits .....................................................14

      E.    The Department's Proposal To Terminate Approval Of The Joint Venture.......................................................15

      F.    The Department's Second Proposal To Terminate Approval Of The Joint Venture ...............................................17

      G.    The Department's Termination Of Its Approval Of The Joint Venture .......................................................................19

      H.    The Department's Alternative Measures To Address Its MEX-Related Concerns ...............................................23

      I.    Proceedings Before This Court................................................24

STANDARD OF REVIEW .......................................................................24

SUMMARY OF THE ARGUMENT ........................................................25

ARGUMENT ...........................................................................................29

     I.    THE ORDER'S EXCLUSIVE FOCUS ON ONE AIRPORT, MEX, IS INCONSISTENT WITH THE STATUTE, AGENCY PRECEDENT, AND REASONED DECISIONMAKING ...............29

A.     The Department's Exclusive Focus On MEX Misses Key Parts Of The Problem..................................................30

B.     The Department's Two Primary Concerns Regarding MEX Are Unsubstantiated.........................................39

C.     The Department's Remaining Concerns Are Speculative And Belied By The Record.........................................43

D.     The Department's Concerns About A Supposed Competitive Advantage For Delta And Aeroméxico Are Irreconcilable With Its Complaints About The Joint Venture's Lack Of Growth ........................................47

II.     THE DEPARTMENT DID NOT ADEQUATELY JUSTIFY ITS DISPARATE TREATMENT OF DELTA AND AEROMÉXICO ..................................................49

III.     THE DEPARTMENT FAILED TO CONSIDER AND ADEQUATELY ADDRESS AVAILABLE ALTERNATIVES .......53

CONCLUSION....................................................................59

CERTIFICATE OF COMPLIANCE.......................................62

CERTIFICATE OF SERVICE ...............................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Sec. Ass'n v. SEC,*
  147 F.4th 1264 (11th Cir. 2025) ...................................................25, 60

*ANR Storage Co. v. FERC,*
  904 F.3d 1020 (D.C. Cir. 2018) .........................................................48

*Bidi Vapor LLC v. U.S. FDA,*
  47 F.4th 1191 (11th Cir. 2022) ........................... 26, 30, 36, 37, 39, 56

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corp. of Eng'rs,*
  833 F.3d 1274 (11th Cir. 2016) .........................................................50

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962)...........................................................................37

*Chamber of Com. of U.S. v. SEC,*
  85 F.4th 760 (5th Cir. 2023) .............................................................40

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016)......................................................................44, 47

*FiberTower Spectrum Holdings, LLC v. FCC,*
  782 F.3d 692 (D.C. Cir. 2015)...........................................................43

*Int'l Ladies' Garment Workers' Union v. Donovan,*
  722 F.2d 795 (D.C. Cir. 1983)...........................................................55

*Interstate Nat. Gas Ass'n of Am. v. Pipeline & Hazardous
  Materials Safety Admin.,*
  114 F.4th 744 (D.C. Cir. 2024).........................................................48

*Motor Vehicle Mfrs. Ass'n U.S., Inc. v. State Farm
  Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)........................................................................25, 26

*Nat'l Fuel Gas Supply Corp. v. FERC,*
  468 F.3d 831 (D.C. Cir. 2006).......................................................25, 41

iv

TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*Office of Commc'n of United Church of Christ v. FCC*,
  707 F.2d 1413 (D.C. Cir. 1983) ..........................................................41

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ..........................................................................55

*R.J. Reynolds Vapor Co. v. FDA*,
  65 F.4th 182 (5th Cir. 2023) ............................................................54

*Rodney v. Nw. Airlines*,
  146 F. App'x 783 (6th Cir. 2005) ......................................................38

*Sierra Club v. U.S. Dep't of Interior*,
  899 F.3d 260 (4th Cir. 2018) ............................................................43

*Sorenson Commc'ns Inc. v. FCC*,
  755 F.3d 702 (D.C. Cir. 2014) ..........................................................46

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*,
  431 F.3d 917 (6th Cir. 2005) ............................................................38

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
  997 F.3d 1247 (D.C. Cir. 2021) ............................................25, 28, 54, 57

*Texas v. Biden*,
  20 F.4th 928 (5th Cir. 2021) ............................................................60

*United States v. JetBlue Airways Corp.*,
  712 F. Supp. 3d 109 (D. Mass. 2024) ................................................38

*United States v. Marine Bancorp., Inc.*,
  418 U.S. 602 (1974) ........................................................................37

*Westar Energy, Inc. v. FERC*,
  473 F.3d 1239 (D.C. Cir. 2007) ............................................25, 28, 50, 54

**Statutes**

5 U.S.C. § 706 ....................................................................................24

49 U.S.C. § 41308 ..............................................................................8

**TABLE OF AUTHORITIES**

(*continued*)

**Page(s)**

49 U.S.C. § 41309 ................................................ 5, 8, 11, 26, 28, 30, 37, 39, 48, 55

49 U.S.C. § 46110 ..........................................................................................5, 6

**Regulations**

14 C.F.R. Part 213 ........................................ 18, 19, 23, 28, 45, 46, 47, 57, 58

**Agency Orders**

Order 92-8-13, 1992 WL 204010 (Aug. 5, 1992).....................................9

Order 92-11-27.........................................................................................30

Order 93-1-11......................................................................................30, 33

Order 96-5-27...........................................................................................9

Order 99-4-17......................................................................................32, 33

Order 2000-10-13.................................................................................32, 35

Order 2001-5-1..........................................................................................32

Order 2002-7-39........................................................................................32

Order 2005-10-18.......................................................................................32

Order 2009-7-10.........................................................................................31

Order 2010-2-8.....................................................................................32, 33

Order 2010-7-8........................................ 3, 8, 10, 26, 30, 32, 33, 35, 36, 37, 38, 52

Order 2010-10-4...................................................................................32, 35

Order 2010-11-10................................................................................10, 51

Order 2013-8-21........................................................................................32

Order 2016-11-16......................................................................................32

Order 2019-5-23...................................................................................31, 32

# TABLE OF AUTHORITIES
## (*continued*)

**Page(s)**

Order 2020-10-13 ............................................................................31

Order 2020-11-9................................................ 26, 31, 34, 35, 38, 52

Order 2022-6-15.........................................................................9, 31

Order 2023-6-24.........................................................................51, 52

Order 2025-10-13 ...........................................2, 23, 45, 47, 57, 58

Order 2025-10-14 ...........................................2, 23, 41, 47, 56

**Other Authorities**

Air Transport Agreement, Memorandum of Understanding, U.S.-
Japan (Dec. 14, 2009) .........................................................................10

Air Transport Agreement Between the Government of the United
States of America and the Government of the United Mexican
States (Dec. 18, 2015) .........................................................................9

Answer of Delta, DOT-OST-2008-0252 (Sept. 9, 2020) .........................52

Answer of Delta, DOT-OST-2019-0014 (Feb. 28, 2019) .........................51

Decreto, Diario Oficial de la Federación (Aug. 29, 2025) .........................19

Dep't of Transp., *DOT Aviation Antitrust Immunity Cases*........................8

Int'l Air Transp. Ass'n, Coordinated Airports.........................................52

Brian Pearce & Gary Doernhoefer, *The Economic Benefits Generated
by Alliances and Joint Ventures*, Int'l Air Transp. Ass'n (Nov. 28,
2011) .........................................................................................................7

**INTRODUCTION**

For the better part of a decade, Petitioners Delta Air Lines, Inc. ("Delta") and Aerovías de México S.A. de C.V. ("Aeroméxico") have operated a Joint Venture that fully integrates their operations on flights between dozens of airports in the United States and Mexico. The Department of Transportation (the "Department") approved the Joint Venture in 2016, heralding it as a measure that would increase competition and benefit consumers. The Joint Venture has done exactly that. It has enabled Delta and Aeroméxico to launch dozens of new U.S.-Mexico flights and provided a competitive counterweight to what were once the two dominant airlines in the U.S.-Mexico market: American and United, which in 2016 had a combined 42.7% market share. Because of the increasingly competitive transborder environment, American, United, and Delta-Aeroméxico today have roughly equal market shares (21%, 16%, and 20% respectively), and all other airlines—including multiple low-cost carriers—have increased their combined market share from 33% to 43%.

Despite the Joint Venture's procompetitive and proconsumer benefits, the Department terminated its approval of the Joint Venture in September 2025—a step the Department has not taken with respect to *any* of the approximately 20 other international airline alliances and joint ventures it has approved. It did so because the Government of Mexico has supposedly erected barriers to competition at a single

1

airport: Benito Juárez Airport in Mexico City ("MEX"). App.511 (Order 2025-9-8) ("Order"). But just weeks before the Department's Order, the Government of Mexico took steps to address many of the Department's concerns. And several weeks after issuing the Order, the Department initiated separate, more targeted actions to address the same competitive conditions at MEX. Order 2025-10-13, https://tinyurl.com/3x66eu29; Order 2025-10-14, https://tinyurl.com/4zsw9wzv. The Department's decision to disregard obvious alternatives and proceed with disapproving the Joint Venture—rendering Delta, Aeroméxico, and their customers collateral damage in the Department's diplomatic dispute with the Government of Mexico—is arbitrary and capricious in multiple respects.

To start, the Department's myopic focus on *a single airport*, MEX, ignored the broader *U.S.-Mexico* market in which the Joint Venture operates. As the Department recognized when approving the Joint Venture in 2016, the U.S.-Mexico market comprises *dozens* of airports, with 1,687 "city pair" routes crisscrossing the two countries. App.74-76. When the Department approved the Joint Venture in 2016, it examined competition in the entire U.S.-Mexico market, including airlines' shares of that market, broader competitive forces in that market, and potential competitive issues with each of the market's 1,687 city pairs. *Id.* The Department's thorough analysis adhered to its statutory mandate and the Department's own longstanding precedent, which require the Department to undertake "a broad

assessment" of the "potential competitive benefits" of a joint venture "*as a whole*." Order 2010-7-8, at 9, https://tinyurl.com/4x77s8pf (emphasis added).

Yet when terminating approval of the Joint Venture, the Department jettisoned that statutorily mandated inquiry, which it has undertaken *every other time* it assessed the competitive effects of an airline joint venture. The Department did not examine broader competitive forces in the U.S.-Mexico market or airlines' shares of that market. Nor did it examine the 1,687 city pairs in the market—identifying only seven city pairs "for illustration purposes" without further analysis. App.522. Instead, the Department rested its reasoning on alleged competitive concerns at MEX alone. The Department thus inexcusably departed from the comprehensive competition analysis the Department itself has recognized is required by "the statute and [its] precedents." Order 2010-7-8, at 9.

Even when discussing competition concerns at MEX, the Department's rationales were unreasoned and unsupported. According to the Department, the Government of Mexico has imposed barriers to competition by banning all-cargo carriers (like UPS) from operating at MEX and limiting the number of "slots" (takeoff and landing times) available to passenger carriers. Yet such policies are not uncommon; many airports are closed to all-cargo operations or are slot-controlled. And the Department has granted and maintained approval for joint ventures operating at many such airports. The Department accordingly needed to substantiate

its assertion of harms stemming from these policies at MEX and establish that they differentiate MEX from other airports with similar restrictions. The Department failed to do so.

For example, to show that the restriction on all-cargo operations causes competitive harms, the Department's Order focused on a "time-sensitive" cargo submarket at MEX that it had not identified previously. The Department failed to provide any analysis of the size or structure of that submarket, let alone document competitive harms within it. Then, in an effort to demonstrate that the Joint Venture failed to increase the availability of connecting flights to U.S. passengers arriving at MEX, the Order inexplicably factored in flights to *international* destinations outside the Joint Venture's U.S.-Mexico scope—while ignoring the increased connectivity *within Mexico*. Finally, the Department suggested the Joint Venture enjoys a competitive advantage from MEX's slot controls, but conclusively undermined its own accusation by criticizing Delta and Aeroméxico for growing *more slowly* at MEX than their competitors.

The Department's disapproval of the Joint Venture also singles out Delta and Aeroméxico for unlawful disparate treatment. The Department has maintained approval of joint ventures anchored at other airports where government-imposed barriers are at least as strict as those at MEX. For example, the Government of Japan has imposed an international all-cargo ban at Tokyo Haneda that is materially

indistinguishable from the all-cargo ban at MEX, but the Department has never revoked its approval of the multiple joint ventures with substantial operations at that airport. The Department provided no justification for its disparate treatment of Delta and Aeroméxico.

The Department also discounted or entirely ignored several obvious, more tailored alternatives to disapproving the Joint Venture—such as restricting Mexican carriers' introduction of new flights between Mexico City and the United States—but then took action to implement some of those *very same alternatives* just weeks later. The Department would have known about those other incipient actions when it disapproved the Joint Venture. And those actions came on the heels of the Government of Mexico's own measures to address many of the competitive concerns the Department identified. The Department failed to explain adequately why disapproval of the Joint Venture remained warranted given these developments.

At every turn, the Department's Order failed to address key aspects of the problem it purported to address, disregarded the governing statute and precedent, and was unreasoned and unfair. The Court should vacate the Order.

## STATEMENT OF JURISDICTION

Delta and Aeroméxico timely petitioned this Court for review of the Department's Order issued under 49 U.S.C. § 41309 on October 9, 2025, "not later than 60 days after the order [was] issued." 49 U.S.C. § 46110(a). Jurisdiction and

venue are proper because Delta and Aeroméxico—as parties to the disapproved Joint Venture—have a "substantial interest" in the challenged order, and because Delta "has its principal place of business" in Atlanta, Georgia.  *Id.*

## STATEMENT OF THE ISSUES

Whether the Department's decision to terminate approval of the Joint Venture and associated grant of antitrust immunity was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because:

1.  the Department's analysis of the Joint Venture's competitive impact conflicts with the statutory standard and the Department's precedent, misses key aspects of the problem, and is unreasoned, internally inconsistent, and unsupported by the record;

2.  the Department did not justify its disparate treatment of the Joint Venture compared to other immunized alliances; or

3.  the Department failed adequately to consider reasonably available alternatives, including those the Department has now initiated.

## STATEMENT OF THE CASE

### A.    Airline Joint Ventures.

Airline alliances and joint ventures have become a fixture in international airline markets, allowing airlines to achieve a level of connectivity not otherwise possible.  International travelers demand service between any two points on the

6

globe, yet cross-border mergers between airlines are often not possible because most countries restrict foreign ownership and control of their airlines. Alliances and joint ventures thus allow airlines based in different countries to coordinate their operations, especially on international routes. *See* Brian Pearce & Gary Doernhoefer, *The Economic Benefits Generated by Alliances and Joint Ventures*, Int'l Air Transp. Ass'n 3-5 (Nov. 28, 2011), https://tinyurl.com/5t2t2vwa.

Joint ventures—sometimes called "virtual mergers"—facilitate exactly the sort of coordination needed to meet consumer demand. They allow airlines to operate in a "metal neutral" fashion in which airlines and consumers are indifferent as to which airline operates a given aircraft (or "metal") within the joint venture's scope. Joint ventures allow airlines to share revenue (and, in some cases, profits and losses) and to coordinate flights, thereby eliminating duplicative profit margins from ticket sales on multi-flight itineraries and leading to lower fares, expanded route networks, additional flight options, improved flight schedules, and reduced travel time—all to consumers' benefit.

For example, because of the Delta-Aeroméxico Joint Venture, a passenger traveling from Atlanta (or any number of U.S. cities with connecting Delta flights to Atlanta) can fly to Guadalajara on a Delta aircraft before seamlessly connecting to Acapulco on an Aeroméxico aircraft—all on a single ticket, with flight times and connections optimized by the airlines' integrated operations.

7

### B.    The Department's Approval Of Airline Joint Ventures.

Congress has recognized joint ventures' efficiencies, authorizing the Department to approve joint-venture agreements and grant them antitrust immunity. *See* 49 U.S.C. §§ 41308(b), 41309(b).  When evaluating a proposed joint venture or whether to "end approval of" a joint-venture agreement, the Department must determine whether the "*agreement* . . . substantially reduces or eliminates competition." *Id.* § 41309(b)(1) (emphasis added).  If it does not, the Department "shall approve" the agreement "when the [Department] finds it is not adverse to the public interest" and does not otherwise violate air commerce and safety regulations. *Id.* § 41309(b).  The Department may also exempt a joint-venture agreement from the antitrust laws to the extent necessary to allow the parties to proceed with the transaction. *Id*. § 41308(b).  The Department regularly exercises this authority and has approved approximately twenty immunized alliances and joint ventures, several of which include over a half-dozen airlines that jointly serve countries around the world.    Dep't of Transp., *DOT Aviation Antitrust Immunity Cases*, https://tinyurl.com/mryrnusx.

"Consistent with the statute and [its own] precedents," the Department reviews how joint-venture agreements "as a whole" will affect competition, "weigh[ing] both pro- and anti-competitive effects [of the ventures] across a number of different markets."  Order 2010-7-8, at 9 (American, British Airways, and the

8

OneWorld Alliance). Specifically, the Department examines how the joint venture will affect competition in the overall regional and transnational markets served (*e.g.*, the U.S.-Asia and U.S.-Japan markets), as well as the city pairs served by that market (*e.g.*, Seattle-Tokyo). *See, e.g.*, Order 96-5-27, at 7-8, https://tinyurl.com/yc75hymd (United-Lufthansa); Order 2022-6-15, at 8-17, https://tinyurl.com/3jkdu6hr (Delta-LATAM).

The Department also often considers whether an "Open Skies" agreement exists between the United States and the country in which a foreign joint-venture participant is based. *See* Order 92-8-13, 1992 WL 204010 (Aug. 5, 1992). Open Skies agreements liberalize air travel between two countries, allowing both countries to designate an unlimited number of air carriers to operate from any points in their territory to any points in the other country without significant governmental barriers. *See id.* at *3. The United States and Mexico executed an Open Skies agreement in 2015. *See* Air Transport Agreement Between the Government of the United States of America and the Government of the United Mexican States (Dec. 18, 2015), https://tinyurl.com/2cpepnz6.

Although the Department considers the existence of an Open Skies agreement, it has never required other countries to remove *all* governmental barriers to air travel as a prerequisite to approving a joint venture. For example, Tokyo's Haneda airport is carved out from the U.S.-Japan Open Skies agreement, leaving the Government

of Japan free to impose restrictions inimical to an Open Skies framework. *See* Air Transport Agreement, Memorandum of Understanding, U.S.-Japan, Annex § 3 (Dec. 14, 2009), https://tinyurl.com/2a9v7zs4. The Government of Japan allocates to U.S. airlines only a very limited number of takeoff and landing slots at Haneda and categorically prohibits international all-cargo operations at Haneda—relegating such all-cargo flights to Tokyo Narita, which is more than 40 miles farther from downtown Tokyo than Haneda.

Despite those barriers to entry, the Department has granted and maintained approval for multiple joint ventures operating out of Haneda, such as United-All Nippon Airways and American-Japan Airlines. *See* Order 2010-11-10, https://tinyurl.com/cj52w7h8. The Department has also granted and maintained approval for joint ventures operating at other airports with similar government-imposed access restrictions, such as London Heathrow, which is tightly slot-controlled due to capacity limitations. *See, e.g.*, Order 2010-7-8 (American-British Airways).

### C. The Department's Approval Of The Delta-Aeroméxico Joint Venture.

Delta and Aeroméxico submitted their Joint Venture to the Department for approval in 2015. App.16. At the time, the Department recognized that the U.S.-Mexico market was highly concentrated. The two dominant competitors, American and United, together controlled "42.7 percent of the U.S.-Mexico market" when

10

measured by passenger seats, "with Aeroméxico (13.5%) and Delta (11.9%) a distant third and fourth." App.74. The Department observed that "American and United ha[d]" "a structural advantage" over their competitors because "both have large hub operations (Dallas-Fort Worth and Houston, respectively) that enable them to serve most markets in Mexico with a range of aircraft, including smaller, short-range aircraft." *Id.* Delta and Aeroméxico accordingly proposed to combine their transborder operations through the Joint Venture to provide a competitive counterweight against the incumbent market leaders.

Consistent with the statutory standard in 49 U.S.C. § 41309(b)(1) and the Department's longstanding approach to joint-venture applications, the Department undertook an extensive analysis of competition in "the U.S.-Mexico transborder market." App.101. Specifically, the Department examined how the Joint Venture could affect competition at the "broad network level" (encompassing Delta's and Aeroméxico's overall operations), the "country-pair level," and the "city-pair level." App.72-76. The Department looked at the structural considerations favoring American and United, airlines' market shares in the U.S.-Mexico market, the "limited scope of the proposed [Joint Venture,] and the low barriers to entry at most airports" that would be served by the Joint Venture. *Id.* The Department tentatively concluded that the Joint Venture would not "substantially reduce or eliminate competition at the network level" (with the potential exception of flights to and from

11

MEX) and that the Joint Venture could "*enhance competition* at the country-pair level" by establishing a legitimate challenger to the two dominant players, American and United.  App.73-74 (emphasis added).

The Department then analyzed each of the 1,687 city pairs offering nonstop service between the United States and Mexico.  App.74-76.  Of those city pairs, the Department identified only 107 that posed *any* "competitive concern[s]" due to the elimination of existing competition between Delta and Aeroméxico.  App.75.  The Department explained that 65 of those 107 city pairs occupy "small or very small markets that together make up less than one percent of all [transborder] market passengers," and that Delta and Aeroméxico were not the largest competitors on another 40 (which represented only 3.7 percent of transborder passengers).  *Id.*  The Department further noted that 1,547 city pairs would see *no* change in competition as a result of the Joint Venture.  *Id.*  The Department accordingly concluded that "[r]oughly 95 percent of [city-pair] markets, which constitute 90 percent of transborder passengers, will see no significant decrease in competition from the [Joint Venture]."  App.76.

The Department next identified *two* city-pairs where eliminating Delta's and Aeroméxico's head-to-head flights could materially affect competition: (1) Los Angeles (LAX) to Guadalajara (GDL) and (2) New York-Kennedy (JFK) to MEX.  App.76.  The Department ultimately determined that "there would not be a

substantial reduction or elimination of competition" for LAX-GDL because of the "lack of market concentration" on that route. *Id.* The Department did find, however, that the Joint Venture posed competitive concerns for JFK-MEX: the Government of Mexico had imposed a nontransparent slot regime that restricted airlines' access to MEX, and JFK was likewise a "highly congested airport" with "few slots" available for new entrants. App.77-80. The Department's extensive city-pair analysis therefore concluded that "JFK-MEX [was] the only nonstop air services market that raise[d] competitive concerns." App.125.

The Department's final order provided a "route-specific remedy" for that concern: Delta and Aeroméxico were required to divest fourteen MEX slot pairs to low-cost carriers in 2017—equivalent to nearly double Delta's MEX slot holdings at that time—and submit a *de novo* application to renew antitrust immunity for their Joint Venture within five years. App.120-26. With those and a few other conditions in place, the Department approved the Joint Venture and granted it antitrust immunity, concluding the Joint Venture was "pro-consumer" and would "deliver substantial public benefits to the traveling public," including "broader connectivity between the United States and Mexico, improved network coordination, reduced travel times, and improved efficiency." App.100.

13

### D. The Joint Venture Enhances Competition And Produces Consumer Benefits.

The ensuing years have borne out the Joint Venture's procompetitive and proconsumer benefits. Since 2017, Delta and Aeroméxico have added 37 routes between the United States and Mexico, such as Miami to Guadalajara and Detroit to Queretaro. App.438-41. The Joint Venture likewise has increased the two airlines' capacity on U.S.-Mexico flights by 22% and their number of connecting flights to destinations across Mexico by at least 5%—providing consumers with expanded flight options, more efficient travel, and more competitive fares. App.446-49.[1]

The Joint Venture has also materially enhanced competition in the overall transborder market. Today, Delta-Aeroméxico, American, and United have roughly equal U.S.-Mexico market shares (20%, 21%, and 16% seat shares, respectively), and all other airlines have increased their combined market share from 33% in 2016 to 43%. App.74, 434-35. Just as the Department hoped in 2016, low-cost carriers have dramatically increased their competitive presence. App.122. Low-cost carrier Volaris, for example, has expanded its share of the U.S.-Mexico market to 16%— the same share as United's. App.434. Viva Aerobus, meanwhile, has increased its

---

[1] In its final Order, the Department for the first time noted that either Delta or Aeroméxico had served some of the 37 newly added routes prior to the Joint Venture. App.538. But Delta and Aeroméxico had suspended the routes as nonviable before 2017, reestablishing them only when they became viable because of the Joint Venture.

14

total transborder service by 131% and—taking advantage of slots divested by Delta and Aeroméxico—has expanded its U.S.-MEX capacity by a staggering 285% to encompass approximately 8% of all U.S.-MEX flights.  App.443-44, 459.

The U.S.-Mexico market has changed in other ways, too.  For example, since 2017, Cancun has overtaken Mexico City as the largest point of origin and destination for U.S.-Mexico flights.  App.479-80.  Airports at Guadalajara, Puerto Vallarta, Los Cabos, and Monterrey also now collectively constitute a far larger share of the U.S.-Mexico market than MEX.  *Id.*  In fact, MEX represents only about 21% of all flights between the United States and Mexico today, a number the Department admits has been "gradually falling" for years.  *Id.*; App.529.  And some routes that neither Delta nor Aeroméxico operates (such as Denver-Cancun) have seen strong growth, while others have experienced a relative decline.  App.480.  In short, the facts show robust competition in this dynamic transborder market.

### E.    The Department's Proposal To Terminate Approval Of The Joint Venture.

In March 2022, Delta and Aeroméxico applied to renew the Joint Venture's antitrust immunity in accordance with the Department's instructions.  App.138.

The Department did not act on that application.  Instead, nearly two years later in January 2024, the Department issued a terse, five-page Order to Show Cause announcing a tentative decision to terminate approval of this "virtual merger." App.229.  The 2024 Order did not contain the robust competition analysis the

15

Department has consistently undertaken, including when approving the Joint Venture.  Rather, the Department merely declared that the Government of Mexico was violating its Open Skies obligations by taking two actions at MEX:  (1) banning all-cargo flights and (2) reducing the number of slots available for passenger airlines.  App.231-32.

Delta and Aeroméxico objected.  App.234.  Among other things, Delta and Aeroméxico pointed out that the relevant statutes do not mention Open Skies agreements, let alone establish an Open Skies prerequisite to approving joint ventures.  App.241-46.  They also noted that all-cargo carriers can still operate out of Mexico City's Santa Lucia airport ("NLU"), located only 30 miles from downtown Mexico City—a distance comparable to other airports handling all-cargo operations for major cities, such as Tokyo Narita or Washington Dulles.  App.252-54.  And they explained that the Department has approved a number of other joint ventures that operate out of slot-controlled airports—including Tokyo Haneda and London Heathrow—that are legally or effectively closed to new entry.  App.258-63.

Delta and Aeroméxico's objections received widespread support.  Representatives at every level—from Senators Ossoff and Klobuchar and Governors Kemp and Cox, to New York City Council members and Commissioners of McAllen, Texas—wrote to emphasize that terminating the Joint Venture could decrease connectivity with Mexico and harm their constituents.  *E.g.*, App.342-59,

16

367-68, 387.  Many businesses expressed similar concerns, explaining that they relied on relationships with Mexico facilitated by the Joint Venture.  *E.g.*, App.361-62, 369, 376-81.

### F.    The Department's Second Proposal To Terminate Approval Of The Joint Venture.

Nearly eighteen months later, in July 2025, the Department issued a longer Supplemental Order to Show Cause.  App.391.  In that order, the Department asserted that terminating approval of the Joint Venture would be warranted because the Government of Mexico's policies at MEX had "altered the playing field for airlines . . . and allow[ed] predominant competitors to gain an unfair advantage in the U.S.-Mexico market."  App.392.

Despite acknowledging that it needed to analyze competition in the "U.S.-Mexico market," the Department still omitted the extensive network, country-pair, and city-pair analysis it has undertaken every other time it analyzed a joint venture's competitive effects.  In fact, the Department mentioned only two city pairs in the market (JFK-MEX and LAX-MEX) and acknowledged that the Joint Venture's share of the JFK-MEX market—the principal market of concern in 2016—had *decreased* from 81% to 72%.  App.422, 426.  And despite asserting that Delta and Aeroméxico had an "unfair advantage," App. 410, the Department elsewhere complained that the Joint Venture's overall seat-capacity growth in the U.S.-Mexico

17

market—as well as the U.S.-MEX market—had "lagged other airline capacity" growth, App.424-25.

Addressing MEX itself, the Department focused primarily on the Government of Mexico's ban on all-cargo operations. The Department emphasized that, unlike all-cargo operators, Delta and Aeroméxico may still transport cargo at MEX via the "belly" of passenger aircraft and, given the all-cargo ban, now represented a larger share of reduced cargo operations at MEX. App.411-14. But the Department again did not account for all-cargo operations at nearby NLU or detail any harms that all-cargo operators might suffer from switching to NLU. *Id.*

The Department also asserted that the slot regime at MEX meant that the airport is "closed effectively . . . to new entrants." App.409. The Department highlighted that the Government of Mexico confiscated approximately "two slot-pairs" each from multiple other airlines, App.410, but it ignored that the Government of Mexico had also confiscated *seventy-two* slot pairs from Delta and Aeroméxico, App.455.

In response, Delta and Aeroméxico identified other, more targeted alternatives to address the Department's concerns. For example, Delta and Aeroméxico noted that the Department could carve out U.S.-MEX cargo operations from the Joint Venture's scope. App.500-01. And they explained that the Department could impose countermeasures on U.S.-MEX flights under Part 213 of the Department's

18

regulations, which gives the Department authority to impose filing requirements for (and even restrict) flights operated by foreign airlines.  App.493-97 (citing 14 C.F.R. Part 213).

### G.    The Department's Termination Of Its Approval Of The Joint Venture.

Just a few weeks after Delta and Aeroméxico filed their objections, the Government of Mexico announced a policy change at MEX, committing to restore confiscated slots to U.S. airlines and to enhance transparency regarding slot allocations.    Decreto, Diario Oficial de la Federación (Aug. 29, 2025), https://tinyurl.com/2y6667uu.    Nevertheless, on September 15, 2025, the Department issued a final Order terminating approval of the Joint Venture, effective January 1, 2026.  App.511.

The Department stated its decision was based on its concerns about "competition in the U.S.-Mexico air services market."  App.511, 519-20.  Yet the Department still did not perform any wider country-pair or city-pair competition analysis—and it again ignored evidence of robust competition in the transborder market.  According to the Department, it did not need to "conduct a longer and more particularized analysis" of the broader market because of the potential competition problems it perceived at MEX.  App.528.  In the Department's view, "MEX is not one market of concern, but many," and it stated for the first time that the "market distortions at MEX . . . raise concerns in multiple city-pair markets."  App.530.  The

19

Department provided seven examples for "illustration purposes," such as "MEX-JFK, MEX-LAX, MEX-ORD, MEX-SEA, and MEX-BOS"—most of which it had not identified in its show-cause orders—without offering any further analysis beyond naming the city pairs. App.522, 530. Nor did the Department analyze any of the 1,687 city pairs it identified and analyzed in 2016.

With respect to MEX itself, the Department again voiced two principal objections to the Government of Mexico's policies. First, the Department characterized the all-cargo ban at MEX as "the most egregious and harmful action" by the Mexican Government and "enough by itself to merit corrective action." App.530. To address the fact that all-cargo services can operate out of nearby NLU, the Department, for the first time, focused on supposedly "lucrative *time-sensitive* cargo" at Mexico City, rather than the broader cargo market. App.530-32 (emphasis added). Under the Department's new reasoning, Aeroméxico's belly-cargo operations at MEX enjoy an advantage over all-cargo operations at NLU with respect to this hitherto unidentified time-sensitive submarket. *Id.* But the Department provided no analysis of the size, structure, or time-sensitivity of the submarket, let alone of concrete harms allegedly suffered by time-sensitive all-cargo operators. *Id.*

Second, the Department identified a handful of underdeveloped potential "anticompetitive and efficiency-reducing outcomes," such as "the possibility" of

20

"reduced growth, decreased [connectivity], . . . and exclusionary conduct" at MEX. App.521. Of those, the "primary issue that the Department [found] with the nature of the joint venture" was that it supposedly led to a reduction in "overall connections beyond MEX." App.521, 534. Yet the Department ignored the Joint Venture's increased connectivity *within* Mexico (such as flights from MEX to Oaxaca) and instead relied on statistics that included flights operating *beyond* Mexico (such as flights to Costa Rica)—and thus beyond the Joint Venture's scope. App.445-46. Delta and Aeroméxico do not—because, according to the terms of the Joint Cooperation Agreement that governs their Joint Venture, they cannot—make joint network, capacity, or pricing decisions on routes outside the Joint Venture's scope. *Id.* The Department offered no explanation why such flights were relevant.

The Department also reiterated its concerns about slot policies at MEX— suggesting they afford an "unfair competitive advantage" to Delta and Aeroméxico—while simultaneously faulting Delta and Aeroméxico for failing to "show[ ] substantial growth by both joint venture partners in all relevant U.S.-Mexico markets." App.521-22, 528-30, 534. Beyond MEX, the Department offered only conjecture about other airports. For example, the Department speculated that the Government of Mexico "could act in a similar manner" at Cancun, without offering any substantiation. App.522. Nor did the Department attempt to square its

conjecture with the Government of Mexico's recent actions to *improve* access to MEX.

The Department also repeated its view that "[a]n Open Skies regulatory framework is necessary under the competition and public interest analysis required by [the statute]." App.527-28. But the Department barely engaged with Delta and Aeroméxico's objection of disparate treatment, and it failed altogether to address the objection that Tokyo Haneda is legally carved out from the U.S.-Japan Open Skies agreement and closed to both new entry and international all-cargo operations. *Id.*; App.487-90. Instead, the Department simply asserted that airports like Haneda and Heathrow are for some reason "not analogous" because they are not "unacceptably distorting competition in a manner that directly undermines the findings of previous orders." App.531.

The Department then rejected the more tailored alternatives that Delta and Aeroméxico identified. For example, the Department declined to carve out U.S.-MEX cargo operations from the Joint Venture because such a carveout would not remedy harms for newly identified "time-definite premium cargo products"—even though, with a carveout in place, those alleged harms would in no way be attributable to the Joint Venture. App.531-32. And the Department acknowledged that the Government of Mexico had taken "positive" steps by promising to return confiscated slots to U.S. airlines and overhaul its slot-allocation procedures at MEX, but claimed

22

there was "no basis to delay" disapproval because the Government of Mexico's steps were not sufficiently comprehensive or longstanding.  App.541-42.

Accordingly, the Department "end[ed] approval" of the Joint Venture as of January 1, 2026.  App.543.  "Because the Department [was] ending approval of the joint venture," it also "terminate[d] the antitrust immunity previously granted to th[e] joint venture."  *Id.*

### H.  The Department's Alternative Measures To Address Its MEX-Related Concerns.

Delta and Aeroméxico petitioned this Court for review of the Department's Order on October 9.  ECF Nos. 1, 16.  Approximately two weeks later, on October 24, the Department issued two *additional* orders in separate proceedings designed to address the very same competitive concerns about MEX that underpinned the Department's Order here.

*First*, the Department proposed to block Aeroméxico and other Mexican carriers from transporting belly cargo between the United States and MEX.  Order 2025-10-14; App.530.  *Second*, the Department exercised its Part 213 authority—the same authority Delta and Aeroméxico had identified as an available alternative—to disapprove certain Aeroméxico routes between the United States and Mexico City, and effectively block Aeroméxico from launching any new U.S.-Mexico City flights.  Order 2025-10-13.  The Department had not mentioned that it was considering either of these alternatives in its orders regarding the Joint Venture.

23

## I.    Proceedings Before This Court.

Promptly after petitioning for review, Delta and Aeroméxico moved the Department to stay its Order on October 10.  ECF Nos. 14, 17.  The Department summarily denied the request on October 24, and the airlines immediately sought a stay from this Court.  ECF Nos. 14, 17.

Delta and Aeroméxico explained that they were likely to succeed on the merits and that compliance with the Order would cause serious and irreparable harms to both them and the traveling public.  As Delta and Aeroméxico emphasized, unwinding their "virtual merger" would be hugely disruptive to their integrated transborder operations and flight planning, requiring both airlines to reassess their upcoming flight schedules, rework highly complex operational arrangements, retrain employees, and develop new programs in each other's countries.  ECF No. 17 at 19-22; ECF No. 14 at 17-20.

This Court granted a stay on November 12.  ECF No. 23.

## STANDARD OF REVIEW

Under the Administrative Procedure Act, this Court "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

To "pass muster" under the arbitrary-and-capricious standard, the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation

for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). An agency's failure to address "an important aspect of the problem" renders its decision arbitrary and capricious. *Id.* So too, the Court must ensure that agency decisions are "reasonable and reasonably explained." *Am. Sec. Ass'n v. SEC*, 147 F.4th 1264, 1273 (11th Cir. 2025). Any explanation that is "internally inconsistent" is by definition arbitrary and capricious. *Id.* at 1274. And if the agency does not "treat like cases alike," *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007), or "give a reasoned explanation for its rejection of . . . alternatives," *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021), its decision is arbitrary and capricious as well. Finally, if any "one of the [agency's] rationales is deficient, [courts] will ordinarily vacate the order unless [they] are certain that [the agency] would have adopted it even absent the flawed rationale." *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006).

## SUMMARY OF THE ARGUMENT

For at least three reasons, the Department's Order is arbitrary and capricious and should be vacated.

I. The Department failed to undertake the comprehensive, evidence-based assessment of the Joint Venture's competitive effects mandated by "the statute," the

Department's "precedents," and the Administrative Procedure Act.  Order 2010-7-8, at 9.

The Department's myopic focus on MEX is a textbook example of an agency's "'fail[ure] to consider an important aspect of the problem.'"  *Bidi Vapor LLC v. U.S. FDA*, 47 F.4th 1191, 1202-03 (11th Cir. 2022) (quoting *State Farm*, 463 U.S. at 43).  As the Department has long recognized, it is charged by statute with analyzing how a joint venture "agreement" will affect competition, 49 U.S.C. § 41309—which requires evaluating the joint venture "as a whole" in the context of the relevant transnational market, Order 2010-7-8, at 9.  Thus, when approving the Joint Venture in 2016—as when considering other joint ventures—the Department examined the Joint Venture's competitive impact on the U.S.-Mexico market, as well as each of the 1,600-plus city pairs within that market.  App.74-75; *see also, e.g.*, Order 2020-11-9, at 6-9, https://tinyurl.com/3x9735pr.

If the Department had performed the same comprehensive analysis here, it would have considered evidence that the Joint Venture has enhanced transborder competition by providing a competitive counterweight to American and United and by fostering a dynamic market with multiple low-cost carriers.  Yet the Department's Order completely ignored almost all of the U.S.-Mexico market, focusing exclusively on competitive conditions at MEX.  That departure from the statute, the

Department's own precedent, and principles of reasoned decisionmaking is alone sufficient to vacate the Order.

Even as to MEX, the Department's explanations were unsubstantiated, internally inconsistent, and, in some cases, belatedly raised for the first time in the Order. The Department's newfound reliance on an undefined "time-definite" cargo submarket is a prime example of this flawed analysis: the Department had not discussed this submarket previously, and the Order provided no analysis of its size or structure. Similarly, the Department provided no explanation for relying on flights beyond Mexico—which are outside the Joint Venture's scope—to suggest that the Joint Venture had reduced Aeroméxico's connectivity from MEX.

Other core aspects of the Department's reasoning were equally flawed. For example, the Order's assertion that the slot restrictions at MEX gave Delta and Aeroméxico an unfair competitive advantage is belied by the Department's criticism that Delta and Aeroméxico's growth at MEX has been *outpaced* by their competitors. And the Department provided no basis for speculating that the Government of Mexico might impose similar cargo and slot restrictions at other airports, such as Cancun, which is particularly improbable given the Government of Mexico's recent steps to *remedy* the Department's concerns at MEX.

II. The Order also subjects Delta and Aeroméxico to unfair and unjustified disparate treatment. According to the Order, "[a]n Open Skies regulatory framework

27

is necessary under the competition and public interest analysis" required by 49 U.S.C. § 41309, and Open Skies are not present at MEX in light of the all-cargo prohibition and slot restrictions.  App.527.  But the Department has never applied this Open Skies prerequisite to terminate approval of any other joint venture—even though Open Skies indisputably do not exist at Tokyo Haneda, which is expressly carved out from the U.S.-Japan Open Skies agreement, is subject to an international all-cargo prohibition and stringent slot restrictions, yet still serves as the hub for multiple immunized joint ventures.  That dissimilar treatment violates the "fundamental norm of administrative procedure [that] requires an agency to treat like cases alike."  *Westar Energy*, 473 F.3d at 1241.

III.  Finally, the Department acted arbitrarily and capriciously by failing to adequately "consider responsible alternatives to its chosen policy"—each of which would have been far less disruptive to airline operations and to the flying public than unwinding this transborder virtual merger—and subsequently pursuing some of those alternatives anyway.  *Spirit Airlines*, 997 F.3d at 1255.  For example, the Department refused to carve out U.S.-MEX cargo operations from the Joint Venture—and then, weeks later, proposed barring Aeroméxico from providing cargo service between the United States and MEX.  The Department also discounted the efficacy of countermeasures under Part 213 of its regulations—while adopting those countermeasures weeks later.  And the Department failed to explain adequately why

28

it should not delay a disapproval decision until the effects of the Government of Mexico's recent reforms at MEX have been realized.

At a minimum, the Department should have examined the cumulative effect of these developments before withdrawing its approval of the proconsumer, procompetitive Joint Venture. Yet even as the Government of Mexico took meaningful steps toward resolving the Department's concerns—and with the Department on the cusp of announcing its own countermeasures—the Department rushed to conclude this proceeding in an effort to increase diplomatic pressure, leaving Delta, Aeroméxico, and millions of air travelers as collateral damage along the way. That too is arbitrary and capricious.

## ARGUMENT

## I. THE ORDER'S EXCLUSIVE FOCUS ON ONE AIRPORT, MEX, IS INCONSISTENT WITH THE STATUTE, AGENCY PRECEDENT, AND REASONED DECISIONMAKING.

The Order's single-minded focus on *one airport*—MEX—misses most of the issue the Department was required to consider before terminating approval of the Joint Venture: competition in the transborder U.S.-Mexico market in which the Joint Venture operates and each of the city pairs in that market. Even as to MEX, the Department's theories of competitive harm rested on shifting, unsupported, or self-contradictory explanations that violate basic principles of reasoned decisionmaking.

29

A.    **The Department's Exclusive Focus On MEX Misses Key Parts Of The Problem.**

**1. *Refusal to Analyze the U.S.-Mexico Market.*** It is a bedrock rule of administrative law that agencies must consider all "important aspect[s] of the problem" at hand. *Bidi Vapor*, 47 F.4th at 1204. But here, the Department completely ignored multiple key aspects of the issue before it: whether competitive considerations warrant terminating approval of the Joint Venture. The statute governing that inquiry requires the Department to analyze whether the Joint Venture "agreement" *itself* "substantially reduces or eliminates competition." 49 U.S.C. § 41309(b)(1). The Department has consistently recognized that this standard requires considering all aspects of the transborder market in which the joint venture operates, "weigh[ing] both pro- and anti-competitive effects" of a venture "as a whole" "*across a number of different markets*" within that broader market. Order 2010-7-8, at 9. In particular, the Department must "ma[ke] a broad assessment" of competition "at the network, country-pair, and city-pair levels." *Id.*

For example, when approving an alliance between KLM Dutch Airlines and Northwest Airlines in 1992—the first international alliance the Department approved—the Department analyzed the "U.S.-Europe, the U.S.-Netherlands, and the Detroit/Minneapolis-St. Paul-Amsterdam markets" (the last of which constituted the only city pairs where KLM and Northwest were competitors). Order 93-1-11, at 9-10, https://tinyurl.com/4ebtyhpf; *see also* Order 92-11-27, at 14-15,

30

https://tinyurl.com/3cw4zfuc. Similarly, when approving the addition of Aer Lingus to the OneWorld Alliance with five other airlines, the Department examined market shares and "barriers to entry" in the "U.S.-Ireland market," as well as how adding Aer Lingus to the alliance would consolidate market shares and affect competition in 5,593 "city pairs between the United States and Europe." Order 2020-11-9, at 6-8; *see also, e.g.*, Order 2022-6-15, at 8-18 (same for 1,968 city pairs); Order 2019-5-23, at 6-10, https://tinyurl.com/552sdyk4 (311 city pairs). As the Department put it when reviewing the then-ten-airline Star Alliance, "[w]e assess the competitive effects of the proposed alliance at multiple levels: city pairs, countries, and regions." Order 2009-7-10, at 16, https://tinyurl.com/4h6msdmx (70,000 city pairs).

The Department undertook precisely that comprehensive assessment when it approved the Joint Venture in 2016, analyzing structural conditions in "the U.S.-Mexico transborder market," market shares in that broad market, and the Joint Venture's competitive impact on each of the 1,687 city pairs offering nonstop service between the United States and Mexico. App.73-75. Those multiple "levels of analysis of relevant competitive markets"—the "broad network level," "country-pair level," and "city-pair level"—are characteristic of *every other* competition analysis the Department has undertaken for transnational joint ventures, App.72, including United-ANA, American-British Airways, and American-Japan Airlines—to name just a few. *See, e.g.*, Order 2020-10-13, at 10-18,

https://tinyurl.com/4hu4r9mj (Delta-WestJet); Order 2019-5-23, at 6-11 (American-Qantas); Order 2016-11-16, at 10-17, https://tinyurl.com/32mah7h7 (American-Qantas); Order 2013-8-21, at 5-13, https://tinyurl.com/3jyc7scp (Delta-Virgin Atlantic-Air France-KLM); Order 2010-2-8, at 13-24, https://tinyurl.com/4kttdk8m (OneWorld Alliance); Order 2010-10-4, at 5-12, https://tinyurl.com/35t45wrz (United-ANA; American-Japan Airlines); Order 2005-10-18, at 7-12, https://tinyurl.com/ynww68sp (American-LAN Peru); Order 2002-7-39, at 7-9, https://tinyurl.com/bdd7edz5 (American-Finnair); Order 2001-5-1, at 7-9, https://tinyurl.com/6dxhmjua (Continental-COPA); Order 2000-10-13, at 9-12, https://tinyurl.com/bdbv2u8d (SAS-Icelandair); Order 99-4-17, at 15-20, https://tinyurl.com/33pujwsr (American-LAN Chile).

Yet in terminating approval of the Joint Venture, the Department abandoned this comprehensive competition analysis. It failed to examine airlines' shares of the U.S.-Mexico market, structural forces in that broader market, or the Joint Venture's competitive impact on any of the 1,600-plus city pairs in the U.S.-Mexico market—all of which it normally considers, "consistent with statute and precedent." Order 2010-7-8, at 9. The Department made no effort to reconcile its truncated approach with the statute or its own precedent.

In fact, the Department has *rejected* the approach it took here when reviewing other joint ventures—emphasizing that its analysis "does not end" upon finding that

32

a joint venture might decrease competition in *parts* of the relevant transnational market. *E.g.*, Order 2010-7-8, at 9. For example, when reviewing the American-British Airways joint venture, the Department acknowledged that the venture could create "harm" in certain markets encompassing London Heathrow—including the "substantially large" Boston-London market, which had no "suitable intervening hubs" to provide competition and had seen no new market entrants for years. Order 2010-2-8, at 22-23. But despite conceding that the American-British Airways joint venture could "increase the risk and difficulty for airlines that may want to enter the market," thus creating "diffuse negative effects in . . . U.S.-U.K. markets generally," *id.*, the Department looked to the "broader competitive environment," weighed the joint venture's procompetitive effects in a number of different markets, and ultimately approved the joint venture, Order 2010-7-8, at 9.

That comprehensive assessment and weighing of a joint venture's procompetitive and anticompetitive effects was hardly aberrational. *See, e.g.*, Order 93-1-11, at 10 ("We concluded, however, that the possible loss of competition in the two city-pair markets appeared to be outweighed by the [Northwest-KLM] Agreement's competitive benefits."); Order 99-4-17, at 13, 23 (a "potential loss of competition" caused by the American-LAN Chile joint venture in a key city-pair market was outweighed "on balance . . . [by] overall competitive opportunities" and other factors). Yet the Department never took those steps when terminating approval

33

of the Delta-Aeroméxico Joint Venture, ignoring extensive evidence of the vigorous competition the Joint Venture has fostered in the transborder market.  App.434-35, 442-44, 450-60.

That unexamined evidence shows the U.S.-Mexico market is an unconcentrated market with low barriers to entry.  Just as the Department hoped when approving the Joint Venture, low-cost carriers like Volaris and Viva have materially expanded their market shares in the U.S.-Mexico market since 2016, with Volaris' share alone increasing from 9.6% to 16%.  App.74; App.434-35; *accord* Order 2020-11-9, at 6-7 (alliance's 60% market share of the total U.S.-Ireland market was acceptable because of the presence of a low-cost carrier).  As the Department further hoped in 2016, the Joint Venture's share of the JFK-MEX market has decreased in recent years.  App.422; App.85-87.  And the Joint Venture's overall market share across the full U.S.-Mexico market in which it operates is only 20%—roughly comparable to American at 21% and United at 16%, and dwarfed by other carriers' combined market share of 43%.  App.434-35

By focusing on a single airport and refusing to consider—as it had in other proceedings—whether any concentration at the airport was outweighed by competitive benefits under the Joint Venture as a whole, the Department contravened the statutory standard, its own settled precedent, and basic principles of reasoned decisionmaking.

34

**2. *Belated References to a Handful of City Pairs.*** The Order's identification of seven city-pair markets only underscores the deficiencies in the Department's analysis. App.522, 530. The Department's listing of those seven city pairs (five of which it had not identified previously) does not come close to addressing the *1,687* city pairs in the U.S.-Mexico market or the competitive dynamics of that broader market. And even for those seven city pairs, the Order fell far short of the in-depth competition analysis the Department has consistently conducted in other joint-venture proceedings.

When the Department assesses city pairs, it typically examines how many airlines provide nonstop service between the cities, airlines' market shares on those routes, whether other airlines' one-stop service to those cities provides competition, and whether a joint venture decreases competition by combining competitors' operations on those routes. *See, e.g.*, App.74-76; Order 2010-7-8, at 9. The Department also analyzes how broader network and country-pair level dynamics affect those routes. *See, e.g.*, App.73-76; Order 2000-10-13, at 9-12; Order 2020-11-9, at 8; Order 2010-7-8, at 9; Order 2010-10-4, at 10-11.

Yet the Department provided none of that analysis here as to the seven city pairs it identified: it never asked how many airlines serve the routes or what their market shares are, whether Delta and Aeroméxico would compete against each other on the routes without the Joint Venture, or whether any competitive dynamics in the

35

broader U.S.-Mexico market affect the routes. *See, e.g.*, App.74-76; Order 2010-7-8, at 9. In fact, the Department did not provide *any* information about these seven city pairs. It merely listed them "for illustration purposes," noted that Delta and Aeroméxico "*potentially* served" them, and then asserted that the Government of Mexico's policies "create[ ] *the possibility* for anticompetitive" harms within them. App.521-22.

The Department's drive-by approach missed "important aspect[s] of the problem." *Bidi Vapor*, 47 F.4th at 1203. Merely identifying a handful of city pairs at the last minute is no substitute for the comprehensive analysis of competition "at the network, country-pair, and city-pair levels" the Department has long found necessary when assessing airline joint ventures. Order 2010-7-8, at 9.

**3. *Failure to Justify Focus on MEX.*** The Department stated it did not need to "conduct a longer and more particularized analysis" because it believed the "changed . . . competitive landscape" at MEX—a "critical gateway" the Joint Venture uses as a "hub"—was sufficient to support its decision. App.528-29. The Department's reasoning provides no justification for departing from "the statute and [its] precedents." Order 2010-7-8, at 9.

The Department "has consistently recognized that" transnational market shares, wider structural forces in transnational markets, and competition in all relevant city pairs "are relevant factors to the determination" about whether to

approve a joint venture. *Bidi Vapor*, 47 F.4th at 1203; *supra* at 30-34. And it has done so because "the statute"—49 U.S.C. § 41309—requires that comprehensive competition analysis. Order 2010-7-8, at 9. The Department was therefore "required to consider" this broader evidence—an "important aspect of the problem"—before terminating approval of the Delta-Aeroméxico Joint Venture, too. *Bidi Vapor*, 47 F.4th at 1204 (emphasis and internal quotation marks omitted).

Making matters worse, the Department never justified treating a single airport, MEX, as a relevant market—let alone, the *only* relevant market. Showing that an area of competition is a "market" is the "necessary predicate" of any competition analysis. *United States v. Marine Bancorp., Inc.*, 418 U.S. 602, 618 (1974). Defining a market typically requires showing that there is no "interchangeability" or "cross-elasticity" of demand between the alleged market and other potential areas of competition; if customers would switch out of the "market" because of higher prices in it, then the alleged "market" is not really a market at all and must be expanded to include other sources of competition. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

Yet the Department never undertook this market-definition exercise as to MEX. And tellingly, both courts and the Department itself have typically looked to city pairs or networks, not individual airports, when assessing the competitive effects of airline transactions. *See, e.g.*, Order 2020-11-9, at 8 (discussing network effects

from adding Aer Lingus to the American-British Airways alliance and effects on 5,593 city pairs); *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 933 (6th Cir. 2005) (discussing routes between Detroit and Philadelphia or Boston); *Rodney v. Nw. Airlines*, 146 F. App'x 783, 787-88 (6th Cir. 2005) (a proposed market definition of an airline's nonstop flights from its "hubs fails as a matter of law"); *United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 138-39 (D. Mass. 2024) (discussing hundreds of routes). The Department gave no reason to deviate from that approach here.

Perhaps recognizing that focusing only on a single airport would be insufficient, the Department asserted that "MEX is not one market of concern, but many"—pointing to the aforementioned seven city pairs that were almost all linked to MEX. App.522, 530. Yet the Department never provided any analysis of these "many" ill-defined markets, such as how they are structured or which airlines compete in them. *Compare* App.522 (Order), *with* App.74-77 (2016 Order providing this analysis); Order 2010-7-8, at 9 (looking to "the broader competitive environment," including "connecting services" for city pairs).

Unreasoned *ipse dixit* cannot excuse the Department's decision to forgo the comprehensive competition analysis it has consistently conducted—under compulsion of both the governing statute and its own precedent—in other joint-venture proceedings, including when approving the Joint Venture in 2016. The

Department's failure to examine the relevant U.S.-Mexico market—instead focusing exclusively on a single airport—is arbitrary and capricious. *See Bidi Vapor*, 47 F.4th at 1203.

## B. The Department's Two Primary Concerns Regarding MEX Are Unsubstantiated.

Even accepting the Department's focus on MEX, and ignoring the constellation of 1,687 city pairs in the U.S.-Mexico market, the Department *still* did not demonstrate that the Joint Venture "substantially reduces or eliminates competition" and thus warrants disapproval. 49 U.S.C. § 41309(b)(1). In its Order, the Department primarily settled on two areas of concern: cargo operations at MEX and a supposed reduction in Aeroméxico's connecting flights at MEX. Neither rationale is sufficiently supported.

**1.** *Unwarranted and belated focus on time-sensitive cargo.* According to the Department, the ban on all-cargo operations at MEX is "[p]erhaps the most egregious and harmful action by the [Government of Mexico]" and is "significant enough by itself to merit corrective action." App.530. Yet as Delta and Aeroméxico repeatedly pointed out, all-cargo operators can still access Mexico City at NLU, an airport located about the same distance from downtown Mexico City (30 miles) as Washington Dulles is from downtown Washington, D.C. (25 miles) and closer than Tokyo Narita (50 miles) is to downtown Tokyo—two other cities where, like Mexico City, a closer-in airport (Reagan National and Haneda, respectively) is effectively

39

subject to an all-cargo ban.  App.457.  In its Final Order, the Department accordingly switched gears and—for the first time—asserted that the all-cargo ban at MEX harmed "competition for premium and *time-definite* [cargo] services."  App.530.  Specifically, the Department suggested that all-cargo operators are harmed because they are unable to transfer packages through MEX to *other* destinations within Mexico as quickly as Aeroméxico.  App.530-32.

The Department's emphasis on "time-definite" cargo services represented another eleventh-hour rationale pushed forward with inadequate analysis.  The Department did not evaluate, for example, the size of the time-sensitive cargo market from Mexico City to other Mexican cities, pricing within that market, or how that market operates.  From the record, it is simply impossible to tell whether there is *any* substantial time-sensitive cargo market between Mexico City and other destinations in Mexico—and tellingly, no all-cargo operators commented on these proceedings.  The record is thus bereft of support for the Department's competitive concerns.  *See Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 778 (5th Cir. 2023) (agency's failure to demonstrate "a genuine problem" was arbitrary and capricious); *Nat'l Fuel Gas Supply Corp.*, 468 F.3d at 839 (similar).

Nor did the Department analyze these supposed competitive harms in the context of the broader U.S.-Mexico market.  It argued, for example, that "Aeroméxico [had] the distinct advantage at MEX" with respect to cargo operations

40

because Aeroméxico "operates a large network to destinations throughout Mexico." App.530. But it did not provide any analysis regarding how time-sensitive packages are routed to destinations throughout Mexico. Nor did it consider whether United's or American's Texas-based hubs, or all-cargo operators' hubs (like FedEx's Miami-based hub), might serve as substitutes for cargo travelling to Mexican destinations beyond Mexico City. *See* App.73-74.

The Department's concerns about Aeroméxico's use of MEX for cargo operations are particularly puzzling given the Department's recent proposal to *prohibit* Aeroméxico from transporting cargo between the United States and MEX. Order 2025-10-14. In the Department's view, this proposal would constrain any supposed "distinct advantage" that "Aeroméxico has" as to MEX cargo operations. App.530. The Department's failure to consider the impact of this "concurrent proceeding" underscores the arbitrary and capricious nature of its disapproval decision. *See Office of Commc'n of United Church of Christ v. FCC*, 707 F.2d 1413, 1441 (D.C. Cir. 1983) (finding an agency action arbitrary and capricious because of "its concurrent proceeding" that would materially alter the regulatory landscape).[2]

---

[2] The Department's underdeveloped reasoning does not make clear whether Aeroméxico's supposed "distinct advantage" is in relation to all-cargo carriers at NLU only, or also passenger carriers at MEX that transport belly cargo. App.532. If the Department is suggesting the latter, Aeroméxico's purported belly-cargo advantage is entirely illusory. Because Aeroméxico does not possess an unfair

*(Cont'd on next page)*

**2.** ***Improper Consideration of Beyond-Mexico Connectivity.***  Besides the all-cargo ban, the "primary issue that the Department f[ound] with the nature of the joint venture" was Aeroméxico's supposed reduction in connecting flights at MEX. App.534; *see also* App.521, 529-30.  According to the Department, Delta and Aeroméxico have decreased capacity for passengers at MEX connecting to non-U.S. destinations (such as Oaxaca or Costa Rica) and focused instead on nonstop traffic between the United States and Mexico City.  App.534.

The Department's connectivity analysis was flawed because, as Delta and Aeroméxico explained to the Department, the connectivity statistics on which it relied included non-U.S. flights *beyond Mexico*—and thus flights beyond the scope of the Joint Venture.  App.534.  The Joint Venture permits Delta and Aeroméxico to coordinate only with respect to flights between the United States and Mexico, as well as flights "within" each country "that connect to transborder service."  App.25.  So, for example, Delta and Aeroméxico can coordinate on flights between Atlanta and MEX, and they can coordinate on increasing connectivity between those flights and flights to other U.S. or Mexican destinations.  *Id.*  But the airlines *cannot* coordinate on connecting flights to *other countries*—such as flights from Atlanta to Toronto or from MEX to Panama City.  *Id.*

---

competitive advantage in MEX passenger flights, *see infra* at 43-45, it does not possess an unfair advantage in transporting belly cargo on those flights.

When the inquiry is properly limited to connecting flights *within* Mexico, connectivity increased—by 5% overall and by 32% to core Mexican cities, like Oaxaca, Durango, and Veracruz.  App.446.  The Department ignored that evidence, instead insisting that Delta and Aeroméxico have not "prioritize[d] connectivity" based on flights from MEX to non-U.S. foreign destinations as to which they cannot coordinate.  App.534.

The Department gave no explanation for considering flights beyond Mexico when faulting the Joint Venture's connectivity at MEX.  App.534.  Its "lack of explanation" for considering those out-of-scope flights is arbitrary and capricious. *Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 293 (4th Cir. 2018).

## C.    The Department's Remaining Concerns Are Speculative And Belied By The Record.

Each of the Department's other competitive concerns is speculative, "unsupported by substantial evidence," and fails to reflect the requisite "minimal level of analysis" demanded by the Administrative Procedure Act.  *FiberTower Spectrum Holdings, LLC v. FCC*, 782 F.3d 692, 700 (D.C. Cir. 2015) (first quote); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (second quote).

**1.  *Conjecture about other airlines.*** According to the Department, the Government of Mexico's slot regime at MEX eliminated "a level playing field" and permitted Delta and Aeroméxico to launch new flights at MEX, whereas "other competitors could not to the same degree."  App.519, 529.  Putting aside that this

43

reasoning overlooks the many other airports in the U.S.-Mexico market, the Department's contention is unsupported.

Multiple other airlines, including American, United, Allegiant, and Viva, commented on the Department's proposed decision—yet *not one* claimed it wanted to launch flights at MEX but was unable to do so because of slot policies. To the contrary, the evidence indicates that market forces, not slot policies, are the primary driver of whether airlines launch flights to and from MEX. For example, at the Department's direction, Aeroméxico and Delta divested fourteen MEX slot pairs to other airlines in 2017, but the recipients *voluntarily returned* eight of those slot pairs by 2019—giving up their ability to launch new flights to and from MEX. App.450. And those airlines that did not return their slots have meaningfully increased their flight offerings between the United States and MEX, including low-cost-carrier Viva, which expanded its share of U.S.-MEX flights from zero in 2016 to 8% in 2024. App.459.

The ability of other carriers to compete effectively against Delta and Aeroméxico at MEX is confirmed by the Department's own calculation that Delta and Aeroméxico's seat capacity growth on U.S.-MEX flights was outpaced by other carriers *every* year between 2016 and 2023. App.425. In 2017, for example, Delta and Aeroméxico grew by 5% at MEX, whereas other carriers grew by 38%; the

following year, Delta-Aeroméxico's 6% growth was dwarfed by other carriers' 51% growth. *Id.*

The record further shows that—far from creating an uneven playing field— the Government of Mexico has applied its MEX slot policies equally to all carriers. The Department emphasized that carriers like American, United, Volaris, and Viva "lost approximately two slot pairs each" at MEX—but ignored that Aeroméxico and Delta together lost *seventy-two* slot pairs. App.410, 455.

Finally, even if Delta and Aeroméxico did have an advantage when it comes to launching flights from MEX, the Department's recent actions—no doubt in development at the time of the Department's Order—will curtail that advantage going forward. Using its Part 213 authority, the Department recently disapproved multiple flights that Aeroméxico operates between the United States and Mexico City, and prohibited Aeroméxico from launching any new flights between the United States and Mexico City. Order 2025-10-13. This action has materially altered the Joint Venture's competitive position at MEX while strengthening the position of carriers, such as American and United, not subject to the Part 213 measures.

**2.** ***Conjecture about airports beyond MEX.*** In a last-ditch effort to show competitive harms in the broader U.S.-Mexico market, the Department speculated that the Government of Mexico "could act in a similar manner at other congested gateways such as Cancun or Monterrey." App.522, 530. But the Department offered

45

nothing to support that conjecture. It pointed to no evidence that the Government of Mexico plans to apply its MEX policies to other airports—or even that the Government of Mexico is *considering* such policies at other airports. Nor did it explain why it could not act if Mexico *did* take such steps, rather than preemptively supposing Mexico would do so. Basing an agency decision on unsupported speculation of this sort is unquestionably arbitrary and capricious. *See Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014).

This is especially true because the Department's speculation is belied by the facts on the ground. The Government of Mexico has recently taken steps to *remedy* the Department's concerns about MEX. App.541-42. By the Department's own admission, the Government of Mexico has committed to restore slots to U.S. airlines, establish new rules for slot allocation, establish an independent slot coordinator, and otherwise adhere to standards the Department has endorsed for the operation of slot-controlled airports. *Id.*[3]

In light of these reforms at MEX—as well as recent actions by the Department to pressure the Government of Mexico to take even further steps—it strains credulity to suggest that the Government of Mexico would replicate its MEX slot and cargo

---

[3] The Department stated that the Government of Mexico "did not address transparency concerns," App.541, but the Government of Mexico's decree directed an examination of transparency issues, Decreto, *supra*.

policies at other airports.  Order 2025-10-13 (Part 213 measures); Order 2025-10-14 (U.S.-MEX belly cargo ban).  The Department's failure to provide any reason to believe that the Government of Mexico would extend its MEX policies to other airports—in the face of substantial evidence to the contrary—is arbitrary and capricious.  *See Encino Motorcars*, 579 U.S. at 221.

> D.    **The Department's Concerns About A Supposed Competitive Advantage For Delta And Aeroméxico Are Irreconcilable With Its Complaints About The Joint Venture's Lack Of Growth.**

The Department's internally inconsistent reasoning is also arbitrary and capricious.

The Department faulted Delta and Aeroméxico for supposedly "deliver[ing] substandard growth in the U.S.-Mexico market when compared to peers"—in an aberrational portion of the Order that, unlike elsewhere, fleetingly extended the Department's competition analysis beyond MEX.  App.526, 533-34 (citing the 2025 Order to Show Cause).  And the Department affirmed the finding in its 2025 Order to Show Cause that "in the U.S.-MEX market, Delta and Aeroméxico seat capacity growth lagged other airline capacity as well."  App.425, 521.

The Department's criticism of Delta and Aeroméxico's supposedly substandard growth directly contradicts the Department's unsupported assertion elsewhere that "the joint venture enables Delta and Aeroméxico to use scale and coordinate action to achieve better outcomes than would be possible for other

47

carriers in light of regulatory conditions" in Mexico. App.522. If other airlines are growing *more rapidly* than Delta and Aeroméxico, then the Joint Venture can hardly be "substantially reduc[ing] or eliminat[ing] competition" or otherwise affording Delta and Aeroméxico an unfair competitive advantage. 49 U.S.C. § 41309(b)(1). This type of "internally inconsistent" and "contradict[tory]" reasoning is the definition of arbitrary and capricious agency action. *Interstate Nat. Gas Ass'n of Am. v. Pipeline & Hazardous Materials Safety Admin.*, 114 F.4th 744, 755 (D.C. Cir. 2024); *see also ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018).

To be sure, the Department's assessment of the Joint Venture's growth is incomplete, including because it ignores the unique headwinds the Joint Venture has faced, such as Aeroméxico's 2020 bankruptcy during the COVID-19 pandemic. App.482. But even with those flaws, it underscores that there is robust competition in the U.S.-Mexico market today, with multiple airlines, including several low-cost carriers, significantly expanding their presence in the market and eroding the dominant position that American and United held before the Joint Venture was launched.

\*   \*   \*

In sum, the Department failed to undertake the same comprehensive competition analysis it has elsewhere acknowledged to be required by statute and precedent, ignored evidence of robust competition in the U.S.-Mexico market,

48

provided no analysis of its newly divined time-sensitive cargo market, and faulted Delta and Aeroméxico for illusory competitive advantages at MEX while simultaneously criticizing the Joint Venture for not growing enough.  At every turn, the Order confirms that the Department missed key parts of the problem it perceived—all while resorting to unsubstantiated, belated speculation about competitive harms at MEX.  That is arbitrary and capricious agency action.

## II.    THE DEPARTMENT DID NOT ADEQUATELY JUSTIFY ITS DISPARATE TREATMENT OF DELTA AND AEROMÉXICO.

The Department is obligated to "treat like cases alike" and give adequate reasons for any change in its position.  *Westar Energy*, 473 F.3d at 1241.  Its failure to do so when terminating approval of the Joint Venture violates "fundamental norm[s] of administrative procedure."  *Id.*; *Black Warrior Riverkeeper, Inc. v. U.S. Army Corp. of Eng'rs*, 833 F.3d 1274, 1289 (11th Cir. 2016) (an agency behaves in an arbitrary way when it treats like cases dissimilarly).

The Department declared that "[a]n Open Skies regulatory framework is necessary under the competition and public interest analysis required by Section[ ] 41309" "to obtain approval of and maintain" an immunized joint venture.  App.527. According to the Department, the Government of Mexico has violated the Open Skies agreement between the United States and Mexico through its slot and cargo policies at MEX, which "inform[ed] the Department's consideration of the pertinent statutory factors."  App.528.

49

The Department's application of an Open Skies predicate to the Joint Venture is impossible to reconcile with the Department's initial and continued approval of two joint ventures that operate primarily out of Tokyo Haneda, where Open Skies indisputably *do not exist*. App.527; App.487-90. Tokyo Haneda is a critical airport for U.S.-Japan air travel; it handles 55% of the overall air traffic between the United States and Japan and is 30 miles closer to downtown Tokyo than Tokyo's other major airport, Narita. App.487-89. However, Haneda is *expressly carved out* from the U.S.-Japan Open Skies agreement. *Id.* With no Open Skies commitments, the Government of Japan has prohibited U.S. carriers from operating all-cargo flights at Haneda and limited U.S. passenger airlines to 18 daily slot pairs—slots the Department itself allocates. Order 2023-6-24, at 1, https://tinyurl.com/mud7ub5c. The only feasible way for a U.S. passenger airline to secure greater access to Haneda is either (1) to enter into an alliance with a Japanese carrier or (2) for the Government of Japan—in its sole discretion—to release more slots to U.S. carriers, and for the Department—in its sole discretion—to allocate those slots to pre-selected routes operated by the airline. *See, e.g.*, *id.*

Despite those stringent access constraints, the Department has approved U.S. airlines' joint ventures with Japanese airlines—between United and All Nippon Airways, and between American and Japan Airlines—and has maintained those approvals in the face of Haneda's international all-cargo ban and slot constraints.

50

Order 2010-11-10, at 1.  Those two joint ventures have an effective duopoly at Haneda, together controlling 80% of the slots there.  Answer of Delta, DOT-OST-2019-0014, at 2 (Feb. 28, 2019), https://tinyurl.com/mpcdmwjd.  And on the rare occasions when the Government of Japan has released additional slots for U.S. carriers, the Department has awarded many of those slots to United and American, only further solidifying their legally protected duopoly.  *See, e.g.*, Order 2023-6-24, at 2.

A similar dynamic has played out at several of the other 213 slot-controlled airports around the world, such as London Heathrow.[4]  Like Haneda in Japan, Heathrow is essential for U.S.-U.K. air travel; it handles over 85% of traffic between the two countries, is the largest single international gateway to the United States, and serves as a major connecting hub for the rest of Europe.  App.491.  Yet Heathrow has remained effectively closed to new entry for years:  the airport is tightly slot-controlled, with incumbent carriers like British Airways protecting their slots through a variety of tactical behaviors.  *Id.*; Answer of Delta, DOT-OST-2008-0252, at 3 (Sept. 9, 2020), https://tinyurl.com/59vn6f88.  Nevertheless, the Department has repeatedly approved an expanding alliance between American, British Airways, and other airlines that have occupied an increasing number of Heathrow's limited slots.

---

[4] *See* Int'l Air Transp. Ass'n, Coordinated Airports, https://tinyurl.com/3ztjscnn.

51

*See* Order 2010-7-8, at 10, 19; Order 2020-11-9.  The Department acknowledged the risk that this alliance would reduce competition in certain markets, but nevertheless approved it after "weigh[ing] both pro- and anti-competitive effects across a number of different markets, consistent with statute and precedent" (though not consistent, it should be said, with the Department's blinkered focus here on MEX).  Order 2010-7-8, at 9; *supra* Part I.A.

The Department made little effort to justify treating the Delta-Aeroméxico Joint Venture more harshly than those operating out of other restricted airports.  It failed even to acknowledge that Haneda has an international all-cargo ban and is carved out of the U.S.-Japan Open Skies agreement—despite making MEX's all-cargo ban a centerpiece of its decision to terminate the Joint Venture.  In fact, the Order devoted a mere two paragraphs to responding to Delta and Aeroméxico's disparate-treatment concerns, declaring that the Government of Mexico uniquely "is unacceptably distorting competition in a manner that directly undermines the [Department's] previous orders."  App.531.  But that only begs the question why the Department is treating the Joint Venture differently in the first place.  If the absence of Open Skies were—as the Order maintained—inimical to joint ventures, App.527, then the Department should have conditioned initial and continued approval of joint ventures at Haneda and other airports on the same standards now being applied to Delta and Aeroméxico.

The Department maintained that these other airports are merely "congest[ed]" and that the issues it has identified at MEX therefore are "not analogous to the issues faced by airlines in other markets." App.531. This blinks reality. The problems at Haneda are demonstrably *worse* than those at MEX because Open Skies do not exist at Haneda *at all* and the Government of Japan's policies entrench the United-All Nippon Airways and American-Japan Airlines duopoly that handles the majority of all U.S.-Japan air traffic.

The Department's disparate treatment of Delta and Aeroméxico is anathema to fundamental principles of administrative law and basic fairness. *See Westar Energy*, 473 F.3d at 1241.

## III.  THE DEPARTMENT FAILED TO CONSIDER AND ADEQUATELY ADDRESS AVAILABLE ALTERNATIVES.

The Order is also arbitrary and capricious because the Department failed adequately to consider multiple alternatives to terminating its approval of the longstanding Joint Venture and, shortly thereafter, took action on several of those alternatives anyway. To discharge its duty to consider "important aspect[s] of the problem before it," the Department was "required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines*, 997 F.3d at 1255. "This principle goes to the heart of reasoned decisionmaking," and agencies' failure to heed it "has led

uniformly to reversal." *Id.*; *see also R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182, 191 (5th Cir. 2023). The Department failed to meet that obligation here.

**1.** ***Carving Out Cargo Operations at MEX.*** The Department called the all-cargo ban at MEX "the most egregious and harmful action" by the Government of Mexico—yet it failed adequately to consider whether, as Delta and Aeroméxico proposed, it could address the all-cargo ban by carving out MEX cargo operations from the Joint Venture's scope. App.500-01; *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("An agency must consider and respond to significant comments[.]").

While the Department initially did not dispute that a carveout would "target" the purported harm to competition from the cargo restriction, App.419, in its final Order, the Department devised a new theory for rejecting this alternative: that a carve-out would disadvantage all-cargo carriers because of the "time penalty that carriers forced to operate" at NLU would incur from transporting "time-sensitive cargo" to MEX. App.532-33. But the statutory inquiry is whether "the *agreement*"—not governmental conduct—"substantially reduces or eliminates competition." 49 U.S.C. § 41309(b)(1) (emphasis added). If Delta and Aeroméxico were prohibited from coordinating their cargo operations at MEX, any lingering "time penalty" or other harm to all-cargo carriers operating at NLU would be caused by government policies, not the Joint Venture.

The Department's *ipse dixit* regarding "time-sensitive cargo" thus failed to satisfy its obligation to provide "an adequate explanation" for rejecting this alternative. *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 817 (D.C. Cir. 1983).

**2. *Barring Aeroméxico from Belly Cargo Operations Between the U.S. and MEX.*** Just weeks after rejecting the targeted alternative of a cargo carveout, the Department proposed banning Aeroméxico from transporting belly cargo from MEX altogether. Order 2025-10-14, at 3. The Department's proposal apparently stemmed from months of work—but the Department said *nothing* in this proceeding about this imminent proposal and its potential effects on cargo operations at MEX. *Id.* at 2-3. This alternative was obviously available to the Department—it was hard at work on the proposal when the Order issued—and the proposal was therefore an "important aspect of the problem" that the Department was required to consider before finalizing its Order. *Bidi Vapor*, 47 F.4th at 1202-03.

There was no justification for the Department to ignore that alternative approach. In the Department's view, its proposed ban would directly affect the "distinct advantage at MEX" that Aeroméxico purportedly enjoys on cargo transport—one of the key reasons the Department identified for disapproving the Joint Venture. App.530. In fact, the Department declared its belief that the proposed

ban would address any "unfair and unequal competitive disparity in the provision of cargo services."  Order 2025-10-14, at 3.

To be clear, Aeroméxico strongly opposes the Department's belly-cargo proposal and has submitted written objections.  Aeroméxico believes the Department's proposal is unsupported because both the U.S.-Mexico all-cargo market and the Mexico City cargo market have remained highly competitive even after all-cargo operations moved to NLU from MEX.  But that does not change the fact that the Department ignored this alternative when it considered whether to disapprove the Joint Venture and then issued the Order, giving "no indication [the Department] even considered" it.  *Spirit Airlines*, 997 F.3d at 1255.  That was arbitrary and capricious.

**3. *Pursuing Part 213 Remedies.*** The Department also failed adequately to consider invoking its Part 213 authority.  Those provisions give the Department authority to require foreign carriers to file additional details regarding their flight schedules—and then potentially ban foreign carriers from operating certain flights altogether.  The Department has now invoked that authority to disapprove certain Aeroméxico flights between Mexico City and the United States and to ban Aeroméxico from launching *all* new flights between Mexico City and the United States.  Order 2025-10-13.

56

The Department's only rationale for not invoking Part 213 in lieu of disapproving the Joint Venture was that its supposed "objective in this proceeding" was to assess "issues affecting competition in the markets served by the joint venture," not to "induce the [Government of Mexico] to comply with the U.S.-Mexico Air Transport Agreement." App.532. But that rationale says nothing about *why* Part 213 action would have been ineffective in addressing the supposed "issues affecting competition" the Department identified—which, again, were primarily rooted in the Government of Mexico's policies, not the Joint Venture itself. *See supra* Part I. In fact, when the Department implemented Part 213 measures just weeks later, it did so to target the same purported "*competitive imbalance*" that animated its disapproval of the Joint Venture. Order 2025-10-13, at 5-8; App.542.

**4. *Delaying Action.*** The Department also failed adequately to explain why it did not delay final action on the Joint Venture until the competitive impact of the Government of Mexico's recent reforms could be more fully realized.

Weeks before the Department issued its Order, the Government of Mexico took actions aimed at rectifying many of the issues at MEX the Department had identified—including announcing rules to liberalize slot allocations at MEX. App.541. The Order thus recognized that the situation was "evolving" and hailed these new measures as "positive" steps toward "addressing . . . [the] concerns that have been raised." App.541. The Department's more recent Part 213 order similarly

"acknowledge[d] and welcome[d] the recent indication . . . that the slots confiscated from U.S. air carriers have been 'returned'" and that MEX will adopt "an automated slot management system"—both of which the Department recognized "have the potential to be positive advancements."  Order 2025-10-13, at 6.

Despite these reforms, the Department proceeded with terminating approval of the Joint Venture based on the supposed absence of a sufficient "track record" on the Government of Mexico's part—and on speculation that Mexico might take more *adverse* actions, even though its recent actions had been *favorable*.  App.541-42; *supra* at 19, 46.  Nowhere did the Department consider the obvious alternative of delaying action on the Joint Venture to give the Government of Mexico time to establish a track record of compliance, refusing even to stay the Order temporarily during the pendency of this litigation—again, without explanation.  ECF No. 16-3.  Particularly given the Department's eighteen months of inaction following its initial 2024 Order to Show Cause, its refusal to postpone disapproval of the Joint Venture pending implementation of the Government of Mexico's reforms is unjustified.

**5.** ***Collective Alternatives.***  Finally, the Department never assessed whether all these developments *in combination* would alleviate its competitive concerns or, at minimum, warrant a delay in disapproving the Joint Venture.

The Joint Venture has been caught in the middle of a diplomatic dispute between the United States and Mexico, but recent developments confirm that the

Department's multi-pronged effort to pressure the Government of Mexico to make changes at MEX is making tangible progress. The Department did not explain why that progress was insufficient—much less why it needed immediately to terminate approval of a nearly decade-old Joint Venture, after 18 months of consideration and with less than four months' lead time for Delta and Aeroméxico to unwind their joint operations. Nor did the Department consider whether a delay of even a *few months* might allow these other initiatives to achieve the Department's objectives without inflicting the harm on consumers and competition that would inevitably result from the Joint Venture's demise.

The Department should have considered whether all these alternatives together could correct—and, in fact, are *already* correcting—the alleged competitive issues caused by the Government of Mexico's conduct. "That omission alone renders [the Department's] decision arbitrary and capricious." *Texas v. Biden*, 20 F.4th 928, 992 (5th Cir. 2021), *rev'd and remanded on other grounds*, 597 U.S. 785 (2022) (internal quotation marks omitted).

## CONCLUSION

The Department's refusal to engage with the robust state of competition in the U.S.-Mexico market, the Government of Mexico's recent MEX reforms, and the Department's own alternative countermeasures—even as it simultaneously condemned the Joint Venture for illusory harms and singled out Delta and

59

Aeroméxico for disparate treatment—confirms that the Department has been moving toward a predetermined outcome from the start. The Court should vacate the Department's arbitrary and capricious Order given the Department's serious errors and the "disruptive consequences" that would be caused by leaving the Order in place, rather than vacating it. *Am. Sec. Ass'n*, 147 F.4th at 1279; ECF Nos. 14, 17.

Dated:  December 29, 2025                    Respectfully submitted,

Matthew J. MacLean                          _/s/ Eugene Scalia_____
Charles F. Donley II                        Eugene Scalia
Edward W. Sauer                             Amir C. Tayrani
Nicole Steinberg                            Christine M. Buzzard
PILLSBURY WINTHROP SHAW PITTMAN LLP         Michael P. Corcoran
1200 Seventeenth Street, N.W.               GIBSON, DUNN & CRUTCHER LLP
Washington, D.C.  20036                     1700 M Street, N.W.
(202) 663-8000                              Washington, D.C.  20036
matthew.maclean@pillsburylaw.com            (202) 955-8500
                                            escalia@gibsondunn.com
*Counsel for Aerovías de México, S.A. de*
*C.V., dba Aeroméxico*                       Peter Carter
                                            Marguerite H. Taylor
                                            DELTA AIR LINES, INC.
                                            1030 Delta Boulevard
                                            Atlanta, GA  30320

                                            Steven J. Seiden
                                            Christopher Walker
                                            DELTA AIR LINES, INC.
                                            601 Pennsylvania Avenue, N.W.
                                            Suite 700
                                            Washington, D.C.  20005

                                            *Counsel for Delta Air Lines, Inc.*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type style, and type-volume limitations.  This brief was prepared using a proportionally spaced type (Times New Roman, 14-point font).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,999 words.  This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

December 29, 2025                    Respectfully submitted,


_/s/ Eugene Scalia_
Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500

## CERTIFICATE OF SERVICE

I hereby certify that on December 29, 2025, I caused a true and correct copy of this motion to be filed electronically through the Court's CM/ECF system, which will send a notice of filing to all registered users.

       */s/ Eugene Scalia*

Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500

63

# ADDENDUM OF PERTINENT STATUTORY PROVISIONS

# TABLE OF CONTENTS

**Page**

49 U.S.C. § 41308 ................................................................................ 1a

49 U.S.C. § 41309 ................................................................................ 2a

## 49 U.S. Code § 41308 – Exemption from the antitrust laws

**(a) Definition.—**

In this section, "antitrust laws" has the same meaning given that term in the first section of the Clayton Act (15 U.S.C. 12).

**(b) Exemption Authorized.—**

When the Secretary of Transportation decides it is required by the public interest, the Secretary, as part of an order under section 41309 or 42111 of this title, may exempt a person affected by the order from the antitrust laws to the extent necessary to allow the person to proceed with the transaction specifically approved by the order and with any transaction necessarily contemplated by the order.

**(c) Exemption Required.—**

In an order under section 41309 of this title approving an agreement, request, modification, or cancellation, the Secretary, on the basis of the findings required under section 41309(b)(1), shall exempt a person affected by the order from the antitrust laws to the extent necessary to allow the person to proceed with the transaction specifically approved by the order and with any transaction necessarily contemplated by the order.

## 49 U.S. Code § 41309 – Cooperative agreements and requests

**(a) Filing.—**

An air carrier or foreign air carrier may file with the Secretary of Transportation a true copy of or, if oral, a true and complete memorandum of, an agreement (except an agreement related to interstate air transportation), or a request for authority to discuss cooperative arrangements (except arrangements related to interstate air transportation), and any modification or cancellation of an agreement, between the air carrier or foreign air carrier and another air carrier, a foreign carrier, or another carrier.

**(b) Approval.—**The Secretary of Transportation shall approve an agreement, request, modification, or cancellation referred to in subsection (a) of this section when the Secretary finds it is not adverse to the public interest and is not in violation of this part.  However, the Secretary shall disapprove—

> **(1)** or, after periodic review, end approval of, an agreement, request, modification, or cancellation, that substantially reduces or eliminates competition unless the Secretary finds that—
>
>> **(A)** the agreement, request, modification, or cancellation is necessary to meet a serious transportation need or to achieve important public benefits (including international comity and foreign policy considerations); and
>>
>> **(B)** the transportation need cannot be met or those benefits cannot be achieved by reasonably available alternatives that are materially less anticompetitive; or
>
> **(2)** an agreement that—
>
>> **(A)** is between an air carrier not directly operating aircraft in foreign air transportation and a carrier subject to subtitle IV of this title; and
>>
>> **(B)** governs the compensation the carrier may receive for the transportation.

2a

**(c) Notice and Opportunity To Respond or for Hearing.—**

**(1)** When an agreement, request, modification, or cancellation is filed, the Secretary of Transportation shall give the Attorney General and the Secretary of State written notice of, and an opportunity to submit written comments about, the filing.  On the initiative of the Secretary of Transportation or on request of the Attorney General or Secretary of State, the Secretary of Transportation may conduct a hearing to decide whether an agreement, request, modification, or cancellation is consistent with this part whether or not it was approved previously.

**(2)** In a proceeding before the Secretary of Transportation applying standards under subsection (b)(1) of this section, a party opposing an agreement, request, modification, or cancellation has the burden of proving that it substantially reduces or eliminates competition and that less anticompetitive alternatives are available.  The party defending the agreement, request, modification, or cancellation has the burden of proving the transportation need or public benefits.

**(3)** The Secretary of Transportation shall include the findings required by subsection (b)(1) of this section in an order of the Secretary approving or disapproving an agreement, request, modification, or cancellation.