No. 25-13546

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

DELTA AIR LINES, INC., AND AEROVIAS DE MEXICO S.A. DE C.V.,
*Petitioners,*

*v.*

DEPARTMENT OF TRANSPORTATION,
*Respondent.*

On Petition for Review of an Order of the Department of Transportation
Docket DOT-OST-2015-0070

BRIEF OF DEPARTMENT OF TRANSPORTATION

GREGORY ZERZAN
  *General Counsel*
CHARLES E. ENLOE
  *Assistant General Counsel*
ERIN D. HENDRIXSON
FARIS MOHAMMED
  *Senior Trial Attorneys*

United States Department of
  Transportation
1200 New Jersey Ave., S.E.
Washington, D.C.  20590

ABIGAIL A. SLATER
  *Assistant Attorney General*
MARK H. HAMER
DINA KALLAY
  *Deputy Assistant Attorneys General*
DAVID B. LAWRENCE
  *Policy Director*
DANIEL E. HAAR
ROBERT B. NICHOLSON
PETER M. BOZZO
  *Attorneys*

United States Department of Justice
Antitrust Division
950 Pennsylvania Ave., NW
Washington, D.C.  20530
(202) 803-1196
peter.bozzo@usdoj.gov

No. 25-13546

*Delta Air Lines, Inc., and Aerovias de Mexico S.A. de C.V. v.*
*Department of Transportation*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 26.1-1, counsel for Respondent certify

that the Certificate of Interested Persons filed by Petitioners on December 29,

2025, omits the following:

Enloe, Charles E., Assistant General Counsel of Respondent

U.S. Department of Transportation

Haar, Daniel E., Chief, Appellate Section, Antitrust Division,

U.S. Department of Justice

Hamer, Mark H., Deputy Assistant Attorney General for the Antitrust

Division

Hendrixson, Erin D., Senior Trial Attorney for Respondent

U.S. Department of Transportation

Kallay, Dina, Deputy Assistant Attorney General for the Antitrust

Division

Lawrence, David B., Policy Director for the Antitrust Division

Mohammed, Faris, Senior Trial Attorney for Respondent

U.S. Department of Transportation

Slater, Abigail A., Assistant Attorney General for the Antitrust Division

Zerzan, Gregory, General Counsel of Respondent U.S. Department of

Transportation

## STATEMENT REGARDING ORAL ARGUMENT

Respondent believes that oral argument will assist the Court in deciding the case.

# TABLE OF CONTENTS

TABLE OF CITATIONS ...................................................................................... iii

INTRODUCTION ................................................................................................ 1

STATEMENT OF THE ISSUES ......................................................................... 4

STATEMENT OF THE CASE ............................................................................ 5

A. The United States' Competition-Based Aviation Policy ................................ 5

B. Department Review of Joint-Venture Applications ....................................... 7

C. Petitioners' 2015 Joint-Venture Application ................................................ 8

D. Deteriorating Competition at MEX ............................................................ 12

E. Proposed Withdrawal of Approval and Antitrust Immunity ...................... 14

F. Final Withdrawal of Approval and Antitrust Immunity ............................ 17

STANDARD OF REVIEW ................................................................................ 20

SUMMARY OF THE ARGUMENT ................................................................. 21

ARGUMENT AND CITATIONS OF AUTHORITY ....................................... 25

A. The Order's Focus on MEX Was Proper. .................................................. 25

   1. The Department's focus on MEX was reasonable and reasonably
      explained and, in any event, was not the Order's only basis. ............... 25

   2. The Department thoroughly justified its finding that the joint venture
      was substantially reducing competition at MEX and harming the
      public interest. .................................................................................... 38

   3. The Order's reasoning is consistent and record-based. ......................... 43

B. The Order Treated Petitioners Fairly. ....................................................... 49

C. The Order Fully Considered But Correctly Rejected Alternatives to
   Withdrawal as Insufficient To Protect Competition or Serve the Public
   Interest. ..................................................................................................... 52

CONCLUSION ................................................................................................. 58

# TABLE OF CITATIONS

**PAGES**

**CASES**

*ABC Aerolineas, S.A. de C.V. v. U.S. Department of Transportation*,
  747 F. App'x 865 (D.C. Cir. 2018).................................................................. 12

*Bidi Vapor LLC v. FDA*,
  47 F.4th 1191 (11th Cir. 2022).................................................................... 32

*Biestek v. Berryhill*,
  587 U.S. 97 (2019)................................................................................21, 44

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*,
  833 F.3d 1274 (11th Cir. 2016)..............................................................20, 21

*\*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)...............................................................................28, 37

*California Dental Ass'n v. FTC*,
  526 U.S. 756 (1999)................................................................................... 40

*FCC v. Fox Television Stations*,
  556 U.S. 502 (2009)................................................................................... 20

*\*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)...............................................................................20, 47

*FCC v. WNCN Listeners Guild*,
  450 U.S. 582 (1981)................................................................................... 29

*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015).................................................................. 53

*Citations primarily relied upon.  11th Cir. R. 28-1(e).

iii

**PAGES**

## CASES

*FTC v. Universal Health, Inc.*,
  938 F.2d 1206 (11th Cir. 1991) .................................................................................. 30, 31

*Hospital Corp. of America v. FTC*,
  807 F.2d 1381 (7th Cir. 1986) .................................................................................. 31

*Judulang v. Holder*,
  565 U.S. 42 (2011) .......................................................................................................... 20

*Lindeen v. SEC*,
  825 F.3d 646 (D.C. Cir. 2016) .................................................................................. 40

*Lopez-Martinez v. U.S. Attorney General*,
  149 F.4th 1202 (11th Cir. 2025) ............................................................................. 21

*Moog Industries v. FTC*,
  355 U.S. 411 (1958) (per curiam) ......................................................................... 56

*National Parks Conservation Ass'n v. U.S. Department of the Interior*,
  835 F.3d 1377 (11th Cir. 2016) ............................................................................... 44

*NCAA v. Alston*,
  594 U.S. 69 (2021) ........................................................................................................ 40

*Office of Communication of United Church of Christ v. FCC*,
  707 F.2d 1413 (D.C. Cir. 1983) ............................................................................... 41

*Seven County Infrastructure Coalition v. Eagle County*,
  605 U.S. 168 (2025) .................................................................................................... 37

*\*Spirit Airlines, Inc. v. Northwest Airlines, Inc.*,
  431 F.3d 917 (6th Cir. 2005) ....................................................................... 26, 27, 38

*Citations primarily relied upon.  11th Cir. R. 28-1(e).

iv

**PAGES**

**CASES**

*United States v. American Airlines Group Inc.*,
  121 F.4th 209 (1st Cir. 2024) ............................................................. 27

*United States v. American Airlines Group Inc.*,
  675 F. Supp. 3d 65 (D. Mass. 2023)................................................. 27

*United States v. Anthem, Inc.*,
  855 F.3d 345 (D.C. Cir. 2017) ........................................................... 28

*United States v. JetBlue Airways Corp.*,
  712 F. Supp. 3d 109 (D. Mass. 2024)..................................... 27, 38

*United States v. Pabst Brewing Co.*,
  384 U.S. 546 (1966)............................................................................ 28

*United States v. Philadelphia National Bank*,
  374 U.S. 321 (1963)...................................................................... 27, 28

*United States v. Rockford Memorial Corp.*,
  898 F.2d 1278 (7th Cir. 1990) ........................................................ 31

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474 (1951) ............................................................................ 21

**STATUTES**

49 U.S.C. § 40101............................................................................ 5, 30, 46

49 U.S.C. § 41308............................................................................ 7, 8, 29

*49 U.S.C. § 41309......................... 1, 4, 7, 8, 12, 18, 21, 28, 29, 41, 50, 51, 53, 54, 57

*Citations primarily relied upon.  11th Cir. R. 28-1(e).

**PAGES**

**REGULATIONS**

14 C.F.R. Part 213 ................................................................................ 24, 46, 54, 55

14 C.F.R. § 213.3 ................................................................................................ 55

**AGENCY ORDERS**

*In re Defining "Open Skies,"* Order 92-8-13, Docket No. 48130,
    1992 WL 204010 (Aug. 1, 1992) ................................................................... 5

Order 92-11-27 ............................................................................................ 33, 36

Order 93-1-11 ........................................................................................ 8, 33, 36

Order 99-4-17 ............................................................................................ 33, 36

Order 99-9-9 ..................................................................................................... 36

Order 2000-10-13 ............................................................................................. 33

Order 2001-5-1 ................................................................................................. 33

Order 2002-1-6 ................................................................................................... 8

Order 2002-7-39 ........................................................................................... 8, 33

Order 2005-10-8 ................................................................................ 7, 8, 33, 51

Order 2009-7-10 ............................................................................................... 33

Order 2010-2-8 ........................................................................................... 33, 35

Order 2010-7-8 ................................................................................... 8, 9, 35, 52

*Citations primarily relied upon.  11th Cir. R. 28-1(e).

PAGES

AGENCY ORDERS

Order 2010-10-4 ..................................................................................................... 33

Order 2010-11-10 ................................................................................................... 50

Order 2013-8-21 ..................................................................................................... 33

Order 2016-11-16 ................................................................................................... 33

Order 2019-05-23 ................................................................................................... 33

Order 2020-10-13 ................................................................................................... 33

Order 2020-11-9 ..........................................................................................33, 39, 52

Order 2022-6-15 ..................................................................................................... 33

Order 2025-10-13 ............................................................................................46, 55

Order 2025-10-14 ............................................................................................41, 42, 54

MISCELLANEOUS

Air Transport Agreement Between the Government of the United States
    of America and the Government of the United Mexican States,
    Mex.-U.S., Dec. 18, 2015 .................................................................................... 6

Antitrust Division, U.S. Department of Justice, *Antitrust Division
    Policy Guide to Merger Remedies* (Oct. 2004)............................................. 53

*Open Skies Agreements Currently Being Applied*,
    U.S. Department of Transportation (last updated Aug. 29, 2025)...................... 6

*Citations primarily relied upon.  11th Cir. R. 28-1(e).

## INTRODUCTION

In 2016, the Department of Transportation granted conditional, time-limited approval and antitrust immunity to a joint venture between two competitors: Petitioners Delta Air Lines, Inc., and Aerovías de México, S.A. de C.V. ("Aeroméxico").  The conditions and time limit were necessary, the Department explained, because the joint venture posed a substantial threat to competition for air traffic between the United States and Mexico City's Benito Juarez International Airport ("MEX").  Over the next nine years, however, the conditions proved insufficient to safeguard competition because the Government of Mexico imposed anticompetitive restrictions at MEX that prevented potential rivals from challenging the joint venture's dominant position.  The approval and antitrust-immunity decisions, which had been intended to secure benefits for air travelers, had become "a license for legalized collusion among partners that control[led] almost 60 percent of operations at [MEX,] the fourth-largest gateway to and from the United States."  App.409.

Because competitive realities failed to live up to the Department's expectations, the Department exercised its authority—expressly conferred by statute—to "end approval of[]" the joint venture and withdraw antitrust immunity, 49 U.S.C. § 41309(b)(1).  The Department did so only after extensively analyzing the competitive concerns flagged in its initial approval decision and determining, based on concrete record evidence, that those

1

concerns had materialized.  And the Department did so only after waiting to see whether competitive conditions would improve, extending the joint venture's antitrust immunity beyond the five years contemplated by the initial approval decision.  Across two presidential administrations, the Department determined that the only course consistent with its statutory mandate—and with protecting competition for approximately $1.8 billion in annual passenger revenue from U.S.-MEX flights[1]—was to withdraw the joint venture's approval and antitrust immunity.  Importantly, the Department's actions limit Petitioners' ability only to engage in competitively sensitive price- and capacity-setting activities, as well as revenue sharing.  Without antitrust immunity, petitioners will remain free to compete vigorously in U.S.-Mexico markets on the same terms as other airlines and to work together as arms-length partners as they did before obtaining immunity in 2016.

Petitioners claim that the Department's order was arbitrary and capricious, but their arguments all suffer from a common flaw:  They fail to appreciate the Department's exhaustively explained and well-supported reasons for focusing on competition at MEX.  Competitive conditions at a single airport affect all flights arriving at or departing from that airport, and flights originating or ending at MEX constitute at least 21% of air traffic between the United States and Mexico.  Because standard competitive analysis

---

[1] This figure is sourced from Sabre Market Intelligence and reflects 2024 revenues, exclusive of taxes and ancillary charges such as baggage fees.

of the airline industry proceeds on a route-by-route basis, the Department appropriately focused—in both its 2016 approval order and its withdrawal order—on routes starting and ending at MEX. Deteriorating competition at MEX also refutes Petitioners' claim that their joint venture was treated differently than others. Petitioners identify no other immunized venture that caused comparable competitive harm at such a significant access point to and from the United States—let alone after the Department had attempted to remedy such harm. And, while Petitioners argue that the Department failed to consider alternatives to withdrawing approval and antitrust immunity, the final order rejected those alternatives because, among other reasons, they would not have fully restored competition at MEX.

Rather than focusing on the Department's well-reasoned analysis, Petitioners introduce distractions by emphasizing recent Mexican reforms and discussing the Department's efforts in separate proceedings to end Mexico's anticompetitive conduct. But, as the Department carefully documented, Mexico's announced—though not yet implemented—reforms fall far short of redressing the Department's concerns about Petitioners' joint venture. And the Department's actions in other proceedings are tailored not to restoring the competition degraded by the venture, but rather to the distinct diplomatic goal of securing Mexico's compliance with its international air-traffic obligations. This Court should reject Petitioners' efforts to turn this case into a sprawling "diplomatic dispute" (Br. 58) and to conflate the wide-

3

ranging issues raised by that dispute with the circumscribed legal questions presented here.

While Congress directed the Department to "end approval of[]" joint ventures "that substantially reduce[] or eliminate[] competition," 49 U.S.C. § 41309(b)(1), Petitioners seek to bar the Department from exercising this authority without jumping through procedural hoops that have no basis in the statutory text. If accepted, this argument would make it harder for the Department to respond to changing competitive conditions by modifying or withdrawing approvals. Contrary to Petitioners' argument, however, the Department here fulfilled its statutory mandate to secure competition in the airline industry, acted consistently with past Department decisions, and offered a comprehensively reasoned explanation for its approach. To end the harm that the joint venture is causing consumers to this day, this Court should deny the petition for review.

## STATEMENT OF THE ISSUES

1. Whether the Department reasonably withdrew approval of and antitrust immunity for an airline joint venture that substantially harms competition at the fourth-largest gateway to and from the United States.

2. Whether the Department acted reasonably by (a) withdrawing approval of and antitrust immunity for a joint venture due to a record of substantially deteriorating competitive conditions while (b) declining to

seek withdrawal as to joint ventures where the record contains no such
showing.

3.  Whether the Department adequately explained its decision to withdraw
approval and antitrust immunity rather than take alternative actions
that would not have remedied the joint venture's anticompetitive effects
and harm to the public interest.

## STATEMENT OF THE CASE

### A. The United States' Competition-Based Aviation Policy

The United States' air-transportation policy "plac[es] maximum reliance
on competitive forces and on actual and potential competition[.]"  49 U.S.C.
§ 40101(a)(6); *see id.* § 40101(a)(12).  To facilitate that goal, the Department
has identified the "basic elements" of a maximally "liberalize[d]" air transport
regime.  *In re Defining "Open Skies,"* Order 92-8-13, Docket No. 48130, 1992
WL 204010, at *1 (Aug. 1, 1992).  Those elements include "[o]pen entry on all
routes[,]" "[u]nrestricted capacity and frequency on all routes[,]" and a
"[l]iberal cargo regime."  *Id.* at *2-3.  When reviewing joint ventures, the
Department uses the phrase "Open Skies" as a shorthand to refer to the
elements that collectively establish a liberalized framework within which air
carriers can freely compete.  *See id.* at *1.

To provide U.S. airlines access to international aviation markets, the
United States negotiates executive agreements embodying Open Skies
principles with its foreign partners to establish predictable rules for airlines

wishing to serve those markets.  The United States has such agreements with nearly 140 countries, including a 2015 agreement with Mexico.[2]  The U.S.-Mexico Air Transport Agreement seeks "to promote and facilitate an international aviation system based on competition among airlines in the marketplace."[3]  The agreement requires both governments to "allow a fair and equal opportunity" for each country's airlines "to compete in providing . . . international air transportation."[4]  Specifically, both governments must "allow each airline to determine the frequency and capacity of the international air transportation it offers based upon commercial considerations in the marketplace."[5]  Neither government may "unilaterally limit the volume of traffic, frequency or regularity of service," except for specified reasons.[6]

---

[2] Air Transport Agreement Between the Government of the United States of America and the Government of the United Mexican States, Mex.-U.S., Dec. 18, 2015 ("U.S.-Mexico Air Transport Agreement"), https://2009-2017.state.gov/e/eb/rls/othr/ata/m/mx/250782.htm; *see Open Skies Agreements Currently Being Applied*, U.S. Dep't of Transp. (last updated Aug. 29, 2025), https://www.transportation.gov/policy/aviation-policy/open-skies-agreements-being-applied.

[3] *See* U.S.-Mexico Air Transport Agreement.

[4] *Id.* art. 11(1).

[5] *Id.* art. 11(2).

[6] *Id.*

## B.  Department Review of Joint-Venture Applications

Congress has also provided that "[t]he Secretary of Transportation shall approve an agreement[]" between air carriers "when the Secretary finds it is not adverse to the public interest."  49 U.S.C. § 41309(b).  "However, the Secretary shall disapprove[] . . . or, after periodic review, end approval of, an agreement . . . that substantially reduces or eliminates competition unless the Secretary finds that[]" specified conditions are satisfied.  *Id.* § 41309(b)(1). When the Secretary issues an order under 49 U.S.C. § 41309 and "decides it is required by the public interest," the Secretary "may exempt a person affected by the order from the antitrust laws to the extent necessary to allow the person to proceed with the transaction specifically approved by the order and with any transaction necessarily contemplated by the order."  49 U.S.C. § 41308(b).

In exercising its congressionally accorded discretion and evaluating "whether a particular transaction is consistent with the public interest," the Department acts "only on a case-by-case basis, in light of the specific facts and circumstances affecting that case."[7]  The Department considers, among other things, whether the United States and any partner nations have entered into

---

[7] Order 2005-10-8, at 6, https://downloads.regulations.gov/DOT-OST-2004-19964-0007/attachment_1.pdf.

an air transport agreement consistent with Open Skies principles.[8]  An Open

Skies framework, the Department has explained, provides "competitive

discipline" by ensuring that, if joint venturers "charge supra-competitive fares

or lower service below competitive levels," new and existing rivals can freely

compete to win business from the venture.[9]  Thus, "[a]n open international

regulatory framework consistent with Open Skies principles, in law and

practice, remains essential, pursuant to 49 U.S.C. §§ 41309 and 41308, for

obtaining approvals of, and maintaining grants of antitrust immunity for,

price- and capacity-setting joint ventures."  Supp.App.64.  The existence of an

air transport agreement embodying Open Skies principles, however, "in no

way guarantees a grant of immunity."  Order 2005-10-8, at 6.

## C.  Petitioners' 2015 Joint-Venture Application

In March 2015, Petitioners requested approval of and antitrust

immunity for a joint venture.  App.16-63.  Petitioners planned to coordinate

on pricing, flight scheduling, marketing, and other functions for nonstop

---

[8] *See, e.g.*, Order 2010-7-8, at 10, 19,
https://downloads.regulations.gov/DOT-OST-2008-0252-
3406/attachment_1.pdf; Order 2002-7-39 at 1, 4, 6, 9,
https://downloads.regulations.gov/DOT-OST-2002-12063-
0008/attachment_1.pdf; Order 93-1-11 at 12,
https://downloads.regulations.gov/DOT-OST-1995-579-
0034/attachment_1.pdf.

[9] Order 2002-1-6, at 5, https://downloads.regulations.gov/DOT-OST-2001-
10429-0036/attachment_1.pdf.

routes between the United States and Mexico, as well as certain connecting flights. App.25-26. The result, Petitioners stated, would be "'metal neutrality' between Delta and Aeromexico on passenger routes between the United States and Mexico"; that is, the airlines would be indifferent as to which of their planes ("metal") was used for a particular flight. App.21.

Petitioners' application acknowledged the importance of liberalized air transport agreements to the Department's review of antitrust-immunity requests. App.48.

In November 2016, the Department issued a show-cause order that tentatively granted approval of and antitrust immunity for the joint venture, subject to stringent conditions. App.64-99. In analyzing the venture's competitive effects, the Department evaluated "three levels . . . of relevant competitive markets"—"a broad network level," "a country-pair level," and "a city-pair level." App.72. The Department "also consider[ed] the potential competitive effects of slot constraints at major airports": MEX and New York City's John F. Kennedy International Airport ("JFK"). *Id.*[10]

---

[10] "A slot is the right to take[]off or land at a particular time and date . . . . To conduct a daily round-trip flight, airlines must hold a pair of slots for each day of the week—one slot for landing and one for takeoff." Order 2010-7-8 at 2 n.2. Airports that experience heavy traffic typically use slots to help alleviate congestion and are considered "slot constrained" because a carrier must hold a slot to schedule a flight for takeoff or landing at a particular time of day.

As the order explained, MEX played a "preeminent role in the Mexican aviation network." App.77-78.  The Department noted that Mexico City, with a population of 21 million, was "the largest city in North America," "the principal air service market in Mexico by orders of magnitude," and "the singular mega-hub for the country."  App.77.  MEX was also "the exclusive access point to the city" given the absence of any "suitable substitute airport." App.78.  Of the approximately six million passengers who flew between the United States and Mexico City annually, the joint venture "would command by far the largest passenger share at 48%, followed in distant second and third by United and American"—which would command only 18% and 16%, respectively.  App.78 & n.31.

The order also explained that the joint venture's competitors would be unlikely to enter or expand at MEX.  App.79-80.  "There is ample evidence in the record," the Department stated, "that MEX is severely constrained" and that "slot administration at the airport is opaque and diverges from industry standard practices."  *Id.*  As Mexico's own competition regulator concluded, this slot regime "present[ed] a barrier to entry to an 'essential input' and [was] anticompetitive."  App.80.  The joint venture, the Department stated, likely would benefit from those conditions:  "Aeromexico, holding almost half of the slots at MEX, is able to use its unique position at the airport to exert market power and to leverage the slot regime to potentially exclude competitors."  App.79-80.  Moreover, while the Department had requested

10

information from MEX about its slot regime, "[t]he answers received did not address barriers to entry in the transborder market or provide a commitment or plan to reform the existing procedures." App.80.

The Department determined that "[t]hese circumstances normally would not support a discretionary grant of antitrust immunity," App.64, and a grant was thus "unjustified without stringent conditions," App.80. Accordingly, the Department proposed (1) "limit[ing] the duration of a grant of [antitrust immunity] while efforts to reform the slot rules continue" and (2) requiring the joint venture to divest slots at MEX and JFK. *Id.*

After reviewing numerous comments, the Department issued a final order in December 2016, conditionally approving and granting antitrust immunity to the joint venture. App.100-37. The Department reiterated that "the importance of access to Mexico City cannot be overstated," noting that "[a]pproximately two-thirds of all domestic and one-third of all international passengers in Mexico have their origin or destination at MEX." App.102. And "[t]he record contains substantial evidence that [Delta and Aeroméxico] exert significant market power at MEX, control approximately 50% of MEX slots, and are able to use the MEX slot allocation system to their advantage by leveraging its non-standard rules to preclude competitive entry by other carriers." *Id.* While some commenters had claimed that the slot regime at MEX was changing, those reforms were "not currently in place and their scope and effectiveness ha[d] not been demonstrated publicly." App.115.

Given the "significant competitive issues" with the joint venture, the Department imposed "stringent conditions" aimed at "ensur[ing] adequate competition."  App.100, 102.  It limited the grant of antitrust immunity to five years, at which point Petitioners would be required to submit a new application to continue the venture, and it required Petitioners to divest 24 slot-pairs at MEX and four slot-pairs at JFK.  App.100, 102, 125.  As the Department explained, "the uncertainty surrounding the slot regime at MEX could mean that the Department would have to carefully consider whether it could approve a new application if tendered, and, if it were to do so, whether additional divestitures would be necessary."  App.126 (internal quotation marks omitted).[11]

Petitioners "accept[ed] the Department's approval of antitrust immunity . . . with the conditions set forth in the [Department]'s Final Order."  Supp.App.3.  The Department retained its authority to "end approval of[]" the agreement, however, if it was found to substantially reduce or eliminate competition.  *See* 49 U.S.C. § 41309(b)(1); *see also* App.115, 126, 132.

## D. Deteriorating Competition at MEX

Starting in 2022, the competition landscape at MEX worsened dramatically.  Instead of improving its slot regime, the Government of Mexico

---

[11] The D.C. Circuit upheld a portion of this order against an arbitrary-and-capricious challenge in *ABC Aerolineas, S.A. de C.V. v. U.S. Department of Transportation*, 747 F. App'x 865, 870-72 (D.C. Cir. 2018).

"reversed course," "confiscati[ng] . . . slots from foreign and domestic carriers at MEX without adhering to international standards." App.410. Because the Government of Mexico had cancelled construction of "a replacement airport for MEX" and was instead relying on "a distant converted military airport," the capacity restrictions at MEX left Petitioners' rivals without meaningful opportunities to compete. App.413-14. In 2023, the Government of Mexico informed the Department that "additional entry at MEX is closed," ending any chance of competition from "new entrant[s]." App.409; *see* Supp.App.23.

Meanwhile, Petitioners maintained their dominance at MEX. By 2024-2025, they "account[ed] for 50 percent of U.S[.]-MEX capacity" and 60% of all departures from MEX. App.422. Even as their competitors were "forced to cut capacity between the U.S. and Mexico City," Petitioners leveraged their market power at MEX to "announce[] new routes." App.410.

Petitioners' advantage extended not only to passenger flights, but also to cargo transport. In 2023, the Government of Mexico banned "all-cargo carriers," such as UPS, from MEX. App.412. The prohibition benefited Petitioners and other airlines that were still permitted to carry cargo to MEX in the bellies of passenger aircraft. App.411. Petitioners' share of cargo tonnage at the airport promptly increased from less than 20% in August 2023 to more than 60% by February 2024. App.412.

As the Government of Mexico's anticompetitive actions took effect, it also became clear that the joint venture had not delivered the consumer

benefits that would be expected from a procompetitive enterprise. Petitioners' growth rate (i.e., percentage change in seat capacity) consistently lagged behind competitors' growth for U.S.-MEX routes from 2016 through 2023.  App.424-25.  And, while Petitioners had claimed that the immunized joint venture would enable them to offer larger travel networks, both airlines saw significant declines in the percentage of connecting passengers on U.S.-MEX flights.  App.427.

## E.  Proposed Withdrawal of Approval and Antitrust Immunity

Although the joint venture's five-year limit expired in December 2021, the Department granted Petitioners a three-month extension to file their renewal application, which they did in March 2022.  Supp.App.7, 11; App.138-228.  The Department also extended the venture's antitrust immunity during the new application's pendency.  Supp.App.7, 11.

Following the deterioration in competition at MEX, the Department issued a show-cause order in January 2024, proposing to end the joint venture's antitrust immunity.  App.229-33.  After inviting and reviewing numerous comments (App.233), the Department issued a supplemental show-cause order offering additional explanation for this conclusion.  App.391-430. The order explained that the Department made its 2016 "grant of [antitrust immunity] subject to strict conditions because [it was] concerned that Mexico would not adhere in practice to the open and pro-competitive regulatory framework that the two countries agreed to in principle."  App.393.  However,

14

"as the facts and circumstances show, those concerns ha[d] materialized." *Id.* The result was that antitrust immunity had become "a license for legalized collusion among partners that control almost 60 percent of operations at the fourth-largest gateway to and from the United States." App.409.

The supplemental show-cause order focused on MEX as "the singular megahub for Mexico without an equivalent substitute, with the most domestic destinations served and host to the largest operations for the five largest Mexican carriers." App.422. The Department detailed "the changed circumstances" at MEX that had "undermine[d] seriously" the basis for antitrust immunity: the closure of entry, the confiscation of slots, the ban on all-cargo carriers, and the cancellation of construction of a replacement airport. App.409-14.

The changes vindicated the Department's original concerns in approving the joint venture. App.414-17. For example, the 2016 order expressed apprehension that MEX's slot regime would not permit "new entry" or enable rivals "to make the adjustments necessary" to compete. App.415; *see* App.86. In the intervening years, the Government of Mexico's anticompetitive slot allocations had "validated" this worry. App.415. Given Petitioners' ongoing dominance at MEX, "[t]he concerns [the Department] identified in 2016 [were] still present . . . , except with the proven experience" that the Department's previously imposed remedies had not restored competition. App.422. Indeed, "[o]ther than . . . attempts made through the

15

slot divestiture process" that the Department ordered in 2016, "no new carrier ha[d] entered the U.S.-MEX market" since the joint venture's approval. *Id.*

The supplemental show-cause order also discussed "the broader U.S.-Mexico market," in which Petitioners had "not add[ed] new capacity at a rate higher than competitors." App.424-25.  In 2017, for example, Petitioners increased their U.S.-Mexico capacity by 8%, while other carriers cumulatively increased their U.S.-Mexico capacity by 19%.  App.425.  In 2024, the percentages were 18% and 70%, respectively.  *Id.*

The Department considered alternatives to withdrawing antitrust immunity and concluded that they would not fully correct the market's competitive distortions.  App.418-19.  For instance, "letting international negotiations play out" was "not viable" because negotiations "ha[d] yielded no progress over several years," leaving consumers to suffer in the meantime. App.418 (italicization omitted).  The Department also explained that it would not "be consistent with the public interest" to "wait[] for things to change," "[c]arv[e] out Mexico City and/or cargo from the scope of the [antitrust immunity] grant," or rely solely on "[o]ther means to compel compliance by Mexico."  App.418-19 (italicization omitted).  Moreover, without antitrust immunity, Petitioners could cooperate in "materially less anticompetitive ways" through "mutual marketing," "frequent flyer cooperation," "mutual code sharing," and "limited schedule cooperation."  App.420, 427.  The airlines

16

would have incentives to pursue these options given Delta's 20% ownership of Aeroméxico.  App.427.

Finally, the Department explained that Petitioners' joint venture materially differed from other alliances that had received immunity "in, for example, the U.S.-Japan market or the U.S.-Europe market."  App.418.  Those markets "ha[d] transparent slot allocation mechanisms that largely conform[ed] to international standards."  *Id.*  And "where certain conditions or government decisions" in those markets "ha[d] the potential to limit entry at gateway airports, the Department ha[d] expressed concern and either exercised its regulatory tools or negotiated outcomes that provide[d] for adequate competition and that maximize[d] public benefit."  *Id.*  Petitioners had not identified any cases analogous to the pending one—i.e., where "restrictions imposed by foreign governments . . . create[d] conditions in which an immunized [joint venture] could substantially reduce or eliminate competition in the market despite the Department's actions to address the issues."  *Id.*

## F. Final Withdrawal of Approval and Antitrust Immunity

The Department invited additional comments.  App.429.  The Department of Justice's Antitrust Division submitted a comment supporting withdrawal of approval and antitrust immunity, noting that the Government of Mexico's "restrictive and potentially discriminatory practices . . . have limited entry and expansion" at MEX.  Supp.App.30.  American Airlines also

17

supported withdrawal, explaining that Petitioners' counterarguments rested on comparing MEX to other airports, such as Tokyo Haneda and London Heathrow, that were not "apt comparisons" because "they [were] managed by foreign governmental entities that work together with the Department to promote fairness and competition." Supp.App.47. Without taking a position on the "broader merits," United Airlines agreed that there were "fundamental differences" between MEX and other airports, "starting with the unilateral and detrimental actions by the Mexican government at MEX." Supp.App.52-53.

In September 2025, the Department issued a final order (the "Order") that "'end[ed] approval' of the joint venture" and withdrew antitrust immunity. Supp.App.75 (quoting 49 U.S.C. § 41309(b)(1)).[12] Reaffirming the findings in its supplemental show-cause order, the Department stated that "the joint venture substantially reduces or eliminates competition in relevant markets and is adverse to the public interest." Supp.App.73.

Responding to Petitioners' concern that the Department had "focuse[d] too much on competitive effects at MEX," the Order explained that "market distortions at MEX[] . . . raise concerns in multiple city-pair markets served from MEX, including JFK-MEX . . . , [Los Angeles International Airport (LAX)]-MEX . . . , and other markets that might benefit from more vigorous

---

[12] Petitioners include a version of the final order in their Appendix whose pages are not in sequence. *See* App.527-35. We include a correctly sequenced version of the order in the Supplemental Appendix and cite that version throughout this brief.

competition between the joint venture partners or new entry from their competitors." Supp.App.81-82; *see* Supp.App.73-74. Petitioners' own statistics showed that 21% of all flights between the United States and Mexico departed from or arrived at MEX. Supp.App.81. As Petitioners thus recognized, "MEX is the centerpiece of [their] joint transborder network, a critical hub for both local and connecting traffic." *Id.* (quoting App.456).

The Department further explained that its "concerns extend[ed]" beyond MEX "to the broader U.S.-Mexico market." Supp.App.82. The Government of Mexico's anticompetitive policies, the Order noted, were "part of a pattern of government interventions" that could cause harm at Cancun, Monterrey, and other Mexican airports. Supp.App.74, 82.

Furthermore, the Department reiterated that it had treated Petitioners consistently and had considered reasonable alternatives. Supp.App.83-85. "This is the only matter," the Order explained, "in which there are established facts and circumstances to show that the foreign partner, in this case the [Government of Mexico], is unacceptably distorting competition in a manner that directly undermines the findings of previous orders approving and granting [antitrust immunity] in the relevant markets." Supp.App.83. And the alternatives proposed by Petitioners, the Department stated, would not accord with "statutory standards and the public interest." Supp.App.84.

While the Order withdrew the approval and antitrust immunity granted in 2016, the Department declined to rule on Petitioners' March 2022

application for renewed approval and a renewed grant of immunity. Supp.App.76.  That application would remain pending, and, "[i]f conditions change[d] again, Delta and Aeromexico [would] have the opportunity to refresh the record and seek to demonstrate that a new joint venture [would] meet statutory standards."  *Id.*

Delta and Aeroméxico filed a petition for review and moved to stay the Order pending review.  This Court granted the stay.

## STANDARD OF REVIEW

Petitioners claim that the Order is arbitrary and capricious and that certain factual findings are "unsupported by substantial evidence."  Br. 24-25, 43 (citation omitted).

Judicial review under the Administrative Procedure Act's arbitrary-and-capricious standard is "deferential," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and "narrow," *FCC v. Fox Television Stations*, 556 U.S. 502, 513 (2009) (citation omitted).  When applying arbitrary-and-capricious review, "[a] court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision."  *Prometheus Radio*, 592 U.S. at 423.  "That is not a high bar," *Judulang v. Holder*, 565 U.S. 42, 45 (2011), and a reviewing court may not "substitute its judgment for that of the agency," *Fox*, 556 U.S. at 513.  Judicial deference extends not only to the agency's "ultimate findings," but also to its "drafting decisions like how much discussion to

20

include on each topic, and how much data is necessary to fully address each issue." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1285 (11th Cir. 2016) (citation omitted).

Substantial-evidence review "overlap[s] a great deal" with arbitrary-and-capricious review. *Lopez-Martinez v. U.S. Attorney General*, 149 F.4th 1202, 1210 n.6 (11th Cir. 2025). Under this "deferential" standard, *Biestek v. Berryhill*, 587 U.S. 97, 107 (2019), "a reviewing court asks '[w]hether on the record as a whole there is substantial evidence to support [the] agency['s] findings." *Lopez-Martinez*, 149 F.4th at 1207 (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 491 (1951)). "[M]ost of the time, 'when the arbitrary or capricious standard is performing th[e] function of assuring factual support, there is no *substantive* difference between what it requires and what would be required by the substantial evidence test." *Id.* (citation omitted).

## SUMMARY OF THE ARGUMENT

1. The Order's focus on MEX is consistent with Congress's statutory directive, codified in 49 U.S.C. § 41309(b)(1), to "end approval of[]" any joint venture that "substantially reduces or eliminates competition." When courts evaluate the competitive effects of joint activity, they typically look to the geographic market(s) in which the activity's effects will be most felt. MEX is one half of numerous relevant city-pair markets in which the joint venture operates, and the airport is clearly crucial to U.S.-Mexico air travel. MEX is the largest city and network hub in Mexico and among the largest destinations for

U.S.-Mexico services, with at least 21% of all U.S.-Mexico flights arriving at or departing from the airport.  And the joint venture is substantially reducing competition at this critical hub, where Petitioners control about 60% of slots and have leveraged their dominance to prevent new entry.

Petitioners' contention that the Order failed to evaluate the joint venture as a whole misapprehends the Department's analysis.  In 2016, the Department considered the entire joint venture and concluded that, absent stringent conditions, the joint venture was anticompetitive, including because it risked harming competition at MEX.  The Department thus granted only conditional, time-limited approval aimed at preserving competition at that singularly important airport.  When the conditions proved ineffective due to the subsequent deterioration in competition, the Department concluded that these changed circumstances undermined the basis for approval.  Nothing required the Department to re-perform its entire 2016 analysis to reach that conclusion.

Petitioners' challenges to the Department's specific findings about competitive conditions at MEX are equally unavailing.  The Department explained that, by banning all-cargo carriers at MEX, the Government of Mexico gave Petitioners a significant competitive advantage, as illustrated by the rapid growth in Petitioners' share of cargo tonnage at the airport from less than 20% to more than 60% in just six months.  The Department also explained that Petitioners' all-cargo rivals could not overcome this advantage

22

by turning to airports besides MEX, especially for time-sensitive cargo.  The record strongly supports these conclusions, and, contrary to Petitioners' claims, the Department had no need to perform a more detailed market analysis to confirm these findings.

The Department also thoroughly justified its conclusion that the joint venture had failed to achieve important public benefits—specifically, enhanced connecting traffic—sufficient to meet the statutory standards for antitrust immunity.  As the Order explained, procompetitive joint ventures typically lead to increased capacity and thus to increased passenger volume on connecting flights.  It is undisputed, however, that the percentage of Petitioners' passengers who took connecting flights after arriving in Mexico City significantly declined after 2016.

The Department also drew reasonable conclusions about entry barriers at MEX based on specific representations from the Government of Mexico and uncontested facts about slot access at the airport.  Similarly, the Department's concerns about anticompetitive government action at other Mexican airports stemmed from careful findings about the Government of Mexico's conduct at MEX and the nature of slot allocation nationwide.  Finally, Petitioners' subpar growth at MEX is consistent with the Department's finding that Petitioners leveraged their dominance at the airport to exclude rivals.  Petitioners grew more slowly than their competitors at MEX from 2016 to 2023—during the early phases of development when procompetitive ventures typically undergo

significant expansion.  After the Government of Mexico adopted new anticompetitive policies in 2022, Petitioners added new routes at MEX while competitors were forced to reduce capacity.  By 2024, Petitioners had surpassed their rivals' growth rates at MEX, demonstrating their effective exercise of market power.

2.  Because Petitioners' joint venture from the start has been uniquely problematic among airline joint ventures, the Department attached stringent conditions to the venture's operation and ultimately withdrew approval and antitrust immunity.  The Department has not withdrawn approval or immunity for ventures operating out of other airports, such as Tokyo-Haneda and London-Heathrow, where the record does not establish changed competitive conditions that require imminent action by DOT to comply with its statutory mandate.  It is, of course, entirely appropriate to take different actions when the facts materially differ.

3.  The Department did consider alternatives to withdrawing approval and antitrust immunity but reasonably found them inadequate.  Remedies aimed at addressing Petitioners' advantage in cargo operations do not address the harm that the joint venture, which holds 60% of MEX slots, inflicts on passengers.  Disapproving flights under 14 C.F.R. Part 213 is a potential means of securing the Government of Mexico's compliance with its obligations under the U.S.-Mexico Air Transport Agreement, not a tool that can effectively redress the joint venture's negative impact on competition and the public

24

interest.  And delaying action would only have compounded harm to consumers given the ongoing problems at MEX.  Even considered in combination, these alternatives fall substantially short of restoring competition or protecting the flying public.  To be sure, the Department has pursued some of these actions in separate proceedings, but some of those proceedings address issues other than the competition and public-interest concerns that justify the Order.  And some supplement the Order but are insufficient on their own to preserve competition and promote the public interest.

## ARGUMENT AND CITATIONS OF AUTHORITY

### A.  The Order's Focus on MEX Was Proper.

#### 1.  The Department's focus on MEX was reasonable and reasonably explained and, in any event, was not the Order's only basis.

a.  The Department properly focused on MEX because, in Petitioners' words, "MEX is the centerpiece of [their] joint transborder network, a critical hub for both local and connecting traffic."  Supp.App.81 (quoting App.456).  According to Petitioners' statistics, approximately "21 percent of the traffic and flights between the United States and Mexico operate to/from MEX."  *Id.*  As the Order explained, MEX constitutes "not one market of concern, but many," and encompasses "multiple city-pair markets served from MEX, including JFK-MEX . . . , LAX-MEX . . . , and other markets."  Supp.App.82; *see* Supp.App.73-74.  Competition analysis of the airline industry typically treats

25

each city-pair as a relevant market, *see infra* at 26-27, and, because MEX constitutes one half of many of these markets, it was an appropriate subject of emphasis.

The Order's attention to MEX was the culmination of a near-decade's worth of Department analysis focused on that crucial airport. The Department's 2016 show-cause order contained a "Special Discussion Concerning Mexico City" that described MEX as "the exclusive access point to" Mexico City, "the singular hub for the country." App.77. "Approximately two-thirds of all domestic and one-third of all international passengers in Mexico," the show-cause order explained, "have their origin or destination at MEX." App.78. In its 2016 final order, the Department reiterated that "the importance of access to Mexico City cannot be overstated." App.102. And, when proposing to withdraw the joint venture's approval and antitrust immunity in 2025, the Department once again discussed "MEX's importance as the singular megahub for Mexico without an equivalent substitute." App.422. Over nine years, the Department thoroughly explained, based on specific record evidence about MEX's usage, that the joint venture's effect on competition at MEX was of paramount concern.

These explanations followed from textbook principles of competition analysis. In the airline industry, courts typically analyze relevant markets on a route-by-route basis because "[i]t is at the route level, after all, that airlines actually compete with one another." *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*,

431 F.3d 917, 933 (6th Cir. 2005). Accordingly, courts have upheld antitrust claims and found antitrust violations where joint ventures, mergers, or monopolistic conduct in the airline industry harmed competition on specific city-pair routes. *United States v. Am. Airlines Grp. Inc.*, 121 F.4th 209, 219, 222-23, 227 (1st Cir. 2024) (affirming decision enjoining entire joint venture based on harm to subset of routes); *see United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65, 117 (D. Mass. 2023) (defining geographic markets as city-pair routes "that include[d] Logan as an endpoint, and those that include[d] New York as an endpoint"); *see also Spirit Airlines*, 431 F.3d at 921, 933 (harm to "Detroit-Boston and Detroit-Philadelphia routes" sufficed for monopolization claim); *United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 150-51, 163-64 (D. Mass. 2024) (treating "each individual [Origin & Destination] pair" as "its own relevant market" and holding merger unlawful because it would harm competition "in at least some of the relevant markets"). Mirroring these courts' analyses, the Department properly concluded that harm to individual city-pairs—those originating or ending at MEX, "the fourth-largest gateway to and from the United States," App.409—substantially hurt competition and harmed the public interest, Supp.App.73-76.

Antitrust decisions apply the same principles when evaluating mergers in other industries. Courts look not just to "where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct

and immediate." *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 357 (1963); *see Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962) (looking to "[t]he 'area of effective competition'" between the parties).  Courts have thus held that, where a merger spanning multiple markets may substantially lessen competition in a subset of those markets, the harm to the subset alone renders the merger anticompetitive and unlawful.  *See United States v. Pabst Brewing Co.*, 384 U.S. 546, 551-52 (1966); *United States v. Anthem, Inc.*, 855 F.3d 345, 367-69 (D.C. Cir. 2017).  Consistent with these decisions, the Department appropriately determined that, "[w]ithout a properly functioning regulatory framework in place at MEX, [it] would not expect the same degree of competitive and public benefits to emerge from the Delta/Aeromexico joint venture with its central hub at MEX."  Supp.App.81.

b.  Petitioners erroneously claim that this analysis was inconsistent with the governing statute, the Department's precedents, and the Administrative Procedure Act.

*Governing statute.*  Congress directed the Department to "end approval of[] an agreement[] . . . that substantially reduces or eliminates competition," 49 U.S.C. § 41309(b)(1), and that is just what the Department did.[13]  It

_____

[13] The statute includes an exception if (1) the agreement "is necessary to meet a serious transportation need or to achieve important public benefits" and (2) "the transportation need cannot be met or those benefits cannot be achieved by reasonably available alternatives that are materially less

reasonably found that the joint venture was "substantially reduc[ing] or eliminat[ing] competition in relevant markets" where Petitioners' "predominant share ('almost 60 percent') at MEX" enabled them to generate "anticompetitive and efficiency-reducing outcomes such as reduced growth, decreased capacity for lower-yield connecting traffic, and exclusionary conduct." Supp.App.73 (quoting App.409).

Congress also made clear that, when the Department grants antitrust immunity under § 41308(b) (as it did here, App.71-72, 81, 117-18), the grant is not a matter of right and can be made only if "required by the public interest." 49 U.S.C. § 41308(b) (Department "may" grant immunity). Given the statute's permissive language and the broad authority conferred by the public-interest standard, *cf. FCC v. WNCN Listeners Guild*, 450 U.S. 582, 593 (1981), the legislative scheme confirms the Department's wide discretion in this field. And the Order demonstrates that the Department exercised that discretion reasonably. *See supra* at 25-28.

Petitioners emphasize that § 41309(b)(1) requires that "the Joint Venture 'agreement' *itself* 'substantially reduce[] or eliminate[] competition'" (Br. 30 (quoting 49 U.S.C. § 41309(b)(1)))—but, again, the findings above demonstrate just that. *See* Supp.App.73. While the Department relied in part on acts by the Government of Mexico, those acts were relevant because they

---

anticompetitive[.]" 49 U.S.C. § 41309(b)(1). Petitioners do not argue that this exception applies here.

created conditions that facilitated the joint venture's anticompetitive exercise of market power. *See* Supp.App.73-74. For example, the confiscation of slots and non-transparent slot administration at MEX enabled Petitioners to leverage their dominance and add new routes while competitors were forced to reduce capacity. Supp.App.74; *see* App.410. And the Government of Mexico's prohibition of all-cargo operations at MEX correlated with a significant increase in Petitioners' share of cargo there. Supp.App.74; *see* App.412. While Petitioners portray themselves as "collateral damage" of the Government of Mexico's actions (Br. 29), the Department has a statutory obligation to withdraw approval and antitrust immunity for any joint venture that harms competition under current market conditions—whether those conditions stem from government conduct, industry consolidation precipitated by mergers of other firms, or any other cause or combination of causes.

The Department's attention to actions of the Government of Mexico was consistent with Congress's emphasis on "avoiding unreasonable industry concentration, excessive market domination, monopoly powers, *and other conditions* that would tend to allow at least one air carrier or foreign air carrier unreasonably to increase prices, reduce services, or exclude competition in air transportation." 49 U.S.C. § 40101(a)(1) (emphasis added). Government regulations are one such condition because, as this Court has explained, they can pose "a substantial barrier to entry by new competitors

30

and to expansion by existing ones." *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1219 (11th Cir. 1991); *see Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986) (considering "the regulatory barrier to entry" in evaluating acquisitions' competitive effects).  "Such barriers," the Court noted, "make concentrated markets more threatening, since there is little chance that other firms (new or old) would be able, in the face of anticompetitive practices, to spur competition."  *Univ. Health*, 938 F.2d at 1219; *see United States v. Rockford Mem. Corp.*, 898 F.2d 1278, 1285 (7th Cir. 1990).  The Order appropriately concluded that, where "competition-suppressing market intervention[s]" by the Government of Mexico had prevented rivals from "disciplin[ing]" the joint venture, the venture was harming competition and inconsistent with the public interest.  Supp.App.90.

*Department precedent.*  Petitioners' claim that the Department departed from agency precedent by failing to consider the joint venture "as a whole" (Br. 30-33) fails twice over.

First, as Petitioners recognize, the Department performed a "comprehensive assessment" of the joint venture in 2016.  Br. 31; *see* App.72-77, 101.  The assessment concluded that, given MEX's status as "the exclusive access point" to Mexico's "singular" urban center, anticompetitive conditions at MEX alone "normally" would have precluded antitrust immunity.  App.64, 77-78; *see* App.100-02.  The Department thus imposed "stringent conditions," including divestitures aimed at "address[ing] . . . barriers to entry" at MEX and

31

"ensur[ing] the proposed alliance" as a whole "was net-positive for the public interest." App.80, 83, 102, 118.[14]  When the Government of Mexico subsequently took actions that restricted new entry, the Department concluded that its earlier competition and public-interest concerns about MEX had been "validate[d]" and that its divestitures had not proven "sufficiently effective." App.414-17, 422; *see* Supp.App.71-73.  To reach that conclusion, the Department had no need to replicate its 2016 analysis.  The Department simply needed to assess whether its earlier concerns about MEX—which it had already determined were sufficient to justify denying antitrust immunity—had materialized.  By confirming that those concerns in fact had come to pass, the Department accounted for all "important aspect[s] of the problem," *Bidi Vapor LLC v. FDA*, 47 F.4th 1191, 1202-03 (11th Cir. 2022) (citation omitted).

---

[14] Petitioners thus are mistaken when they say that the 2016 final order "conclud[ed] the Joint Venture was 'pro-consumer' and would 'deliver substantial public benefits to the traveling public'" (Br. 13).  The order found that the Department's conditions could "*mak*[*e*] the approval of the alliance pro-consumer." App.100 (emphasis added).  And the order found that the venture "ha[d] the *potential* to deliver substantial public benefits" but that "significant competitive issues . . . could prevent the public from realizing those benefits if left unchecked." *Id.* (emphasis added).  Similarly, while Petitioners claim that "the Department recognized that the U.S.-Mexico market was highly concentrated" before their joint venture (Br. 10), the Department found a "relatively un-concentrated market overall[.]" App.74.

Petitioners miss the mark by citing (at 30-32) past orders in which the Department analyzed competitive effects "at multiple levels: city pairs, countries, and regions."[15]  In 2016, the Department performed a comparable analysis for Petitioners' venture.  App.72-77.  The Order, however, addressed

---

[15] Order 2009-7-10, at 16, https://downloads.regulations.gov/DOT-OST-2008-0234-0253/attachment_1.pdf; *see* Order 2022-6-15, at 8-17, https://downloads.regulations.gov/DOT-OST-2020-0105-0054/attachment_1.pdf; Order 2020-11-9, at 6-8, https://downloads.regulations.gov/DOT-OST-2008-0252-3450/attachment_1.pdf; Order 2020-10-13, at 10-18, https://downloads.regulations.gov/DOT-OST-2018-0154-0049/attachment_1.pdf; Order 2019-05-23, at 6-11, https://downloads.regulations.gov/DOT-OST-2018-0030-0138/attachment_1.pdf; Order 2016-11-16, at 10-17, https://downloads.regulations.gov/DOT-OST-2015-0129-0031/attachment_1.pdf; Order 2013-8-21, at 5-13, https://downloads.regulations.gov/DOT-OST-2013-0068-0029/attachment_1.pdf; Order 2010-10-4, at 5-12, https://downloads.regulations.gov/DOT-OST-2010-0059-0180/attachment_1.pdf; Order 2010-2-8, at 13-24, https://downloads.regulations.gov/DOT-OST-2008-0252-3390/attachment_1.pdf; Order 2005-10-8, at 7-12; Order 2002-7-39, at 7-9; Order 2001-5-1, at 7-9, https://downloads.regulations.gov/DOT-OST-2000-8577-0013/attachment_1.pdf; Order 2000-10-13, at 9-12, https://downloads.regulations.gov/DOT-OST-2000-7248-0008/attachment_1.pdf; Order 99-4-17, at 15-20, https://downloads.regulations.gov/DOT-OST-1997-3285-0047/attachment_1.pdf; Order 93-1-11, at 9-10; Order 92-11-27, at 14-15, https://downloads.regulations.gov/DOT-OST-1995-579-0024/attachment_1.pdf.

a question that none of the cited orders had addressed: whether to withdraw previously granted approval and immunity because concerns raised about a specific airport in an earlier competitive-effects analysis had materialized. Supp.App.71-73.  In answering that question, the Order reasonably focused on the airport of primary competitive concern.  *Id.*

Second, the Department also "extended [its] competition analysis beyond MEX" (Br. 47), as Petitioners ultimately admit.  The Department determined that Petitioners had "not add[ed] new capacity at a rate higher than competitors, *either* in the broader U.S.-Mexico market or in the U.S.-MEX market[,] in most years subsequent to receiving [antitrust immunity]." App.424 (emphasis added); *see* Supp.App.85-86 (affirming this finding).  But "a pro-competitive joint venture," the Order explained, "should have shown substantial growth by both joint venture partners in all relevant U.S.-Mexico markets."  Supp.App.86.  Moreover, the Government of Mexico's anticompetitive acts at MEX were not "isolated," but "part of a pattern of government interventions at odds with a liberalized Open Skies framework." Supp.App.82.  That pattern could spread beyond MEX to other "congested airport[s]," such as Cancun.  *Id.*  This analysis demonstrates, contrary to Petitioners' contention (Br. 14-15, 34), that the Department determined the joint venture risked harming competition in the U.S.-Mexico market writ large, not just U.S.-MEX markets.

Petitioners put particular—but misplaced—emphasis (Br. 2-3, 8-10, 26, 30, 32-33, 35-38) on DOT Order 2010-7-8, in which the Department evaluated a venture that encompassed three airlines' transatlantic services by "weigh[ing] both pro- and anti-competitive effects across a number of different markets." *Id.* at 2, 9. Petitioners, however, omit key pieces of the order's reasoning. The Department stated that the venture would "result in a reduction in the number of competitors in nonstop overlap markets" but that "the anti-competitive effects in the nonstop overlap markets would be limited." *Id.* at 9. Specifically, the air transport agreement between the United States and the European Union, which embodied Open Skies principles, had enabled "at least three major airlines [to] beg[i]n serving the United States from Heathrow[.]" *Id.* at 10. Moreover, the Department conditioned its approval upon slot transfers "designed to address 'lost competition.'" *Id.* at 14-15 (quoting Order 2010-2-8, at 26).

The Department's approach here is fully consistent with its approach in 2010. In each instance, the Department identified competitive concerns arising from slot constraints and imposed remedies to address them. *See* Order 2010-7-8, at 14-15; App.100-02, 120. In each, the Department considered "the broader competitive environment." Order 2010-7-8, at 9; *see* Supp.App.71-73; App.232, 409-18. Whereas the 2010 order found that this environment was consistent with Open Skies principles, conducive to entry, and amenable to slot remedies (Order 2010-7-8, at 10, 14-15), the

35

Department in this case determined that competitive conditions in Mexico contravened Open Skies principles, prevented entry at MEX, and were irremediable through slot divestitures.  Supp.App.71-73, 81-82; *see* App.232, 408-18, 421-22.  The Department applied the same analytical framework in the 2010 order and this case, reaching different outcomes only because the facts materially differed.

The same is true of two other orders referenced by Petitioners.  *See* Br. 33.  In one, the Department concluded that, with conditions, a joint venture in the U.S.-Chile market was "unlikely . . . to substantially reduce competition in *any* relevant market."[16]  In the other, the Department approved a joint venture in the U.S.-Netherlands market that risked raising fares in two city-pairs but "should be disciplined by the connecting services offered by the [venturers'] competitors."  Order 92-11-27, at 16; *see* Order 93-1-11, at 10-11. In this case, on the other hand, the Department concluded that the joint venture would harm competition regardless of the conditions imposed and that there was not "sufficient competition to discipline" Petitioners. Supp.App.73-75, 82, 90; *see* App.421-22.

*Administrative Procedure Act.*  Petitioners argue that the Order's focus on MEX was arbitrary and capricious because the Department never

---

[16] Order 99-4-17, at 13 (emphasis added); *see* Order 99-9-9, at 7, 9, 16, 21, https://downloads.regulations.gov/DOT-OST-1997-3285-0059/attachment_1.pdf.

performed a "market-definition exercise as to MEX." Br. 37. Under the arbitrary-and-capricious standard, however, a court asks "only whether the agency decision was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 180 (2025). And it was in this case.

Petitioners state that "city pairs or networks, not individual airports," are the appropriate focus of competitive analysis. Br. 37-38. The Order recognized this principle. As Petitioners acknowledge (Br. 38), the Department stated that MEX was "not one market of concern, but many." Supp.App.82. The Department thus focused on "market distortions at MEX" because those distortions "raise[d] concerns in multiple city-pair markets served from MEX, including JFK-MEX . . . , LAX-MEX . . . , and other markets." *Id.*

Petitioners also claim that, to define relevant markets, the Order should have "show[n] that there [was] no 'interchangeability' or 'cross-elasticity' of demand between the alleged market and other potential areas of competition." Br. 37 (quoting *Brown Shoe*, 370 U.S. at 325); *see* also Br. 35-36. But, as explained by the case on which Petitioners rely, market definition is "a pragmatic, factual" exercise, "not a formal, legalistic one." *Brown Shoe*, 370 U.S. at 336. And a pragmatic, common-sense approach makes clear that city-pairs are typically not interchangeable: Passengers who want to fly from one point to another do not view a flight leaving from (or arriving at) a different

37

place to be a "viable alternative." *JetBlue*, 712 F. Supp. 3d at 149 (citation omitted); *see Spirit Airlines*, 431 F.3d at 933 ("It is at the route level, after all, that airlines actually compete with one another." (citation omitted)).  The Order did not need to perform an econometric analysis to conclude that "MEX-JFK, MEX-LAX, MEX-[Chicago O'Hare], MEX-[Seattle], and MEX-[Boston]" routes were each "relevant markets."   Supp.App.74; *see* Supp.App.82.  In any event, Petitioners concede that the 2016 final order conducted a "thorough analysis" that "adhered to [the Department's] statutory mandate" (Br. 2), and that analysis fully justified terminating the joint venture if certain conditions materialized, App.100, 102, 115-18—as they did, Supp.App.71-73.[17]

### 2. The Department thoroughly justified its finding that the joint venture was substantially reducing competition at MEX and harming the public interest.

Petitioners also challenge the Order's findings about the joint venture's effect on competition at MEX (Br. 39-49), but those findings are supported by substantial evidence.  The Order explained that Petitioners controlled "almost 60 percent" of MEX slots, used their dominance to exclude competitors, and

---

[17] Petitioners claim that the Order identified city-pair markets that had not been referenced in previous orders.  Br. 35-36.  But the Department's show-cause orders made clear that its concerns were about competitive conditions at MEX—and thus conditions that could affect all routes starting or ending at the airport.  App.232, 409-15.  The Order did not introduce new facts "[b]elated[ly]" (Br. 35 (italicization and boldface omitted)) by identifying specific city-pairs that "illustrat[ed]" the Department's earlier-expressed concerns.  Supp.App.74.

significantly increased their share of cargo at the airport after the Government of Mexico barred their all-cargo rivals from MEX.  Supp.App.73-74, 82.  In the meantime, the venture was not generating substantial consumer benefits for passengers flying through MEX:  Petitioners generally grew more slowly than their competitors and "admit[ted] that overall connections beyond MEX [were] down."  Supp.App.85-86.[18]

a.  Petitioners dispute the Order's findings on cargo (Br. 39-41)—but unpersuasively.  The Department reasonably concluded that the Government of Mexico's ban on all-cargo operators at MEX gave Petitioners a competitive advantage at the airport.  Supp.App.72, 74, 82, 84-85.  The Department explained that Petitioners' cargo share on U.S.-MEX routes "ha[d] dramatically increased."  Supp.App.82.  And, because Aeroméxico was MEX's "largest slot holder" and "serve[d] the most destinations throughout the country," "[n]o

---

[18] Although Petitioners do not dispute their dominant 60% slot share at MEX, they cite an order (Br. 34) in which the Department tentatively approved a joint venture that gave one carrier a 60% market share in the U.S.-Ireland market.  Order 2020-11-9, at 6.  But the Department also found that the market included three other competitors, including a low-cost carrier, and that there were "relatively low barriers to entry that will be further reduced." *Id.* at 6-7.  Here, U.S.-MEX markets had seen no entry outside of the slot-divestiture process since 2016, and barriers to entry were insurmountable due to the Government of Mexico's actions that worsened competitive conditions and exacerbated anticompetitive effects caused by the immunized joint venture.  Supp.App.71-75; App. 422.

other cargo carrier" could compete with its network. *Id.*[19] To access that network, rival carriers without operations at MEX would need to use "Felipe Angeles International Airport (NLU) or other less preferred airports." Supp.App.84. Then those carriers would have to "spend up to two hours trucking cargo on two-lane roads from NLU to MEX" before transferring the cargo to Aeroméxico for shipment elsewhere. *Id.* The "three-hour transfer process" would put competitors at a particular disadvantage with respect to "lucrative time-sensitive cargo" shipments. *Id.*

Contrary to Petitioners' claims (Br. 40-41), the Department did not need to perform a more detailed analysis of "the time-sensitive cargo market" to justify these conclusions. The level of analysis necessary to evaluate anticompetitive effects "can vary depending on the circumstances." *NCAA v. Alston*, 594 U.S. 69, 97 (2021). All that is required is "an enquiry meet for the case," which does not always "call for the fullest market analysis." *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 779, 781 (1999). And agencies need not perform a "quantitative economic analysis unless the statute explicitly directs [them] to do so." *Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016). The Department's

---

[19] Petitioners mistakenly assert that, "[b]ecause Aeroméxico does not possess an unfair competitive advantage in MEX passenger flights, it does not possess an unfair advantage in transporting belly cargo on those flights." Br. 41-42 n.7. But the joint venture's market power and MEX's slot-allocation rules have accorded the airline a competitive advantage for MEX passenger flights. *See* Supp.App.73-74.

conclusions about time-sensitive cargo found thorough support in the Order's undisputed findings about Petitioners' cargo share, Aeroméxico's network, and the logistics of transferring cargo from NLU to MEX. Supp.App.82, 84-85.

The Department's later order—made when this case was already underway and proposing to terminate cargo operations on all Mexican airlines' U.S.-MEX flights[20]—does not undermine this reasoning. *Contra* Br. 41. The termination is not final, and the proposal contemplates giving Aeroméxico more than 100 days to comply upon finalization. Order 2025-10-14, at 2, 4. The Department's statutory mandate is to "end approval of[]" joint ventures "that substantially reduce[] or eliminate[] competition," 49 U.S.C. § 41309(b)(1), and permitting consumers to suffer anticompetitive harm until other administrative actions play out would violate that mandate. *See* Supp.App.76 ("Any actual or potential harm is affecting stakeholders, including consumers, *now*.").[21]

---

[20] Order 2025-10-14, https://downloads.regulations.gov/DOT-OST-2025-1920-0001/attachment_1.pdf.

[21] *Office of Communication of United Church of Christ v. FCC*, 707 F.2d 1413 (D.C. Cir. 1983), says nothing to the contrary. *See* Br. 41. It involved "concurrent rulemaking proceedings," 707 F.2d at 1439, while the proceeding at issue in this case was over by the time the Department proposed terminating Aeroméxico's U.S.-MEX cargo operations. In any event, unlike the two orders here, the dual proceedings in *Office of Communication* resulted in inconsistent outcomes. *Id.* at 1441-42.

Even if finalized, the cargo-termination proposal is not intended to address the harm that the joint venture is inflicting on passengers and thus would not undermine the Department's conclusion that the joint venture is anticompetitive.  *See* App.419.  The proposal would not apply to Delta, and, as it makes clear, the termination is "not in the short-term interest of shippers and consumers" but is a regrettably necessary step aimed at a separate diplomatic goal: "persuad[ing] the Government of Mexico to rescind its prohibition against U.S. all-cargo carriers operating at MEX[.]"  Order 2025-10-14, at 3-4.

Finally, Petitioners err in claiming that the Order's discussion of time-sensitive cargo was an "eleventh-hour rationale" (Br. 40).  The supplemental show-cause order put Petitioners on notice of this issue, stating that "Mexico's actions harm[ed] . . . consumers of air travel and products relying on time-sensitive air cargo shipments traded between the two countries."  App.392.

b.  Petitioners also unpersuasively challenge the Order's findings on connectivity.  The Order found—and this point is undisputed—that "overall connections beyond MEX are down[.]"  Supp.App.86.  But Petitioners do argue that the Department should have considered only connecting flights to other U.S. or Mexican destinations (i.e., flights within the venture's scope).  Br. 42-43.  This argument, however, misconceives the nature and importance of competition.  Immunized joint ventures that are procompetitive typically reduce "markups on itineraries involving travel on both carriers," and

42

decreased prices bring increased passengers.  Supp.App.86.  "[I]n early phases of the implementation of a joint venture, traffic volumes on connecting routes increase significantly[,] and joint venture partners increase capacity to/from their hubs to carry increasing numbers of connecting passengers across their networks."  *Id.*  The Order properly recognized that Petitioners, however, were not acting like a procompetitive joint venture because they were carrying a significantly lower proportion of connecting passengers on U.S.-MEX flights (*id.*)—a point that stands regardless of whether those passengers' ultimate destinations were in Mexico or elsewhere.

**3. The Order's reasoning is consistent and record-based.**

Petitioners additionally challenge the Order's discussion of barriers to entry, competitive conditions at airports beyond MEX, and Petitioners' growth rates, but Petitioners' criticisms are unconvincing.

a.  *Barriers to entry.*  The Order explained that "[e]ntry at MEX is severely restricted."  Supp.App.72.  The Government of Mexico "confirmed to the Department in direct correspondence . . . that additional entry is closed," App.409; *see* Supp.App.23, and issued a resolution in 2023 substantially reducing MEX operations, Supp.App.72 n.24.  MEX also confiscated "approximately two slot pairs each" from competing carriers, including American and United.  App.410; *see* Supp.App.74.  And, "[o]ther than the attempts made through the slot divestiture process, no new carrier ha[d] entered the U.S.-MEX market" since 2016.  App.422; *see* Supp.App.82-83.

43

These findings refute Petitioners' claim that other carriers could "compete effectively against Delta and Aeroméxico at MEX" (Br. 44).

Petitioners resist these findings but never maintain that they are unsupported by substantial evidence—the standard they would have to meet to succeed on a factual challenge. *See Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019). For example, Petitioners note that some recipients of slots divested by Petitioners in 2017 at MEX later gave up those slots (Br. 44), but that development only strengthens the Department's case. The divestitures' purpose was to "mitigate . . . the identified transparency, regulatory, and market-power concerns with the slot regime at MEX." App.421. But "the failure of the majority of divestiture recipients—including all U.S. carrier recipients—to sustain services in the market" indicated that the divestitures had not served this purpose. App.422. Petitioners obviously would have preferred an agency finding that the divestitures' failure reflected competitors' lack of interest in MEX. *See* Br. 44. But that preference is irrelevant as long as the Department's findings are supported by "more than a mere scintilla," *Biestek*, 587 U.S. at 103 (citation omitted)—as they are. Supp.App.71-74, 82-83; *see* App.422; *see also Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior*, 835 F.3d 1377, 1384 (11th Cir. 2016) ("The ability to find adequate support in the record for a contrary conclusion is insufficient to overturn an agency's factual conclusion."). Similarly, the fact that no competing airlines submitted comments expressing a desire "to launch flights

at MEX" (Br. 44) is consistent with the finding that MEX's policies limited these airlines' ability to enter the market.

Petitioners point out that one divestiture recipient, Viva, increased its share of U.S.-MEX flights (Br. 44), but the Order accounted for "Viva's modest expansion."  Supp.App.83.  Despite that development, the Department stated, "the distortions caused by the [Government of Mexico] have limited growth and network adjustments by many carriers such that an ongoing grant of [antitrust immunity] is no longer justified."  *Id.*  This conclusion was reasonable given that, other than parties such as Viva that had received divestiture slots, no new carriers had entered MEX since 2016.  Supp.App.82-83; *see* App.422.

Nor does MEX's confiscation of Aeroméxico and Delta slots (Br. 45) undermine the Order's conclusions.  Despite these confiscations, "Aeroméxico initiated new flying from MEX to Boston (BOS), Raleigh Durham (RDU), Tampa (TPA), and Washington Dulles (IAD) airports in 2024, and to Philadelphia (PHL) . . . in 2025."  App.410 n.71; *see* Supp.App.74.  Given their market power, Petitioners were able to absorb confiscations and "achieve better outcomes" than were possible for other carriers whose slots were taken.  Supp.App.74.

The Department's subsequent order disapproving certain flights by Aeroméxico and other Mexican carriers[22] likewise does not undermine the Order. *See* Br. 45. Disapproving Mexican carriers' flights does not remove Delta flights and does not enhance entry for other carriers at MEX. App.419; *see* Supp.App.83-84. Rather, it rests on a different regulatory basis than the Order and serves a distinct purpose: to "respon[d] to the longstanding and widespread noncompliance by the [Government of Mexico] with the [U.S.-Mexico Air Transport] Agreement." Order 2025-10-13, at 8; *see id.* at 1 (order issued "pursuant to 14 CFR Part 213"). If anything, the disapprovals weaken the joint venture's case for approval and antitrust immunity given that Aeroméxico can no longer offer as many flights to meet customers' needs. App.419; *see* Supp.App.83-84.

b. *Competitive conditions beyond MEX.* The Order identified "a realistic possibility" that the Government of Mexico could replicate its anticompetitive policies at MEX "at other congested gateways such as Cancun or Monterrey." Supp.App.74. The Order appropriately considered this possibility given Congress's directive that the Department account for "potential competition," not just actual competition. 49 U.S.C. § 40101(a)(6), (a)(12). And this "realistic possibility" rested on the Government of Mexico's anticompetitive acts at MEX, coupled with "Mexico's lack of a coherent and transparent slot

---

[22] Order 2025-10-13, https://downloads.regulations.gov/DOT-OST-2025-0436-0022/attachment_1.pdf.

allocation regime that is applied consistently at the national level." App.409-10; *see* Supp.App.74. Because the agency "made a reasonable predictive judgment based on the evidence it had," *Prometheus Radio*, 592 U.S. at 427, it did not act arbitrarily or capriciously. *See* Br. 45-46.

Petitioners claim that recent actions by the Government of Mexico undermine the Order's conclusion (Br. 46-47), but the Department appropriately accounted for those actions. It explained that, while MEX had "notified U.S. carriers that it [would] return their confiscated slots," the returns would take "several traffic seasons." Supp.App.93. In addition, "critical details" about the return process, including "what the capacity picture at MEX [would] look like once U.S. carriers' historical slot allocations [were] restored[,] remain[ed] unanswered." *Id.* The Order also noted that, while Mexico had revised its "national airports law," Mexican officials would need "further information . . . to interpret and implement the new rules." *Id.* Given the reforms' uncertain trajectory, they did not allay the Department's well-supported concerns about possible anticompetitive acts beyond MEX. Supp.App.93-94.

c. *Petitioners' lack of growth.* Petitioners erroneously claim that they cannot have grown more slowly than their competitors, as the Order found, if they also used their market power to overcome slot restrictions at MEX, as the Order also found. Br. 44-45, 47-48; *see* Supp.App.72, 74, 85-86. But Petitioners overlook the specifics of the Department's growth analysis.

47

The Department found that, from 2016 to 2023, Petitioners' growth at MEX lagged that of their competitors.  App.425; *see* Supp.App.85-86. Petitioners' substandard growth contradicted the Department's experience with procompetitive joint ventures, in which the partners typically "increase capacity to/from their hubs" during "early phases of the [venture's] implementation."  Supp.App.86.  After the Government of Mexico initiated its latest round of anticompetitive actions at MEX in 2022, however, Petitioners progressively narrowed the growth gap.  App.425; *see* Supp.App.66.  By 2024, they had overtaken their rivals, in part due to Aeroméxico's "new service from Mexico City to several U.S. cities[,] such as Raleigh/Durham, Tampa, and Washington-Dulles."  App.424.

**U.S.-Mexico City Percentage Seat Change Compared to 2015**[23]

| Year | Petitioners | All Other Carriers |
|------|-------------|--------------------|
| 2021 | -12% | 11% |
| 2022 | -1% | 12% |
| 2023 | 3% | 4% |
| 2024 | 15% | 13% |

The Department's findings about Petitioners' low growth at MEX from 2016-2023 are fully consistent with its finding that, by 2024-2025, Petitioners were

---

[23] App.425.

"announc[ing] new routes" even as MEX's slot-administration system "forced [other carriers] to cut capacity."  App.410; *see* Supp.App.72, 74, 85-86.

The Department also concluded that Petitioners grew more slowly than their competitors in the U.S.-Mexico market as a whole from 2016 through 2024.  Supp.App.85-86; App.425.  But it is perfectly consistent to find (1) substandard growth in a broad market and (2) the ability to leverage market power at a specific airport within that market.  *See* Supp.App.72, 74, 85-86.[24]  Indeed, relatively low growth is exactly what one would expect of an anticompetitive joint venture—particularly one that operates with a comparative advantage conferred by a closed market and a grant of antitrust immunity.  *See* Supp.App.85-86.

## B. The Order Treated Petitioners Fairly.

From the start of this joint venture, the Department has correctly recognized its potentially serious and distinctive risks to competition at MEX. Accordingly, in its initial approval of the joint venture in 2016, the Department imposed important conditions—in addition to extensive slot divestitures, an unprecedented five-year limit to allow a timely reassessment of the state of competition.  App.100-02, 119, 131.  Those concerns and cautions were exacerbated rather than ameliorated, as the Government of

---

[24] Petitioners assert that the Department's growth analysis did not account for "Aeroméxico's 2020 bankruptcy" (Br. 48), but Petitioners exhibited substandard growth both long before and long after 2020.  App.425.

Mexico continued to use opaque slot administration, confiscated large numbers of slots, and banished all-cargo carriers entirely—actions that caused the joint venture to reduce competition substantially. Supp.App.71-75. In response to this substantial reduction in competition, the Department in the Order, as required by 49 U.S.C. § 41309(b)(1), withdrew approval of the joint venture and terminated its antitrust immunity. Supp.App.95. Petitioners claim that the agency's treatment of their joint venture was unfairly different from its treatment of other joint ventures (Br. 49-53), but while an agency should not treat similar situations differently, it certainly may treat different situations differently. As the Order explained, that was the case here. Supp.App.83; *see* App.418.

Thus, Petitioners' focus on two joint ventures operating at Tokyo-Haneda airport (Br. 50-51) is inapt. The Department approved and immunized these ventures in 2010 after finding that, "overall, each alliance [would] be procompetitive and [was] likely to generate substantial public benefits to the traveling and shipping public."[25] Both before and after the approval, the United States productively collaborated with Japan to expand slot access at Haneda. As United Airlines documented in a filing referenced by the Order (Supp.App.83), the two nations entered into a memorandum of understanding in 2010 that opened up certain slot-pairs at Haneda, with

---

[25] Order 2010-11-10, at 1, https://downloads.regulations.gov/DOT-OST-2010-0059-0185/attachment_1.pdf.

additional slot-pairs added in 2016 and 2019.  Supp.App.54-55.  The United States and Japan are working to further liberalize access to Haneda, including during talks in 2024 and 2025 attended by Delta.  Supp.App.55.  Throughout these negotiations, "Japan has not reversed course[ or] withdrawn agreed slots, and no specific carrier from the U.S. or Japan has been treated unfairly or unequally at [Haneda]."  *Id.*; *see* Supp.App.47 (American Airlines making similar point); *see also* Supp.App.83 (referencing American's comment).  Whereas competitive conditions at Haneda have improved in ways that strengthen the Department's initial findings about competition and the public interest, competitive conditions at MEX have deteriorated in ways that undermine the corresponding findings here.  *See* Supp.App.71-75.

Haneda's treatment in the air transport agreement between the United States and Japan (Br. 50) does not undermine the Order.  While the Order stated that Open Skies principles are "essential competiti[on]-enabling elements," it also explained that withdrawing approval and antitrust immunity was based on "the statutory factors specified in 49 U.S.C. § 41309: that under present circumstances the joint venture agreements are adverse to the public interest and substantially reduce[] competition."  Supp.App.79.  The Department evaluates each joint venture "on a case-by-case basis, in light of the specific facts and circumstances affecting that case," Order 2005-10-8, and, based on the evidence before the Department, the statutory factors do

not require withdrawing approval for joint ventures operating at Haneda.  *See* Supp.App.83.

Petitioners' comparison of their joint venture to one at London-Heathrow (Br. 51-52) is even further afield.  When approving that venture, the Department acknowledged Heathrow's slot constraints and required the venturers to relinquish slots at the airport.  Order 2010-7-8, at 2, 12.  This remedy, along with other conditions, "ensure[d] adequate competition and enhance[d] the public benefits of the alliance[.]"  *Id.* at 2; *see id.* at 8.  When approving the venture's subsequent expansion, the Department again found that the alliance would "not substantially reduce competition" and was "not adverse to the public interest," while also reaffirming the slot remedy's "ongoing importance."  Order 2020-11-9, at 9, 13.  Petitioners are in a materially different position:  As the failed divestitures confirm, even stringent conditions cannot render their venture procompetitive or compatible with the public interest.  Supp.App.73-76, 83-85; *see* App.421-22.

## C. The Order Fully Considered But Correctly Rejected Alternatives to Withdrawal as Insufficient To Protect Competition or Serve the Public Interest.

a.  The Department explained that Petitioners' proposal to "[r]emov[e] the cargo cooperation from the joint venture would only target one element of the competitive harm" and fail to "address passenger harm."  App.419; *see* Supp.App.83-84 (referencing supplemental show-cause order's discussion of carve-out alternative).  Moreover, even as to cargo, this alternative would not

52

solve "the broader market access problem at MEX":  Cargo carriers now forced to operate at NLU "or other less preferred airports" would still need to rely on Aeroméxico to get their cargo to many destinations in Mexico.  Supp.App.84; *see supra* at 40.

Without addressing this alternative's inability to remedy passenger harm, Petitioners claim that the carve-out's effect on competing cargo carriers is immaterial because "the statutory inquiry is whether 'the *agreement*'—not governmental conduct—'substantially reduces or eliminates competition'" (Br. 54 (quoting 49 U.S.C. § 41309(b)(1))).  By the time the Department considered the proposed carve-out, however, it had already concluded that the joint venture was harming competition and disserving the public.  Supp.App.73-76.  At that point, the relevant question became whether any alternatives to withdrawal would restore competition and promote the public interest.  Supp.App.83-85.  The alternative's inefficacy in enhancing rival cargo carriers' opportunities is plainly pertinent to that inquiry.  *Id.*; *cf. FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 72 (D.D.C. 2015) (where merger likely would harm competition, remedies "require[d] replacing the *competitive intensity* lost as a result of the merger rather than focusing narrowly on returning to premerger [concentration] levels" (quoting Antitrust Div., U.S. Dep't of Justice, *Antitrust Division Policy Guide to Merger Remedies* 5 (Oct. 2004))).

b.  Petitioners fault the Department for ignoring prohibition of Aeroméxico carriage of belly cargo on U.S.-MEX routes as a possible remedy.

Br. 55-56.  This argument is puzzling, as no party proposed this remedy, and Aeroméxico "strongly opposes" it, Br. 56.

Furthermore, the practical effect of such a ban would be much the same as a carve-out of U.S.-MEX cargo operations, which the Department fully discussed and rejected.  *See* Supp.App.84-85; App.419.  The fact that, subsequent to the Order, the Department in a separate order proposed a ban on Aeroméxico carriage of belly cargo on U.S.-MEX flights is no reason for concern.  The Order, relying on 49 U.S.C. § 41309(b)(1), was designed to improve competition by ending an anticompetitive joint venture and "reserve[d] the [Department's] right to take, or not take, other actions to address its concerns in the bilateral U.S.-Mexico market."  Supp.App.63-64, 73-75, 84.  The subsequent proposed ban on Aeroméxico belly cargo sought the rather different goal of "persuad[ing] the Government of Mexico" to act "consistent[ly] with its obligations under the [U.S.-Mexico Air Transport] Agreement."  Order 2025-10-14, at 4.  Encouraging compliance with Open Skies principles is a worthy and important activity, and in the long, and even medium, run, compliance will benefit competition.  *See id.* at 3-4.  It will not, however, necessarily restore competition in the short run, *see id.* at 3—as the Order will, *see* Supp.App.84; App.419.

c.  The Department comprehensively explained why applying 14 C.F.R. Part 213, which permits the Department to request and disapprove certain flight schedules, is not an adequate alternative to withdrawing approval and

antitrust immunity.  Supp.App.83-84; App. 419; *see* 14 C.F.R. § 213.3.
Disapproving flight schedules, the Department explained, would not redress
"competitive concerns" because it would "further reduc[e] capacity in a
market" where Petitioners have "unique flexibility" to respond to such
reductions.  App.419; *see* Supp.App.83-84 (referencing supplemental show-
cause order's discussion of Part 213).  Moreover, because the Department had
not yet disapproved any schedules when the Order was issued, the
Department could not allow "present market conditions," Supp.App.84—and
the concomitant "consumer harm," App.419—to fester pending those
schedules' review.  When the Department subsequently disapproved certain
schedules, it acknowledged the "competitive imbalance" at MEX but, contrary
to Petitioners' suggestion (Br. 57), did not find that the disapprovals remedied
the joint venture's harm to competition.  Order 2025-10-13, at 3.  Rather, the
disapprovals served a different purpose: responding to Mexico's
"longstanding and widespread noncompliance . . . with the [U.S.-Mexico Air
Transport] Agreement[.]"  *Id.* at 8; *see supra* at 46.

    d.  Contrary to Petitioners' assertions (Br. 57-59), the Department
persuasively demonstrated why further delay was not an acceptable option.
App.418; *see* Supp.App.83-84 (referencing supplemental show-cause order's
consideration of further delay).  The Department had already "waited multiple
years and deferred by 18 months specific action from the January 2024 show
cause order with the expectation that extensive and high-level consultations

under the [U.S.-Mexico Air Transport] Agreement would resolve the underlying issue of Mexico's noncompliance with the Agreement."  App.418.[26] But "those consultations yielded nothing in the way of resolving the concerns," and continuing to wait "was no longer viable as it [was] causing significant confusion, promoting an unlevel playing field, and harming consumers[.]"  *Id.*  Nor were there benefits to waiting:  "[T]he competitive issues are documented and longstanding, and a new and even more elongated process will do little if anything to shed further light on the competitive environment."  App.419.

The Department also considered recent promised Mexican reforms but determined that they would require significant time and effort for successful implementation.  Supp.App.93-94.  Furthermore, the Department did not have sufficient evidence to conclude that the reforms, once effected, would address its concerns about the joint venture.  *Id.*; *see supra* at 47.  Those well-supported and well-explained determinations were not arbitrary and capricious.  *Cf. Moog Indus. v. FTC*, 355 U.S. 411, 413 (1958) (per curiam) (declining to overturn agency's "apprais[al] [of] the adverse effect on competition that might result from postponing a particular order prohibiting continued violations of the law").

---

[26] Petitioners' repeated complaints about the 18-month delay (Br. 17, 58-59) are thus misplaced.  Those eighteen months "provided every opportunity" for the competitive situation to improve and "for [Petitioners] to prepare for the eventuality that the situation would not change."  App.408.

e. It is difficult to understand Petitioners' argument that the Department should have considered all four alternatives "in combination" (Br. 58 (emphasis omitted)) when they describe one of the four alternatives as unworthy of adoption (Br. 56). That oddity aside, the alternatives, even considered collectively, are aimed neither at the problems afflicting passengers—indeed, they threaten to worsen them (App.419)—nor at fully resolving the problems afflicting cargo. *See supra* at 52-56.

Finally, as the Department explained, Congress accorded it "flexibility to consider reasonably available alternatives that are materially less anticompetitive" than immunized joint ventures. App.420; *see* 49 U.S.C. § 41309(b)(1)(B). Among those reasonably available alternatives are "non-immunized forms of cooperation between Delta and Aeromexico, such as loyalty program coordination and code sharing." Supp.App.68. "[W]ithout immunity, [Petitioners] will still be able to provide consumer benefits" through these programs and "other joint marketing activities[—] activities they have engaged in for more than 30 years[.]" Supp.App.91. And Petitioners will likely take advantage of these opportunities given their long history of cooperation, "Delta's 20 percent ownership stake in Aeromexico," and their "shared commercial interests." *Id.*

## CONCLUSION

The Court should deny the petition for review.

January 28, 2026

Respectfully submitted,

*/s/ Peter M. Bozzo*

GREGORY ZERZAN
   *General Counsel*
CHARLES E. ENLOE
   *Assistant General Counsel*
ERIN D. HENDRIXSON
FARIS MOHAMMED
   *Senior Trial Attorneys*

United States Department of
   Transportation
1200 New Jersey Ave., S.E.
Washington, D.C.  20590

ABIGAIL A. SLATER
   *Assistant Attorney General*
MARK H. HAMER
DINA KALLAY
   *Deputy Assistant Attorneys*
   *General*
DAVID B. LAWRENCE
   *Policy Director*
DANIEL E. HAAR
ROBERT B. NICHOLSON
PETER M. BOZZO
   *Attorneys*

United States Department of
   Justice
Antitrust Division
950 Pennsylvania Ave., NW
Washington, D.C.  20530
(202) 803-1196
peter.bozzo@usdoj.gov

*Counsel for Respondent*
   *U.S. Department of*
   *Transportation*

## CERTIFICATE OF COMPLIANCE

I hereby certify, this 28th day of January, 2026, that the foregoing brief complies with the applicable type-face, type-style, and type-volume limitations. This brief was prepared using a proportionally spaced type (New Century Schoolbook, 14-point font) and consists of 12,462 words. This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare the brief.

*/s/ Peter M. Bozzo*
_____

Peter M. Bozzo

*Attorney for the U.S. Department of Transportation*

## CERTIFICATE OF SERVICE

I hereby certify that, this 28th day of January, 2026, I caused a true and correct copy of the foregoing brief to be filed using the Court's CM/ECF system, which automatically sends notification to the parties and counsel of record.

*/s/ Peter M. Bozzo*
_____

Peter M. Bozzo

*Attorney for the U.S. Department of Transportation*