No. 25-13546

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

DELTA AIR LINES, INC., AND AEROVIAS DE MEXICO S.A. DE C.V.,
*Petitioners,*

*v.*

DEPARTMENT OF TRANSPORTATION,
*Respondent.*

On Petition for Review of an Order of the Department of Transportation
Docket DOT-OST-2015-0070

## RESPONDENT'S SUPPLEMENTAL APPENDIX

GREGORY ZERZAN
  *General Counsel*
CHARLES E. ENLOE
  *Assistant General Counsel*
ERIN D. HENDRIXSON
FARIS MOHAMMED
  *Senior Trial Attorneys*

United States Department of
  Transportation
1200 New Jersey Ave., S.E.
Washington, D.C.  20590

ABIGAIL A. SLATER
  *Assistant Attorney General*
MARK H. HAMER
DINA KALLAY
  *Deputy Assistant Attorneys General*
DAVID B. LAWRENCE
  *Policy Director*
DANIEL E. HAAR
ROBERT B. NICHOLSON
PETER M. BOZZO
  *Attorneys*

United States Department of Justice
Antitrust Division
950 Pennsylvania Ave., NW
Washington, D.C.  20530
(202) 803-1196
peter.bozzo@usdoj.gov

# INDEX OF APPENDIX

Notice of the Joint Applicants (Dec. 21, 2016)

   Dkt. No. DOT-OST-2015-0070-0100 ........................ Tab A (Supp.App.1)

Order 2020-12-18 (Dec. 17, 2020)

   Dkt. No. DOT-OST-2015-0070-0235 ........................ Tab B (Supp.App.6)

Letter from Lic. Alejandro Varela Arellano, Coordinador Jurídico de Transporte (Nov. 28, 2023)

   Dkt. No. DOT-OST-2015-0070-0334 ..................... Tab C (Supp.App.13)

Comments of the Department of Justice, Antitrust Division (Aug. 8, 2025)

   Dkt. No. DOT-OST-2015-0070-0342 ..................... Tab D (Supp.App.25)

Comments of American Airlines, Inc. (Aug. 11, 2025)

   Dkt. No. DOT-OST-2015-0070-0343 ..................... Tab E (Supp.App.42)

Answer of United Airlines, Inc. (Aug. 20, 2025)

   Dkt. No. DOT-OST-2015-0070-0346 ..................... Tab F (Supp.App.50)

Order 2025-9-8 (Sept. 15, 2025)

   Dkt. No. DOT-OST-2015-0070-0354 ..................... Tab G (Supp.App.62)

# Tab A

Notice of the Joint Applicants (Dec. 21, 2016)

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| **Joint Application of** | ) |
| | ) |
| **DELTA AIR LINES, INC. and** | ) |
| **AEROVIAS DE MEXICO, S.A. DE C.V.** | ) **Docket DOT-OST-2015-0070** |
| | ) |
| **Under 49 U.S.C. §§ 41308 and 41309** | ) |
| **for Approval of and Antitrust Immunity** | ) |
| **for Alliance Agreements** | ) |

## NOTICE OF THE JOINT APPLICANTS

Communications with respect to this document should be sent to:

David Lamoyi
General Counsel
Aldo Miranda
Associate General Counsel Corporate
AEROVIAS DE MEXICO, S.A. DE C.V.
Paseo de la Reforma 445 Col.
Cuauhtemoc, 06500, Mexico City, D.F.,
Mexico

Peter Carter
Executive Vice President
& Chief Legal Officer
DELTA AIR LINES, INC.
1030 Delta Boulevard
Atlanta, Georgia 30320

Robert E. Cohn
Patrick R. Rizzi
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Tel. 202-637-5600
Counsel for
AEROVIAS DE MEXICO, S.A. DE C.V.

Christine Wilson
Senior Vice President – Legal
Regulatory & International
Alexander Krulic
Associate General Counsel –
Regulatory & International
Christopher Walker
Director – Regulatory & International
DELTA AIR LINES, INC.
1212 New York Avenue, NW Suite 200
Washington, DC 20005
Tel. 202-216-0700

**December 21, 2016**

**BEFORE THE
DEPARTMENT OF TRANSPORTATION
WASHINGTON, D.C.**

| | |
|---|---|
| **Joint Application of**<br><br>**DELTA AIR LINES, INC. and<br>AEROVIAS DE MEXICO, S.A. DE C.V.**<br><br>**Under 49 U.S.C. §§ 41308 and 41309<br>for Approval of and Antitrust Immunity<br>for Alliance Agreements** | )<br>)<br>)<br>)<br>)  **Docket DOT-OST-2015-0070**<br>)<br>)<br>) |

## <u>NOTICE OF THE JOINT APPLICANTS</u>

Delta Air Lines, Inc. (Delta) and Aerovias de Mexico, S.A. de C.V. (Aeromexico) accept the Department's approval of antitrust immunity (ATI) for their proposed Joint Cooperation Agreement (JCA) with the conditions set forth in the DOT's Final Order, dated December 14, 2016, with the following comments.

The consumer benefits of ATI-enabled alliances are well-documented. They include better connectivity, more frequencies, and lower prices. We applaud the Department's role over the years in helping develop and promote ATI as an important aviation policy. We also thank the Department for its attention to this particular application and acknowledge that the Department's determination was conducted with the utmost good faith. We respectfully believe, however, that had the conditions in the Final Order been less onerous, the JCA would have generated even greater consumer benefits.

The Department's Final Order recognizes the substantial consumer benefits associated with the Delta-Aeromexico JCA, but imposes onerous conditions unsupported by precedent or economic theory. These include the number of divestitures, the nature

of the divestitures, and the five-year expiration date on the approval. The unprecedented conditions were imposed not to address any competitive concerns – because the Final Order acknowledges that robust competition exists – but instead because of a perceived interest of the public that DOT determined it needed to address. In markets with robust competition, the public interest is not served by the Government favoring a particular type of competitor, imposing a redistribution of assets, and deciding who should compete where. Earlier well-established ATI precedent from the Department has recognized that substantial consumer benefits are generated even when the JV partners hold a much larger combined market share than what would exist if this Delta-Aeromexico JCA were approved without conditions.

If ATI policy has changed such that ATI alliances will only be approved after a re-engineering of competition, the cost of such alliances will become so high that it will create serious questions about how ATI alliances are formed in the future and jeopardize the substantial consumer benefits associated with such alliances.

Respectfully submitted,

David Lamoyi
General Counsel

AEROVIAS DE MEXICO, S.A. DE C.V

Peter Carter
Executive Vice President &
Chief Legal Officer

DELTA AIR LINES, INC.

**Supp.App.4**

## CERTIFICATE OF SERVICE

A copy of the foregoing letter has been served this 21st day of December, 2016, upon the following persons via email:

| Air Carrier | Name | Email Address |
| --- | --- | --- |
| Alaska Airlines | David Heffernan | dheffernan@cozen.com |
| Alaska Airlines | Jeremy Ross | jeremy.ross@alaskaair.com |
| American | Howard Kass | howard.kass@aa.com |
| American | Robert Wirick | robert.wirick@aa.com |
| Frontier | Howard Diamond | Howard.Diamond@flyfrontier.com |
| Hawaiian | Parker Erkmann | perkmann@cooley.com |
| Interjet | Moffett Roller | mroller@rollerbauer.com |
| JetBlue | Robert Land | robert.land@jetblue.com |
| JetBlue | Evelyn Sahr | esahr@eckertseamans.com |
| JetBlue | Drew Derco | dderco@eckertseamans.com |
| Southwest | Bob Kneisley | bob.kneisley@wnco.com |
| Southwest | Leslie Abbott | leslie.abbott@wnco.com |
| Spirit Airlines | David Kirstein | dkirstein@yklaw.com |
| Spirit Airlines | Joanne Young | jyoung@yklaw.com |
| Sun Country | Mathew Friebe | mathew.friebe@suncountry.com |
| Sun Country | Larry Chestler | larry.chestler@suncountry.com |
| United | Dan Weiss | dan.weiss@united.com |
| United | Thomas Bolling | thomas.bolling@united.com |
| United | Marc Warren | mwarren@crowell.com |
| Virgin America | John Varley | john.varley@virginamerica.com |
| Volaris | Anita Mosner | anita.mosner@hklaw.com |
| Volaris | Jennifer Nowak | jennifer.nowak@hklaw.com |
|  | Susan McDermott | susan.mcdermott@dot.gov |
|  | Jenny Rosenberg | jenny.rosenberg@dot.gov |
|  | Todd Homan | todd.homan@dot.gov |
|  | Peter Irvine | peter.irvine@dot.gov |
|  | Brian Hedberg | brian.hedberg@dot.gov |
|  | Robert Finamore | robert.finamore@dot.gov |
|  | Brett Kruger | brett.kruger@dot.gov |

# Tab B

Order 2020-12-18 (Dec. 17, 2020)

Order 2020-12-18
Issued: December 17, 2020



**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 17th day of December, 2020

| |
|---|
| **Joint Application of**<br><br>**DELTA AIR LINES, INC.**<br>**AEROVIAS DE MEXICO, S.A. DE C.V.**<br><br>**Under 49 U.S.C. §§ 41308 and 41309 for Approval of and Antitrust Immunity for Alliance Agreements** |

**Docket DOT-OST-2015-0070**

## ORDER

### SUMMARY

By this Order, the U.S. Department of Transportation (the Department) grants in part the motion of Delta Air Lines, Inc. (Delta) and Aerovías de México, S.A. de C.V. (Aeromexico) (collectively, the "Joint Applicants") to amend Order 2016-12-13 to remove the expiration on their grant of antitrust immunity (ATI) and the requirement that they file a *de novo* application. The Department maintains the requirement that the Joint Applicants file a *de novo* application, but extends the due date for filing that application from no later than the fifth anniversary of the joint venture to March 31, 2022. Moreover, the Department extends the Joint Applicants' grant of ATI through the pendency of that application. By this Order, the Department also denies the application of United Airlines, Inc. (United) to acquire one Mexico City Benito Juarez International Airport (MEX) slot pair returned by JetBlue Airways Corporation (JetBlue) further to the divestitures made by Delta and Aeromexico as a condition of approval of the joint venture.

### BACKGROUND

On December 14, 2016, the Department issued Order 2016-12-13, approving and granting antitrust immunity (ATI) for a joint venture between Delta and Aeromexico, for operations primarily between points in the United States and Mexico. The Department included several conditions to that approval, including slot divestitures at MEX and New York's John F. Kennedy International Airport (JFK) and a five-year time limit on the grant of ATI. The Joint Applicants accepted the conditions on December 21, 2016, and the joint venture was implemented as planned.

On July 3, 2019, Delta and Aeromexico submitted a motion requesting the Department amend Order 2016-12-13 to remove the conditions that established the five-year expiration for the grant of ATI and required a *de novo* application. They subsequently replied to the comments of other interested parties.[1] The Joint Applicants contend that the five-year review condition creates a disincentive to long-term investment and is unreasonably burdensome. They argue that competition in the U.S.-Mexico market is robust, and that their market share has actually decreased since implementation of the approved joint venture, showing that any concerns about competition are being allayed. The Joint Applicants conclude that the joint venture has produced substantial public benefits, such as increased service on transborder routes. They argue that slot access at MEX has not proven to be a barrier to entry as many of the recipients of divested slots either did not need their slots, or have returned their slots and left the market due to exogenous circumstances. Further, they argue that the Mexican government has adopted legislative and regulatory changes improving the predictability and transparency of slot allocation, in alignment with international standards.

On November 22, 2019, United filed a separate request in the docket seeking to acquire one pair of divested slots that JetBlue had announced it would be relinquishing. United states that its recent attempts to get slots from the MEX slot coordinator have been unsuccessful. JetBlue filed a letter in the docket supporting United's application and VivaAerobus (a Mexican low-cost carrier) filed in opposition. On February 5, 2020, United filed a Notice informing the Department that it had secured its requested slot at MEX for the IATA summer 2020 season, but was not assured that it would be able to operate using the same slot times for the IATA winter 2020 season. Given its desire to operate the new flight on a year-round basis, United requested that the Department deem United eligible for the slot and grant its application to ensure continuity of its new flight.

**Responsive Pleadings:**

The Department received several pleadings opposing the Joint Applicants' motion which are summarized below.

Alaska Airlines, Inc. (Alaska) argues that although the Mexican government is in the process of implementing changes to the MEX slot system, it remains at best a work in progress and the competition problems that the Department identified at MEX have not been fixed.[2] Alaska argues that it would be premature to remove the condition, as the reforms are still in progress. Alaska further argues that the slot divestitures imposed have not resolved the anticompetitive

---

[1] Consolidated Reply and Motion for Leave to File, Aug. 15, 2019.
[2] Answer of Alaska Airlines, Inc. to Motion to Amend Order 2016-12-13, Aug. 2, 2019, DOT-OST-2015-0070-0219 at 4.

situation at MEX because new entrants have not been able to compete with the Joint Applicants, especially for connecting traffic.

Southwest Airlines Co. (Southwest) states that it was only three years ago that the Department determined that the Joint Applicants' joint venture would be in the public interest only with (among other conditions) a five-year limit.[3]  The Joint Applicants objected to the condition then, but eventually accepted it.  Southwest argues that the size, proximity, and importance of the Mexican market warrants special scrutiny being given to this joint venture and a thorough *de novo* review is appropriate given the Joint Applicants' continued dominance in the U.S.-MEX market.  Southwest also argues that what slot system reforms have been implemented at MEX were likely only due to the Department's five-year condition, and that removing it may reduce incentives for further reform.

JetBlue Airways Corp. (JetBlue) argues that the five-year condition was warranted when it was imposed and remains so today.[4]  JetBlue states that five years is an appropriate interval to review whether the public benefits promised in the Joint Applicants' application have been realized and whether the slot reforms at MEX have been implemented and are effective.  JetBlue notes that the transborder market remains fluid and, contrary to the Joint Applicants' claim, carriers' retrenchment from MEX demonstrates that the Department's divestiture did not go far enough to check the Joint Applicants' dominance at MEX.  Finally, JetBlue argues that the time limit condition has not had a "chilling effect" as the Joint Applicants have suggested it would, as they have continued to invest in the alliance.

The Delta Master Executive Council of the Air Line Pilots Association, International (Delta-MEC) argues that Delta pilots are being shut out of growth opportunities because Delta "outsources" these opportunities to cheaper Aeromexico pilots.[5]  The Delta-MEC argues that if the Department grants the Joint Applicants' motion, it should require the Joint Applicants to discuss the joint venture's impact on the balance of flying for Delta pilots and the growth of U.S. aviation jobs in their annual reports.

ABC Aerolineas S.A de C.V. (Interjet) filed an answer in which it argues that Aeromexico has engaged in anticompetitive practices.[6]  Interjet alleges that Aeromexico has made recruitment offers to large numbers of Interjet pilots and flight attendants.  Interjet argues that these offers have been part of an effort to disrupt Interjet's operations.

---

[3] Answer of Southwest Airlines Co. to Motion of Delta-Aeromexico to Amend Order 2016-12-13, Aug 2, 2019, DOT-OST-2015-0070-0220 at 2.
[4] Answer of JetBlue Airways Corporation, Aug. 2, 2019, DOT-OST-2015-0070-0218, at 2.
[5] Consolidated Surreply and Motion for Leave to File of the Delta Master Executive Council of the Air Line Pilots Association, International, Aug. 29, 2019, DOT-OST-2015-0070-0223.
[6] Answer and Motion for Leave to File of ABC Aerolineas S.A. de C.V. dba Interjet, Nov. 5, 2019, DOT-OST-2015-0070-0226.

**DISCUSSION**

The Department will grant the motion, in part.

With respect to the matter of whether to file a new application, we have decided that a *de novo* application, as required by the Final Order, remains necessary and appropriate. The Department does not have a sufficient basis to set aside the review process established in Order 2016-12-13. Importantly, the Joint Applicants will have the opportunity to present further evidence in the *de novo* application process, and that evidence will be considered on its merits.

The Department established the five year *de novo* review of the Delta/Aeromexico joint venture based upon two primary factors. First, both the Department and the Mexican competition authority, the *Comisión Federal de Competencia Económica* (COFECE), had found that the slot allocation regime at MEX was opaque and anticompetitive, and that Aeromexico, the largest slot holder, was the primary beneficiary.[7] Through anticompetitive rules and lax enforcement, Aeromexico had been able to underutilize its slot portfolio while simultaneously keeping slots out the hands of competitors.[8] Under these circumstances, the Department determined that the five-year period was long enough to evaluate the impact of any future changes and reforms in the MEX slot regime objectively, while providing some certainty to interested parties regarding the rules that would apply to the new alliance.

Second, the U.S.-Mexico market had recently been liberalized and the likely competitive effects of a new joint venture were difficult to predict.[9] It was also unclear how well ATI would be suited to a large, mostly short-haul, point-to-point market, rather than the transoceanic, connecting markets in which immunized alliances traditionally exist. As such, the Department believed that it would be warranted to reexamine the grant of ATI after a suitable observation period. The Department balanced the competing interests and set the review period at five years with a *de novo* application process that enabled full consideration of new evidence.

The Joint Applicants argue that competitive conditions have changed so fundamentally that the basis for the five-year period and *de novo* application no longer exists – that such a process would be "wasteful and potentially disruptive."[10] While it is likely that competitive conditions in the market have changed since 2016, the Department believes there is a high bar to removing a pillar of the 2016 decision and changing a process that was the product of deliberation by multiple interested parties and was agreed to by the Joint Applicants. In our view, there is insufficient evidence in the record to support a substantial course correction at this time. To reach this conclusion, we need not address all market developments and data points identified by the Joint Applicants. While some of the information provided would tend to support a renewed

---

[7] Order 2016-11-2 at 15-17 and Order 2016-12-13 at 16-18.
[8] *Ibid.*
[9] Order 2016-12-13 at 27-28.
[10] See Consolidated Reply at 17.

application for antitrust immunity, other information would need to be examined in greater detail or in a broader context.

In response to the Joint Applicants' motion, interested parties have argued that slot access at MEX remains difficult at best.  Likewise, the U.S.-Mexico market has not developed as expected due to economic factors, as well as natural disasters and disruptions in travel (*e.g.*, Mexico City suffered a major earthquake in September 2017, causing significant damage throughout the city and at MEX).[11]  The Department notes certain changes in MEX slot administration, which interested parties point out have only been in effect for a short period of time, during a downturn in the U.S.-Mexico market.  The Department finds that it is too soon to evaluate the efficacy of these changes.  The Department will address any competitive concerns based on the record developed in a future application.

With regard to the uncertainty the Joint Applicants cite about the commercial risk of a lapse of ATI due to the expiration provision, we recognize the ongoing importance of this argument to the Joint Applicants.[12]  Therefore, the Department will extend the grant of ATI during our review of the Joint Applicants' *de novo* application, so long as the Joint Applicants file their application in a timely manner and work expeditiously toward establishing a substantially complete record. The Department will also, *sua sponte*, grant the Joint Applicants an additional three months to file their application, in light of COVID-19 impacts.[13]

The Department also denies the request of United to acquire certain slots that were part of the divestiture required by Order 2016-12-13.  The Department established a well-defined process for determining the eligibility of carriers, the initial allocation of divested slots, and their subsequent administration, and will not alter it now.  This process was reviewed and affirmed in the Court of Appeals.[14]  Allowing United, an ineligible carrier per the Final Order, to acquire the divested slots here would be inequitable to other carriers deemed ineligible.

**ACCORDINGLY:**

1.   We grant the motion of Delta Air Lines, Inc. (Delta) and Aerovías de México, S.A. de C.V., dated July 3, 2019 in this docket with respect to removing the expiration of their grant of antitrust immunity.  That grant of antitrust immunity will continue in effect through the Department's review of the Joint Applicants' *de novo* application, so long as that application is filed on or before March 31, 2022, and contains all of the elements listed in footnote 13;

---

[11] The Department is deciding this motion based on the pleadings in the public record.  Clearly, the COVID-19 public health emergency has also significantly impacted the U.S-Mexico aviation market since the pleadings on this matter were filed.

[12] Order 2016-12-13 at 26-28.

[13] The Department will consider an application in this matter to be timely filed if it is received no later than March 31, 2022.  The filing should include all relevant agreements to be reviewed and immunized along with supporting documentation and data responsive to the Department's standard O&D data request.

[14] *ABC Aerolíneas, S.A. de C.V. v. DOT, No. 17-1056 (D.C. Cir. Aug. 14, 2018).*

2.  We deny the motion of Delta Air Lines, Inc. (Delta) and Aerovías de México, S.A. de C.V., dated July 3, 2019, seeking to remove the requirement for a *de novo* application;

3.  We deny the application submitted by United Airlines, Inc., in its pleading dated November 22, 2019;

4.  We grant all motions for leave to file submitted to date; and

5.  We will serve this Order on all parties on the service list for this docket.

By:

**Joel Szabat**

Assistant Secretary

Aviation and International Affairs

(SEAL)

*An electronic version of this document is available at*
*https://www.regulations.gov*

6

# Tab C

Letter from Lic. Alejandro Varela Arellano, Coordinador Jurídico de Transporte (Nov. 28, 2023)

 

**SUBSECRETARÍA DE TRANSPORTE**

Ciudad de México a  de noviembre de 2023.

**Benjamin J. Taylor**
**Director Office of International Aviation**
**U.S. Department of Transportation.**

Dear Benjamin:

Before addressing the technical consultations still pending, I would like to share a chart on which it is shown the progress on cargo migration to AIFA and where it shows all issues discussed haver been addressed and solved.

As well I will share as an annex to this letter the conclusions on the technical review conducted by the "*Coordinación Nacional de Proteccion Civil*" (National Civil Protection Agency; considering the information there contained is sensible I would ask to be shared with the needed discretion.

Nevertheless, we considered that even though we are sharing this document, the Agreement does not stablish an obligation to justify technical, security or operational decisions made by any of our governments.

As you will see in the chart, the cargo operations of all airlines have been significantly improved regarding volume and number of operations.

Regarding the claim of the DOT about not having enough information to validate or support the operational conditions that led to the Decree, besides the already annexed documents, is necessary to consider that the current congestion has led AFAC, our Civil Aviation Authority to recommend a reduction in the number of operations per hour at AICM. Since 2010 Mexican authorities have been consistent in addressing operational issues regarding the large increase in aircraft size (see chart below). This has resulted in increased congestion in every facet of the operation including ATC congestion from increased separation requirements, taxi-way congestion from the physically larger aircraft, and gate/terminal congestion from the increased volumes and corresponding boarding times.





Additionally, Mexico City has seen a number of recent runway incursion events. These include Aeromexico flight 117 on May 10th 2023 and Volaris 799 on May 7th 2022.

These safety issues are no different than what other airports around the world have seen including in the US because of the post-COVID recovery in traffic combined with staffing and productivity challenges.



*Source: Diio Cirium*

As it has already happened in other similar airports which faced similar situation as AICM, is that once there is no slots available during the day, passenger airlines start scheduling more flights at night. To avoid a situation where we have a very short window at night for Cargo airlines, due to increasing commercial departures and delays, it was decided to move Cargo Airlines out of AICM and suggested the new Mexico City Airport Felipe Angeles ("AIFA") which has better infrastructure and is strategically located for cargo

Avenida de los Insurgentes Sur 1089, Colonia Noche Buena, C.P. 03720    T: 01 (55) 5723 9300
Alcaldía Benito Juárez, CDMX. www.gob.mx/sct

 

operations and logistics. Congestion at AICM is a problem that needs to be addressed in the short and medium term and in choosing mechanisms to address congestion, mechanisms are appropriately being balanced for numerous criteria including their effectiveness, long term necessity, ease of implementation, and disruptiveness to airport and carrier operations. Is of the essence to share some of the important criteria we considered:

1. The new Mexico City Airport has been increasing its commercial and combined operations, national airlines are increasing their operations in order to compensate the slot reduction at AICM.

2. While there is no room for all passenger airlines in the new AIFA airport, there is room for all cargo airlines operating in AICM, and nowadays all of them are operating at full capacity at AIFA, and have increased their flights frequencies.

3. AIFA is better located than AICM for Cargo airlines due to a shorter distance to main distribution centers in the State of Mexico.

In general, cargo transportation is less sensitive to the proximity of airports to city centers compared to passenger flights. While passengers prefer airports that are closer to urban areas for convenience, cargo operations prioritize factors such as logistics and efficiency. In fact, Fedex and UPS distribution centers are closer to AIFA that they are to AICM.



 

While we understand moving from AICM to AIFA represented a challenge, we are confident, all cargo airlines (domestic & international) will very soon benefit from a much more efficient operation than those passenger airlines operating in the aged AICM.

Is of the essence to address the flexibility they now can schedule their flights not only at night but at any other time of the day in an un-restricted slot airport.

The Mexican government believes that recommending the move of all-cargo carriers to AIFA is also consistent with the situation at slot constrained airports world-wide where precious slot and real estate resources are dedicated towards passenger vs. cargo service. Examples include Frankfurt, Tokyo, Washington, London, or Sao Paolo.

Furthermore, the US government has dealt with similar situations at congested airports in the US including limiting all cargo operations to remote airports. Examples of constraints include the slots and perimeter rules at DCA and LGA, slots at EWR and JFK, a variety of restrictions at Dallas Love airport. Historically, operations at Chicago O'Hare were also restricted. Additionally, the FAA recently reduced operations at Newark by 10% in 2023 for similar reasons to AFAC at Mexico City.

In this regard, the International Air Transport Association (IATA) has classified the AICM as a Level 3 airport considering that it has been provided with information that "specifies the scheduling restrictions (...) as well as data showing how full or nearly full the airport is, demonstrating the need to coordinate slots."[1]

Policy 1.5 of the IATA World Slot Guidelines states that Tier 3 designation for an airport should only be received and maintained when comprehensive demand and capacity analyses lead to the conclusion that demand for airport infrastructure significantly exceeds declared capacity. [2]In line with the above, it is observed that the various declarations of saturation are supported by operational data that show that the AICM is indeed saturated. As noted above, the increase in average aircraft size and recent safety events have pushed AICM to an edge of what can be operated, past its breaking point, resulting in further capacity reductions.

---

[1] Information published by IATA and available at: https://www.iata.org/contentassets/4ede2aabfcc14a55919e468054d714fe/wasg-annex-12.7.xlsx

[2] Policy 1.5 of the Guidelines available at https://aviacionline.com/wp-content/uploads/2020/03/slots-guia-IATA.pdf

Avenida de los Insurgentes Sur 1089, Colonia Noche Buena, C.P. 03720
Alcaldía Benito Juárez, CDMX. www.gob.mx/sct
T: 01 (55) 5723 9300

 

According to the Guidelines, the classification of an airport as Level[3], a saturated airport, implies the need for that airport to be coordinated and therefore constitutes an operational exception. Therefore, the saturation of the AICM constitutes an operational reason that updates the assumption established in Article 11.2 of the ATA. In accordance with the above, the Cargo Decree has as its operational reason the need to seek alternatives to reduce the effects of saturation.

Moreover, it's important to note that the Cargo Decree follows the rules of our country's laws. According to Article 95 of the Airports Law Regulations, when airports are busy or fully scheduled, passenger flights are given preference over cargo flights. This aligns with global suggestions too. Policy 8.4, titled "Additional Criteria for the Initial Allocation of Slots," in the Guidelines suggests that if the main criteria for allocating slots aren't enough, other factors should be considered. This includes the possibility of creating local guidelines.  Regarding this issue, the Agreement cannot be above nationals laws.

Regarding the issues related to the provisions of the ATA under Annex 1(C)(4) with respect to selling and marketing services to Mexico City.

We should make the necessary adjustments to the ATA to include AIFA (NLU) in the marketing as part of Mexico City. This applies not only to passenger services but also encompasses all cargo services. An understandable situation in a big metropolitan and very populated city. Also, the case in US airports such us DEN or Washington DC.

As for the believes that the Decree conflicts with carriers' fair and equal opportunity to compete and the claim that it gives an unfair advantage to combination carriers at the expense of all-cargo carriers, and therefore conflicts with the right of fair competition as guaranteed in Article 11. The Cargo Decree is not designed to compromise free competition. It does not exhibit favoritism toward any specific group nor is it aligned with any kind of interest. Instead, its primary objective is to safeguard the well-being of passengers at AICM. This objective is in accordance with national legislation, where prioritization of passenger safety is emphasized, particularly at coordinated or congested airports.

---

[3] The Resolution declaring the saturation of the AICM published on August 31, 2023 summarizes these data and sets out the conclusions of a study carried out by Servicios a la Navegación en el Espacio Aérea Mexicano on August 22, 2023. Information available at: https://www.dof.gob.mx/nota_detalle.php?codigo=5700389&fecha=31/08/2023#gsc.tab=0

Avenida de los Insurgentes Sur 1089, Colonia Noche Buena, C.P. 03720    T: 01 (55) 5723 9300
Alcaldía Benito Juárez, CDMX. www.gob.mx/sct

 

The exclusivity of AICM for air passenger transport services does not constitute discrimination against cargo carriers or impede their competitive capabilities. This is due to the fundamental distinction between air passenger and cargo services, as their operations and incentives are entirely disparate in accordance with Mexican legislation. Notably, comprehensive antitrust studies on a global scale consistently treat passenger transportation and freight transportation as separate markets.

The Mexican Federal Competition Commission ("COFECE"), the European Commission, the U.S. Department of Justice and other competent authorities in the United States have consistently analyzed these services as distinct markets.

As noted above, cargo is far less sensitive to precise airport location (indeed in many parts of the world, cargo is transported for long distances between airports as part of the "air cargo" service) and the DOT has provided no evidence that the cargo operations will have either a disadvantage or advantage in operating at AIFA (NLU). As noted above, the largest US freight operators have their distribution centers closer to the new Mexico City Airport AIFA.

There is no inherently anti-competitive cost being imposed on cargo carriers. Indeed, we suspect that the relocation will provide long term benefits to cargo operators. This situation is common world-wide including major metro like Frankfurt, Washington DC, New York, London, Tokyo or Sao Paolo. Close in metro airports are usually space constrained and built 60 years ago. As passengers inherently care more about where they end up vs cargo, premium space is dedicated to service passenger service as a result. Limited belly cargo operations continue at the close-in airports, but both because of operational constraints at the close-in airport and the benefits of operating at a less space constrained airport, most of the cargo is transported from the airport is further out. We are aware of no data or evidence that suggests that the cargo freighter operations at those airports are not able to compete with the belly carriers. Quite the opposite, it is our understanding that freighter carriers tend to charge higher rates than belly carriers.

Is extremely important to consider that all cargo airlines have increased their operations since they moved to AIFA, which implies the have better conditions to operate in spite of the claims already addressed above.

Avenida de los Insurgentes Sur 1089, Colonia Noche Buena, C.P. 03720          T: 01 (55) 5723 9300
Alcaldía Benito Juárez, CDMX. www.gob.mx/sct



# COMUNICACIONES
SECRETARÍA DE INFRAESTRUCTURA, COMUNICACIONES Y TRANSPORTES

It is crucial to emphasize that our primary objective was to provide all airlines with airports and facilities conducive to safe and efficient operations. Furthermore, it is pertinent to note that:

· Only ~18% of the cargo capacity in the AICM-USA Cargo market is deployed by passenger airlines.

· 82% of the cargo between AICM-USA has been relocated to AIFA from AICM with full cargo airlines. [4]



*Source: Agencia Federal de Aviación Civil*

International competition precedents have clearly identified that air cargo services are typically provided by three different types of air cargo carriers:

- Commercial airlines (combined cargo & passengers): these are airlines that also carry passengers. These airlines carry cargo in the cargo space (or baggage hold) or

---

[4] For example, in the analysis regarding the concentrations between the airlines commercially known as "Delta" and "Aeromexico" (CNT-050-2015 and CNT-127-2016) COFECE analyzed the relevant market as the scheduled air transport of passengers between Mexico and the United States. While the analysis of the concentration between the airlines commercially known as Avianca Cargo and Aeronunión analyzed the relevant air cargo transport market (CNT092-2022).

Avenida de los Insurgentes Sur 1089, Colonia Noche Buena, C.P. 03720    T: 01 (55) 5723 9300
Alcaldía Benito Juárez, CDMX. www.gob.mx/sct




passenger cabin but may also have dedicated cargo aircraft. There are no true combination carriers into Mexico City in the way that KLM used to have 50/50 cargo/passenger 747s or Alaska with 737 combi operations in Alaska. All the US belly carriers only use cargo as limited ancillary revenue to their passenger traffic.

- Exclusively cargo airlines: those who operate exclusively with cargo aircraft.

- Integrators: they differ by the following five characteristics: they have an air network with regular flights, through which a large proportion of the volumes managed by the company are transported; They have worldwide coverage, manage a hub and spoke model; They have a proprietary data network for cargo tracking and have a reputation that the consumer considers to be ontime and reliable. It is considered that there are only four integrators in the world: FedEx, TNT, DHL, and UPS.[5]

Even if these three types of cargo service providers compete with each other and their consumer services are substitutes, this does not necessarily imply that the Cargo Decree has established a competitive restriction for all-cargo airlines. This conclusion is simplistic, as it does not analyze the real competitive dynamics of freight carriers, it simply assumes that all freight carriers require takeoff and landing in the AICM to be competitive, based on an origin to-destination route analysis. This conclusion is imprecise and one dimensional because the analysis of competition between air cargo carriers should not be conducted based on an origin to destination route analysis.

The European Commission has stipulated in various precedents that this origin-destination route analysis is not applicable for freight carriers, mainly because: **i)** the service is less sensitive to the arrival and departure times than the passenger air transport service, **ii)** the cargo is usually transported from other points of departure, other than the airport of origin, and is transported to endpoints other than the destination airport, so it can be routed to other points and can use flights with multiple stops without affectation. Considering the above, the analysis of competition of freight transport in European precedents has been carried out considering a regional scope (intra-Europe).[6]

---

[5] European Commission case M.6570, concentration between UPS and TNT Express, and European Commission case M.7630, concentration between Fedex and TNT Express.

[6] Concentration between Delta, Air France-KLM, Virgin Group and Virgin Atlantic (Case M8964), Concentration between Delta Airlines, Virgin Group, Virgin Atlantic Limited (Case M.6828), Concentration between IAG and Bmi (Case M.6447). 7 This has been determined in the analyses carried out by the European Commission in the merger cases between UPS and TNT Express (Case M.6570) and between Fedex and TNT Express (Case M.7630).

Avenida de los Insurgentes Sur 1089, Colonia Noche Buena, C.P. 03720        T: 01 (55) 5723 9300
Alcaldía Benito Juárez, CDMX. www.gob.mx/sct

 

Since the analysis of competition between air cargo carriers should not be conducted on the basis of an origin-destination route scope because the airport of origin and destination does not reflect the geographical scope relevant to the competitive dynamics of air cargo services, it is not possible to determine that there is a competitive restriction for carriers operating exclusive cargo flights simply because they cannot operate in the AICM.

In order to properly analyze the impact of the ban on the operation of cargo flights on the AICM, a much more comprehensive analysis is required considering, at least, the following factors: **(i)** the areas of influence of the airport points of origin and destination and the connections they have to other points (of origin and final destination) in order to be able to determine the regional geographical scope that determines the competitive dynamics; **(ii)** the fact that air freight is in direct competition with other modes of transport (mainly by wheel and rail); and **(iii)** the existence of some impact on market participants considering the different cargo business models.

In this regard, article 28 of the Political Constitution of the United Mexican States provides for the right to free competition and competition and the Federal Law on Economic Competition seeks to guarantee free competition and economic competition, as well as to prevent, investigate, penalize, and eliminate monopolies, monopolistic practices, barriers to free competition and economic competition. and other restrictions on the efficient functioning of markets.

To determine whether there are barriers to competition and free competition in the US-AICM cargo territory that limit the ability to compete, prevent or distort the process of competition and free competition, a technical analysis must be carried out to determine the relevant market and the objective and technical evaluation of the effect that the possible barrier has on said market. Such analysis that can only be carried out by the competent autonomous constitutional body, the Federal Economic Competition Commission ("COFECE") , through its investigative powers.

Finally, if such an investigation will determine that the Cargo Decree creates a barrier to competition and free competition, the economic competition authority will issue corrective measures, including recommendations to the regulatory authority, to eliminate said barrier.

Avenida de los Insurgentes Sur 1089, Colonia Noche Buena, C.P. 03720    T: 01 (55) 5723 9300
Alcaldía Benito Juárez, CDMX. www.gob.mx/sct

**Supp.App.22**





In summary:

Is of the essence to address the complexity of seeking to ease operational congestion at an old urban airport that was not built for today's demands and of launching a secondary airport in that market. Particularly where that process is occurring in Mexico's center of commerce and largest and capital city, dealing with the immediate need to reduce congestion at the airport and to take necessary steps for a long-term solution is challenging. The United States has itself navigated similar processes in New York, Washington DC and Dallas and we assume those processes were not perfect nor gladly adopted by all airlines.

By virtue of the regulation and the best international practices indicated in this document, it is observed that the Cargo Decree accredits the exception established in article 11.2 of the ATA, since the prohibition of cargo flights in the AICM was issued under operational safety reasoning, and said prohibition that is in line with the Chicago Convention, since it applies equally to aircraft of any State.

In accordance with international and national precedents, it is not possible to assume that the Cargo Decree implies discrimination and affects the ability of cargo carriers to compete, since even assuming that the different types of cargo transport are substitutes, the prohibition of operating cargo flights in the AICM by itself does not necessarily restrict the competition of cargo carriers. Because the competition between them does not depend on the airport of origin and destination but on the regional scope they may have. Therefore, in principle, there is no breach of economic competition. By virtue of the foregoing, to prove a breach of economic competition, the competent authority must conduct an in-depth and detailed analysis to determine the relevant market and verify whether this prohibition may affect competition in cargo transport.

As for the request to clarify whether the AICM slot committee will assign slots to new airlines and/or new services might enter AICM, the slot reduction will apply to all airlines and operations, no slots will be assigned as long as the operational and technical conditions at AICM prevails.





Regarding Information as to when U.S. carriers might expect to have the slots that were rescinded beginning with the Winter 2022 season returned, the slot reduction will prevail until the operation a technical capacity of the AICM, including terminal buildings prevails

Finally, about whether it is possible to expire the February 2 all-cargo decree now that all airlines have moved to AIFA, we are still working on the issue since there is no legal precedent to address such matter related to a Presidential Decree.

**Lic. Alejandro Varela Arellano**
**Coordinador Jurídico de Transporte**

Avenida de los Insurgentes Sur 1089, Colonia Noche Buena, C.P. 03720      T: 01 (55) 5723 9300
Alcaldía Benito Juárez, CDMX. www.gob.mx/sct

Supp.App.24

# Tab D

Comments of the Department of Justice,
Antitrust Division (Aug. 8, 2025)

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| **Joint Application of:** ) | |
| ) | |
| **DELTA AIR LINES, INC.** ) | |
| **AEROVIAS DE MEXICO, S.A. DE C.V.** ) | |
| **IBERIA LÍNEAS AÉREAS DE ESPAÑA, S.A.** ) | **DOT-OST-2015-0070** |
| ) | |
| ) | |
| **Under 49 U.S.C. §§ 41308 and 41309 for approval of** ) | |
| **and antitrust immunity for alliance agreements** ) | |

## <u>COMMENTS OF THE DEPARTMENT OF JUSTICE</u>

Abigail Slater
Assistant Attorney General,
Antitrust Division

Dina Kallay
Deputy Assistant Attorney General,
Antitrust Division

David Lawrence
Director of Policy,
Antitrust Division

Patricia C. Corcoran, Acting Chief
Katherine C. Speegle, Assistant Chief
Transportation, Energy, and Agriculture Section
Antitrust Division

Charlie Beller
Counsel to Assistant Attorney General,
Antitrust Division

Dated: August 8, 2025

US Department of Justice
450 5th Street, N.W.
Washington, D.C. 20530

### Comments of the United States Department of Justice

The Department of Justice ("DOJ") submits this comment in support of the Department of Transportation's ("DOT") Supplemental Order to Show Cause ("Show Cause Order") in the matter of the Joint Application of Delta Air Lines, Inc. ("Delta") and Aerovías de México, S.A. de C.V. ("Aeromexico") for their Joint Cooperation Agreement and related international airline alliance agreements (collectively, the "Joint Venture" or "JCA").[1]

In exercising its statutory authority to grant or modify antitrust immunity for an international airline alliance,[2] DOT must provide notice to DOJ and an opportunity for DOJ to comment on whether a request, modification, or cancellation of antitrust immunity is warranted— "whether or not it was approved previously."[3] DOJ submits these comments in support of DOT's tentative decision to withdraw its approval and grant of antitrust immunity for the Delta/Aeromexico Joint Venture.

### I.  Executive Summary

"Federal antitrust law is a central safeguard for the Nation's free market structures." *North Carolina State Bd. Of Dental Examiners v. FTC*, 574 U.S. 494, 502 (2015). The

---

[1] U.S. Dep't of Transp., 2025-7-12 Supplemental Order to Show Cause, Docket DOT-OST-2015-0070 (July 21, 2025), https://www.regulations.gov/document/DOT-OST-2015-0070-0333, ("Supplemental Show Cause Order").

[2] *See* 49 U.S.C. § 41308(b) ("When the Secretary of Transportation decides it is required by the public interest, the Secretary, as part of an order under section 41309 or 42111 of this title, *may exempt* a person affected by the order from the antitrust laws to the extent necessary to allow the person to proceed with the transaction specifically approved by the order and with any transaction necessarily contemplated by the order.") (emphasis added).

[3] 49 U.S.C. § 41309(c)(1) ("When an agreement, request, modification, or cancellation is filed, the Secretary of Transportation shall give the Attorney General and the Secretary of State written notice of, and an opportunity to submit written comments about, the filing. On the initiative of the Secretary of Transportation or on request of the Attorney General or Secretary of State, the Secretary of Transportation may conduct a hearing to decide whether an agreement, request, modification, or cancellation is consistent with this part whether or not it was approved previously.").

1

antitrust laws "are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972). Immunizing conduct from the antitrust laws therefore risks undermining our free market system and so must be done sparingly, carefully, and only in pursuit of legitimate—and actually realized—benefits.

Competition is particularly valuable in the airline industry. Airline competition benefits American consumers whether they are traveling for work or leisure within the United States or to a foreign destination. Competition drives lower prices, better quality, and more of the services consumers want. The benefits of competition specifically in air travel are reflected in the specific policies set forth by Congress in authorizing when DOT may grant antitrust immunity, including the need to "plac[e] *maximum reliance on competitive market forces* and on *actual and potential competition*."[4]    Likewise, free market principles disfavoring immunities from the antitrust laws apply with at least equal force in the airline industry.[5]   In line with these statutory mandates and the importance of robust enforcement of the U.S. antitrust laws, prior DOJ comments on DOT's international airline alliance immunity applications have underscored the importance of open market access for airlines wishing to serve a route for ensuring

---

[4] 49 U.S.C. § 40101(a)(6) (emphasis added) (identifying statutory policy criteria applicable to carrying out subpart ii, which includes Chapter 413 "foreign air transportation" (§§ 41301-41313)).

[5] *E.g., Republic Airlines v. C.A.B.*, 756 F.2d 1304, 1317 (8th Cir. 1985) ("[A]ntitrust immunity for airline agreements is intended to be the exception and not the rule."); *Cain v. Air Cargo, Inc.*, 599 F.2d 316, 320 (9th Cir. 1979) ("We have noted that immunity from the antitrust laws is not lightly inferred.").

2

competition and have urged requiring open access to markets as a condition precedent to any grant of antitrust immunity by DOT.[6]  DOT has consistently endorsed this approach.[7]

Open market access makes it possible that other airlines will replace the competition that is eliminated between immunized joint venture partners. The likelihood of entry mitigating anticompetitive harm is a standard consideration in DOJ's enforcement of the U.S. antitrust laws in domestic airline mergers and alliances. In accordance with these policies, DOT conditioned its initial approval of Delta's and Aeromexico's request to immunize their Joint Venture from antitrust enforcement on the creation of a liberalized bilateral air service agreement between the

---

[6] *See, e.g.,* U.S. Dep't of Just., Comments on the Show Cause Order, Docket DOT-OST-2008-0234, at 1 (June 26, 2009) (Star Alliance), https://www.justice.gov/sites/default/files/atr/legacy/2009/06/30/247556.pdf ("For many past applications, the principal public interest benefit furthered by DOT's grant of immunity has been the negotiation of open skies agreements with the home country of the U.S. carriers' alliance partners."); U.S. Dep't of Just, Public Comments, Docket DOT-OST-2008-0252 (Dec. 21, 2009) (OneWorld Alliance), https://www.justice.gov/sites/default/files/atr/legacy/2009/12/30/253575.pdf; U.S. Dep't of Just., Public Comments, Docket DOT-OST-2004-19214 (Aug. 19, 2005) (Delta and KLM et al.), DOT-OST-2004-19214-0164_attachment_1.pdf; U.S. Dep't of Just., Public Comments, Docket DOT-OST-2001-11029 (Dec. 17, 2001) (American Airlines and British Airways), https://www.regulations.gov/document/DOT-OST-2001-11029-0029; U.S. Dep't of Just., Comments on Order to Show Cause, Docket DOT-OST-1995-618 (May 28, 1996) (Delta and Swissair et al.) ( DOT-OST-1995-618-0039_attachment_1.pdf).

[7] See, e.g., U.S. Dep't of Transp., 96-11-1 Order Granting Approval and Antitrust Immunity for Certain Alliance Agreements, Docket DOT-OST-1996-1411, at 3 (Nov. 1, 1996), https://www.regulations.gov/document/DOT-OST-1996-1411-0015 ("The predicate for our approval and grant of antitrust immunity … is the existence of the expansive new aviation agreements between the United States and Denmark, Norway, and Sweden."); U.S. Dep't of Transp., 2000-4-22 Order to Show Cause, Docket DOT-OST-1999-6528, at 2 (Apr. 21, 2000), https://www.regulations.gov/document/DOT-OST-1999-6528-0011; U.S. Dep't of Transp., 2001-3-4 Order to Show Cause, Docket DOT-OST-1999-6680, at 2 (Mar. 2, 2001), https://www.regulations.gov/document/DOT-OST-1999-6680-0007; U.S. Dep't of Transp., 2002-6-18 Order Granting Approval and Antitrust Immunity for Alliance Agreements, Docket DOT-OST-2002-11842, at 1 (June 27, 2002), https://www.regulations.gov/document/DOT-OST-2002-11842-0008-0002; U.S. Dep't of Transp., 2005-1-23 Order Granting Approval and Antitrust Immunity for a Commercial Cooperation Agreement, Docket DOT-OST-2004-18613, at 1 (Jan. 27, 2005), https://www.regulations.gov/document/DOT-OST-2004-18613-0005; U.S. Dep't of Transp., 2008-4-17 Show Cause Order, Docket DOT-OST-2007-28644, at 2 (Apr. 9, 2008), https://www.regulations.gov/document/DOT-OST-2007-28644-0174; U.S. Dep't of Transp., 2009-4-5 Show Cause Order, Docket DOT-OST-2008-0234, at 2 (Apr. 7, 2009), https://www.regulations.gov/document/DOT-OST-2008-0234-0193; U.S. Dep't of Transp., 2019-05-23 Order to Show Cause, Docket DOT-OST-2018-0030, at 4 (June 3 , 2019), https://www.regulations.gov/document/DOT-OST-2018-0030-0138.

3

United States and Mexico.  As conceptualized and conditioned, this agreement would facilitate free and open competition on routes between the two countries, including through reforms to slot allocation at Benito Juárez International Airport ("MEX").[8]  DOT also required that the Applicants re-apply for a renewed grant of antitrust immunity for the Joint Venture after five years.[9]

Because competitive open market access is critical to mitigate the potential loss in competition that may result from a grant of antitrust immunity to an international airline alliance,[10] DOJ supports DOT's tentative decision not to renew antitrust immunity for the JCA. The record evidence suggests that restrictive and potentially discriminatory practices by the Government of Mexico ("GOM") have limited entry and expansion by certain carriers at MEX and thereby undermined competitive conditions in Mexico, thwarting open market access on routes between Mexico and the United States.

## II. Statutory Framework

Under the applicable statute, DOT must disapprove a proposed agreement if it "substantially reduces or eliminates competition" *unless* DOT finds that the agreement "is

---

[8] U.S. Dep't of Just., 2016-11-2 Order to Show Cause, Docket DOT-OST-2015-0070 (Nov. 4, 2016), https://www.regulations.gov/document/DOT-OST-2015-0070-0074, ("2016 Show Cause Order").

[9] *Id*; DOT's decision to automatically sunset its initial grant of antitrust immunity is consistent with general principles of statutory construction that exemptions and immunities are disfavored. S*ee Cost Mgm't Svc's, Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 948 (9th Cir. 1996) ("[E]xemptions from the antitrust laws are strictly construed and strongly disfavored") (quoting *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 421 (1986)); *Republic Airlines v. C.A.B.*, 756 F.2d 1304, 1317 (8th Cir. 1985) ("[A]ntitrust immunity for airline agreements is intended to be the exception and not the rule."); *Cain v. Air Cargo, Inc.*, 599 F.2d 316, 320 (9th Cir. 1979) ("We have noted that immunity from the antitrust laws is not lightly inferred.").

[10] *Cf.* U.S. Dep't of Transp., 2024-1-17 Order to Show Cause, Docket DOT-OST-2015-0070, at 4 (Jan. 26, 2024), https://www.regulations.gov/document/DOT-OST-2015-0070-0245, ("The Department's longstanding policy is that an air transport agreement that contains the [open market access] elements defined in Order 92-8-13 between the home countries of the Joint Applicants is the fundamental prerequisite needed to allow for consideration of an immunized alliance. The *existence of these elements in an agreement is critical to address potentially harmful impacts of antitrust immunity.*" (emphasis added)).

4

necessary to meet a serious transportation need or to achieve important public benefits" *and* that any such need or benefit cannot be met through "reasonably available alternatives that are materially less anticompetitive."[11] If DOJ approves an anticompetitive agreement on those grounds, it must exempt it from U.S. antitrust laws.[12]

If DOT finds that an agreement does not reduce or eliminate competition and is consistent with the public interest, DOT must approve it, but exemption from the antitrust laws is authorized only if it is *required* by the public interest;[13] even then, immunity is authorized only "to the extent necessary to allow the person to proceed with the transaction specifically approved by the order and with any transaction necessarily contemplated by the order."[14]

Congress provided express public interest criteria that DOT must consider when determining whether to grant antitrust immunity for an international airline alliance.[15] In doing so, Congress counseled "*placing maximum reliance on competitive market forces and on actual and potential competition*."[16] Moreover, in exercising its broader authority to administer international air transportation, Congress provided that DOT "shall develop a negotiating policy emphasizing the greatest degree of competition compatible with a well-functioning international air transportation system,"[17] including, among other things: i.) non-

---

[11] 49 U.S.C. § 41309(b)(1)(A)-(B) (emphasis added).
[12] 49 U.S.C. § 41308 (c).
[13] *See* 49 U.S.C. § 41309(b).
[14] 49 U.S.C. § 41308(b).
[15] *See* Supplemental Show Cause Order, *supra* note 1, at 12-13.
[16] 49 U.S.C. § 40101(a)(6) (emphasis added).
[17] 49 U.S.C. § 40101(e).

5

discriminatory treatment of U.S. airlines; ii.) maximal market access to facilitate dynamic responses to consumer demand; iii.) elimination of operational and marketing restrictions.[18]

These public interest criteria are all consistent with the fundamental competition policy principle that open market access can alleviate the potential anticompetitive effects of antitrust immunity, particularly where access to limited competitively significant inputs such as airport slots (and related regulatory requirements) constrains the ability of competitive rivals to discipline the exercise of market power that may result from an immunized international airline alliance.[19]

## III.    Procedural Background

### A.    The Initial Application

The Applicants jointly applied for DOT approval of and antitrust immunity for a comprehensive alliance agreement on March 31, 2015.[20] On November 4, 2016, DOT issued a Show Cause Order announcing its intention to conditionally approve the proposed alliance with certain modifications, including slot divestitures and standard data reporting requirements, to ensure open market access.[21] The Show Cause Order also stipulated that the immunity would last only five years because "it is unclear if the Department's proposed divestitures will be sufficient

---

[18] *See Id* at (4), (5), (9).

[19] *See* Warren L. Dean & Jeffrey N. Shane, *Alliances, Immunity, and the Future of Aviation*, 22 THE AIR AND SPACE LAW. NO. 4, 18 (2010) ("The congressional decision to maintain the CAB's antitrust exemption authority for agreements relating to international aviation, and to keep it at DOT, was predicated on a recognition that competition in international aviation is closely related to, and often a product of, bilateral negotiating process. If the U.S. government was to attempt through diplomacy to move its aviation trading partners coherently toward a more market-based and pro-competitive regime, it was essential that the antitrust exemption authority be vested in the agency primarily responsible for the development of U.S. international aviation policy.").

[20] Joint Application of Delta Airlines, Inc. and Aerovías de México for Approval of and Antitrust Immunity for Alliance Agreements, Docket DOT-OST-2015-0070 (Apr. 31, 2015), https://www.regulations.gov/document/DOT-OST-2015-0070-0005.

[21] 2016 Show Cause Order, *supra* note 8, at 20-33.

6

at the end of that term."[22] DOT further noted that "[i]f sufficient competitive reforms to the slot administration regime at MEX have not been implemented" by the end of the five-year period, "the Department would have to carefully consider whether it could approve a new application[.]"[23]

DOJ concurred with DOT's Show Cause Order and shared its views with DOT that the Antitrust Division's review of the record had found that the proposed Joint Venture would likely result in competitive harm given that entry at MEX was highly unlikely. DOJ urged DOT to stand by the conditions in the proposed Order, including open airport access at MEX and the requirement that the applicants re-apply for immunity if they wished to continue to benefit from antitrust immunity beyond five years.[24] On December 14, 2016, DOT approved the alliance agreements and granted antitrust immunity as set forth in Show Cause Order 2016-11-2.[25]

## B.    Application for Renewal of Antitrust Immunity

On March 29, 2022, the Applicants jointly sought reauthorization of the JCA and a renewal of DOT's grant of antitrust immunity.[26] On January 26, 2024, DOT announced its determination that recent events "have in effect removed the necessary precondition for the consideration of an [antitrust immunity] application or continuation of an existing immunized joint venture: the *de*

---

[22] *Id* at 27.

[23] *Id.*

[24] Sunsetting the initial grant of antitrust immunity was supported by the competition policy considerations underlying DOT's discretionary authority to grant an exemption from the antitrust laws based on the public interest. Competitive conditions are dynamic, particularly in international air transportation, and continued evaluation of relevant competitive conditions supports narrow construction of applicable exemption to the antitrust laws.

[25] U.S. Dep't of Just., 2016-12-13 Final Order, Docket DOT-OST-2015-0070 (Dec. 14, 2016), https://www.regulations.gov/document/DOT-OST-2015-0070-0096.

[26] Joint Application of Delta and Aeromexico for Renewed Approval of and Grant of Antitrust Immunity for Alliance Agreements, Docket DOT-OST-2015-0070 (Mar. 29, 2022), https://www.regulations.gov/document/DOT-OST-2015-0070-0236.

7

*facto* or *de jure* implementation of a fully liberalized air transport agreement consistent with Order 92-8-13."[27] DOT reiterated that it premised its 2016 grant of immunity on improvements to "the predictability and transparency of [the] slot allocation process" at MEX, along with the provision of "substantial additional capacity" that would alleviate the Joint Venture's potential for competitive harm.[28]

In its review of the Applicants' renewed request for antitrust immunity, DOT found that "the capacity at MEX has been reduced over the last three IATA traffic seasons, to the detriment of both current air carriers and potential new entrants."[29] The result is "no possibility of new entry at MEX for the foreseeable future."[30] Accordingly, DOT determined that "the condition precedent necessary for consideration and continuation of antitrust immunity, [. . .] is no longer present." DOT thus found that the anticipated open market access reforms supporting the initial time-limited grant of antitrust immunity have not occurred.[31]

### C.    Objection of the JCA Partners to Initial Show Cause Order

In response to DOT's January 2024 Show Cause Order, the JCA Applicants argued *inter alia* that DOT failed to apply the relevant statutory standards (49 U.S.C. §§ 41308 – 41309) and imposed an "extra-statutory" "Open Skies predicate for approval of an international alliance agreement and a grant of ATI" in violation of the Administrative Procedures Act ("APA").[32]

---

[27] U.S. Dep't of Just., 2024-01-17 Order to Show Cause, Docket DOT-OST-2015-0070-0245, at 1 (Jan. 26, 2024), https://www.regulations.gov/document/DOT-OST-2015-0070-0245.
[28] *Id* at 2.
[29] *Id* at 4.
[30] *Id.*
[31] *Id* at 4-5.
[32] Delta Airlines, Inc. & Aerovías de México, S.A. de C.V., Objection of the JCA Partners to Show Cause Order 2024-01-17, Docket DOT-OST-2015-0070, at 5, 10 (Feb. 23, 2024), DOT-OST-2015-0070-0258_attachment_1.pdf.

8

"Open Skies" in this case refers to the U.S.-Mexico Air Transportation Agreement, which provided the potential for expanded competitive access to the Mexican air transportation marketplace, and which served as a justification for the initial grant of antitrust immunity.[33] Moreover, the Applicants contended "a Show Cause Order and any final order of the Department dismissing the application and rejecting ATI must explain why predicating ATI on an Open Skies agreement between the relevant countries is justified by, and furthers the underlying purposes of, Sections 41308 and 41309 and how the [Government of Mexico's]'s alleged failure to comply with its Open Skies obligations impairs those provisions' objectives."[34]

### D.    DOT's Supplemental Show Cause Order

On July 19, 2025, DOT issued a Supplemental Order to Show Cause.[35]  Among other things, DOT provided additional information and reasoning in support of its tentative decision not to renew antitrust immunity for the JCA. On the "Open Skies predicate" objection raised by the Applicants, DOT argued that the "Department's approach is firmly grounded in statute and U.S. competition law."[36] DOT articulated specific competitive dynamics in international air transportation that support the significance of open market access as embodied in Open Skies agreements:

> "[DOT's] starting point for reviewing a joint venture [between international airlines] is ensuring that it will operate within a pro-competitive regulatory framework where market forces, not government intervention, determine market outcomes. In many industries, one might take for granted that firms can enter a market and compete vigorously without

---

[33] *See* 2016 Show Cause Order, *supra* note 8, at 1, 7.
[34] Delta & Aerovías de México, *supra* note 32, at 11.
[35] Supplemental Show Cause Order, *supra* note 1.
[36] *Id* at 16.

9

interference from the government. Not so in the global airline industry. While commercial aviation in the United States since its deregulation in 1978 is subject to market forces based on U.S. law, when it comes to flights beyond U.S. borders, the markets and ability to access them are subject to the terms of an air services agreement negotiated between the United States and a foreign government."[37]

DOT further clarified that validation of whether such open market access "exist[s] in principle and is adhered to in practice" enables DOT to determine whether "a minimally procompetitive environment exists to adequately discipline the type of integrated commercial activities that the Joint Applicants propose, which includes joint pricing, capacity planning, and revenue sharing like a merged firm."[38]

## IV.    Open Market Access is Integral to Competition and the Public Interest Justifications Supporting DOT's Ability to Grant Antitrust Immunity to International Airline Alliances

In reviewing airline joint ventures and mergers that threaten to reduce competition, DOJ assesses the likelihood that entry or expansion by rivals will mitigate anticompetitive harm caused by a transaction. As part of this analysis, DOJ considers all barriers to entry and expansion,[39] including limited access to airport infrastructure required to offer service at an airport, such as gates, and other regulatory constraints, such as limited access to slots or other operating authorizations required to offer service in a market.[40]  The availability of assets or permissions required to offer service at an airport plays a vital role in determining the degree of actual and

---

[37] *Id.*

[38] *Id* at 17.

[39] U.S. Dep't of Just. & Fed. Trade Comm'n, 2023 Merger Guidelines § 3.2, https://www.justice.gov/atr/merger-guidelines.

[40] *See United States v. Am. Airlines Grp.*, 675 F. Supp. 3d 65, 78 (D. Mass 2023) ("An airline's ability to operate at a particular airport depends on a number of factors…. One is access to gates at which passengers can board and disembark flights. The number of gates allocated to a carrier dictates the number of flights it can operate at the airport.").

10

potential competition — two criteria that Congress proscribed in its policies for DOT's evaluation of the public interest in granting antitrust immunity to international airlines alliances.[41]

The fact that an entry barrier is created by government regulation does not make it any less relevant. Consideration of similar issues in other industries — such as the effects of patents, professional licensing requirements, and regulatory approvals required to sell pharmaceuticals or pesticides — is commonplace in antitrust competitive effects analysis. The competition concern with market access is particularly acute in the international air transportation context in which a foreign national regulatory authority with control over critical airport infrastructure may have an incentive to preference foreign national carriers (or an alliance that includes such a carrier) over American air carriers that are not part of immunized alliance. DOT's record makes that concern clear.

DOT found that new competitive entry at the leading international gateway in Mexico, Benito Juárez International Airport (MEX), is effectively closed, and that the GOM "could act in a similarly arbitrary manner at other congested gateways, given Mexico's lack of a coherent and transparent slot allocation regime that is applied consistently at the national level.[42] Moreover, GOM's confiscation of slots from foreign and domestic carriers without adhering to international standards raised "fundamental concerns as to [GOM's] commitment to historical rights and principles of fairness and new entry that are critical at congested gateways."[43]

---

[41] 41 U.S.C. § 40101(a)(6) ("[P]lacing maximum reliance on competitive market forces and on actual and potential competition").
[42] Supplemental Show Cause Order, *supra* note 1, at 19-20.
[43] *Id* at 20.

11

DOT further considered the impact of GOM's slot allocation practices on actual and potential competition, noting that the absence of a reasonable slot allocation mechanism created a "closed" competitive environment in which the largest national carrier and its immunized alliance partner could leverage a large common pool of existing slot holdings, "magnify[ing] the competitive concerns" of antitrust immunity.[44] In effect, DOT found that not only did the slot regulations at Benito Juárez International Airport (MEX) foreclose potential entry or repositioning that could discipline an immunized alliance. But also that the existing share of slots held by Aeromexico at MEX exacerbated the risks that antitrust immunity could enable anticompetitive retrenchment instead of output expansion or service quality improvements consistent with the public interest. DOT's quantitative analysis of network expansion by the JCA partners following the initial grant of antitrust immunity corroborated this competition concern.[45]

Moreover, DOT conducted a counterfactual competitive evaluation consistent with the analytical framework that the DOJ uses to assess the likelihood of competitive effects under U.S. antitrust laws.[46] In sum, DOT considered standard evidence of competitive constraints to actual and potential competition in the markets that would be affected by the proposed immunized alliance.

Thus, far from reflecting an extra-statutory condition, DOT's consideration of an effective

---

[44] *Id*.

[45] *See Id* at 37 ("[DOT] preliminary quantitative analysis shows that following implementation of the JV, flights to Aeromexico's largest hub carry significantly more local passengers as opposed to beyond MEX passenger than before implementation of the JV.").

[46] *Id* at 20 ("The Department cannot simply count the number of new services by the joint venture from MEX. It must also take in to account the counterfactual (i.e., what Delta and Aeromexico could have done otherwise) and the overall impact on the market given limitations placed on their competitors.").

12

"Open Skies" agreement regulatory framework as part of its evaluation of antitrust immunity is consistent with the robust competitive effects analysis required under DOT's operative statute. The record in this matter makes clear that consideration of the regulatory impact on market competition was integral to DOT's well-reasoned decision not to renew antitrust immunity for the Delta-Aeromexico Joint Venture based on the facts presented in this case.

## V. Conclusion

DOJ supports DOT's tentative decision to withdraw its approval and grant of antitrust immunity for the Delta/Aeromexico Joint Venture. DOT conducted an analytically rigorous evaluation of the competitive effects of the Joint Venture consistent with its statutory authority and its public interest mandate to consider competitive market forces and the impact of actual and potential competition.

Respectfully submitted,

/s/ Abigail Slater

Abigail Slater
Assistant Attorney General
Antitrust Division
United States Department of Justice

Dated: August 8, 2025

13

**BEFORE THE**
**DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

_____

| | |
|---|---|
| **Joint Application of:** | ) |
| | ) |
| **DELTA AIR LINES, INC.** | ) |
| **AEROVIAS DE MEXICO, S.A. DE C.V.** | ) |
| **IBERIA LÍNEAS AÉREAS DE ESPAÑA, S.A.** | ) |
| | )  **DOT-OST-2015-0070** |
| | ) |
| | ) |
| **Under 49 U.S.C. §§ 41308 and 41309 for approval of** | ) |
| **and antitrust immunity for alliance agreements** | ) |
| | ) |

_____

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing COMMENTS OF THE DEPARTMENT OF

JUSTICE has been served this day by e-mail upon each of the following addresses:

| Air Carrier | Name | Email Address |
|---|---|---|
| Aeromexico | Charles Donley | charles.donley@pillsburylaw.com |
| Aeromexico | Edward Sauer | edward.sauer@pillsburylaw.com |
| Alaska | David Heffernan | dheffernan@cozen.com |
| Allegiant | Aaron Goerlich | agoerlich@ggh-airlaw.com |
| American | Brent Alex | brent.alex@aa.com |
| American | Bruce Wark | bruce.wark@aa.com |
| American | Molly Wilkinson | molly.wilkinson@aa.com |
| Amerijet | Roy Leon | rleon@amerijet.com |
| Atlas | Keinan Meginniss | keinan.meginniss@atlasair.com |
| Atlas | Sascha Vanderbellen | sascha.vanderbellen@atlasair.com |
| Delta | Chris Walker | chris.walker@delta.com |
| Delta | Steven Seiden | steven.seiden@delta.com |
| Federal Express | Anne Bechdolt | anne.bechdolt@fedex.com |
| Federal Express | Brian Hedberg | brian.hedberg@fedex.com |
| Frontier | Howard Diamond | Howard.diamond@flyfrontier.com |
| Hawaiian | Parker Erkmann | perkmann@cooley.com |
| JetBlue | Robert Land | robert.land@jetblue.com |
| JetBlue | Reese Davidson | reese.davidson@jetblue.com |
| Kalitta Air | Jonathon Foglia | jfoglia@cozen.com |
| National Airlines | Malcolm Benge | mlbenge@zsrlaw.com |
| National Airlines | John Richardson | jrichardson@johnlrichardson.com |

| Polar Air Cargo | Kevin Montgomery | kevin.montgomery@polaraircargo.com |
|---|---|---|
| Southwest | Leslie Abbott | leslie.abbott@wnco.com |
| Spirit Airlines | David Kirstein | dkirstein@yklaw.com |
| Spirit Airlines | Joanne Young | jyoung@yklaw.com |
| Sun Country | Rose Neale | rose.neale@suncountry.com |
| United | Dan Weiss | dan.weiss@united.com |
| United | Steve Morrissey | steve.morrissey@united.com |
| United | Amna Arshad | aarshad@crowell.com |
| UPS | Dontai Smalls | dsmalls@ups.com |
| DOT | Todd Homan | todd.homan@dot.gov |
| DOT | Peter Irvine | peter.irvine@dot.gov |
| DOT | Jason Horner | jason.horner@dot.gov |
| DOT | Fahad Ahmad | fahad.ahmad@dot.gov |
| DOT | Kevin Bryan | kevin.bryan@dot.gov |
| DOT | Benjamin Taylor | benjamin.taylor@dot.gov |
| DOT | Robert Finamore | robert.finamore@dot.gov |
| DOT | Brett Kruger | brett.kruger@dot.gov |
| DOT | Kristen Gatlin | kristen.gatlin@dot.gov |
| DOT | Joseph Landart | joseph.landart@dot.gov |
| DOT | Tricia Kubrin | tricia.kubrin@dot.gov |
| DOJ | Katherine Celeste | katherine.celeste@usdoj.gov |
| DOJ | Patricia Corcoran | patricia.corcoran@usdoj.gov |
| FAA | Robert Carty | robert.carty@faa.gov |
| Department of State | David Williams | williamsds3@state.gov |
| ALPA | Evin Isaacson | evin.isaacson@alpa.org |
| Info | | info@airlineinfo.co |

Date:  August 8, 2025

/s/ Charlie Beller
Charlie Beller
Counsel to Assistant Attorney General
Antitrust Division
United States Department of Justice,
950 Pennsylvania Ave., NW
Washington D.C., 20530
(202) 598-2698
charlie.beller@usdoj.gov

1

# Tab E

Comments of American Airlines, Inc. (Aug.
11, 2025)

**BEFORE THE**
**U.S. DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| Joint Application of<br><br>DELTA AIR LINES, INC. and<br>AEROVIAS DE MEXICO, S.A. DE C.V<br><br>under 49 U.S.C. §§ 41308 and 41309 for approval of and antitrust immunity for alliance agreements | Docket DOT-OST-2015-0070 |

## <u>COMMENTS OF AMERICAN AIRLINES, INC.</u>

Communications about this document should be addressed to:

R. Bruce Wark
Senior Vice President & Deputy
  General Counsel
AMERICAN AIRLINES, INC.
1 Skyview Drive
Fort Worth, TX 76155

Stephen Neuman
Senior Vice President, Global Government
  Affairs
AMERICAN AIRLINES, INC.
1200 Seventeenth Street, NW, Suite 400
Washington, DC 20036

Alan J. Devlin
Seung Wan (Andrew) Paik
Alexandra Clark
LATHAM & WATKINS LLP
555 11th St., NW
Washington, D.C. 20004
alan.devlin@lw.com
andrew.paik@lw.com
alexandra.clark@lw.com

*Counsel for American Airlines, Inc.*

August 11, 2025

**BEFORE THE**
**U.S. DEPARTMENT OF TRANSPORTATION**
**WASHINGTON, D.C.**

| | |
|---|---|
| Joint Application of<br><br>DELTA AIR LINES, INC. and<br>AEROVIAS DE MEXICO, S.A. DE C.V<br><br>under 49 U.S.C. §§ 41308 and 41309 for approval of and<br>antitrust immunity for alliance agreements | Docket DOT-OST-2015-0070 |

## <u>COMMENTS OF AMERICAN AIRLINES, INC.</u>

American submits these comments in response to the Department's July 19, 2025, Supplemental Order to Show Cause, which proposes to withdraw the prior approval and grant of antitrust immunity for the joint venture operated by Delta and Aeromexico.[1]

American supports the Department's decisive actions consistent with this Administration's America First policy, which promotes vibrant trade with foreign countries on terms that allow U.S. companies to compete fairly.  Open Skies agreements, when properly implemented, achieve that very goal.  By fostering vigorous competition between and among U.S. and foreign carriers on equal terms, such agreements create conditions suitable for antitrust-immunized joint ventures that can unlock substantial customer benefits.  Absent a properly functioning Open Skies agreement, however, U.S. carriers may be systematically disadvantaged, forced to compete on unfavorable terms, and subject to higher costs—distorting competition to foreign carriers' benefit and at consumers' expense.  Such has unfortunately been the case with respect to the Government of Mexico ("GoM"), whose actions and policies with

---

[1] Common names for airlines are used in this submission.  Supplemental Order to Show Cause, Order 2025-7-12, DOT-OST-2015-0070 ("Supplemental Order to Show Cause").

**Supp.App.44**

respect to Benito Juarez International Airport ("MEX") have been exhaustively laid out by the Department. In American's view, the three America First actions announced by the Department, including the proposal to withdraw antitrust immunity to the Delta-Aeromexico JV in the Supplemental Order to Show Cause, properly seek to ensure that international aviation markets are fair and procompetitive for U.S. airlines and U.S. consumers alike.[2]

In supporting the Department's tentative decision in the Supplemental Order to Show Cause, American reiterates the comments that it submitted in response to the Department's January 26, 2024, Show Cause Order.[3] As discussed in that submission, the Department's longstanding policy of tying together the achievement of Open Skies and grant of antitrust immunity has fostered competition in two important ways. First, making Open Skies a predicate for antitrust immunity has incentivized countries to adopt Open Skies agreements and remove protectionist barriers to competition that insulate foreign carriers from entry and expansion of U.S. airlines. Second, grants of antitrust immunity enable international airlines to integrate complementary networks in a metal-neutral manner to grow and improve international travel options for U.S. consumers.

This longstanding policy has enabled U.S. airlines to partner with international airlines to deliver more accessible, affordable, and convenient ways to travel to international destinations in the context of a liberalized operational environment. As experience with immunized joint businesses in the context of Open Skies has accumulated, the industry has consistently observed that antitrust immunity enables growth that enhances competition and lower fares. The

---

[2] Trump's Transportation Secretary Sean P. Duffy Announces Slate of America First Actions to Combat Mexico's Abuse of Bilateral Aviation Agreement, Anti-competitive Behavior, July 19, 2025, https://www.transportation.gov/briefing-room/trumps-transportation-secretary-sean-p-duffy-announces-slate-america-first-actions.

[3] Comments of American Airlines, Inc., Feb. 23, 2024, DOT-OST-2015-0070-0257.

2

Department acknowledges that, "[b]ased on experience in multiple ATI cases, the Department views increased capacity as one of the key benefits of a grant of ATI, as the additional capacity can lower fares and create additional demand in several markets."[4]  Numerous empirical studies confirm the same:  Immunized joint businesses grow output.[5]  This is because, with antitrust immunity, airline partners can rationally integrate and optimize their complementary networks.  This in turn stimulates demand, which unlocks opportunities for upgauging, additional frequencies, and new nonstop routes that would not exist absent antitrust immunity.  More and better opportunities for increased flying lead to additional investments in aircraft, which means overall net-new flying for the immunized joint business airlines.

The Department's tentative decision to withdraw approval and grant of antitrust immunity for the Delta-Aeromexico JV is consistent with the Department's longstanding policy that has successfully fostered growth and competition for decades.  The arbitrary measures taken by the GoM, including prohibiting cargo operations at MEX and reducing capacity at MEX without transparency, unfairly protect Mexico's home carrier, Aeromexico, from competition with U.S. airlines, in violation of the U.S.-Mexico Open Skies agreement.  Absent Mexico's compliance with the Open Skies agreement, the necessary predicate for continued approval and grant of antitrust immunity for the Delta-Aeromexico JV also no longer exists.

Delta and Aeromexico attempt to downplay the unique problems at issue by comparing the situation in MEX to other slot-constrained airports where immunized joint businesses

---

[4] Supplemental Order to Show Cause, at 33.

[5] Robert J. Calzaretta, Jr., Yair Eilat, & Mark Israel, *Competitive Effects of International Airline Cooperation*, J. Comp. L. & Econ. (Oct. 2017), https://doi.org/10.1093/joclec/nhx016, at 22 ("We conclude that ATIs and JVs increase total traffic and are therefore beneficial to international passengers, as demonstrated by an increase in demand for and thus output of international travel."); Jan K. Brueckner & Ethan Singer, *Pricing by International Airline Alliances: A Retrospective Study*, Economics of Transportation 20 (2019), at 16 ("It is well known that by, stimulating connecting travel to foreign destinations, alliances have greatly increased the volume of flow traffic on their GTG routes, and this exercise can provide further confirmation of this phenomenon.").

operate, such as London Heathrow, Tokyo Haneda, Lisbon, Frankfurt, Madrid-Barajas, and Toronto Pearson.[6]  American does not consider these to be apt comparisons.

It is true, as Delta and Aeromexico explain, that the "Department has entertained and maintained antitrust immunity for decades notwithstanding slot-access challenges at key hub airports worldwide because it duly recognizes that, on balance, the pro-consumer and pro-competitive benefits of immunized metal-neutral joint venture cooperation are substantial—and they outweigh the harms, if any, resulting from slot-access challenges at highly congested airports."[7]  But this applies to airports like London Heathrow, Tokyo Haneda, Lisbon, Frankfurt, Madrid-Barajas, and Toronto Pearson because they are managed by foreign governmental entities that work together with the Department to promote fairness and competition.

The Department's concerns with MEX go far beyond slot-access challenges.  It is the GoM's regrettable lack of sufficient transparency, adherence to international norms, and efforts to collaborate with the Department in addressing these slot-access challenges that have worsened since the Department first raised serious concerns in the 2016 order granting antitrust immunity to Delta and Aeromexico that is unprecedented and merits special attention.

As the Department details in the Supplemental Order to Show Cause, the Department raised "substantial slot and regulatory transparency issues" that "needed to be addressed by the GoM" in 2016, when the Department first granted antitrust immunity to Delta and Aeromexico.  Since then, the GoM has confiscated slots at MEX from U.S. airlines like American and United without adhering to international standard.  And, to this day, the GoM has provided insufficient transparency as to whether and when the airlines may be able to recover all of those slots or

---

[6] Objection of the JCA Partners to Show Cause Order 2024-01-17, Feb. 26, 2024, DOT-OST-2015-0070-0258, at 25.

[7] *Id*. at 23.

4

otherwise expand their services in MEX.  Additionally, the GoM also forced all cargo carriers to

leave MEX abruptly by decree, further limiting competition and contributing to the lack of due

process and transparency for U.S. airlines that operate flights to/from Mexico.  The GoM's

actions justify robust action by the Department because they have continued despite the

Department's repeated articulation of concerns about slot management in MEX, with nearly a

decade provided to the GoM for corrective action.  American is aware of no comparable situation

with respect to any other international joint business.

American believes strongly in the benefits of antitrust immunity.  But, as the Department

has explained, certain conditions must exist for grants of antitrust immunity to reliably yield

substantial consumer benefits over time.  Therefore, and as explained above, American reaffirms

its support for the Department's tentative conclusion that these actions fail to comply with the

U.S.-Mexico Open Skies agreement and that failure to comply removes the regulatory predicate

(open skies) that is necessary for antitrust immunity.  Because the absence of this regulatory

predicate is sufficient to warrant withdrawal of antitrust immunity, American does not take a

position on the larger merits of the application of Delta and Aeromexico for antitrust immunity

nor the Department's assessment of alternatives and harm.[8]

Respectfully submitted,

/s/ R. Bruce Wark
R. Bruce Wark
Senior Vice President & Deputy
 General Counsel
AMERICAN AIRLINES, INC.

---

[8] In the Supplemental Order to Show Cause, the Department briefly addresses economic analysis submitted by Brian Keating that estimated economic harm of more than $800 million due to potential service changes after antitrust immunity is withdrawn.  We understand that the Department's view is that this analysis is "not determinative" because the Department's focus remains on "broader public interest concerns."  American takes no view on the substance of Keating's analysis or the Department's concerns about the analysis.  However, the cancellation or reduction of service on at-risk routes can lead existing aircraft to be parked and not utilized elsewhere.  In the event that antitrust immunity is withdrawn, airlines would likely lose revenue on joint-business routes from the unraveling of efficiency-enhancing cooperation that existed with antitrust immunity.

DOT-OST-2015-0070
Comments of American Airlines, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2025, I served a copy of the foregoing document upon the following persons via email.

**Department of Transportation**
benjamin.taylor@dot.gov
brett.kruger@dot.gov
robert.finamore@dot.gov
kristen.gatlin@dot.gov
joseph.landart@dot.gov
tricia.kubrin@dot.gov
eugene.alford@dot.gov
todd.homan@dot.gov
peter.irvine@dot.gov
jason.horner@dot.gov
fahad.ahmad@dot.gov
kevin.bryan@dot.gov

**Federal Aviation Administration**
robert.carty@faa.gov

**Department of Justice**
katherine.celeste@usdoj.gov
patricia.corcoran@usdoj.gov
charlie.beller@usdoj.gov

**Department of State**
badenjs@state.gov

**Aeromexico**
charles.donley@pillsburylaw.com
edward.sauer@pillsburylaw.com

**Air Line Pilots Association**
evin.isaacson@alpa.org

**Alaska Airlines, Inc.**
dheffernan@cozen.com

**Allegiant**
agoerlich@ggh-airlaw.com

**Amerijet**
rleon@amerijet.com

**Atlas Air**
george.kopcsay@atlasair.com
keinan.meginniss@atlasair.com
sascha.vanderbellen@atlasair.com

**Delta Air Lines, Inc.**
chris.walker@delta.com
steven.seiden@delta.com

**Federal Express Corp.**
anne.bechdolt@fedex.com
brian.hedberg@fedex.com

**Frontier Airlines**
howard.diamond@flyfrontier.com

**Hawaiian Airlines**
perkmann@cooley.com

**JetBlue Airways Corp.**
robert.land@jetblue.com
reese.davidson@jetblue.com

**Kalitta Air**
jfoglia@cozen.com

**National Airlines**
mlbenge@zsrlaw.com

**Polar Air Cargo**
kevin.montgomery@polaraircargo.com

**Southwest Airlines Co.**
leslie.abbott@wnco.com
jenn.poeppelmeier@wnco.com

**Spirit Airlines**
dkirstein@yklaw.com
jyoung@yklaw.com

**Sun Country**
rose.neale@suncountry.com

**United Airlines, Inc.**
dan.weiss@united.com
steve.morrissey@united.com
aarshad@crowell.com

**United Parcel Service**
dsmalls@ups.com

**Airline Info**
info@airlineinfo.com

/s/ Alexandra P. Clark
Alexandra P. Clark

# Tab F

Answer of United Airlines, Inc. (Aug. 20, 2025)

EFORE THE

DEPARTMENT OF TRANSPORTATION

WASHINGTON, D.C.

--------------------------------------------------------------

|  |  |  |
|---|---|---|
| Joint Application of | : | |
| | : | |
| DELTA AIR LINES, INC. and | : | Docket DOT-OST-2015-0070 |
| AEROVIAS DE MEXICO, S.A. DE C.V. | : | |
| | : | |
| Under 49 U.S.C. §§ 41308 and 41309 for | : | |
| Approval of and Antitrust Immunity for | : | |
| Alliance Agreements | : | |
| | : | |

--------------------------------------------------------------

ANSWER OF
<u>UNITED AIRLINES, INC.</u>

Communications with respect to this document should be sent to:

Steve Morrissey
Vice President—
   Regulatory & Policy
United Airlines, Inc.
815 Connecticut Avenue, NW
Suite 500 – DCAIZ
Washington, DC 20006
(202) 521-4373
steve.morrissey@united.com

Daniel A. Weiss
Managing Director—
   International Affairs
   and Regulatory
United Airlines, Inc.
233 South Wacker Drive
10th Floor – HDQIZ
Chicago, IL 60606
(872) 825-6828
dan.weiss@united.com

James Conneely
Deputy General Counsel –
   Regulatory, Facilitation
   and Security
United Airlines Inc.
233 South Wacker Drive
11th Floor – HDQLD
Chicago, IL 60606
(872) 825-8311
james.conneely@united.com

Amna Arshad
Ahmad AlDajani
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2739
aarshad@crowell.com
aaldajani@crowell.com

Counsel for
United Airlines, Inc.

August 20, 2025

BEFORE THE

DEPARTMENT OF TRANSPORTATION

WASHINGTON, D.C.

```
-------------------------------------------------------------
                                      :
Joint Application of                  :
                                      :
    DELTA AIR LINES, INC. and         :        Docket DOT-OST-2015-0070
    AEROVIAS DE MEXICO, S.A. DE C.V.   :
                                      :
Under 49 U.S.C. §§ 41308 and 41309 for :
Approval of and Antitrust Immunity for :
Alliance Agreements                   :
                                      :
-------------------------------------------------------------
```

ANSWER OF
UNITED AIRLINES, INC.

Pursuant to 14 C.F.R. Part 302, United[1] respectfully submits this Answer in response to the Objection filed by Delta and Aeromexico to the Department's Supplemental Show Cause Order ("SCO") tentatively withdrawing antitrust immunity ("ATI") for their Joint Cooperation Agreement ("JCA"). While United takes no position on the broader merits of the SCO, and while Mexican officials informed IATA, American, Delta, and United on an August 18, 2025 call that slots confiscated in the Winter 2022/2023 and Summer 2023 seasons will be reinstated—with any resulting impact to the Department's SCO unknown to United—United must respond to several inaccurate claims in Delta's Objection that directly implicate United's operations and alliances.

As pertinent to Delta's Objection, several of Delta's assertions mischaracterize the distinct circumstances at airports like Tokyo Haneda ("HND") and Lisbon ("LIS"), incorrectly drawing false equivalences to Mexico City International Airport ("MEX"). United urges the Department to

---

[1]       Common names are used for airlines.

Answer of United

Page 2 of 8

consider the clarifications set forth below, which correct the record in the public interest under 49 U.S.C. §§ 41308-41309.

## I.    Delta's Statements Ignore Key Distinctions Between MEX and other Foreign Airline Hub Locations.

Delta draws superficial parallels between MEX and other slot-constrained airports like HND and LIS, asserting that the Department applies a double-standard by scrutinizing the JCA at MEX while tolerating alliances at similarly restricted hubs, in alleged violation of the Administrative Procedure Act ("APA").[2] Delta also contends the Department fails to reconcile its permissive stance on alliances like United/ANA at HND with its restrictive approach to MEX and the JCA.[3] But these comparisons conveniently ignore fundamental differences, starting with the unilateral and detrimental actions by the Mexican government at MEX—actions on which many parties, including Delta and Aeromexico themselves, appear in broad agreement as impairing combination carrier services. This underscores why Delta's analogies fall flat.

As the Department knows from annual reports and prior proceedings, the United/ANA alliance has delivered longstanding public benefits, including enhanced global network connectivity, seamless travel options, and improved customer convenience for millions of travelers. United stands ready to demonstrate these ongoing advantages.

The United/ANA JV's operational scope continues to expand thoughtfully, operating 22 distinct routes between the United States and Asia/Pacific in 2024 (consistent with 2023), with 12 routes offering twice-daily service or more and total seats increasing approximately 26% year-

---

[2]    Dep't of Transp., Delta Air Lines, Inc. & Aeromexico ATI, Objection to Supplemental Show Cause Order, Docket No. DOT-OST-2015-0070 (Aug. 11, 2025), at 53 [hereinafter "Delta Objection"].

[3]    *Id.* at 57.

over-year. Notably, the JV has grown in recent years with intra-Asia flying via United B737 aircraft on new routes such as NRT-Cebu, NRT-Kaohsiung, NRT-Ulaanbaatar, and upcoming NRT-Palau—all points not served by ANA. The alliance builds capacity in a thoughtful, pro-consumer manner valuing the unique attributes of Tokyo's airports, with HND ideal for downtown Tokyo and domestic Japan connections and Narita ("NRT") for north/east Tokyo and beyond-Asia links. For consumers, United provides service from NRT to key United hubs in the United States including Denver, Houston, Los Angeles, Newark Liberty, San Francisco, Guam, and Saipan, and from HND to geographically diversified hubs like Chicago, Los Angeles, Newark Liberty, San Francisco, Washington, D.C., and Guam. And when additional HND slot pairs became available due to Delta and Hawaiian's non-use or misuse, United competed vigorously to secure them, adding flights that directly benefit the traveling public and United States communities—unlike Delta's track record of squandering such opportunities.

Delta's claim that the Department has done nothing to improve HND access is particularly audacious, bordering on willful ignorance. Delta asserts that the Department has never proposed mechanisms for better HND access, questioned Japan's compliance with the bilateral agreement, or consider whether Open Skies conditions support ongoing immunity for alliances like United/ANA.[4] In reality, HND stands as a model of distinction from MEX, thanks to the Department's persistent efforts to liberalize access under the U.S.-Japan bilateral agreement. These include:

- the 2010 U.S.-Japan Memorandum of Understanding ("MOU"), which opened HND with an initial four overnight slot pairs—a significant improvement over prior zero access;[5]

---

[4]    *Id.* at 56.

[5]    U.S. Dep't. of State, Memorandum of Understanding Between the United States of America and Japan on International Air Transportation (Oct. 25, 2010), available at https://2009-2017.state.gov/documents/organization/150284.pdf.

Answer of United

Page 4 of 8

- the 2016 Record of Discussions ("ROD") amending the MOU to add five daytime and one nighttime slot pairs;[6] and

- the 2019 ROD, which delivered the largest incremental increase in slot pairs for HND – U.S. flying, larger than what was secured by any other foreign country negotiating with Japan. The result was an additional 12 daytime slots for a total of 17 daytime slots and one nighttime slot. The 2019 ROD also establishes a framework for progress toward open skies with guidelines such as allowing carriers to swap, transfer, and lease slots based on IATA Worldwide Slot Guidelines, and including all international slots between 6:00 a.m. and 10:55 p.m. local in the pool, as well as those between 10:00 p.m. and 6:55 a.m.[7]

Recent air service talks in 2024 in Washington and 2025 in Tokyo—attended by Delta representatives, no less—continue to advance these very principles. It is United's understanding that in these most recent discussions the Department and Japan have agreed in principle to remove the distinction between HND daytime and nighttime slots. Progress may be gradual, and Japan will need to negotiate with multiple countries to achieve the HND open access envisioned, but it is consistent: Japan has not reversed course, withdrawn agreed slots, and no specific carrier from the U.S. or Japan has been treated unfairly or unequally at HND. And finally, nor has the Department withdrawn HND slot pairs to U.S. airlines without cause, unlike the unilateral moves at MEX. And it was Delta's years of abusing Department start-up and dormancy rules that prompted reallocation of Delta's slots at HND, a fact Delta conveniently omits.[8]

Delta's portrayal of LIS is equally misleading. Delta argues that TAP controls nearly 50% of LIS slots and uses them to support transatlantic flights under the immunized alliance involving

---

[6]    U.S. Dep't of State, Record of Discussions on U.S.-Japan Civil Air Transport Agreement (Feb. 18, 2016), available at https://2009-2017.state.gov/e/eb/rls/othr/ata/j/ja/253150.htm.

[7]    U.S. Dep't of State, Record of Discussions on U.S.-Japan Civil Air Transport Agreement (Aug. 2, 2019), available at https://www.state.gov/u-s-japan-record-of-discussions-of-august-21-2019.

[8]    *See* U.S. Dep't of Transp., Docket No. DOT-OST-2019-0014, Order 2023-11-5, Order 2024-1-18 (reallocating HND slots from Delta).

United and others.[9] In truth, United and TAP are members of the A++ ATI grant, but their cooperation falls far short of the coordinated scheduling, pricing, and revenue sharing Delta implies—it is limited to modest codeshare activity, with United placing its UA* designator on eight routes operated by TAP beyond LIS and TAP placing its TP* designator on 21 routes beyond United's United States hubs to domestic points, no reciprocal codeshare on United States-Portugal flights, and basic systemwide loyalty program benefits. This is a far cry from Delta's insinuation of slot-sharing dominance, and it certainly does not "fund" United's transatlantic operations at LIS as Delta suggests.

The reality at LIS is distant from Delta's narrative of highly coordinated activity harming competitors like themselves. United has faced its own hurdles in expanding at LIS, yet has strategically enhanced United States-Portugal connectivity for the benefit of the traveling and shipping public by serving points outside Lisbon, such as Faro, Funchal, Porto, and Ponta Delgada. Delta could pursue similar innovation but has chosen not to, preferring instead to cry foul over imagined inequities at LIS.

United's LIS slot holdings—totaling just two daily arrival and departure slots—are granted independently by the LIS slot coordinator, with zero involvement from TAP. Specifically, for Summer 2025 local times:

- Slot pair #1 supports EWR-LIS-EWR (daily 8:20 arrival/10:25 departure), originally granted to Continental Airlines well before any alliance with TAP;

- Slot pair #2 supports IAD-LIS-IAD (daily 10:30 arrival/12:20 departure), granted directly to United.

---

[9]     Delta Objection, *supra* note 2, at 59.

Notably, United's request for a second EWR-LIS-EWR operation in Summer 2024 was granted on only two days per week, and its bid for an additional flight in Summer 2025 on the route was flatly denied—hardly the picture of alliance-enabled dominance Delta sketches.

## II.    Delta's Market Comparisons and Consistency Claims Lack Support

Delta accuses the Department of an unacknowledged policy shift, demanding explicit recognition and justification for any departure. Delta argues that agencies must acknowledge policy changes, provide good reasons, and consider engendered reliance interests,[10] but Delta's market comparisons and portrayal of the Department's consistency towards other alliances are not supported by the record.

For example, Delta's claim—that the Department fails to treat similarly situated carriers alike—relies on the flawed premise that HND and LIS are "like" MEX, ignoring the nuanced ecosystems of bilateral compliance and negotiation histories that make them incomparable.[11] HND, for one, is far less restrictive than Delta's caricature suggests, thanks to the Department's sustained liberalization efforts detailed above. The U.S.-Japan agreements from 2010, 2016, and 2019 have progressively increased slot availability and flexibility, enabling alliances like United/ANA to deliver measurable public benefits.

By contrast, the SCO details violations of the U.S.-Mexico bilateral agreement since 2022 that are unique to that agreement. The Department's action in the SCO thus directly targets these specific bilateral violations at MEX and does not implicate United/ANA at HND, where the alliance has thrived under a stable, liberalizing framework that has delivered substantial and measurable public benefits. Indeed, the cooperative U.S.-Japan framework stands in sharp contrast

---

[10]    *Id*. at 53.

[11]    *Id*. at 51-62.

Answer of United

Page 7 of 8

to Mexico, with negotiations that have steadily expanded HND access without such violations by the Japanese government. The SCO's targeted action against DL/AM is therefore properly viewed as addressing the problems at MEX and should not be viewed or argued as a broader policy shift affecting other alliances. DOT acknowledges this, with the SCO stating that "[The Japan-U.S. market] presents facts and circumstances that are different from this case as Japan has transparent slot mechanisms that largely conform to international standards."[12]

### III.    Delta's Call for Consistency Cuts Both Ways

Finally, Delta invokes the "fundamental norm" of treating like cases alike, decrying disparate treatment. Delta claims the Department's unacknowledged shift leads to unfair treatment of its JV, violating the principle that agencies must handle similar cases consistently.[13] Delta should heed its own words, as its ATI/JV with KLM/Air France is based at Amsterdam Schiphol (AMS), where Dutch officials continue to pursue capacity restrictions despite previous successes by industry and government to moderate those restrictions. Delta's finger-pointing at foreign hubs rings hollow when its own alliances invite the same scrutiny.

If we are compiling lists of foreign airports hubbed by U.S. ATI/JV partners with access challenges, Seoul Incheon (ICN) should be added to the list. While Delta points accusatory fingers at HND and LIS, its grants of ATI and JVs with KLM at AMS and Korean at ICN could deserve equal time under the microscope if Delta's deflections of attention from MEX are to be entertained. Even domestically, Delta's logic boomerangs: Access at New York JFK—where Delta has a hub—

---

[12]    Dep't of Transp., Delta Air Lines, Inc. & Aeromexico ATI, Show Cause Order 2025-7-12 (Jul. 12, 2025), Docket No. DOT-OST-2015-0070, at 28.

[13]    Delta Objection, *supra* note 2, at 54.

is notoriously challenging, with peak-hour capacity maxed out. This mirrors Delta's attacks on

HND.

WHEREFORE, for the reasons set forth above, United respectfully requests that the

Department consider these clarifications in evaluating Delta's Objection and grant such other relief

as may be necessary in the public interest.

Respectfully submitted,

_____

Amna Arshad
Ahmad AlDajani

Crowell & Moring LLP

Counsel for United Airlines, Inc.

August 20, 2025

## CERTIFICATE OF SERVICE

I certify that I have this date served the foregoing document on the following persons by causing a copy to be sent electronically in accordance with the Department's Rules of Practice:

| Air Carrier | Name | Email Address |
| --- | --- | --- |
| Aeromexico | Charles Donley | charles.donley@pillsburylaw.com |
| Aeromexico | Edward Sauer | edward.sauer@pillsburylaw.com |
| Alaska/Hawaiian | David Heffernan | dheffernan@cozen.com |
| Allegiant | Laura Overton | laura.overton@allegiantair.com |
| Allegiant | Thomas Mueller | Thomas.mueller@wilmerhale.com |
| American | Bruce Wark | bruce.wark@aa.com |
| American | Brent Alex | brent.alex@aa.com |
| American | Ronce Almond | ronce.almond@aa.com |
| Amerijet | Roy Leon | rleon@amerijet.com |
| Atlas | Keinan Meginniss | keinan.meginniss@atlasair.com |
| Atlas | Sascha Vanderbellen | Sascha.vanderbellen@atlasair.com |
| Breeze | Parker Erkmann | perkmann@cooley.com |
| Delta | Steven Seiden | steven.seiden@delta.com |
| Delta | Christopher Walker | chris.walker@delta.com |
| Delta | Eugene Scalia | dforrester@gibsondunn.com |
| Delta | Amir Tayrani | atayrani@gibsondunn.com |
| Federal Express | Anne Bechdolt | anne.bechdolt@fedex.com |
| Federal Express | Brian Hedberg | brian.hedberg@fedex.com |
| Frontier | Howard Diamond | howard.diamond@flyfrontier.com |
| JetBlue | Robert Land | robert.land@jetblue.com |
| JetBlue | Reese Davidson | reese.davidson@jetblue.com |
| Kalitta Air | Jonathon Foglia | jfoglia@cozen.com |
| National Airlines | Malcolm Benge | mlbenge@zsrlaw.com |
| National Airlines | John Richardson | jrichardson@johnlrichardson.com |
| Polar Air Cargo | Kevin Montgomery | kevin.montgomery@polaraircargo.com |
| Southwest | Leslie Abbott | leslie.abbott@wnco.com |
| Spirit Airlines | David Kirstein | dkirstein@yklaw.com |
| Spirit Airlines | Joanne Young | jyoung@yklaw.com |
| Sun Country | Rose Neale | rose.neale@suncountry.com |
| UPS | Anita Mosner | anita.mosner@hklaw.com |
| UPS | Dontai Smalls | dsmalls@ups.com |
| DOT | Todd Homan | todd.homan@dot.gov |
| DOT | Peter Irvine | peter.irvine@dot.gov |
| DOT | Jason Horner | jason.horner@dot.gov |
| DOT | Fahad Ahmad | fahad.ahmad@dot.gov |
| DOT | Kevin Bryan | kevin.bryan@dot.gov |
| DOT | Benjamin Taylor | benjamin.taylor@dot.gov |

| DOT | Robert Finamore | robert.finamore@dot.gov |
| DOT | Brett Kruger | brett.kruger@dot.gov |
| DOT | Kristen Gatlin | Kristen.gatlin@dot.gov |
| DOT | Joseph Landart | joseph.landart@dot.gov |
| DOT | Tricia Kubrin | tricia.kubrin@dot.gov |
| DOJ | Katherine Celeste | katherine.celeste@usdoj.gov |
| DOJ | Patricia Corcoran | patricia.corcoran@usdoj.gov |
| DOJ | Robert Carty | robert.carty@faa.gov |
| State Dep't | Juha Salin | salinjp@state.gov |
| State Dep't | Evin Isaacson | evin.isaacson@alpa.org |
| Airline Info | | info@airlineinfo.com |

_____
    Amna Arshad

August 20, 2025

# Tab G

Order 2025-9-8 (Sept. 15, 2025)

Order 2025-9-8
Issued: September 15, 2025



**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 15th day of September 2025

| | |
|---|---|
| **Joint Application of**<br><br>**DELTA AIR LINES, INC.<br>AEROVIAS DE MEXICO, S.A. DE C.V.**<br><br>**Under 49 U.S.C. §§ 41308 and 41309 for<br>Approval of and Antitrust Immunity for<br>Alliance Agreements** | **Docket DOT-OST-2015-0070** |

### FINAL ORDER

By this Order, the U.S. Department of Transportation (the Department) makes final the proposed decision in Order 2025-7-12 to end the price- and capacity-setting joint venture operated by Delta Air Lines, Inc. (Delta) and Aerovias de Mexico, S.A. DE C.V. (Aeromexico). Specifically, the Department terminates approval of the Delta/Aeromexico joint venture agreements under 49 U.S.C. § 41309 and associated grant of antitrust immunity (ATI) under 49 U.S.C. § 41308. This termination is effective as of January 1, 2026.

This action is necessary because of ongoing anticompetitive effects in U.S.-Mexico City markets that provide an unfair advantage to Delta and Aeromexico as two predominant competitors and create unacceptable actual and potential harm for stakeholders, including consumers. These anticompetitive effects have broader implications beyond Mexico City, affecting competition for passengers and cargo operations in additional markets between the United States and Mexico.

The Government of Mexico (GoM) continues along a path of market intervention and distortion that adversely affects competition in the U.S.-Mexico air services market and is contrary to the U.S.-Mexico Air Transport Agreement in which the GoM made a "commitment to promote and facilitate an international aviation system based on competition among airlines in the marketplace."[1] As documented in this proceeding, the GoM confiscated slots, prohibited all-cargo operations at Mexico City's primary airport, Benito Juarez International Airport (MEX),

---

[1] Air Transport Agreement Between the Government of the United States of America and the Government of the United Mexican States (Dec. 18, 2015) at 1, *available at* https://20092017.state.gov/e/eb/rls/othr/ata/m/mx/250782.htm.

perpetuated a slot allocation regime that does not meet international standards and advantages Aeromexico, and generally demonstrated that, at any time, the GoM may upset aviation operations and long-term commercial planning by airlines through arbitrary action.[2]

In such an environment, it is inappropriate for the Department to continue a grant of ATI because there is inadequate competition in the market.  Significant problems become not just possible, but likely: higher fares in some markets, stifled innovation, reduced capacity (including frequencies and new routes), "doing business" challenges for U.S. carriers due to government intervention, and other impediments for incumbent competitors and new entrants.  The Department is observing some of these impacts in the U.S.-Mexico market already and the anticompetitive impacts are exacerbated by the joint venture.  An open international regulatory framework consistent with Open Skies principles, in law and practice, remains essential, pursuant to 49 U.S.C. §§ 41309 and 41308, for obtaining approvals of, and maintaining grants of antitrust immunity for, price- and capacity-setting joint ventures.

This action is the culmination of an objective factual assessment based upon nearly a decade of persistent competition issues, effectuated through a transparent process of reviewing joint venture alliances under Sections 41309 and 41308, applying rigorous standards that the joint venture partners must continually meet.  The Department is authorized by Congress to review developments in the marketplace periodically and act as warranted to safeguard competition in domestic and international markets.[3]

The Department is not foreclosing the possibility of an improved competitive environment in the future.  The GoM has begun engaging with the Department to discuss U.S. concerns stemming from Mexico's noncompliance with the U.S.-Mexico Air Transport Agreement.  However, it will take time before the Department is able to assess the GoM's willingness and ability to come back into and remain in full compliance with the U.S.-Mexico Air Transport Agreement, and for competitive market conditions to improve in the U.S.-Mexico market.

Even without a grant of ATI, Delta and Aeromexico have considerable flexibility to compete in the market and to work together to maintain and enhance their joint offerings.  Delta's 20 percent equity stake in Aeromexico will be a powerful economic incentive to continue cooperation subject to the antitrust laws.  If conditions improve, the Department will take those improved conditions into account at that time.

## I.    BACKGROUND

In 2015, the United States and the GoM agreed to a liberalized air services regulatory framework, with the resulting U.S.-Mexico Air Transport Agreement containing all elements of

---

[2] *See* Order to File Schedules, Order 2025-7-11 (July 19, 2025), DOT-OST-2025-0436-0001 (hereinafter referred to as "Order 2025-7-11").

[3] *See e.g.,* 49 U.S.C. § 41309 (b)(1) (the Secretary shall "after periodic review, end approval of, an agreement … that substantially reduces or eliminates competition…").

an Open Skies agreement as defined by the Department.[4]  Even before the agreement became effective, the United States indicated to the GoM and interested parties that each application for ATI is considered on its merits: "[b]ecause the DOT must, by statute, take into account the competitive market conditions contemporaneous with the filing of an ATI application, carriers should be aware of the need to take into account the availability of all essential commercial rights … in the framework of a modernized agreement."[5]

In 2016, the Department completed a lengthy review and granted a request by Delta and Aeromexico to launch a joint venture in the U.S.-Mexico market with a grant of ATI.  The joint venture is an integrated commercial arrangement enabling the joint venture partners to coordinate prices, capacity, and operations.  The full history of this matter, captured in nearly a decade of filings in this docket, is recited in Order 2025-7-12 and summarized as follows:

- ***First Application***: On March 31, 2015, Delta and Aeromexico applied for approval of, and a grant of ATI for, a joint venture providing integrated services between the U.S. and Mexico.  The Department paused the proceeding pending the implementation of an Open Skies agreement between the U.S. and the GoM.  During consideration of the application, the Department identified and committed to the record several significant competitive concerns regarding concentration at MEX, problematic competitive behaviors by incumbents at MEX, and anticompetitive slot administration practices by Mexican authorities.

- ***Approval with Conditions***: Based on concerns in the record, the Department identified a narrow pathway by which Delta and Aeromexico could obtain a grant of ATI, subject to strict conditions.  Among other factors, the Department was concerned about the slot allocation mechanism at MEX and its impact on competition and the realization of public benefits otherwise unattainable.  The conditions included a slot divestiture, limiting the duration of the approvals to five years, and language clarifying that the Department could review and terminate the ATI at any time.  Delta and Aeromexico were required to submit and obtain approval of a *de novo* application as a requirement to maintain ATI going forward.  The Department memorialized these conditions in a show cause order, with notice and an opportunity for comment, and a final order.  Delta and Aeromexico accepted the conditions on November 30, 2016[6] and were given approval of, and a grant of ATI for, their joint venture on December 14, 2016, for a limited time with an expiration date.[7]

---

[4] *See* Supplemental Order to Show Cause, Order 2025-7-12 (July 19, 2025)  at 15 and footnote 64 (hereinafter referred to as "Order 2025-7-12").
[5] Order 2025-7-12 at 4, citing U.S.-Mexico Memorandum of Consultations (Nov. 7, 2014), U.S. Department of State, *available at* https://2009-2017.state.gov/e/eb/rls/othr/ata/m/mx/250782.htm.
[6] Reply of the Joint Applicants (Nov. 30, 2016), DOT-OST-2015-0070-0091.
[7] Final Order, Order 2016-12-13 (Dec. 14, 2016), DOT-OST-2015-0070-0096.

3

- ***Extension of the Expiration Date***: In December 2020, by Order 2020-12-18, due to the COVID-19 pandemic and other reasons, the Department agreed to postpone the expiration of the ATI. The Department stated that the "grant of antitrust immunity will continue in effect through the Department's review of the Joint Applicants' *de novo* application."[8]

- ***Second Application***: On March 29, 2022, Delta and Aeromexico filed a *de novo* application. The Department reviewed the application and determined to suspend the procedural schedule.[9] The suspension did not terminate the existing ATI, which continued in effect pending further consideration of the issues. The *de novo* application was filed at a time when competitive concerns in the market were increasing significantly. Order 2025-7-12 explains that, among other things, the Federal Aviation Administration had determined that the GoM was not providing aviation safety oversight in accordance with international standards and had frozen the service offered by Mexican carriers to existing levels, lessening competition.[10]

- ***The GoM's Non-Compliance with the U.S.-Mexico Air Transport Agreement and Unilateral Changes to the Regulatory Framework***: Beginning in 2022, the GoM took a series of measures that restricted the U.S.-Mexico air services market, calling into question the propriety of the continued approval of the joint venture and undermining the Department's findings in its ATI orders. These actions were documented by Notice in Docket DOT-OST-2021-0152, Order 2024-01-17 in this docket and again in Order 2025-7-11 in Docket DOT-OST-2025-0436 and Order 2025-7-10 in Docket DOT-OST-2025-0435, the former having been expressly cited and relied upon in Order 2025-7-12 in this docket.

- ***Early Proposal to Withdraw the Grant of ATI***: In January 2024, after reviewing the *de novo* application and considering the issues then affecting the market, the Department proposed to withdraw its grant of ATI from Delta and Aeromexico by dismissing their pending application. Order 2024-01-17 identified the Department's concerns, noting the decree by the GoM prohibiting all-cargo operations at MEX, the confiscation of U.S. carrier slots, and the unreliable and nontransparent slot administration practices that reduced capacity and restricted new entry at MEX.

Over the subsequent 18 months, the Department continued engagement with the GoM concerning its violations of the bilateral agreement, but to no avail. The adverse conditions not only continued but worsened.[11]

---

[8] Order 2020-12-18 (Dec. 17, 2020) at 5, DOT-OST-2015-0070-0235.
[9] *See* Notice (April 11, 2022), DOT-OST-2015-0070-0239; *see also* Order 2025-7-12 at 9-10.
[10] *See* Order 2025-7-12 at 9-10.
[11] *See, e.g.*, Order 2025-7-10 (July 19, 2025) (documenting that the GoM began impairing operating rights of charter and cargo carriers), DOT-OST-2025-0435-0001.

4

### A. Supplemental Show Cause Order 2025-7-12

On July 19, 2025, the Department issued a detailed Supplemental Show Cause Order proposing to end the Delta/Aeromexico joint venture previously approved in 2016. In Order 2025-7-12, the Department cited a comprehensive list of authorities authorizing the Department to review regulatory conditions on an ongoing basis.[12] The Department explained that the applicable statutes for reviewing international joint ventures are 49 U.S.C. §§ 41309 and 41308 and that the Department's critical assessment of the international regulatory framework in relevant markets is firmly grounded in the statutory standards.

The Department established that circumstances have changed in the U.S.-Mexico City and broader U.S.-Mexico markets since the initial approval of the Delta/Aeromexico joint venture, and that significant competition concerns exist that create actual and potential harm for U.S. stakeholders, including consumers.[13] The Department outlined the competition-limiting measures taken by the GoM, including by reference to Order 2025-7-11, which required Mexican carriers to begin filing schedules. The Department explained the distortions in competition that are occurring and are likely to continue occurring due to inadequate competition in the market. Order 2025-7-12 described how these distortions have reduced the economic incentive for the Delta/Aeromexico joint venture to pass along to consumers economic benefits in the form of better services, lower prices, and increased capacity on hub-to-hub routes providing additional seats for connecting markets.

The Department conducted two analyses using publicly available information and market data widely available to interested parties: the Analysis of Changed Circumstances, which included a review of detrimental competitive effects and loss of public benefits, and the Additional Factual Assessment of Competitive Conditions. Relying upon the Analysis of Changed Circumstances, the Department applied the statutory standards in 49 U.S.C. §§ 41309 and 41308 to the facts and circumstances in the record:

> Based on these facts and circumstances, the Department cannot clear the statutory hurdles in section 41309 to approve, or maintain approval of, a significant [joint venture] agreement; rather, the statute guides us to 'after periodic review, end approval of … an agreement…that substantially reduces or eliminates competition.'
>
> [T]he Department concludes tentatively that its 2016 findings and conclusions supporting approval of the joint venture under 49 U.S.C. § 41309 and a grant of antitrust immunity for Delta and Aeromexico under 49 U.S.C. § 41308 are no longer valid. Consistent with this conclusion, under section 41309, the Department disapproves tentatively the [joint venture] agreement because continuation would be adverse to the public interest. Under section 41308, the

---

[12] *See* Order 2025-7-12 at 12-14 ("All of the statutes of general applicability strongly counsel the Department to remain vigilant and dynamic in its assessment and view of the public interest.").
[13] Order 2025-7-12 at 2-3, 10, 18-28.

Department determines tentatively that a grant of ATI is not required by the public interest.[14]

Before drawing tentative conclusions, the Department considered alternative approaches. Order 2025-7-12 documented the Department's consideration of (1) maintaining the ATI while waiting for events to change, (2) abandoning the earlier proposal to withdraw the grant of ATI and letting international negotiations play out, (3) carving out Mexico City and/or cargo from the scope of the ATI grant, and (4) using other means, such as 49 U.S.C. § 41310, to address competitive concerns. The Department weighed these alternatives in two pages of discussion and highlighted language in the ATI statutes providing that the Secretary shall disapprove a joint venture that substantially reduces competition unless he finds that (1) the agreement is necessary to meet a serious transportation need or to achieve important public benefits, and (2) the transportation need cannot be met or those benefits cannot be achieved by reasonably available alternatives that are materially less anticompetitive. In the context of this case, those reasonably available alternatives may include non-immunized forms of cooperation between Delta and Aeromexico, such as loyalty program coordination and code sharing.

The Department explained that there were two proceedings involving Delta and Aeromexico. The first proceeding was the review of the existing approval and grant of ATI as extended through the pendency of the Department's review, which may result in modification or termination of the ATI as warranted.

The second proceeding was initiated with the *de novo* application that the Department directed Delta and Aeromexico to file if they wished to obtain renewed approval of, and a grant of ATI for, the joint venture agreements to extend beyond the initial limited term. When the new application was filed in 2022, the Department suspended the procedural schedule via a Notice issued April 11, 2022, until the record was substantially complete. Order 2025-7-12 did not change this procedural posture. Thus, the *de novo* application remains suspended under the Department's previously issued Notice.[15]

After the Department issued Order 2025-7-12, Delta and Aeromexico, supported by several interested parties, moved for additional time to respond. Delta and Aeromexico asked for four additional weeks. The Department granted them one additional week over and above the normal 14-day comment period, stating that a longer extension risks the possibility of unnecessarily prejudicing parties affected by the competitive issues in the U.S.-Mexico market.

---

[14] Order 2025-7-12 at 25, 38.
[15] Notice (April 11, 2022), DOT-OST-2015-0070-0239.

### B. Comments on the Supplemental Show Cause Order 2025-7-12

The Department invited public comments on Order 2025-7-12.[16] **Delta and Aeromexico** continue to object strenuously to the Department's proposed action, defending their joint venture as proconsumer and procompetitive. They contend that their joint venture generates nearly 4,000 U.S. jobs, more than $310 million of U.S. gross domestic product (GDP), and more than $200 million of annual tourism spending in the United States. They stress that if their joint venture is unwound, those economic benefits will disappear, including that up to $800 million in annual consumer benefits could evaporate, up to two dozen routes could be canceled, smaller aircraft could replace current narrowbodies, and tens of thousands of jobs could be threatened. The two joint venture partners are concerned that the Department's approach would punish a U.S. company and a Mexican airline with significant U.S. ownership, while strengthening the hand of the Mexican state-sponsored airline, Mexicana. They also argue that the Department has failed to apply the relevant statutory standards and violated the Administrative Procedure Act.

The **Asociacion Sindical de Pilotos Aviadores de Mexico**, representing Aeromexico's pilots, opposes the Department's proposed action, highlighting that current marketplace activities produce significant labor, economic, and public benefits for Americans and Mexicans alike.

While not taking a position on the merits of the joint venture, **Allegiant Air and Viva Aerobus** express support for the Department's approach but also serious reservations insofar as the two carriers may be unable to develop a planned immunized alliance in the U.S.-Mexico market. Allegiant and Viva, which also have a request for ATI pending, appreciate that every application for approval of, and ATI for, a joint venture should be assessed on the specific facts, and they agree with the Department that the effectiveness of the Open Skies relationship is an important factor in the statutory competitive analysis. They submit that any failings of the Delta/Aeromexico joint venture would not be found in a competing joint venture by Allegiant and Viva. Allegiant and Viva state that the "ongoing delay in engaging in a fact specific assessment of the Allegiant/Viva alliance" is not only unfair but also anticompetitive and costly to consumers. Allegiant and Viva ask the Department to address any "prerequisites" of U.S.-Mexico cooperation expeditiously and to cease preventing greater competition in markets outside of Mexico City, such as leisure or "beach" markets that would be served by an Allegiant/Viva alliance. In a subsequent pleading, Allegiant and Viva state that "Open Skies" is not a prerequisite.

The **Department of Justice, Antitrust Division (DOJ)** underscores the importance of open market access for airlines wishing to serve a route for ensuring competition and endorses the Department's approach of reviewing the international regulatory framework (*i.e.*, whether there is an Open Skies agreement in law and practice) as a threshold requirement in reviewing

---

[16] **Exhaustless Inc.** and **Steven P. Endres** posted documents raising issues and concerns outside the scope of the proceeding.

international airline alliances.  DOJ also supports the Department's tentative decision not to renew the grant of ATI for Delta and Aeromexico.

**American Airlines** supports the Department's "decisive actions" to promote vibrant trade with foreign countries on terms that allow U.S. companies to compete fairly.  Absent a properly functioning Open Skies agreement, American says, U.S. carriers may be systematically disadvantaged and forced to compete on unfavorable terms, subjecting them to higher costs and distorting competition – and this is occurring now in the U.S.-Mexico market, American affirms. American supports the Department's tentative decision as consistent with longstanding approaches.

**United Airlines** takes no position on the merits of the Department's proposal but argues that Delta and Aeromexico have drawn false equivalencies between competitive effects in Mexico City, caused in large part by the restrictive actions of the GoM, and competitive effects in other congested cities such as Lisbon or Tokyo.  United believes that, in defending their joint venture, Delta and Aeromexico have ignored key distinctions in the operating and regulatory environment.[17]

## II.    STATUTORY FRAMEWORK

The Department reviews joint venture agreements involving foreign air transportation filed under 49 U.S.C. §§ 41309 and 41308 in accordance with its procedural regulations at 14 CFR Part 303. A person seeking approval of a transaction covered by 49 U.S.C. § 41309 may file an application.  Applications must be prepared and submitted consistent with the Department's procedures.  The applicant must state explicitly whether it seeks ATI under 49 U.S.C. § 41308.

When reviewing new requests, the Department undertakes a two-step process.  The first step, under Section 41309, involves determining whether the cooperation agreement is "adverse to the public interest," based on competitive factors (competitive effects analysis).  The Secretary shall approve the agreement if it is consistent with the public interest.  The Secretary shall disapprove, or after periodic review, end approval of, an agreement that substantially reduces or eliminates competition, unless the Secretary finds that the agreement is necessary to meet a serious transportation need or achieve important public benefits, and the transportation need cannot be met, or those benefits cannot be achieved, by reasonably available alternatives that are materially less anticompetitive.

The second step, under Section 41308, involves the request for ATI.  If the Secretary approves an agreement, he may exempt the parties to the agreement from the antitrust laws, when he decides it is required by the public interest, but only to the extent necessary to allow those parties to proceed with the transaction.  To determine whether an exemption is required by the public

---

[17] **JetBlue Airways** filed a letter in the docket, dated August 28, 2025, expressing concerns about airport access in markets where there are immunized alliances, including markets like Lisbon.  JetBlue indicates that the promise of an Open Skies policy is that new entrants and smaller carriers should not face barriers to entry, but rather should be able to succeed or fail in a competitive marketplace based on their commercial merit.  Embedded in JetBlue's letter is a motion for leave to file based upon good cause shown, which we grant.

8

interest, the Department conducts a detailed examination of public benefits (public benefits analysis). The Department's findings must be included in the final order approving or disapproving the agreement.

The Department has significant discretion to review past approvals and grants of antitrust immunity and to modify or revoke them as warranted. In its competitive analysis under Section 41309, the Department may modify, disapprove, or end any previously approved joint venture if, based on current facts and circumstances, the joint venture agreements have become adverse to the public interest, broadly defined, or they substantially reduce or eliminate competition without being necessary to meet a serious transportation need or to achieve important public benefits. In addition, in reviewing any ATI conferred previously in any Section 41309 transaction, the Department may at any time terminate or modify such a grant of ATI if it determines the ATI is not required by the public interest. Indeed, if the agreement under review is found to be adverse to the public interest under Section 41309, no grant of immunity under Section 41308 is possible. It was for that reason that the Department proposed to revoke the prior grant of ATI in Order 2025-7-12. After the Department found that the Delta/Aeromexico joint venture is adverse to the public interest (and substantially reduces competition) and must be disapproved, as a matter of law the prior grant of ATI must be revoked.

## III.    DECISION

After review of the objections, comments, and answers to objections on the record, the Department has decided to finalize the proposal in Order 2025-7-12, with some modifications, and end approval of and grant of ATI for the Delta/Aeromexico joint venture.

### A.  Explanation of the Decision

Changed Facts and Circumstances

The Department makes final the factual assessment from Order 2025-7-12, which incorporated by reference findings in Order 2025-7-11 describing the GoM's violations of the U.S.-Mexico Air Transport Agreement. Order 2025-7-12 identified significant and material changes to competitive conditions in U.S.-Mexico City and broader U.S.-Mexico markets in which the Delta/Aeromexico joint venture competes versus the Department's assessment in 2016 when the joint venture was initially approved and given a temporary grant of ATI. The following key facts and circumstances are firmly supported in the evidentiary record:

- Since 2022, the GoM has repeatedly distorted competition in the market in ways that are material to competition for passenger services, all-cargo services, passenger/combination services, entry into congested markets, predictability of entry across multiple markets, and with regard to ensuring a level playing field and equal opportunity to compete, including for airlines such as Delta and Aeromexico that operate with special permissions to coordinate prices and capacity without normal enforcement of the U.S. antitrust laws.[18]

---

[18] Order 2025-7-12 at 2, 18-19 (summarizing the GoM's actions and incorporating Order 2025-7-11).

9

- The GoM is not compliant with numerous provisions of the U.S.-Mexico Air Transport Agreement and thus is not acting consistently with all elements of a liberalized Open Skies agreement. These violations have deleterious implications for airline competition in the U.S.-Mexico market.[19]

- The competitive conditions in affected markets, at a minimum with respect to the GoM's ability to maintain a consistent and procompetitive regulatory framework, consistently have been poor for a number of years and have deteriorated further.[20]

- The Delta/Aeromexico joint venture includes price- and capacity-setting mechanisms that the parties would not implement without the approval of, and a grant of ATI from, the Department.[21]

- The Delta/Aeromexico joint venture has a predominant share of capacity in the U.S.-Mexico City market and a substantial share of the broader U.S.-Mexico market.[22]

- The Delta/Aeromexico joint venture partnership controls at least a predominant share of slots at MEX and has considerably more flexibility to adjust to adverse or changing circumstances at that airport or reductions in capacity than other competitors – even if those reductions also negatively impact Delta and Aeromexico.[23]

- Entry at MEX is severely restricted.[24] The slot administration process at MEX, and potentially other Mexican airports in the future, is non-transparent and needs reform to promote competition to and from Mexican gateways.[25]

- There are distortive effects in the market for cargo services to, from, and via Mexico City: all-cargo carriers were forced to absorb the cost of moving to new facilities involuntarily. Ongoing coordination between Delta and Aeromexico at MEX gives them commercial advantages in cargo carriage not available to their competitors by law.[26] Delta and Aeromexico have increased their share of a constrained and lucrative market for cargo services at MEX.[27]

---

[19] Order 2025-7-12 at 2, 18 and Objection of the JCA Partners to Supplemental Show Cause Order 2025-7-12 (Aug. 11, 2025) at 19 ("The JCA Partners do not dispute the Department's factual observations regarding the GOM's actions at MEX"), DOT-OST-2015-0070-0344 (hereinafter referred to as "Objection").

[20] Order 2025-7-12 at 19.

[21] Joint Application of Delta and Aeromexico for Renewed Approval of and Grant of Antitrust Immunity for Alliance Agreements (March 29, 2022) at 2 ("[C]losely integrated pricing, network planning, revenue management, joint sales, and other enhanced cooperation [are] made possible by the immunized JCA"), DOT-OST-2015-0070-236.

[22] Objection at 3 and Order 2025-7-12 at 32.

[23] Order 2016-11-2 at 15-17, Order 2016-12-13 at 16-18, and Order 2025-7-12 at 32.

[24] Order 2025-7-11 at 4 ("the GoM issued a Resolution on August 31, 2023, declaring MEX runway usage to be saturated and mandating that MEX operations be further reduced from 52 to 43 per hour effective with the Winter 2023/2024 traffic season"), DOT-OST-2025-0436-0001.

[25] Order 2025-7-12 at 19-20.

[26] Order 2025-7-12 at 2-3, 19, 21-22.

[27] Order 2025-7-12 at 22.

**Supp.App.72**

- Delta and Aeromexico have materially less incentive or ability to deliver public benefits that would not otherwise be possible without a grant of ATI given the restrictions at MEX and Aeromexico's hub at MEX.[28]

### Ending Approval Under Section 41309 and Termination of the Grant of ATI

The Department makes final its tentative conclusions that the findings from 2016 supporting the approval of the Delta/Aeromexico joint venture and the relevant agreements submitted under Section 41309 are no longer valid and that currently the joint venture substantially reduces or eliminates competition in relevant markets and is adverse to the public interest.

Order 2025-7-12 recounted the findings from the 2016 orders conditionally approving and making a temporary grant of ATI and provided a "cross-walk" showing how current facts and circumstances in the U.S.-Mexico market no longer support continuation of the ATI.[29]  The Department affirms this review and determination.

Order 2025-7-12 also described detrimental competitive and public-benefits effects in sufficient detail to support a finding that the joint venture, in the context of current market and regulatory conditions, "substantially reduces or eliminates competition" as set forth in 49 U.S.C. § 41309. Order 2025-7-12 highlights the anticompetitive and distortive actions by the GoM, which are alone sufficient to support a conclusion under the statute that there is a substantial reduction of competition in relevant markets.  However, the Department makes clear in Order 2025-7-12 that its decision rests on the materiality of the changing competitive conditions in which the Department would expect the joint venture to compete.  The Department demonstrates a connection between the negative effects on competition caused by the GoM and further "downline" anticompetitive effects that the Department would expect from a price- and capacity-setting joint venture operating in those markets, especially in view of the scale achieved by Delta and Aeromexico and other particulars such as the carriers' commanding share of U.S.-MEX markets where entry is severely restricted.  In brief, the Delta/Aeromexico joint venture exacerbates competitive concerns and materially contributes to a substantial reduction in competition.[30]

In Order 2025-7-12, the Department looked at practical impacts and documented competitive concerns supporting corrective action, which the Department affirms here:

- Delta and Aeromexico's predominant share ("almost 60 percent") at MEX, the fourth-largest gateway to the United States, creates the possibility for anticompetitive and efficiency-reducing outcomes such as reduced growth, decreased capacity for lower-yield connecting traffic, and exclusionary conduct.[31]  The Department makes clear that these

---

[28] Order 2025-7-12 at 25-26.
[29] Order 2025-7-12 at 18, 24-27 (explaining that the findings from the 2016 approvals/grants of antitrust immunity were no longer valid and cross-referencing the specific findings with current evidence in the record).
[30] Order 2025-7-12 at 2-3, 19-28.
[31] Order 2025-7-12 at 19.

anticompetitive and efficiency-reducing effects are evident in potentially all U.S.-MEX markets actually or potentially served by Delta and Aeromexico in competition with other airlines, including, for illustration purposes, MEX-JFK, MEX-LAX, MEX-ORD, MEX-SEA, and MEX-BOS.  These are relevant markets in which the lack of a procompetitive regulatory framework combines with the price- and capacity-setting flexibilities of a joint venture to yield serious and actionable concerns about the reduction of competition.

- Based on the GoM's interventionist and arbitrary capacity decisions in Mexico City, the Department sees a realistic possibility that the GoM could act in a similar manner at other congested gateways such as Cancun or Monterrey.[32]  The Department makes clear that in this regard all markets in the U.S.-Mexico market that could potentially be served by Delta and Aeromexico are of concern.  For illustration purposes, CUN-JFK and CUN-BOS would be two such markets.

- The GoM's stalled and retrenched approach to slot administration creates actual and potential harm across many U.S.-Mexico markets, not just those serving MEX.  The GoM confiscated slots on spurious and unsupported grounds, refused to implement reforms suggested by Mexico's competition authority, and called into question the principle of historical rights, fairness, and new entry.  In the midst of this ongoing policy change by the GoM, Delta and Aeromexico maintain the largest share of slots at MEX and a history of successfully navigating challenges through means that are not available to other carriers.  The approval of and grant of ATI for the joint venture enables Delta and Aeromexico to use scale and coordinated action to achieve better outcomes than would be possible for other carriers in light of regulatory conditions.

- The GoM forced U.S. all-cargo carriers to exit MEX.  This action was disruptive, costly, and it violated the U.S.-Mexico Air Transport Agreement; importantly, it denied all-cargo carriers a fair and equal opportunity to compete against passenger/combination carriers that remain able to carry cargo to and from MEX.  In the midst of this government intervention, Delta and Aeromexico are able to use the approval of and grant of ATI to coordinate cargo operations to, from, and via MEX, creating a material advantage enabled by the grant of ATI.  This coordinated advantage unnecessarily and artificially reduces competition in cargo markets to, from, and via MEX to other Mexican destinations, and limits innovation and choice outside of MEX by all-cargo operators.

Order 2025-7-12 listed a number of public interest factors from the Department's authorizing statutes – factors that are relevant to the competitive effects observed in the U.S.-Mexico market.[33]  Throughout all economic matters, including the review of applications for approval of and a grant of ATI for a joint venture, the Department, as noted in Order 2025-7-12, is charged with "placing maximum reliance on competitive market forces," avoiding "conditions that would tend to allow at least one air carrier or foreign air carrier to unreasonably increase prices, reduce services, or exclude competition in air transportation," and "eliminating discrimination and unfair competitive practices faced by United States airlines in foreign air transportation,

---

[32] Order 2025-7-12 at 19-20.
[33] Order 2025-7-12 at 12-13.

including unreasonable restrictions on operations." Drawing upon these factors and the competitive and public benefits assessments, the Department tentatively determined that continuing the joint venture would be "adverse to the public interest."[34] The Department affirms that approach and determination here.

The Department also found tentatively (and affirms here) that the joint venture agreements substantially reduce competition under current market conditions. A joint venture that is found to reduce or eliminate competition substantially under Section 41309 cannot be approved unless the Department finds that the joint venture is necessary to meet a serious transportation need or to achieve important public benefits. As the Department has documented in this Final Order, and Orders 2025-7-12 and 2024-01-17, Delta and Aeromexico's joint venture does not meet this bar. The anticompetitive effects and distortions that the Department has documented are significant, and they fundamentally undermine the functioning of a competitive market where carriers have the right to enter new markets and compete on a fair and equal basis. Order 2025-7-12 did not find any compelling facts and circumstances to override this assessment. In short, using the language of the statute, the Department did not find that, despite a substantial reduction in competition, the joint venture is necessary to meet a serious transportation need or to achieve important public benefits.

In view of the findings and conclusions above, the Department concludes that it should exercise its authority under 49 U.S.C. § 41309(b)(1) to "end approval" of the joint venture agreement and related agreements and does therefore find under Section 41309(b) that those agreements substantially reduce competition and should be disapproved.[35]

<u>Review Under Section 41308</u>

Based on the same facts supporting the Department's decision that Delta and Aeromexico cannot meet the standards for approval of the joint venture under Section 41309, Order 2025-7-12 made clear that they cannot meet the standards for a grant of ATI to implement the joint venture under Section 41308. The standards required for a grant of ATI under Section 41308 are higher than those of Section 41309 (including that a grant of ATI is "required by the public interest").[36] Furthermore, as discussed above, having disapproved the joint venture agreements, the Department is required to revoke the related grant of ATI as no longer being necessary to proceed with the transaction approved under Section 41309.

The Department's conclusions using the standards in Sections 41309 and 41308 are consistent with the rationales provided in past ATI cases, including the first grant of ATI in this docket. The changes in market conditions have wide-ranging implications. A functioning, pro-

---

[34] Order 2025-7-12 at 38.
[35] The Department also finds that, notwithstanding any showing that the agreements substantially reduce or eliminate competition, that the agreements are adverse to the public interest under Section 41309. This finding results in the same necessity to disapprove (or end approval of) the alliance agreements and withdraw ATI under Section 41308.
[36] Order 2025-7-12 at 14, 17 (describing the standards in Section 41308 and stating that the Department's analysis in this matter, as it relates to analyzing the regulatory framework, is supported independently by Section 41308).

13

competitive market is essential to ensure that immunized joint venture partners have adequate economic incentives to pass along the benefits of their integrated commercial arrangements to consumers.[37]  Absent a competitive market landscape, including a procompetitive regulatory framework as a critical element, the airlines cannot show, to the Department's satisfaction under the "required by the public interest standard," that the joint venture will produce substantial public benefits that would not otherwise be achieved through vigorous competition and arms-length commercial cooperation.[38]  In addition, in the absence of an approved joint venture under Section 41309, there is no basis or need for a grant of ATI under Section 41308.  The Department thus withdraws the previous grant.

<u>The Pending 2022 Application</u>

In 2016, when it first granted Delta and Aeromexico approval and ATI, the Department intended for those approvals to be time-limited so that it could monitor and periodically review market developments.[39]  Given this posture, the Department offered Delta and Aeromexico the option to submit a new application for approval of and a grant of ATI on an ongoing basis.  Delta and Aeromexico submitted their "renewal" application in 2022.[40]

The Department's decision here exercises the statutory authorities to review immunized joint ventures at any time.  Changes to competitive conditions in the marketplace, including government-imposed distortions of competition, are affecting the joint venture operations and competitors *now*.  Any actual or potential harm is affecting stakeholders, including consumers, *now*.  If there are sufficient facts and circumstances to justify a modification of the authorities, it is logical and appropriate to take action with respect to the joint venture activities *now*.  Further, this Final Order deals with the merits of the matter in accordance with the public interest factors provided by Congress.

At the same time, the Department's decision does not change the status quo by dismissing or denying the 2022 application.  If conditions change again, Delta and Aeromexico will have the opportunity to refresh the record and seek to demonstrate that a new joint venture will meet statutory standards.

### B.  Response to Comments

The Department received several comments in response to Order 2025-7-12, with some in support, some neutral, and some in opposition to the proposal to end approval of and terminate the ATI for the alliance.  A threshold issue emerges from the comments of Delta and Aeromexico that should be addressed at the outset.

---

[37] *See* Show Cause Order, Order 2008-4-17 (Apr. 9, 2008) at 13, DOT-OST-2007-28644-0174; and *see* Final Order, Order 2008-5-32 (May 22, 2008) at 2, DOT-OST-2007-28644-0185.

[38] *See* Order 2016-12-13 at 19.

[39] Order 2016-12-13 at 26-28.

[40] Joint Application of Delta and Aeromexico for Renewed Approval of and Grant of Antitrust Immunity for Alliance Agreements (March 29, 2022), DOT-OST-2015-0070-0236.

The thrust of Delta and Aeromexico's comments is that their joint venture is unquestionably procompetitive and that many of the economic benefits in the U.S.-Mexico market, ranging from a dynamic and competitive market to broader positive effects on GDP and job base, depend upon the joint venture. Were the Department to withdraw its grant of ATI, they argue, those benefits would "evaporate," and severe disruptions could occur, including the cancelation of up to two dozen services, the loss of tens of thousands of jobs, and a reduction in GDP.[41]

Over the course of 18 months, Delta and Aeromexico have consistently argued that the Department's reconsideration of the joint venture is unacceptable and unlawful. They urge the Department to start a review from scratch and not consider current distortions and their materiality to competition by the joint venture. According to this view, the continuing operation of the Delta/Aeromexico joint venture is a critical enabler of travel in the U.S.-Mexico air transport market and, therefore, the Department cannot take any action in this matter.

The basis for a decision is straightforward, focusing on the public interest. As the Department discusses further below, it does not agree that this action will result in net-negative consequences for the traveling and shipping public, or that the joint venture is the critical factor in maintaining a competitive marketplace.

To the contrary, the joint venture is exacerbating the competitive issues that are present and growing. An immunized alliance is not an entitlement. Far too much is at stake when the question is whether two airlines should comply with the U.S. antitrust laws. "Immunizing conduct from the antitrust laws … risks undermining our free market system and so must be done sparingly, carefully, and only in pursuit of legitimate—and actually realized—benefits."[42] Airlines seeking to obtain or maintain an immunized alliance with price- and capacity-setting mechanisms must meet rigorous statutory standards on an ongoing basis and demonstrate to the Department's satisfaction that their arrangements are and will continue to be in the public interest, broadly defined. If circumstances change after an approval is given, the Department may identify those changed circumstances, consider the materiality of the circumstances to the findings and to competition in joint venture markets, and modify the decision to any extent necessary to meet the statutory standards and the public interest. If the Department determines that any critical findings underpinning the prior decision are no longer valid, the Department will withdraw prior approvals until circumstances are more favorable. This approach will safeguard the positive benefits for stakeholders, including consumers, in the market, and prevent unnecessary harm to competition.

The Department has provided full and adequate due process to the joint venture partners here, even as conditions worsened. Order 2025-7-12 detailed the negative competitive effects caused by the GoM that have implications not just in U.S.-Mexico City markets, but also in other U.S.-Mexico markets (including by incorporating by reference Order 2025-7-11). The Department then identified Delta and Aeromexico as significant competitors in many of these markets and

---

[41] Objection at 1-5.
[42] Comments of the U.S. Department of Justice Antitrust Division (Aug. 8, 2025) at 2, DOT-OST-2015-0070-0342.

15

the predominant competitors in the U.S.-Mexico City market in which the distortive effects are having their greatest impact at the moment. The Department explained that the price- and capacity-setting mechanisms in the joint venture would provide Delta and Aeromexico with unique privileges that are unavailable to other competitors, such as the ability to shift capacity from one airline to the other, that could exacerbate the distortive effects of the GoM's policies and increase the actual and potential harm for U.S. stakeholders. Under current statutory standards, these impacts alone would be sufficient to support a decision to disapprove the joint venture agreements and deny or withdraw the grant of ATI.

The Department went on to conduct an Additional Factual Assessment of Competitive Conditions in Order 2025-7-12. The Department did so to "further support the Department's decision to terminate the Delta/Aeromexico ATI and show why the Open Skies regulatory framework is critical."[43] Among other things, the Department tentatively found: that "[s]ervices to the Mexico City market are not meaningfully contestable, and competition and competitive benefits for consumers seem to be decreasing"; that analysis of "scheduled capacity since the implementation of the [joint venture] shows that Delta and Aeromexico have delivered substandard growth in the U.S.-Mexico market when compared to peers"; that the "growth that the Department hoped to see, enabled by a grant of ATI, does not seem to have materialized"; that, on balance, "current information suggests that Delta's and Aeromexico's capacity increases are less than those of their competitors, undermining a case that the ATI is enabling more public benefits than would otherwise be possible without a grant of antitrust immunity"; and that "traffic data both prior to the full implementation of [the] alliance in 2016 versus 2024 indicates that on U.S.-MEX routes there is marked reduction in the amount of connectivity at both the U.S. origin and Mexico City than there was before the implementation of the [joint venture]."[44]

Delta and Aeromexico appear largely to accept the facts and circumstances of Mexico's competitive distortions. In fact, Delta and Aeromexico indicate that they too are victims,[45] underscoring the timeliness of the Department's decision to act now to protect the public interest. Failure to act would further compound the distortive competitive effects and become part of the problem. This choice of timing reflects the Department's efforts to balance the costs and benefits of ongoing forbearance with the costs and benefits to the traveling public of taking corrective action.

### *Compliance with the Administrative Procedure Act*

Delta and Aeromexico dedicate a substantial portion of their response to Order 2025-7-12, arguing that the Department's proposed approach in Order 2025-7-12 is "fatally flawed" under the Administrative Procedure Act. Their primary arguments are that the Department has not applied the correct statutory standards, has not dealt with a key aspect of "the problem," has departed from past precedent without explanation, has failed to consider other alternatives to its

---

[43] Order 2025-7-12 at 31.
[44] Order 2025-7-12 at 31-37.
[45] Objection at 23.

action, and has failed to engage with key facts and studies submitted by the airlines. The Department will address these arguments in turn.

### *Applying 49 U.S.C. §§ 41309 and 41308*

Delta and Aeromexico argue that the Department has not applied the relevant statutory standards in Sections 41309 and 41308 to their immunized agreements. They emphasize that, in addition to superimposing a new requirement on the statute – the Open Skies predicate – the Department went through a process of disapproving and withdrawing the grant of immunity from the joint venture without showing that it "substantially reduces or eliminates competition," a showing they believe is required by Section 41309.

The Department disagrees. Order 2025-7-12 contained a reasoned analysis of the statutory requirements set forth in Sections 41309 and 41308. Order 2025-7-12 also specifically applied those standards to the present facts and circumstances. Still, Delta and Aeromexico, which previously supported this mode of analysis,[46] are unconvinced. They make the nuanced argument that, while the actions of foreign governments affecting competitive conditions in the market may be relevant to a competition analysis (but not, apparently, the primary focus), an Open Skies predicate is an invented step not supported by the statutory authority.[47]

As explained in Order 2025-7-12, the Department considers the applicable regulatory framework when it evaluates an international joint venture under 49 U.S.C. §§ 41309 and 41308.[48] An Open Skies regulatory framework is necessary under the competition and public interest analysis required by Sections 41309 and 41308 but not sufficient to obtain approval of and maintain a grant of ATI. As defined by the Department, an Open Skies agreement provides for, among other things, open entry, market-based pricing, and open route rights. If these essential competitive-enabling elements are present in law and in practice, the Department can reliably evaluate the structural impact of the proposed joint venture and its likely effects on consumers and the overall public interest.

Delta and Aeromexico argue that the Department engaged in an unsupported "Step 0" analysis under the statutory scheme, failing to use the tests and language provided therein. However, the basis for the Department's actions in this case is the statutory factors specified in 49 U.S.C. § 41309: that under present circumstances the joint venture agreements are adverse to the public interest and substantially reduces competition. While a "preliminary test" is not found expressly in the statutory language of Sections 41308 or 41309, compliance with an Open Skies agreement has a statutory foundation in the public interest and competition analysis required by Section 41309 and, for that matter, Section 41308.[49] Mexico's violations of the U.S.-Mexico Air

---

[46] Order 2025-7-12 at footnotes 62-63.
[47] Objection at 6, 36.
[48] Order 2025-7-12 at 15.
[49] *See* Comments of the U.S. Department of Justice Antitrust Division at 9 ("DOT articulated specific competitive dynamics in international air transportation that support the significance of open market access as embodied in Open Skies Agreements") and at 11 ("The fact that an entry barrier is created by government regulation does not make it

Transport Agreement, an Open Skies agreement by its terms, inform the Department's consideration of the pertinent statutory factors. The Department's decision, however, is based on an overall analysis of the statutory factors as applied to the joint venture. The Department considered, in addition to the effect on the market of Mexico's violations of the U.S.-Mexico Air Transport Agreement, the materiality of the change in market conditions on the operations of the joint venture, the joint venture's predominant market share at MEX, spillover effects in markets beyond Mexico City, and the ability of the joint venture to leverage its position under a grant of ATI to disadvantage competitors.

The argument that the Department did not conduct a proper analytical assessment under the statute – that it did not apply the "substantially reduce or eliminate competition standard" under 49 U.S.C. § 41309(b) – must also fail. The plain text of Order 2025-7-12 invalidates the point.[50] To the extent that Delta and Aeromexico believe the Department must conduct a longer and more particularized analysis of all potentially relevant markets, the Department disagrees. As noted above, the Department's analysis under Section 41309 focused first on identifying the changed circumstances in the competitive landscape in several critical and relevant markets to, from, and via Mexico City, and then on assessing whether those circumstances undermined the findings granting ATI.

Delta and Aeromexico argue that "even accepting the Department's own Open Skies policy, the Department has it backward. Under that policy, disapproval of a cooperative agreement is not an appropriate consequence of an Open Skies breach; the only permissible consequence under that policy is the loss of ATI."[51] Then, they undertake an elaborate statutory construction that is unmoored from a plain language reading of the statute. By way of example, Delta and Aeromexico argue that "[b]ecause the Department did not correctly apply Step 1 of the statutory analysis to the JCA–even accepting the validity of the Department's Open Skies policy–the Department must re-do that analysis before it can be in a position to conclude that the JCA no longer meets the ATI test in Step 2 of the statutory analysis."[52] They continue: "even if the Open Skies predicate were appropriate at Step 2 of the statutory analysis, the Department could apply it here only by addressing each of the 11 Open Skies factors and determining which the G[o]M has allegedly violated."

The Department reemphasizes that this decision is based on its determination that the Delta-Aeromexico joint venture is adverse to the public interest and substantially reduces competition. Based upon facts and circumstances established in the record, the Department has determined

---

any less relevant. Consideration of similar issues in other industries – such as the effects of patents, professional licensing requirements, and regulatory approvals required to sell pharmaceuticals or pesticides – is commonplace in antitrust competitive effects analysis. The competition concern with market access is particularly acute in the international air transportation context in which a foreign national regulatory authority with control over critical airport infrastructure may have an incentive to preference foreign national carriers…."), DOT-OST-2015-0070-0342.

[50] See, e.g., Order 2025-7-12 at 25.

[51] Objection at 40.

[52] "JCA" is in reference to the joint cooperative agreement representing the antitrust-immunized joint venture between Delta and Aeromexico.

18

that the joint venture no longer meets the statutory standards in Sections 41309 and 41308.  The Department notes that the Department of Justice's Antitrust Division commented that the "record in this matter makes clear that consideration of the regulatory impact on market competition was integral to DOT's well-reasoned decision not to renew antitrust immunity for the Delta-Aeromexico Joint Venture based on the facts presented in this case."[53]

### Addressing Key Aspects of the Problem

Delta and Aeromexico argue that the Department disregards multiple key aspects of the problem and otherwise fails to provide sufficient reasoning.  The crux of their argument is that Order 2025-7-12 focuses too much on competitive effects at MEX, which is a single airport served by the joint venture partners in the U.S.-Mexico market.[54]

The Department's "focus" on MEX is warranted by several factors evident in the record.  As Delta and Aeromexico indicate in their pleadings, "MEX is the centerpiece of the JCA Partners' joint transborder network, a critical hub for both local and connecting traffic."[55]  Without a properly functioning regulatory framework in place at MEX, the Department would not expect the same degree of competitive and public benefits to emerge from the Delta/Aeromexico joint venture with its central hub at MEX.  Using the measurement provided by the joint venture partners, 21 percent of the traffic and flights between the United States and Mexico operate to/from MEX.[56]  The Department's 2016 orders identified approximately 5 million passengers per year between the United States and Mexico City,[57] and while the percentage of total traffic in this market appears to be gradually falling relative to other U.S.-Mexico markets, the market is still growing in absolute terms and still retains a substantial percentage of total U.S.-Mexico traffic.

Based on any of these figures, MEX is a major and critical gateway.  The Delta/Aeromexico joint venture has a predominant position at this gateway – controlling approximately 60 percent of the slots at the airport – and enjoys unique flexibilities by virtue of the ATI.  These flexibilities include revenue sharing, shifting flights between the airlines to address slot shortages and preserve historical rights, and jointly setting pricing and capacity.  Indeed, as documented herein, they have taken advantage of this situation to add additional services in U.S. markets whereas other competitors could not to the same degree, and they have shifted their focus from using MEX as a connecting hub airport to one focused more on higher-profitability nonstop traffic.[58]  In circumstances where competition is diminishing and/or market distortions exist, these flexibilities become unfair competitive advantages.  The Department affirms the findings in

---

[53] Comments of the U.S. Department of Justice Antitrust Division (Aug. 8, 2025) at 13, DOT-OST-2015-0070-0342.
[54] Objection at 43, 48.
[55] Objection at 24.
[56] Objection at 57.
[57] Order 2016-11-12 at 15.
[58] Order 2025-7-12 at 37.

Order 2025-7-12 on these points and assesses that the competitive issues observed today at MEX are sufficient to disapprove the Delta/Aeromexico joint venture and withdraw the grant of ATI.

Further, in the context of reviewing the Delta/Aeromexico joint venture, MEX is not one market of concern, but many. The market distortions at MEX, compounded by the predominant position of the joint venture partners, raise concerns in multiple city-pair markets served from MEX, including JFK-MEX (an overlap market), LAX-MEX (a market with intermittent overlapping services), and other markets that might benefit from more vigorous competition between the joint venture partners or new entry from their competitors.

Competition between and among all-cargo and combination cargo services is also significant enough by itself to merit corrective action. Perhaps the most egregious and harmful action by the GoM is the cargo decree requiring all-cargo carriers to move their services from MEX. This decree prevents all-cargo carriers from competing effectively against combination carriers in the provision of cargo services between the United States and MEX and beyond to the greater Mexico market on a fair and equal basis. As noted in Order 2025-7-12, Delta and Aeromexico's cargo share for U.S.-MEX has dramatically increased to 73 percent.[59] Under the current distorted regulatory framework, Aeromexico has the distinct advantage at MEX where it operates a large network to destinations throughout Mexico – and this advantage impacts competition for premium and time-definite services in the broader U.S.-Mexico market. Delta and Aeromexico's argument that, unlike passengers, cargo can be routed via different hubs because it does not care how it travels is unpersuasive, because, among other things, time-definite cargo products carry a revenue premium commensurate with the speed of delivery. Aeromexico is the only hubbing carrier in Mexico and MEX and, as the largest slot holder at MEX, serves the most destinations throughout the country. No other cargo carrier can replicate that network. The Department has ample reason to be concerned about maintaining a grant of ATI to Aeromexico under these circumstances.

The Department's concerns extend to the broader U.S.-Mexico market. The GoM's policies giving rise to particular decisions at MEX are not isolated effects of unintentional mistakes; they are part of a pattern of government interventions at odds with a liberalized Open Skies framework that make the market less competitive. Using Cancun as an example, the Department would be concerned that the prospect of future arbitrary action could affect competition to and from that congested airport, with potential impacts on the competition offered by immunized joint ventures. Finally, Delta and Aeromexico argue that access issues at MEX are not as profound as the Department suggests. To support their argument, Delta and Aeromexico state that the Department's claim in Order 2025-7-12 that "no new carrier has entered the U.S-MEX market since" 2016 is false; that Viva entered in 2017 and has grown since then to operate eight percent of U.S.-MEX flights.[60] The Department notes that Delta and Aeromexico omit a crucial part of the sentence in Order 2025-7-12, which reads, *"[o]ther than the attempts made through the slot divestiture process,* no new carrier has entered the U.S.-MEX market since that time"

---

[59] Order 2025-7-12 at 22.
[60] Objection at 27.

(emphasis added).[61]  Viva was a recipient of the Department's slot divestiture process and began U.S.-MEX services in December 2017 with flights to Las Vegas and then subsequently added New York-JFK with "remedy slots" secured by the Department.  The data show that Viva has expanded its footprint modestly at MEX, serving additional destinations.  During this time period, an important competitor, Interjet, exited the market and the GoM redistributed a significant portion of Interjet's MEX slots to Viva, allowing Viva to further expand its services from MEX.[62]  The Department believes that, despite Viva's modest expansion, the distortions caused by the GoM have limited growth and network adjustments by many carriers such that an ongoing grant of ATI is no longer justified.

### Consistent Application of ATI

Delta and Aeromexico argue that the Department has departed from past precedent without explanation, and therefore acted in an arbitrary and capricious manner, by treating this case differently than past ATI cases and by holding the carriers to a different standard.  They argue that Tokyo-Haneda (HND), London-Heathrow (LHR), and Lisbon (LIS) are just as congested as MEX, but the Department has not attempted to withdraw its grant of ATI from joint ventures operating at those airports.

The Department is concerned about the impact of congestion and airport access on competition where immunized joint ventures operate.  However, there is no inconsistency or infirmity in the Department's decision to act in this case.  There is a distinction here.  This is the only matter in which there are established facts and circumstances to show that the foreign partner, in this case the GoM, is unacceptably distorting competition in a manner that directly undermines the findings of previous orders approving and granting ATI in the relevant markets.  While the Department does not preclude the possibility that similar facts and circumstances could be established in future matters involving other markets, the comments by Delta and Aeromexico do not provide any specific allegations or actionable information, other than to point out congestion at other global gateways.  As American and United point out in their filings, Mexico's issues complying with the air services agreement in ways that distort competition are not analogous to the issues faced by airlines in other markets at this point in time.  The Department also notes that Delta, in claiming inconsistent treatment, ignores the fact that it too enjoys ATI in all three of the examples it cites (HND, LHR and LIS) via its partnerships with Korean Air and the Blue Skies joint venture.

### Considering Reasonable Alternatives

Delta and Aeromexico insist that the Department failed to consider alternatives to its action in violation of the Administrative Procedure Act.  They repeat the alternatives that the Department considered explicitly in Order 2025-7-12,[63] including letting the Department's Part 213 action

---

[61] Order 2025-7-12 at 32.
[62] *See* Objection at 28; *see also* Answer of Concesionaria Vuela Compania de Aviacion, S.A.P.I. de C.V. dba Volaris (Feb. 2, 2023) at footnote 19, DOT-OST-2021-0152-0042.
[63] *See, e.g.*, Order 2025-7-12 at 28-31.

run its course, taking action under 49 U.S.C. § 41310, invoking consultations or arbitration under the U.S.-Mexico Air Transport Agreement, and finally, carving out U.S.-MEX cargo operations in lieu of ending approval of and grant of ATI for the existing alliance agreements.

The carriers misread the Department's orders, asserting that disapproval of the joint venture (and termination of the grant of ATI) is a misdirected attempt to enact countermeasures against Mexico and thus punish the joint venture partners unfairly for actions taken by the GoM. That the Department's decision might induce the GoM to comply with the U.S.-Mexico Air Transport Agreement is neither wrong nor undesirable. But it is not the Department's objective in this proceeding. The objective is to assess the extent to which there are issues affecting competition in the markets served by the joint venture and ensure that approved joint ventures and grants of ATI remain consistent with statutory standards and the public interest. The Department will continue to reserve the right to take, or not take, other actions to address its concerns in the bilateral U.S.-Mexico market. Here, the Department is addressing the anticompetitive effects made worse by the approved and immunized joint venture. The finalized actions in the Order are a consequence of the present market conditions and the joint venture operations – not a means to rectify the GoM's actions. As stated in Order 2025-7-12, even addressing the compliance concerns in the bilateral market "does not necessarily lead to the continuation of grants of ATI in the U.S.-Mexico market."[64]

With respect to the cargo carveout alternative, Delta and Aeromexico benefit from the inability of all-cargo carriers to operate at MEX and from seamlessly interlining cargo, particularly lucrative time-sensitive cargo, at MEX to other destinations in Mexico. These represent competitive disadvantages for all-cargo and combination carriers operating at Felipe Angeles International Airport (NLU) or other less preferred airports. Even if Delta and Aeromexico had no exclusivity provisions on partnerships, all-cargo/combination carriers operating at NLU would still have to spend up to two hours trucking cargo on two-lane roads from NLU to MEX, then clear the cargo through another airport for transfer to Aeromexico belly-cargo operations.[65] These requirements are substantially more onerous given that a three-hour transfer process reduces speed to destination – the primary attribute of time-definite premium cargo products. Not only does a carve out not solve the broader market access problem at MEX for both combination and cargo carriers, it would have to be accompanied by a number of additional regulations and oversight by the Department to be effective: (1) prohibiting exclusivity provisions of Delta and Aeromexico partnerships; (2) requiring that Aeromexico interline with competitors; and (3) requiring Aeromexico to interline cargo at the same rates with the same degree of inventory and capacity access as Aeromexico provides Delta. Even then, such conditions on Delta-Aeromexico could not compensate for the time penalty that carriers forced

---

[64] Order 2025-7-12 at 29.
[65] Order 2025-7-12 at 21.

to operate at other airports will continue to face, creating a permanent structural competitive disadvantage for those carriers.

In sum, the Department considered reasonable alternatives when it made its decision to revoke its approval of the joint venture agreements and grant of ATI.

### *Providing Substantial Evidence and Adequate Reasoning*

According to Delta and Aeromexico, the Department's decision lacks substantial evidence, is internally inconsistent, and does not provide adequate reasoning. Notably, Delta and Aeromexico assert that the Department manufactured and misapplied statistics, failed to engage with an assessment by expert consultants in the 2022 application and Delta's objections, and did not demonstrate harm.

<u>Growth and Connectivity</u>

The Department reviewed these assertions and the data provided by Delta and Aeromexico and is aware that the carriers are particularly concerned with the assessment that their growth in the U.S.-Mexico market is "substandard," which is to say that despite their grant of ATI they grew in the market at a slower pace than other competitors. If true, this would undermine a primary basis of the grant of ATI, which is that the joint venture will produce greater public benefits than would otherwise occur absent a grant of ATI.

Order 2025-7-12 assessed the capacity growth comparing 2015 as a base year versus subsequent years. Delta and Aeromexico respond by claiming that the Department should have chosen 2016 as the base year, but the Department chose 2015 because 2015 was the year in which Delta and Aeromexico initially submitted their application for ATI to the Department.[66] The Department chose 2015 as a means of comparison in a year where there was no ATI to subsequent years in which Delta and Aeromexico enjoyed their grant of ATI. Delta and Aeromexico also fault the Department for comparing their growth against all other carriers operating in the U.S.-Mexico market, including Mexican and U.S. Low Cost Carriers (LCCs), saying that the growth of LCCs post the grant of ATI was disproportionately high and skewed the Department's analysis.[67] In citing service benefits attributable to ATI, Delta and Aeromexico conflate benefits arising from the newly implemented air services agreement and the expanded slot portfolios of Aeromexico, Volaris, and Viva Aerobus obtained from Interjet's bankruptcy. The Department refutes this argument, as the base for the Department's comparison included all other carriers, including large U.S. carriers that already had large shares in the U.S.-Mexico market, as well as smaller carriers that ended up growing. Consequently, the Department's analysis in Order 2025-7-12 took into account both the higher growth of the LCCs enabled by the open entry provisions of the newly implemented U.S.-Mexico Air Transport Agreement, as well as the comparatively lower growth of other carriers in its analysis.[68] Regardless of whether the Department chose

---

[66] Objection at 11-12, 20.
[67] Objection at 11-12.
[68] Order 2025-7-12 at 35.

2015 or 2016 as Delta and Aeromexico prefer, and regardless of the carrier set against which the Department compared market growth, a pro-competitive joint venture should have shown substantial growth by both joint venture partners in all relevant U.S.-Mexico markets. It did not, as demonstrated in Order 2025-7-12.[69]

The primary public benefit of ATI is the reduction in double marginalization or multiple markups on itineraries involving travel on both carriers. Experience has shown that, in early phases of the implementation of a joint venture, traffic volumes on connecting routes increase significantly and joint venture partners increase capacity to/from their hubs to carry increasing numbers of connecting passengers across their networks. It is reasonable to expect that MEX, as the primary hub of Aeromexico and the fourth largest international gateway to/from the United States, would support a substantial increase in connecting traffic once the two networks were linked in an immunized joint venture.

The Department's analysis in Order 2025-7-12 shows that Delta and Aeromexico did not prioritize connectivity as expected. The Department observed that Delta and Aeromexico use MEX more as an origination-and-destination (O&D) market than as a hub.[70] Delta and Aeromexico state that connections to in-scope destinations within Mexico have increased, which they characterize as consistent with expectations. Delta and Aeromexico admit that overall connections beyond MEX are down, which is the primary issue that the Department finds with the nature of the joint venture. As the Department notes in Order 2025-7-12, on Aeromexico-operated flights from the United States to Mexico City, nonstop traffic ending in Mexico City increased by 32 points, from 44 percent pre-joint venture to 76 percent after implementation, while on Delta-operated flights from the United States to Mexico City, nonstop traffic ending in Mexico City increased by 23 points, from 28 percent to 51 percent.[71]

This result is precisely the opposite of what the Department expects to see post implementation of an immunized alliance. In this case, the actions of the GoM, as documented extensively in this order and in Order 2025-7-12, likely have affected the incentives for the joint venture partners to pass along the benefits of the alliance to consumers. This conclusion is reflected in lower levels of connectivity at the largest (by far) Mexican hub – where the primary benefits of the reduction in double marginalization and tremendous increase in connecting traffic have not been nearly as substantial as in other joint ventures. This fact suggests that Delta and Aeromexico are protecting high-end, nonstop O&D revenue rather than providing more capacity to carry more passengers in one- or two-stop markets involving Mexican domestic segments operated by Aeromexico.

<u>Keating Analysis</u>

Order 2025-7-12 reviewed and responded to the work submitted by Bryan Keating on behalf of Delta and Aeromexico. Keating claims that withdrawing the grant of ATI would lead to

---

[69] Order 2025-7-12 at 34-35.
[70] Order 2025-7-12 at 37.
[71] Order 2025-7-12 at 37.

**Supp.App.86**

irreparable economic harm to communities in the United States and Mexico. He goes on to conclude that consumer harm could reach $800 million and, as summarized by Delta and Aeromexico in their Objection, that the joint venture "generates nearly 4,000 U.S. jobs, more than $310 million of U.S. GDP, and more than $200 million of annual tourism spending in the United States." Citing Keating's work, the carriers assert that "[i]f Delta and Aeromexico's Joint Cooperation Agreement ('JCA') is unwound, those economic benefits for the United States will evaporate …."[72]

Keating's paper was "based largely on Delta's network planners' identification of 21 routes, either operating or planned, that are *at risk* of cancellation or reduced service in the event of the dissolution of the Joint Cooperative agreement...." The Department has multiple serious concerns about the accuracy of the assessment, including the assumption that when the at-risk routes are canceled or reduced the existing aircraft will be parked and not utilized elsewhere.[73]

As a basis for his estimated impact figures, Keating focuses on markets that he claims would be withdrawn should ATI cease. However, he does not acknowledge that some markets have proven not to be viable, even for an immunized alliance. For example, since receiving ATI, Delta and Aeromexico announced, began selling, and have since withdrawn from service on routes from Monterrey to New York, Salt Lake City, and Los Angeles, and from Guadalajara to Detroit. Other routes that Aeromexico has announced, such as Mexico City to Raleigh/Durham, continue to be sold and have not been withdrawn, suggesting that those are more viable.

While the GoM has arbitrarily removed slots from longstanding slot holders at MEX, access remains opaque, and new operators cannot establish a foothold at this important airport. Meanwhile, Delta and Aeromexico, which together hold more than 60 percent of the slots, are able to expand their flying in MEX-U.S. markets and continue to add flights at MEX to the U.S. even when others cannot do so. Aeromexico began service from Tampa, Florida, to Mexico City in July 2024, and Aeromexico also began service from Mexico City to Newark in Winter 2024 and Phoenix and Philadelphia in 2025. Additional services such as these indicate that Aeromexico and Delta continue to search for growth opportunities in what is the largest international market from the United States while the joint venture's competitors cannot, thereby reinforcing the anticompetitive regulatory environment.

Given some of the flaws identified in his approach, the Department, through its own analysis, has determined that Keating's $800 million estimate is inflated. Furthermore, several assumptions he makes regarding the 21 routes and associated 1,062 one-stop connecting routes that would be at risk are so questionable that they undermine the credibility of his assessment. For example:

- Keating provides no independent assessment of the Delta/Aeromexico network going forward, relying exclusively on Delta's network planning team without incorporating the

---

[72] Objection at 1.
[73] Order 2025-7-12 at 30-31.

views of Aeromexico.  At points, the author assumes what was identified as *at risk* is a given outcome, treating arguments of probability as certainty.

- Delta's network planning team identified impacted routes by comparing the antitrust immunized joint venture to run-of-the-mill arms-length codesharing.  However, the choice of arms-length codesharing as the counterfactual overestimates the reality and ignores that the parties are still SkyTeam members, that they have a strategic partnership, and that they have aligned incentives going well beyond a typical codeshare relationship, especially given that Delta holds a 20 percent ownership stake in Aeromexico.  Delta's history with other partners where ATI was not pursued due to the Department's action (*i.e.*, Delta-WestJet) shows that the carrier is incentivized and likely to pursue an alternative path beyond the typical arms-length arrangement to produce similar benefits.

- Keating makes no attempt to quantify fare impacts as a result of taking away ATI, including on nonstop overlap routes (*e.g.*, JFK-MEX) where the reintroduction of an additional competitor would likely lead to lower fares.  The author does, however, note portions of the economic literature that support his argument – namely, that joint venture cooperation is estimated to decrease *connecting* fares modestly – without referencing the literature's evidence contrary to his argument: joint venture cooperation is estimated to increase *gateway-to-gateway* fares modestly.[74]

- Keating uses market stimulation curves for routes originating in Europe for 2005-2015 (footnote 25) as a proxy for calculating demand that is stimulated by nonstop routes in the U.S.-Mexico market in 2024.  This approach likely results in an overestimate due to the short-haul and more domestic-like nature of transborder U.S.-Mexico travel versus intercontinental travel.

- In the QSI analysis (footnote 26), Keating is annualizing a week in July 2024 to reflect the year.  July is a peak demand travel month and annualizing July data will also likely lead to a significant overestimate.

- Keating's numbers are likely inflated as at least five of the routes he identifies as being part of his 21-route analysis were never started or have only operated minimal frequencies.  Even some that were started, such as Atlanta-Merida (ATLMID), have since ceased operating, indicating that even with the support of ATI, some markets simply are not viable.

With regard to the "nearly 4,000 U.S. jobs," Keating states that the elimination of the joint venture would put at risk "3,779 jobs in the United States" as the "at-risk frequencies directly and indirectly support thousands of jobs, including pilots, flight attendants, reservations staff, maintenance staff, customer service staff, and management.  They further support non-airlines jobs through the purchase of goods and services by airlines.  Finally, these frequencies support tourism jobs...."[75] The Department has reservations about these estimates.  Keating incorrectly

---

[74] *See Pricing by International Airline Alliances: A Retrospective Study Using Supplementary Foreign-Carrier Fare Data*, Brueckner and Singer, revised Feb. 2019, *available at* https://sites.socsci.uci.edu/~jkbrueck/DOT_study.pdf.
[75] *An Economic Assessment of the Effect of Eliminating the Joint Cooperation Agreement between Delta Air Lines and Aeromexico*, Bryan Keating (Feb. 23, 2024) at 5, DOT-OST-2015-0070-0258 (hereinafter referred to as "Keating").

assumes that if the at-risk routes are impacted, existing assets will be parked and not utilized elsewhere, where they would provide significant and similar economic benefits. This assumption is a fatal flaw in the paper. In an environment in which aircraft delivery timelines continue to be uncertain and all delivery slots are spoken for, and when Delta has a number of aircraft on order, it is unlikely the withdrawal of the grant of ATI will have long-term implications for Delta's fleet plan. In essence, the jobs and airplanes supporting the identified routes will not simply "evaporate"; Delta will redeploy the airplanes onto other routes in its network, thereby significantly reducing the possibility of these estimated job losses. The narrowbody fleet that Delta uses for these services may be reallocated to an additional frequency on a domestic route such as Minneapolis/St. Paul to Atlanta or Orlando, or any number of high-demand domestic routes or nearby international routes such as to the Caribbean, while airlines typically have a more difficult time finding alternative uses for widebody aircraft used in international immunized joint ventures due to demand, regulatory, slot, and network compatibility issues, among others.

The flaw extends to Keating's claims regarding the more than $310 million in U.S. GDP and $200 million in tourism that could "evaporate" should the joint venture be terminated. Keating calculates these numbers based, in part, on summing up the estimated impact of job losses associated with the cessation of Delta services on two routes, as well as on the estimated loss of visitor spending to the United States due to the loss of nonstop service on the 21 routes identified. These numbers also incorporate the loss of Delta jobs in the United States tied to a reduction in servicing Aeromexico flights to the United States.[76] The Department believes that these numbers are likely inflated due to the already mentioned issues regarding the estimates of both flight reductions and job losses, as well as the fact that these numbers incorporate estimates for several routes that were never operated.

Finally, the Department notes that a determination of whether an agreement achieves important public benefits under 49 U.S.C. § 41309(b)(1)(A) is broader than simply whether an agreement benefits one or two companies, such as Delta and Aeromexico. As the statutory language explicitly states, the analysis is whether the joint venture produces benefits to the "public." Under that analytical framework, even if Delta and Aeromexico were to lose market share due to competitors that provide better services or lower prices, that could be a net gain for consumers and the public writ large. Many significant public benefits of the Delta/Aeromexico alliance are likely to continue absent ATI as the two carriers have every economic incentive to continue non-immunized coordinated activities, such as codesharing and frequent flyer program cooperation, in order to retain their market shares. The public benefits solely attributable to ATI (*e.g.*, substantial capacity increases, especially for connecting passengers across both networks, as noted in the Department's orders and the 2016 final order granting conditional ATI in this case) have not been fully realized, as noted in Order 2025-7-12 and affirmed above. Any financial loss that Delta would experience from a lack of ATI (and not recapture through its financial investment in Aeromexico or other arms-length commercial decisions) would flow from the

---

[76] Keating at 44-45.

inability to engage in joint price and capacity setting usually prohibited by the U.S. antitrust laws. The public will clearly benefit from resumption of competition between Delta and Aeromexico, given the lack of sufficient competition to discipline a virtual merger of transborder operations due to the competition-suppressing market intervention by the GoM.

<u>More Potential Harm from the ATI Withdrawal</u>

Delta and Aeromexico claim that their ATI has enabled them to add more routes than they would otherwise be able to serve in the market, and that by removing ATI, these routes would be at risk, leading to the previously discussed "evaporation" of benefits. They claim that between "October 2023 and June 2025, on the expectation that ATI-level JCA coordination would continue indefinitely, the JCA partners launched flights in 37 new transborder markets, increased frequencies in four existing markets, and upgauged equipment in 17 markets."[77]

A closer evaluation of these claims reveals some inaccuracies when compared to publicly available OAG schedule information, suggesting that Delta and Aeromexico have a long-standing interest in serving several market pairs in the U.S.-Mexico market absent the ATI. Of the 37 "new" markets, schedule data shows that 12 are, indeed, routes that the partners had at no time served before and were inaugurated in the time period referenced (*e.g.*, Tampa-Mexico City (TPAMEX) and Raleigh Durham-Mexico City (RDUMEX)).[78] Three are markets that the partners started serving during the initial stages of their joint venture post 2017, reduced during the COVID pandemic, and restored during the time period referenced (*i.e.*, Atlanta-Queretaro (ATLQRO), Detroit-Queretaro (DTWQRO), and Denver-Monterrey (DENMTY)). The remaining 22 markets are ones in which Delta and/or Aeromexico had a presence at various times pre-joint venture, during the COVID pandemic, and during the referenced time period. For example, schedule data shows that at least one of the partners has served the Los Angeles-Guadalajara (LAXGDL) market continuously since at least 2010, with only small gaps of service in May of 2020 during the depths of the pandemic and for three months during 2023. Markets such as Minneapolis/St. Paul-Puerto Vallarta (MSPPVR) have been served on a seasonal basis for at least as long with no cessation of service during COVID. By relying on these claims, Delta and Aeromexico cast doubt on the severity of impacts the cessation of ATI will have on their operations in the U.S.-Mexico market.

Many of the routes that Delta and Aeromexico claim to be at risk are leisure routes such as MSPPVR, Minneapolis/St. Paul-San Jose del Cabo (MSPSJD), Cincinnati-Cancun (CVGCUN), Atlanta-Cancun (ATLCUN), Detroit-Cancun (DTWCUN) and others.[79] These are unique markets that have been operated largely by Delta (and not Aeromexico) for U.S. customers

---

[77] Objection at 15.

[78] In addition to RDUMEX and TPAMEX, these are the additional wholly-new routes: Atlanta to San Luis Potosi (ATLSLP); Atlanta to Tulum (ATLTQO); Detroit to Tulum (DTWTQO); Newark to Mexico City (EWRMEX); Orlando to Guadalajara (GDLMCO); McAllen to Mexico City (MFENLU); Miami to Guadalajara (GDLMIA); Minneapolis/St. Paul to Tulum (MSPTQO); Philadelphia to Mexico City (MEXPHL); and Phoenix to Mexico City (MEXPHX). It should be noted that Delta it is withdrawing service from DTWTQO and MSPTQO. Source: OAG Schedules.

[79] Objection at 16.

traveling on vacations. These are routes in which the vast majority of customers originate in the United States and may connect on a Delta-operated flight at the U.S. departure point to the Delta-operated flight to the Mexico "beach" destination. Upon arrival at the Mexican destination, these customers do not connect to a further Mexican destination on Aeromexico; they terminate at the "beach" destination. Delta is not reliant on assistance from Aeromexico to operate these flights because, in general, the primary customers, American citizens, have the relationship with and loyalty to Delta. Delta is not likely to end this type of flying as doing so would simply cede this traffic to competitors.

Reliance Interests

The Department is aware of the future costs, and challenges, that Delta and Aeromexico will face to wind down the joint venture. The Department acknowledges these and other reliance interests and, as discussed below, has decided to extend the wind-down period from October 25, 2025, proposed in Order 2025-7-12, to January 1, 2026, to provide a longer transition period in order to reduce disruption. The Department also notes that since 2022, it has conducted this proceeding as deliberately and patiently as possible to avoid any unnecessary impacts. However, the actual and potential harm occurring in the U.S.-Mexico market, as well as the benefits of restoring fair and open competition in accordance with our longstanding and consistent approach to Open Skies markets, outweigh the reliance interests of the joint venture partners and is more responsive to the statutory standards in Sections 41309 and 41308, which focus on the public interest. As noted above, the Department has made this assessment by balancing the costs of continued forbearance with the costs and benefits to the traveling and shipping public of acting now.

Delta and Aeromexico will continue cooperating as arms-length commercial partners, continuing many of the benefits of the joint venture. As reported by Delta, the two carriers began their first codeshare in 1994, over 30 years ago, and entered into an enhanced alliance relationship in 2011.[80] Given this longstanding partnership, which predates the 2017 implementation of the immunized joint venture by several years, Delta's 20 percent ownership stake in Aeromexico, the shared commercial interests stemming from the carriers' participation in the SkyTeam alliance, and the commercial imperative to maintain their shares in a growing international market, Delta and Aeromexico will continue to have every economic incentive to cooperate in the U.S.-Mexico market even without ATI. And even without immunity, they will still be able to provide consumer benefits through codesharing, frequent flyer program cooperation, and other joint marketing activities (activities they have engaged in for more than 30 years), which will enable them to continue to attract customers to their services. The estimates of harm the companies provide do not assume such ongoing cooperation and are, at best, inflated, especially since both carriers engaged in such cooperation prior to obtaining ATI.

---

[80] Press Release (Nov. 18, 2015), Delta Air Lines, *available at* https://ir.delta.com/news/news-details/2015/Delta-Announces-Intention-to-Acquire-Additional-Shares-of-Grupo-Aeromexico/default.aspx

29

Needing ATI to Compete

In their responses to Order 2025-7-12, Delta and Aeromexico argue that, even though Delta is one of the three largest U.S. global carriers, they need ATI to compete with United and American in the largest international market to/from the United States, while Allegiant argues that it needs ATI just to enter this market.[81] It has not been the Department's policy to grant ATI for the purpose of enabling one carrier to compete with another carrier without also generating fundamentally new benefits that would not otherwise be possible.

The Department has encouraged airlines to establish arms-length cooperation that does not require ATI first, such that if ATI is granted, all benefits generated proximate to the grant of ATI would fit the statutory definition of "benefits otherwise not obtainable." Only once the benefits obtainable from this arms-length cooperation have been exhausted does the Department consider ATI to align economic incentives to further integrate operations to achieve public benefits otherwise unobtainable. In at least two applications for ATI, the Department has approved the proposed cooperation but denied ATI, given that the carriers had not sufficiently developed non-immunized cooperation to justify a grant of immunity.[82]

The 2022 Application

Delta and Aeromexico believe that the Department has not engaged with their *de novo* March 29, 2022, application for ATI, including the document production and economic analysis provided by them before the substantial distortions of competition came into focus. The 2022 application for ongoing renewal of the joint venture will continue to be addressed in a separate proceeding. In that proceeding, the Department suspended the procedural schedule on April 11, 2022.

When considering a *de novo* ATI application, the Department's regulations provide for a multi-step process that must be completed before that application is ripe for adjudication by the Department.[83] This process includes, among other things, public notice, an opportunity for the public to comment on the application, and, as warranted, show cause proceedings.[84] This process has not yet been completed, and therefore the Department will not issue a decision on the *de novo* application at this time. However, in the interest of considering all reasonably available information in its evaluation of Delta and Aeromexico's existing ATI, the Department reviewed the pertinent information included in the *de novo* application, including the corresponding data and information and economic analysis. Delta and Aeromexico also had an opportunity to

---

[81] Objection at 31, 44-45; and Joint Answer of Allegiant Air and Viva Aerobus (Aug. 21, 2025) at 4, DOT-OST-2015-0070-0348.

[82] Final Order, Order 2020-3-5 (March 13, 2020), DOT-OST-2018-0084; and Final Order, Order 2011-11-12 (Nov. 9, 2011), DOT-OST-2011-0111, in which the Department granted approval for joint venture agreements to Hawaiian and Japan Airlines in Order 2020-3-5 and to American Airlines and Qantas in Order 2011-11-12 under Section 41309 without granting ATI under Section 41308.

[83] 14 CFR Part 303, Subpart E.

[84] *See* id.

provide any additional information that they consider pertinent in their response to the Department's show-cause order in this proceeding.

Delta and Aeromexico's recently expressed concerns about the suspension of the 2022 proceeding are unavailing.[85]  The *de novo* ATI application is not currently ripe for an adjudication while, as discussed previously, Delta and Aeromexico's existing immunized joint venture is subject to continuing review under Sections 41309 and 41308.  Therefore, this order will finalize the Department's consideration of the existing immunized joint venture without taking action on the *de novo* application.

### *Reviewing Recent Information*

In rendering this decision, the Department is aware of two steps that the GoM has announced it will take.  First, the MEX airport authority has notified U.S. carriers that it will return their confiscated slots in the coming traffic seasons.[86]  This is an evolving situation and certain critical details with respect to how the process will work and what the capacity picture at MEX will look like once U.S. carriers' historical slot allocations are restored remain unanswered.  What is clear at present is that this process will require a period of several traffic seasons.  Second, on August 29, 2025, the office of Mexican President Claudia Sheinbaum published a decree amending, adding, and repealing various provisions of the national airports law.[87]  The provisions provide for the establishment of new rules for historical treatment of slots, new "use or lose" rules, and a new slot coordinator.  It is apparent from the text of the decree that further information will be required in order for Mexican civil aviation officials to interpret and implement the new rules.  Critically, the decree did not address transparency concerns with respect to capacity declarations at constrained airports in Mexico.  Transparency in setting capacity at an airport is critical for fostering competition and is in keeping with international standards.

The Department views these steps as positive and anticipates and looks forward to continuing a deliberative process of bringing Mexico into compliance with the U.S.-Mexico Air Transport Agreement and addressing all of the well-founded concerns that have been raised.  For the purposes of this ATI proceeding, the steps taken to date fall well short of addressing the competitive issues raised by the operation of an immunized joint venture in the U.S.-Mexico market.  The Department emphasized in Order 2025-7-12 that the severity of the concerns required Mexico to "establish a track record of providing certainty that the rights of new entry,

---

[85] The Department notes that there is a Motion from Delta and Aeromexico to suspend the procedural schedule for their 2022 application pending in the docket.  Motion to Suspend the Procedural Schedule (Feb. 9, 2024), DOT-OST-2015-0070-0253.  Because this Order takes no action on the 2022 application, the Department continues to defer adjudication of the pending motion.

[86] Answer of United Airlines, Inc. (Aug. 21, 2025) at 1 ("Mexican officials informed IATA, American, Delta, and United on an August 18, 2025, call that slots confiscated in the Winter 2022/2023 and Summer 2023 seasons will be reinstated"), DOT-OST-2015-0070-0346.

[87] *See* Decreto, Diaro Oficial de la Federacion (Aug. 29, 2025), *available at* https://dof.gob.mx/nota_detalle.php?codigo=5766959&fecha=29/08/2025.

31

competitive pricing, and a fair and equal opportunity to compete will be respected."[88] The Department sees no basis to delay or change the decision proposed in Order 2025-7-12.

### C. Conclusion

In view of the facts, circumstances, and discussion above, the Department is moving forward to end approval of the joint venture under 49 U.S.C. § 41309 (as adverse to the public interest and substantially reducing competition) and to terminate the grant of ATI used to implement that joint venture.[89]  Because there will no longer be an approved agreement under Section 41309, the joint venture will no longer be eligible for ATI under 49 U.S.C. § 41308.

The Department emphasizes that our decision is limited to the statutory factors specified in these ATI statutes.  It is not our view that arms-length cooperation between Delta and Aeromexico is anticompetitive.  To the extent that these airlines wish to continue that cooperation following the termination of the grant of their ATI, readers should draw no inferences or conclusions about any negative competitive effects arising from those arrangements.  The Department is ending approval of the package of agreements, featuring an integrated price- and capacity-setting joint venture agreement at the core, submitted for our review in 2015 and updated by the airlines since that time.  The Department asked Delta and Aeromexico to comment on any transition issues of this nature and received no comments.

There is a wind down period.  In Order 2025-7-12, the Department proposed that the joint venture should end October 25, 2025.  Delta and Aeromexico indicated that given the practical challenges of winding down the joint venture, they request, at a minimum, an extension of the termination date through March 28, 2026.  The Department recognizes the practical challenges and reliance interests.  The Department agrees to extend the termination date to January 1, 2026.  This provides additional time to settle accounts and prevent disruptions for customers ahead of some holiday travel and end of year business.  This date strikes the appropriate balance between addressing the practical challenges and reliance interests, on the one hand, and protecting the public interest, on the other hand.  Therefore, by the terms of this order, Delta and Aeromexico will not have a grant of ATI on January 1, 2026.

The Department remains focused on maintaining a level playing field.  The GoM's intervention in transborder markets creates an imperative for the Department to act not only to withdraw ATI in a transborder market no longer open and contestable as provided in the U.S.-Mexico Air Transport Agreement, but to avoid distortive and competition-suppressing impacts that further discriminate against other carriers in the market, including some that may seek their own immunized joint ventures.  This approach to ATI establishes parity for all market participants.  The concept of parity extends to the wind down period as well.  Delays in winddown and

---

[88] Order 2025-7-12 at 2.
[89] The Department also finds that Delta and Aeromexico no longer meet the standard in 49 U.S.C. § 41308, which is to say that the grant of ATI is no longer required by the public interest whether or not they engage in commercial cooperation or have an approved joint venture under Section 41309.  Order 2025-7-12 at 38.

termination of the grant of ATI only compound the unfairness and actual and potential harm to other carriers and consumers.

**ACCORDINGLY:**

1.  We determine that, effective January 1, 2026, the findings of Order 2016-12-13, as modified by Order 2020-12-18, are no longer valid.  Further:

    a.  Under 49 U.S.C. § 41309, we end approval of the joint venture described in the application submitted by Delta Air Lines, Inc. and Aerovias de Mexico, S.A. DE C.V. on March 31, 2015, in this docket, including any modifications made since up to and including the present.  For the avoidance of doubt, we also end approval of the joint venture described in this subparagraph and find that approval is not necessary to meet a serious transportation need or to achieve important public benefits (including international comity and foreign policy considerations);

    b.  Because the Department is ending approval of the joint venture under 49 U.S.C. § 41309, the Department terminates the antitrust immunity previously granted to this joint venture under 49 U.S.C. § 41308;

    Accordingly, as of 12:00 a.m. Eastern Standard Time on January 1, 2026, the joint venture between Delta Air Lines, Inc. and Aerovias de Mexico, S.A., DE C.V. will be disapproved and will cease to have a grant of antitrust immunity from the Department;

2.  We reserve the right to take further or separate action as warranted by the public interest;

3.  We defer action on Delta Air Lines Inc.'s February 9, 2024 Motion to Suspend the Procedural Schedule in this docket; and

4.  We grant all motions for leave to file submitted to date.

33

**Supp.App.95**

By:

**SEAN P. DUFFY**
Secretary of Transportation

(Seal)

*An electronic version of this document is available online at [www.regulations.gov](www.regulations.gov).*

34

## CERTIFICATE OF SERVICE

I hereby certify that, this 28th day of January, 2026, I caused a true and correct copy of the foregoing Supplemental Appendix to be filed using the Court's CM/ECF system, which automatically sends notification to the parties and counsel of record.

*/s/ Peter M. Bozzo*
_____

Peter M. Bozzo

*Attorney for the U.S. Department of Transportation*