No. 25-13546

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

DELTA AIR LINES, INC. AND AEROVIAS DE MEXICO S.A. DE C.V.,

*Petitioners*,

v.

DEPARTMENT OF TRANSPORTATION,

*Respondent*.

_____

On Petition For Review Of An Order Of The Department Of Transportation
Docket DOT-OST-2015-0070

_____

### PETITIONERS' REPLY BRIEF

_____

Matthew J. MacLean
Charles F. Donley II
Edward W. Sauer
Nicole Steinberg
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 663-8000
matthew.maclean@pillsburylaw.com

*Counsel for Aerovías de México, S.A. de C.V., dba Aeroméxico*

Eugene Scalia
Amir C. Tayrani
Christine M. Buzzard
Michael P. Corcoran
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
(202) 955-8500
escalia@gibsondunn.com

*Counsel for Delta Air Lines, Inc.*

*[Additional counsel listed on inside cover]*

Peter Carter
Marguerite H. Taylor
DELTA AIR LINES, INC.
1030 Delta Boulevard
Atlanta, GA  30320

Steven J. Seiden
Christopher Walker
DELTA AIR LINES, INC.
601 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C.  20005

*Counsel for Delta Air Lines, Inc.*

*Delta Air Lines, Inc. and Aerovías de México S.A. de C.V. v. Department of Transportation*
Case No. 25-13546

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rules 26.1-1 through 26.1-3, Petitioners provide the following certificate of interested persons:

1. **Aerovías de México S.A. de C.V.**, Petitioner.

2. **Omeed A. Assefi**, Acting Assistant Attorney General for the Antitrust Division, United States Department of Justice.

3. **Christine M. Buzzard**, counsel for Petitioner Delta Air Lines, Inc.

4. **Peter M. Bozzo**, counsel for Respondent the United States Department of Transportation.

5. **Peter Carter**, Chief External Affairs Officer of Delta Air Lines, Inc.

6. **Michael P. Corcoran**, counsel for Petitioner Delta Air Lines, Inc.

7. **Gregory D. Cote**, counsel for Respondent the United States Department of Transportation.

8. **Delta Air Lines, Inc.**, Petitioner (NYSE: DAL).

9. **Charles F. Donley II**, counsel for Petitioner Aerovías de México S.A. de C.V.

10. **Charles E. Enloe**, Assistant General Counsel for Respondent the United States Department of Transportation.

11. **Grupo Aeroméxico S.A.B. de C.V.** (AEROMEX.MX), parent company of Aerovías de México S.A. de C.V.

12. **Daniel E. Haar**, Chief of the Appellate Section, Antitrust Division, United States Department of Justice.

13. **Mark H. Hamer**, United States Department of Justice.

14. **Erin D. Hendrixson**, Senior Trial Attorney for Respondent the United States Department of Transportation.

15. **Dina Kallay**, Deputy Assistant Attorney General for the Antitrust Division, United States Department of Justice.

16. **David B. Lawrence**, Policy Director for the Antitrust Division, United States Department of Justice.

17. **Matthew J. MacLean**, counsel for Petitioner Aerovías de México S.A. de C.V.

18. **Steven Mintz**, counsel for Respondent the United States Department of Transportation.

19. **Faris Mohammed**, Senior Trial Attorney for Respondent the United States Department of Transportation.

20. **Robert Nicholson**, counsel for Respondent the United States Department of Transportation.

21.  **Edward W. Sauer**, counsel for Petitioner Aerovías de México S.A. de C.V.

22.  **Eugene Scalia**, counsel for Petitioner Delta Air Lines, Inc.

23.  **Steven J. Seiden**, Director – Regulatory Affairs of Delta Air Lines, Inc.

24.  **Abagail A. Slater**, former Assistant Attorney General for the U.S. Department of Justice.

25.  **Nicole Steinberg**, counsel for Petitioner Aerovías de México S.A. de C.V.

26.  **Marguerite H. Taylor**, Deputy General Counsel and Chief Litigation Counsel of Delta Air Lines, Inc.

27.  **Amir C. Tayrani**, counsel for Petitioner Delta Air Lines, Inc.

28.  **Christopher Walker**, Director – Regulatory and International Affairs of Delta Air Lines, Inc.

29.  **United States Department of Transportation**, Respondent.

30.  **Gregory Zerzan**, General Counsel for Respondent the United States Department of Transportation.

The below are subsidiaries of Delta Air Lines, Inc.

Aero Assurance Ltd.
Aircraft Foreign Sales, Inc.
Cardinal Insurance Company (Cayman) Ltd.
Comair Holdings, LLC
Comair, Inc.
Comair Services, Inc.

*Delta Air Lines, Inc. and Aerovías de México S.A. de C.V. v. Department of Transportation*
Case No. 25-13546

Compass Airlines, Inc.
Crown Rooms, Inc.
DAL Global Services, LLC
DAL Moscow, Inc.
Delta AirElite Business Jets, Inc.
Delta Air Lines, Inc. and Pan American World Airways, Inc.—
Unterstutzungskasse GMBH
Delta Air Lines Dublin Limited
Delta Air Lines Private Limited
Delta Benefits Management, Inc.
Delta Connection Academy, Inc.
Delta Loyalty Management Services, LLC
Epsilon Trading, LLC
Kappa Capital Management, LLC
MCH, Inc.
Mesaba Aviation, Inc.
MLT Inc.
Montana Enterprises, Inc.
New Sky, Ltd.
Northwest Aerospace Training Corporation
Northwest Airlines Charitable Foundation
Northwest Airlines Corporation
Northwest Airlines, Inc.
NW Red Baron LLC
NWA Fuel Services Corporation
NWA Real Estate Holding Company LLC
NWA Retail Sales Inc.
NWA Worldclub, Inc.
Tomisato Shoji Kabushiki Kaisha

The below are subsidiaries of Aerovías de México S.A. de C.V.

Administradora Especializada en Negocios, S.A. de C.V.
Aerolitoral, S.A. de C.V.
Aeromexpress, S.A. de C.V.
Aerosys, S.A. de C.V.
Aerovías Empresa De Cargo, S.A. de C.V.
AM DL MRO JV, S.A.P.I. de C.V.
Am Formación Interna, S.A. de C.V.
Centro de Capacitación Alas de América, S.A. de C.V.

*Delta Air Lines, Inc. and Aerovías de México S.A. de C.V. v. Department of Transportation*
Case No. 25-13546

Corporación Nadmin, S.A. de C.V.
Empresa de Mantenimiento Aéreo, S.A. de C.V.
Estrategias Especializadas de Negocios, S.A. de C.V.
Fundación Aeroméxico, A.C.
Inmobiliaria Avenida Fuerza Aérea Mexicana 416, S.A. de C.V.
Inmobiliaria Boulevard Aeropuerto 161, S.A. de C.V.
Inmobiliaria Grupo Aeroméxico, S.A. de C.V.
Operadora de Franquicias y Productos Aéreos, S.A. de C.V.
Sistemas Integrados de Soporte Terrestre En México, S.A. de C.V.

The below are affiliates of Aerovías de México S.A. de C.V.

Aeroméxico Cargo, S.A.P.I. de C.V.
AM BD GP JV, S.A.P.I. de C.V.
Concesionaria de Vuelos, S.A. de C.V.
Integración y Supervisión de Recursos Corporativos, S.A. de C.V.
Loyalty Servicios Profesionales Mundiales, S.A. de C.V.
Plm Premier, S.A.P.I. de C.V.
Servicios Corporativos Aeroméxico, S.A. de C.V.
T2 Servicios Aeroportuarios, S.A. de C.V.

No publicly traded company or corporation apart from those listed above has an interest in the outcome of the case. Petitioners will file an amended certificate of interested persons should they become aware of a change in interests that would affect the disclosures as required by Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-4.

Additionally, pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, counsel for Petitioner Delta Air Lines, Inc. hereby certifies that Petitioner Delta Air Lines, Inc. is a publicly held company, traded under stock ticker NYSE: DAL, with no parent company. Counsel for Petitioner Delta Air Lines, Inc. further certifies that no publicly held corporation holds 10% or more of Delta Air

*Delta Air Lines, Inc. and Aerovías de México S.A. de C.V. v. Department of Transportation*
Case No. 25-13546

Lines, Inc.'s stock.  The Vanguard Group, Inc. owns 10% or more of Delta Air Lines, Inc.'s stock.  Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-2, counsel for Petitioner Aerovías de México S.A. de C.V. hereby certifies that Petitioner Aerovías de México S.A. de C.V. is a wholly owned subsidiary of Grupo Aeroméxico, S.A.B. de C.V., a publicly held company.  Counsel further certifies that Delta Air Lines, Inc. and Apollo Global Management, Inc. are the only publicly held corporations that own more than 10% of Grupo Aeroméxico's capital stock.

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

ARGUMENT ........................................................................................................4

I.    THE ORDER IS ARBITRARY AND CAPRICIOUS MANY
      TIMES OVER .......................................................................................4

      A.    The Department's Exclusive Focus On MEX Misses Key
            Parts Of The Problem.................................................................4

      B.    The    Department's    Concerns    About    MEX    Are
            Unsubstantiated And Contradicted By The Department's
            Own Critiques Of The Joint Venture's Supposed Lack Of
            Growth.....................................................................................17

II.   THE DEPARTMENT DID NOT ADEQUATELY JUSTIFY
      ITS DISPARATE TREATMENT OF THE JOINT VENTURE........24

III.  THE DEPARTMENT FAILED TO CONSIDER AND
      ADEQUATELY ADDRESS AVAILABLE ALTERNATIVES .......25

CONCLUSION...................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bidi Vapor LLC v. U.S. FDA*,
   47 F.4th 1191 (11th Cir. 2022) ...............................................5, 6, 9, 26

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)................................................................7, 13

*Chamber of Com. of U.S. v. SEC*,
   85 F.4th 760 (5th Cir. 2023) ...............................................................18

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health
   Admin.*,
   626 F.3d 84 (D.C. Cir. 2010)................................................................20

*Interstate Nat. Gas Ass'n of Am. v. Pipeline & Hazardous Materials
   Safety Admin.*,
   114 F.4th 744 (D.C. Cir. 2024)....................................................17, 22

*Motor Vehicle Mfrs. Ass'n U.S., Inc. v. State Farm Mut. Auto. Ins.
   Co.*,
   463 U.S. 29 (1983)................................................................2, 3, 5, 10

*Nat'l Fuel Gas Supply Corp. v. FERC*,
   468 F.3d 831 (D.C. Cir. 2006)..............................................................4

*Nat'l Shooting Sports Found., Inc. v. Jones*,
   716 F.3d 200 (D.C. Cir. 2013)..............................................................28

*Nat'l Treasury Emps. Union v. Horner*,
   854 F.2d 490 (D.C. Cir. 1988)..............................................................10

*Sorenson Commc'ns v. FCC*,
   755 F.3d 702 (D.C. Cir. 2014)..............................................................20

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*,
   431 F.3d 917 (6th Cir. 2005) ...............................................................8

*Spirit Airlines, Inc. v. U.S. Dep't of Transp. & Fed. Aviation Ass'n*,
   997 F.3d 1247 (D.C. Cir. 2021).........................................................26

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*United States v. Am. Airlines Grp. Inc.*,
  121 F.4th 209 (1st Cir. 2024)...................................................................8

*United States v. Am. Airlines Grp. Inc.*,
  675 F. Supp. 3d 65 (D. Mass. 2023)........................................................8

*United States v. Anthem, Inc.*,
  855 F.3d 345 (D.C. Cir. 2017)................................................................8

*United States v. Baker Hughes*,
  908 F.2d 981 (D.C. Cir. 1990)..........................................................7, 13

*United States v. JetBlue Airways Corp.*,
  712 F. Supp. 3d 109 (D. Mass. 2024)..................................................7, 8

*United States v. Marine Bancorp., Inc.*,
  418 U.S. 602 (1974)...........................................................................7, 18

*Westar Energy v. FERC*,
  473 F.3d 1239 (D.C. Cir. 2007)............................................................25

**Statutes**

15 U.S.C. § 18..................................................................................2, 7, 8

49 U.S.C. § 41308.................................................................................10

49 U.S.C. § 41309...............................................................2, 4, 6, 7, 8, 10, 15

**INTRODUCTION**

The Department's brief confirms that its Order selectively ignored key issues, repeatedly relied on self-contradictory reasoning, and cast aside readily available alternatives to reach the Department's predetermined objective—disapproving the Delta-Aeroméxico Joint Venture. The Department never disputes, for example, that the Order lacks the comprehensive city-pair, network, and country-level competition analysis it has performed for *every other* airline joint venture—including its 2016 approval of the Joint Venture here. Nor does it deny that the Joint Venture has *increased* competition in the overall U.S.-Mexico market, which provides consumers with far greater travel options today than in 2016. Instead, the Department declares that this analysis and evidence were irrelevant to its disapproval of the competition-enhancing Joint Venture.

The Department's defense of that flawed decision fails across the board. The Department argues that Benito Juárez Airport ("MEX") in Mexico City—the origin or destination for only 21% of U.S.-Mexico flights—is a critical airport, DOT.Br.24-26, but admits that a single airport like MEX is not a relevant market for competition purposes, *id.* at 26-27. The Department nevertheless tries to justify its focus on MEX based on the Order's reference to five MEX-linked city pairs, *id.* at 2-3, 36-38—but the Order admittedly contained *zero* details about alleged anticompetitive harms to any of those (or any other) transborder city-pair routes, such as a market analysis of

1

the city pairs or airlines' market shares. Resting disapproval on that handful of unexamined city pairs manifestly fails to provide a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Similar logical gaps and contradictions plague the rest of the Department's arguments. The Department cannot make up its mind, for example, whether its competitive assessment should be based on nine-year-old data from 2016, "present market conditions," or speculation about *future* actions by the Government of Mexico. DOT.Br.30, 32, 46, 55. Nor can the Department decide whether it was appropriate for the Order to forgo any market analysis under 49 U.S.C. § 41309, *id.* at 34, 39-41, or whether Section 7 of the Clayton Act applies, *id.* at 24-26—which, if it did, *would require a market analysis*. And the Department repeatedly complains about "regulations" by the Government of Mexico that pose "substantial barrier[s]" to competition at MEX, *id.* at 1, 30-31, yet dismisses alternatives that would address those purported barriers as merely "responding to Mexico's" policies that supposedly violate the U.S.-Mexico "Open Skies" agreement, *id.* at 53-55.

The Department's account of how and when the Government of Mexico's actions limited competition at MEX is similarly confused. The Department cannot resolve whether those policies have impaired other airlines since 2019, when several airlines spontaneously returned MEX slots to the Mexican government for

reallocation, DOT.Br.44, or whether they only had such effects beginning in 2024, when the Joint Venture for the first time grew more quickly than other airlines at MEX, *id.* at 48.  Nor can the Department decide whether Delta and Aeroméxico are improperly "leverag[ing] their dominance" at MEX, *id.* at 30, or whether instead the Joint Venture's anticompetitiveness is manifested in supposedly anemic growth, with other airlines growing more quickly than the Joint Venture at MEX "from 2016 to 2023," *id.* at 48.  And in that heads-I-win, tails-you-lose analysis, the fact that in 2024 the Joint Venture's growth *outpaced* its competitors' is somehow more evidence of anticompetitive harms.

The Department's defense of its disparate treatment of the Joint Venture is similarly infirm.  The Department attempts to distinguish Tokyo's Haneda airport—which is expressly carved out from the U.S.-Japan Open Skies agreement and is subject to an international all-cargo ban—by noting that conditions at Haneda are slowly improving.  DOT.Br.51.  But even if true, that does not change the fact that the Department disapproved the Joint Venture because "[a]n Open Skies regulatory framework" is supposedly "necessary" under the statute, App.527-28, yet left in place approval of multiple joint ventures at Haneda, where Open Skies indisputably do not exist.

Nor can the Department's treatment of Haneda be squared with its refusal to adopt more tailored alternatives here.  The Department dismisses those alternatives

3

as not "fully restor[ing] competition at MEX," DOT.Br.3, 52-53, but admittedly is not requiring the full restoration of competition at Haneda to maintain approval of the joint ventures operating there.  At minimum, the Department should have allowed its ongoing diplomatic efforts—which have already prompted the Government of Mexico to institute slot reforms at MEX—and the Department's recently announced regulatory measures addressing Mexican carriers' routes and cargo services to play out before disapproving the Joint Venture.  Without this Court's stay, that precipitous step would already have caused widespread harms and disruption to two major airlines and the traveling public.

None of this is reasoned decisionmaking—and even *one* of these failures, by itself, is sufficient to require vacatur, a point the Department does not dispute.  *See Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) (Kavanaugh, J.).

## ARGUMENT

### I.  THE ORDER IS ARBITRARY AND CAPRICIOUS MANY TIMES OVER.

#### A.  The Department's Exclusive Focus On MEX Misses Key Parts Of The Problem.

The Department cannot escape the Order's failure to consider all aspects of the competitive issue at hand.  The Department does not dispute that the statute provides the same standard—"substantially reduces or eliminates competition"—for both approving and "end[ing] approval of" joint venture agreements.  49 U.S.C.

4

§ 41309(b)(1)(A). And the Department admits that every other time it has applied that statutory standard to a joint venture, it has comprehensively analyzed the venture's competitive effects at multiple levels: "the broad network level," the "country-pair level," and the "city-pair level." Petr.Br.30-33 (collecting the Department's orders). The Department thus was required by both the statute and its own precedent to consider the Joint Venture's competitive effects in the full U.S.-Mexico market. *See Bidi Vapor LLC v. U.S. FDA*, 47 F.4th 1191, 1202-03 (11th Cir. 2022).

Yet the Department never did so. By the Department's own telling, the Order at most mentioned five city-pair markets linked to MEX (and two other non-MEX city pairs), DOT.Br.2-3, 21, 25-26, 36-38, even though MEX is the origin or destination for only a "gradually falling" 21% share of U.S.-Mexico flights. App.529. The Order therefore ignored the remaining 79% of U.S.-Mexico flights and 1,680 of the 1,687 city pairs within the U.S.-Mexico market, while failing entirely to analyze the country-pair and network levels of competition. And even for the five MEX-linked city pairs the Order did mention, it offered no meaningful analysis of market shares, price competition, or anything else that might show the Joint Venture has harmed competition on those city-pair routes. The Department's failure to consider important aspects of the competition question renders its Order arbitrary and capricious. *See State Farm*, 463 U.S. at 43.

5

None of the Department's responses can alter that conclusion.

**1.** ***The Department Could Not—But Did—Ignore the Broader U.S.-Mexico Market.*** The Department principally contends that it did not need to consider the broader competitive environment—such as the wider U.S.-Mexico market or the 1,687 city pairs in that market—because a supposed reduction in competition at MEX alone was sufficient to disapprove the Joint Venture. DOT.Br.24-29. But the Department provides no support for that single-minded focus on MEX, and the statute forbids it.

To "end approval" of a joint venture, the Department must find that the joint venture "substantially reduces or eliminates competition." 49 U.S.C. § 41309(b)(1)(A). Nothing in that statutory language suggests that a reduction in competition in one submarket can justify disapproval of a joint venture that fosters competition more broadly; in such a situation, the joint venture generates a net *increase* in competition—not a "substantial[ ] reduc[tion]." Consistent with that comprehensive approach, the Department has repeatedly recognized that the statute requires "a broad assessment" of the "pro- and anti-competitive effects" of a joint venture "*as a whole* . . . across a number of different markets." Order 2010-7-8, at 9 (emphasis added); *see also* Petr.Br.30-33 (collecting similar examples); *Bidi Vapor*, 47 F.4th at 1203 (an agency's prior orders "confirm that the [agency] has consistently recognized" certain materials as "relevant factors").

Rather than engaging with the text of § 41309(b), the Department relies on cases brought under Section 7 of the Clayton Act. DOT.Br.26-27. But the Department provides no explanation for invoking that statute here. And it provides equally little explanation for why Section 7 supposedly supports its blinkered competition inquiry. Section 7 explicitly prohibits mergers that might lessen competition "in any line of commerce or in any activity affecting commerce *in any section of the country*." 15 U.S.C. § 18 (emphasis added). To the extent Section 7 supports enjoining mergers based on regional conditions, it does so because of clear statutory language targeting market segments. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 336 (1962) ("a geographic submarket [may] be considered the appropriate 'section of the country'"); *see also United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 162 (D. Mass. 2024) (similar).

Section 41309(b), by contrast, asks without qualification whether a joint venture "substantially reduces or eliminates competition." That open-ended language calls for a broader assessment of a joint venture's competitive effects "as a whole," as the Department has repeatedly recognized. *E.g.*, Order 2010-7-8, at 9; Order 2009-7-10; Order 2020-11-9; Order 2022-6-15.[1]

---

[1] Even if Section 7 applied, the Order would still have missed key parts of the problem. For example, Section 7 requires a market analysis and "totality-of-the-circumstances approach," which the Order concededly did not undertake. *United States v. Baker Hughes*, 908 F.2d 981, 984 (D.C. Cir. 1990); *United States v. Marine (Cont'd on next page)*

The Department cannot evade the mountain of its own precedents that understood Section 41309(b) to require this broader analysis. The Department concedes the uniformity of its prior practice but insists that its earlier approval orders did not address whether to terminate approval of a joint venture. DOT.Br.33-34. That is a distinction without a difference: the statute provides the *same* standard for both approving and terminating approval of joint ventures. 49 U.S.C. § 41309(b)(1)(A).

The Department also accuses Petitioners of cherrypicking the contents of its prior orders. DOT.Br.35-36. Not so. In those orders, the Department explicitly adopted a broader mode of competition analysis that balances a joint venture's

---

*Bancorp., Inc.*, 418 U.S. 602, 618 (1974); *see also, e.g.*, *JetBlue Airways Corp.*, 712 F. Supp. 3d 109 (evaluating market shares, potential for supracompetitive pricing, other indicia of market power, and efficiencies during a 17-day trial with 22 witnesses, 900 exhibits, and thousands of pages of other evidence). And the Department's Section 7 cases examined competitive effects commensurate with the scope of the transaction at issue, which the Department failed to do here in ignoring the broader U.S.-Mexico market served by the Joint Venture. *See United States v. Am. Airlines Grp. Inc.*, 675 F. Supp. 3d 65, 73 (D. Mass. 2023), *aff'd*, 121 F.4th 209 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2866 (2025) (discussing competition "in the northeast" United States where the alliance was limited to the northeast United States); *Am. Airlines Grp.*, 121 F.4th at 220, 227 (same); *JetBlue Airways Corp.*, 712 F. Supp. 3d at 131-51 (market shares on hundreds of routes affected by a proposed merger); *United States v. Anthem, Inc.*, 855 F.3d 345, 349 (D.C. Cir. 2017) (anticompetitive effects in "fourteen . . . states" served by one company); *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917, 925 (6th Cir. 2005) (only two city-pair markets were challenged by plaintiff).

procompetitive and anticompetitive effects, while *rejecting* the narrower approach the Department took here:

> Virgin Atlantic [asked the Department] to disapprove the application [for American and British Airways] outright on the basis that there is some potential harm in certain specific nonstop overlap markets, regardless of the severity of that harm or the potential competitive benefits to be derived from the alliance as a whole. *This approach is too narrow*. Consistent with the statute and our precedents, we made a broad assessment of the alliance at the network, country-pair, and city-pair levels, and applied a balancing test . . . . Virgin Atlantic provides no sound basis to justify ignoring the broader competitive environment.

Order 2010-7-8, at 9 (emphasis added); *see also, e.g.*, Order 2013-8-21, at 5-13; Order 99-4-17, at 13, 23; Order 93-1-11, at 10 (all similar). That is not remotely "the same analytical framework" applied in the Order, DOT.Br.36, which refused to apply a "broad assessment" of the Joint Venture's competitive effects or a "balancing test."

To elide these analytical distinctions, the Department focuses on the *outcome* of its analysis in those prior orders, emphasizing that they did not find a substantial reduction in competition in any submarket or that they imposed remedies to address anticompetitive problems in submarkets. DOT.Br.35-36. But that confuses results with process. Under bedrock arbitrary-and-capricious principles, the Department is "required to consider" the comprehensive competition analysis mandated by the statute and its own precedent regardless of whether that comprehensive analysis ultimately yields a different outcome. *Bidi Vapor*, 47 F.4th at 1204.

9

The same flaw infects the Department's other attempts to justify its narrow focus on MEX.  The Department asserts, for example, that it could reasonably fixate on MEX given MEX's importance to the Joint Venture as a hub and MEX's asserted "crucial" role in the U.S.-Mexico market.  DOT.Br.25-26.  Even ignoring that MEX represents a dwindling 21% share of U.S.-Mexico flights, App.529, that argument again confuses outcomes with process.  Regardless of how the Department ultimately weighs all the relevant competitive considerations, it was required to *consider* the full U.S.-Mexico market and explain why it rejected Petitioners' evidence of robust competition in that broader market.  *State Farm*, 463 U.S. at 43.  The same goes for the Department's invocation of its statutory "discretion," DOT.Br.29—even statutory grants of "broad" discretion require agencies to "examine[] the relevant" factors to satisfy arbitrary-and-capricious review.  *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 496, 499 (D.C. Cir. 1988) (quotation marks omitted).[2]

The Department contravened that standard when it focused exclusively on MEX, to the exclusion of the wider transborder market the Joint Venture serves.

---

[2] The Department's invocation of discretion is misplaced in any event because the Department grounds that discretion in 49 U.S.C. § 4130<u>8</u>.  DOT.Br.29.  The Order ended approval of the Joint Venture under § 4130<u>9</u>, which requires the comprehensive competition analysis discussed above.  App.543.

**2.** ***The Department's Reliance on MEX-Related City Pairs Fails on Its Own Terms.*** Even if the Department were correct that it could disapprove a joint venture based solely on competitive conditions in a single submarket, it *still* missed key parts of the problem it perceived. The Department admits that a single airport like MEX is not a market; it is merely "one half of many of the[ ] markets" at the country-pair, city-pair, and network levels the Department typically analyzes. DOT.Br.26. The Department thus pivots to contend that the Order found a reduction in competition in some undefined number of "routes starting and ending at MEX." *Id.* at 3, 37. Yet the Order did not provide analysis of *any* city pairs to support such a finding, including the five MEX-linked city pairs it listed "for illustration purposes." App.522.

When the Department analyzes competition at the city-pair level, it consistently examines many more factors than it did in the Order. Petr.Br.35. Among other things, the Department usually looks at how many airlines provide service between the cities, airlines' market shares on those routes, whether a joint venture would combine competitors' operations on those routes, and whether other airlines provide competition through one-stop service on the route. *Id.* (collecting the Department's orders). Only by answering such questions can the Department ascertain how a joint venture will actually affect competition for a given city pair.

11

For example, when approving the United-ANA and American-JAL joint ventures, the Department decided that granting the two ventures a duopoly on the Chicago-Tokyo route did not raise competitive concerns because passengers "could select an alternative alliance . . . and its connecting hubs to complete their itinerary." Order 2010-10-4, at 11.  Similarly, the Department decided that granting the United-ANA alliance a monopoly on the Washington-Tokyo market (where United had "hubs on both ends") was acceptable because of competition from connecting service and the fact that the "Washington-Tokyo market support[ed] the fewest passengers" of any market of concern.  *Id.*; *see also, e.g.*, Order 2000-10-13, at 9-12; Order 2020-11-9, at 8; Order 2010-7-8, at 9; Order 99-4-17, at 15-16 (all providing similar analyses).  The Department followed that settled mode of analysis when assessing the proposed Joint Venture in 2016, carefully analyzing 1,687 U.S.-Mexico city pairs and concluding that "JFK-MEX [was] the only nonstop air services market that raise[d] competitive concerns."  App.77-80; App.125-26 (providing a "route-specific remedy" for that concern).

Yet the Order provided nothing like that analysis for *any* of the seven total city pairs (or five MEX-linked city pairs) it identified, let alone any of the other unnamed city pairs linked to MEX.  Despite gesturing toward the LAX-MEX city pair, for example, the Department never asked how many airlines serve that nonstop route, what their market shares are, or whether other airlines provide competition

12

through, for example, a one-stop LAX-Houston-MEX route. Nor did the Department look at any airline's pricing on that route, whether the Joint Venture charges supracompetitive prices on LAX-MEX flights, or whether Delta and Aeroméxico would compete against each other on that route without the Joint Venture.

To excuse its failure to undertake a city-pair analysis, the Department emphasizes that city pairs are not interchangeable, so it had no "need to perform an econometric analysis to conclude that MEX-JFK, MEX-LAX," or other city pairs were "relevant markets." DOT.Br.38. But these questions are part and parcel of any competition analysis, *see Brown Shoe*, 370 U.S. at 325, as the Department has repeatedly recognized, *see, e.g.*, Order 2010-10-4, at 11. The point of performing such a cross-elasticity analysis here is not to determine whether passengers would elect to fly to different destinations, but rather to determine whether the Joint Venture faces meaningful competition—either on a nonstop or connecting basis— on the same city pair. Similarly, the reason to consider market shares on the routes, the number of airlines on the routes, and whether low-cost carriers provide competition is to determine whether the Joint Venture faces meaningful competitive constraints or could raise prices to supracompetitive levels on any particular route. *E.g.*, *Baker Hughes*, 908 F.2d at 986; Order 2010-10-4, at 10-11.

13

The Department refutes none of this in its brief and performed none of this analysis in its Order. Instead, the Order summarily concluded that MEX (which, as an airport, is concededly not a discrete market) is experiencing government-imposed barriers to competition and that some number of mostly unnamed city pairs (only five of which are expressly MEX-linked) are affected in unspecified ways. App.522, 530. That is patently insufficient. Without performing its ordinary competition analysis, the Department has no way of knowing whether the Joint Venture has market power on any city-pair route or could raise prices to supracompetitive levels on any route. For all the Order says, each route could reflect robust competition due to, for example, recent expansion by low-cost carriers like Viva or Volaris. Nor did the Order address the possibility that there would be *less* competition on these routes without the Joint Venture, because, as Delta and Aeroméxico pointed out, they likely would be unable to provide their current comprehensive service without the Joint Venture. App.435-36.

Thus, even for the few city pairs the Department identified, it did not provide anything approaching a proper competition analysis.

**3. *The Department Did Not Analyze the Broader U.S.-Mexico Market.*** The Department ultimately argues that it *did* look at more than just MEX—in 2016 (at 31-32) and in 2025 (at 34). But the Department barely defends either claim, and for good reason.

14

The Department's stale market analysis in approving the Joint Venture in 2016 clearly cannot justify the Department's disapproval of the Joint Venture *nine years later*. Market conditions can change rapidly, and the statute authorizes the Department to disapprove a joint venture only where it finds, "*after periodic review*," that the joint venture is anticompetitive—underscoring that a disapproval decision must be based on a contemporaneous competition analysis that justifies disapproving a joint venture previously found to be "not adverse to the public interest." 49 U.S.C. § 41309(b) (emphasis added).

The Department then pivots and contends that the Order was in fact based on "current market conditions." DOT.Br.30. But the Department never actually addressed current conditions in the full U.S.-Mexico market served by the Joint Venture. Had the Department done so, it would have confronted an array of evidence demonstrating that any competition concerns at MEX are substantially outweighed by the Joint Venture's marketwide competitive benefits. *See* Petr.Br.14-15.

In attempting to manufacture a comprehensive market analysis, the Department contends that the Order examined two things: the Joint Venture's supposed lack of growth and the possibility that the Government of Mexico might replicate its MEX policies at other airports. DOT.Br.34. This limited inquiry is a far cry from the comprehensive analysis—spanning competition at the city-pair,

country, and network levels—that the Department has undertaken for every other joint venture, "consistent with statute and precedent." Order 2010-7-8, at 9; *see* Br. 30-33; *supra* at 4-5.

In fact, the Department acknowledged in its Order that it elected not to undertake its usual "longer and more particularized analysis of all potentially relevant markets." App.528. The Order never examined, for example, market shares or trends in the wider U.S.-Mexico market, let alone the Joint Venture's effects at the network level or on the vast majority of the 1,687 transborder city pairs. The Department thus never grappled with the fact that the Joint Venture has a mere 20% share of the overall U.S.-Mexico market, with American, United, and Volaris holding 21%, 16%, and 16% market shares, respectively—leaving 27% for other competitors. App.422, 434-35. Nor did the Department evaluate whether rapidly growing low-cost carriers like Volaris and Viva discipline the wider U.S.-Mexico market. Petr.Br.14-15.

Instead, the Department rushed to its preconceived judgment, disregarding the concrete evidence of robust competition in the broader U.S.-Mexico market and mentioning that wider market only for purposes of speculating that the Government of Mexico might introduce anticompetitive measures at airports beyond MEX. App.522, 530. That selective approach is unquestionably arbitrary and capricious.

16

**B.    The Department's Concerns About MEX Are Unsubstantiated And Contradicted By The Department's Own Critiques Of The Joint Venture's Supposed Lack Of Growth.**

Even if the Department's focus on MEX were appropriate, the purported competition problems it identified at MEX do not withstand scrutiny.  The Department seeks refuge under the substantial-evidence standard, asserting that it had at least a "scintilla" of evidence to support its findings.  DOT.Br.38-39, 44.  But the Order's flaws go well beyond a lack of supporting evidence.  The Order must also be vacated because it is replete with conclusions that ignore key aspects of the issue at hand, that are inconsistent with each other, and that lack cogent reasoning— each of which constitutes arbitrary and capricious action.  *See Interstate Nat. Gas Ass'n of Am. v. Pipeline & Hazardous Materials Safety Admin.*, 114 F.4th 744, 755 (D.C. Cir. 2024).  The Department fails to muster a coherent response.

**1. *No Cargo Market Analysis.***  Despite identifying the ban on all-cargo operations at MEX as "[p]erhaps the most egregious and harmful" problem in its Order, App.530, the Department offers little defense of its scant cargo analysis.  The Department starts by parroting the Order's findings about the Joint Venture's share of cargo operations at MEX.  DOT.Br.39-40.  But nowhere does the Department explain how the Joint Venture's share causes competitive harm when all-cargo operators can freely operate at nearby NLU (just as they use Washington Dulles or Tokyo Narita, rather than Reagan National or Haneda).  Petr.Br.39-40.

17

The Department contrives a concern about "time-sensitive cargo," which it claims will be shipped from NLU through MEX with a time penalty and then on to other destinations in Mexico. Pet.Br.40-41; App.530-32. But the Order never substantiated that all-cargo carriers actually operate in this manner. Petr.Br.40-41. On this record, it remains entirely possible that all-cargo operators prefer to route time-sensitive packages to secondary destinations in Mexico through other, less congested hubs, such as United's hub in Houston or American's hub in Dallas/Fort Worth. The Order provides no evidence about all-cargo operators' routing preferences, instead substituting speculation for facts.

The Department insists that it was not required to perform "the fullest market analysis" of Mexico City cargo operations. DOT.Br.40. But even accepting that questionable premise, it does not excuse the Department's failure to undertake *any* market analysis. At minimum, the Department was required to demonstrate that its competition concerns represent a "genuine problem," *Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 778 (5th Cir. 2023), and there is nothing more fundamental to a competition analysis than ascertaining the structure and bounds of the relevant market, *see Marine Bancorp.*, 418 U.S. at 618-19. Without any sort of market analysis, the Department did not have an adequate basis for declaring that the Joint Venture possesses an unfair competitive advantage in cargo operations.

**2. *Inapposite Connectivity Analysis.*** Although the Order called the Joint Venture's supposed reduction in connecting MEX flights a "primary issue," App.534, the Department barely defends the point in its brief. In particular, the Department does not dispute that Delta and Aeroméxico have increased capacity and enhanced connectivity on U.S.-Mexico flights and that its own connectivity analysis included U.S.-originating flights to destinations in third countries beyond Mexico (such as a multi-segment itinerary featuring a Delta-operated segment from Atlanta to MEX and an Aeroméxico-operated segment from MEX to Costa Rica). DOT.Br.42-43. Nor does it dispute that Delta and Aeroméxico do not coordinate with respect to such flights, which are beyond the Joint Venture's U.S.-Mexico scope. App.25.

The Department responds only that procompetitive joint ventures "typically" lead to increased "traffic volumes on connecting routes," a point that supposedly "stands regardless of whether those passengers' ultimate destinations were in [the joint venture's scope] or elsewhere." DOT.Br.42-43. But the Department's reasoning about the "typical[ ]" joint venture—which says nothing about *this* Joint Venture—was based on nothing more than the Order's *ipse dixit* assertion about what "[e]xperience" has supposedly "shown." App.534. The Department's unsubstantiated invocation of its "experience"—without any citation or elaboration—fails to provide an adequate explanation for this key step in its

reasoning. *See Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 93 (D.C. Cir. 2010) (mere reliance on "knowledge and expertise" is insufficient without "identify[ing] what this knowledge or expertise is, nor point[ing] to a study or comparison").

3. ***Conjecture About Other Airports.*** The Department does not point to any evidence substantiating its speculation that the Government of Mexico might replicate its MEX policies at other airports. Instead, it says that the Order "made a reasonable predictive judgment" about "potential competition" at other airports. DOT.Br.46-47. But naked speculation is an inadequate basis for agency action, particularly action that will materially harm two major airlines and the traveling public. *See Sorenson Commc'ns v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014); App.339-390 (letters discussing harm to the public). And, even if the Department's conjecture came to pass, the Government of Mexico's actions at other airports would be relevant here only if they somehow gave Delta and Aeroméxico—which jointly constitute only 20% of the U.S.-Mexico market—an unfair competitive advantage at those airports. The Order nowhere asserts—let alone supports—that essential point.

To the contrary, the Department's speculation about other airports is contradicted by the record: far from taking steps to replicate its MEX policies, the Government of Mexico recently rolled them back at MEX itself. Petr.Br.45-46. The

20

Department dismisses that development—which the Order characterized as "positive," App.541—because of its "uncertain trajectory," DOT.Br.47. But the Department cannot have it both ways: if the Government of Mexico's future actions at MEX (where Mexico has already commenced reforms) are "uncertain," then the possibility that the Government of Mexico might take unidentified anticompetitive actions at other airports is doubly uncertain, given that it has never applied its MEX policies at any other airport during the Joint Venture's ten-year history. The Department identifies no reason to believe that the Government of Mexico would change course now, on the heels of instituting reforms at MEX itself. And the Administrative Procedure Act does not allow the Department to privilege fanciful speculation over actual events.

**4. *Contradictory Analysis About MEX Operations and the Joint Venture's Growth.*** The Order's discussion of barriers to competition at MEX is also internally inconsistent. Petr.Br.43-45. As Petitioners explained, the Department's finding that the Government of Mexico eliminated a "level playing field" at MEX and excluded the Joint Venture's competitors at MEX is inconsistent with the Order's other findings that: (a) the Joint Venture's growth both at MEX and in the U.S.-Mexico market has been outpaced by its competitors', and (b) in 2019, those competitors voluntarily relinquished slots the Joint Venture had made available to them in 2017. Petr.Br.43-46, 47-48. Those findings belie the Department's characterization of

21

Delta and Aeroméxico as enjoying "an unfair advantage" at MEX—an airport with a "gradually falling" share of U.S.-Mexico flights and one where the Joint Venture's competitors elected not to retain slots that could have been used to launch new U.S.-bound flights. App.511, 529.

The Department can do nothing to reconcile the Order's contradictory findings about competition at MEX, which are neither "reasoned" nor "reasonably explained." *Interstate Nat. Gas Ass'n of Am.*, 114 F.4th at 749, 755 (quotation marks omitted). In response to the glaring contradiction between the Order's findings that the Joint Venture is supposedly restricting competition while growing more slowly than its competitors, the Department asserts that the Joint Venture grew more slowly only before 2024, when the Government of Mexico's anticompetitive policies supposedly kicked in and Delta and Aeroméxico "overt[ook] their rivals." DOT.Br.48. In the Department's own telling, however, the "Government of Mexico initiated its latest round of anticompetitive actions at MEX in 2022," yet other carriers continued to outpace Delta and Aeroméxico's growth at MEX for *two more* years (12% versus -1% in 2022 and 4% versus 3% in 2023). *Id.* Even in 2024—after being surpassed by its competitors at MEX for eight straight years—the Joint Venture's growth at MEX was merely *2%* more than its rivals', who collectively posted a solid 13% growth in line with prior post-COVID years. App.425. Such

numbers hardly tell a story of anticompetitive harms.  And, tellingly, no *amici* have appeared to support the Department's claims.

The Department's timeline also introduces yet another contradiction.  When trying to explain away the fact that the Joint Venture's competitors voluntarily divested MEX slots in 2019, the Department asserts that they did so because of "transparency" and "regulatory" problems at MEX (at 44)—rather than a lack of commercial interest.  But if transparency and regulatory problems at MEX caused the divestitures in 2019, the Department cannot credibly claim—as it does—that other airlines grew robustly through 2023 because the Government of Mexico's anticompetitive policies did not begin taking their toll at MEX until 2024.  App.511.

\*     \*     \*

At every turn, the Department's reasoning is riddled with *ipse dixit* and contradictions.  While the Department twists itself into knots to defend its fundamentally flawed reasoning, the truth is straightforward: the previously concentrated U.S.-Mexico market is now fiercely competitive, in large part because of the Joint Venture.  Delta and Aeroméxico have increased connectivity within Mexico while continuing to face robust competition, even at MEX, where their competitors have surpassed the Joint Venture's passenger growth.  The Joint Venture likewise faces cargo competition from other passenger carriers operating at MEX

23

and all-cargo carriers operating at nearby NLU.  The Department's assertions to the contrary are results-oriented, logically inconsistent, and unsubstantiated.

## II.   THE DEPARTMENT DID NOT ADEQUATELY JUSTIFY ITS DISPARATE TREATMENT OF THE JOINT VENTURE.

The Department barely disputes its disparate treatment of the Joint Venture. The Order explicitly deemed "[a]n Open Skies regulatory framework" to be "necessary . . . to obtain approval of and maintain" the Joint Venture, and the Order terminated approval of the Joint Venture in part based on its determination that the Government of Mexico's actions at MEX—including its ban on all-cargo operations—were inconsistent with its Open Skies agreement.  App.527-28.  At the same time, Open Skies *do not exist* at other airports—such as Tokyo Haneda—where Department-approved joint ventures continue to operate.

The Department does not dispute that Haneda is expressly carved out from the U.S.-Japan Open Skies agreement or that the Government of Japan has imposed a ban on international all-cargo carriers at the airport.  App.487-89.  That alone is fatal to the Order, which disapproves the Joint Venture based on indistinguishable facts.  App.527-28.

The Department feebly asserts that "competitive conditions at Haneda have improved" and that "the United States productively collaborated with Japan to expand slot access at Haneda."  DOT.Br.50-51.  But the Department identifies no improvement in the international all-cargo prohibition at Haneda.  And even as to

24

passenger flights, U.S. airlines remain limited to 18 daily slot pairs—slots the Department itself allocates. Order 2023-6-24, at 1. Despite these strict barriers to entry, two U.S. airlines—American and United—continue to operate joint ventures with Japanese airlines out of Haneda. Petr.Br.50-52. In the face of this disparate treatment, the Department's pronouncement that, based "on a case-by-case" review, Haneda is supposedly distinguishable from MEX (at 51-52) is manifestly inadequate to satisfy its obligation to "treat like cases alike." *Westar Energy v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007).

Nor can the Department reconcile the Order with its continued approval of joint ventures operating out of slot-controlled London Heathrow. DOT.Br.52. The Department says that it found the American-British Airways alliance would not substantially reduce competition with remedies such as divestitures. *Id*. But it does not dispute that Heathrow is a far more critical gateway to the United Kingdom than MEX is to Mexico. Nor does it dispute that, despite those divestiture remedies, Heathrow has remained effectively closed to new entry for years, even as the American-British Airways alliance has managed to acquire 60% of Heathrow's slots. Petr.Br.50-52. The disparate treatment is unmistakable.

## III. THE DEPARTMENT FAILED TO CONSIDER AND ADEQUATELY ADDRESS AVAILABLE ALTERNATIVES.

The Department also discounted multiple alternatives to disapproving the Joint Venture—several of which it moved to implement just weeks after the Order.

Petr.Br.53-59.  For example, the Department could have addressed its concerns about competitive conditions at MEX by restricting Mexican carriers' introduction of new flights between Mexico City and the United States under Part 213 of the Department's regulations, or by carving out cargo operations from the Joint Venture's scope.  *Id.*  The Department failed to explain why terminating approval of the longstanding Joint Venture—to the substantial detriment of Delta, Aeroméxico, and the traveling public—was the superior choice, particularly now that the Government of Mexico has initiated its own reforms at MEX.  ECF Nos. 14, 17; App.339-90 (detailing harms).  The Department thus abdicated its responsibility to consider these reasonable alternatives.  *See Spirit Airlines, Inc. v. U.S. Dep't of Transp. & Fed. Aviation Ass'n*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (such a failure "has led uniformly to reversal" (quotation marks omitted)).

The Department identifies no persuasive reason for this Court to ignore its contemporaneous regulatory actions instituting U.S.-Mexico City flight restrictions under Part 213 and proposing to ban Mexican carriers' belly cargo on MEX flights. The Department's action on these initiatives just weeks after issuing the Order confirms these alternatives constituted obvious, "important aspect[s] of the problem" the Department purported to address in the Order.  *Bidi Vapor*, 47 F.4th at 1202-03 (relevant factors may exist "even beyond the administrative record") (quotation marks omitted).

The Department primarily contends that these alternatives "sought the rather different goal of 'persuad[ing] the Government of Mexico'" to redress its anticompetitive policies at MEX, rather than to remedy the "joint venture's harm to competition." DOT.Br.54, 55, 57. That is a *non sequitur*. The Department elsewhere is emphatic that "the *Government of Mexico* imposed anticompetitive restrictions at MEX that prevented potential rivals from challenging the joint venture's dominant position." *Id.* at 1 (emphasis added). In fact, the Department does not identify anything that the *Joint Venture* itself has done to harm competition. And the Order leaves no doubt that the Government of Mexico's policies at MEX were the impetus for the Department's action. *See, e.g.*, App.519 ("the [Government of Mexico] has repeatedly distorted competition in the market"). Alternatives targeting this supposed root cause were due heightened consideration, not summary dismissal.

The Department also repeatedly contends that the alternatives identified by Petitioners would not fully and immediately "restore competition" at MEX. DOT.Br.53. But the Department never justifies imposing such a high bar for these alternatives—especially where terminating approval of the Joint Venture would inflict substantial economic harm and widespread travel disruption, which is precisely why Petitioners moved for, and this Court granted, a stay. Nor is the Department's preferred standard consistent with its decision to permit multiple joint

27

ventures to operate out of airports like Haneda or Heathrow, where the Department's diplomatic tools have concededly not fully "restor[ed] competition."

Similarly, the Department fails adequately to explain why it opted not to delay terminating approval of the Joint Venture pending the outcome of the Government of Mexico's recent slot reforms at MEX. The Department insists that, by the time of its 2025 show-cause order, it "had already 'waited multiple years'" and that "consultations yielded nothing." DOT.Br.55-56 (quoting App.418). But when the consultations *did* yield results—in the form of the Government of Mexico's commitment to return confiscated slots and reform slot-allocation procedures at MEX—the Department terminated approval of the Joint Venture weeks later anyway. The Department's fixation on its previously chosen course, without considering whether recent developments call for a more nuanced approach, is legally untenable.

Finally, the Department acts puzzled by Petitioners' assertion that it should have considered "alternatives 'in combination.'" DOT.Br.57. But that is just a commonsense application of the Administrative Procedure Act's requirement that the Department consider *all* relevant issues bearing on its decision. *See, e.g.*, *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013). Here, for example, the Department admits that the Government of Mexico recently took "positive" steps to address MEX slot policies, but it complains that these steps do

28

not extend to the all-cargo ban.  App.541; DOT.Br.55-56.  The Department thus
could have delayed disapproval of the Joint Venture to see if these changes redress
any slot problems while *also* carving out cargo operations from the Joint Venture to
target any lingering competitive concerns.  Yet the Order did not even *consider* this
obvious option.

## CONCLUSION

The Department's Order is arbitrary and capricious for multiple reasons.  Each
of these reasons compels vacatur, a remedy the Department nowhere disputes.

29

Dated:  February 18, 2026                        Respectfully submitted,


Matthew J. MacLean                               ___/s/ Eugene Scalia_____
Charles F. Donley II                             Eugene Scalia
Edward W. Sauer                                  Amir C. Tayrani
Nicole Steinberg                                 Christine M. Buzzard
PILLSBURY WINTHROP SHAW PITTMAN LLP              Michael P. Corcoran
1200 Seventeenth Street, N.W.                    GIBSON, DUNN & CRUTCHER LLP
Washington, D.C.  20036                          1700 M Street, N.W.
(202) 663-8000                                   Washington, D.C.  20036
matthew.maclean@pillsburylaw.com                 (202) 955-8500
                                                 escalia@gibsondunn.com

*Counsel for Aerovías de México, S.A. de*
*C.V., dba Aeroméxico*                           Peter Carter
                                                 Marguerite H. Taylor
                                                 DELTA AIR LINES, INC.
                                                 1030 Delta Boulevard
                                                 Atlanta, GA  30320

                                                 Steven J. Seiden
                                                 Christopher Walker
                                                 DELTA AIR LINES, INC.
                                                 601 Pennsylvania Avenue, N.W.
                                                 Suite 700
                                                 Washington, D.C.  20005

                                                 *Counsel for Delta Air Lines, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the undersigned certifies that this brief complies with the applicable typeface, type style, and type-volume limitations.  This brief was prepared using a proportionally spaced type (Times New Roman, 14-point font).  Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 6,490 words.  This certificate was prepared in reliance on the word-count function of the word-processing system used to prepare this brief.

February 18, 2026                Respectfully submitted,


_/s/ Eugene Scalia_
Eugene Scalia
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C.  20036
(202) 955-8500

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2026, I caused a true and correct copy of this motion to be filed electronically through the Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ Eugene Scalia*

Eugene Scalia

GIBSON, DUNN & CRUTCHER LLP

1700 M Street, N.W.

Washington, D.C.  20036

(202) 955-8500
